# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FRAY LYNCH,                                    :
                                               :
      Plaintiff,                          :
                                               :        C.A. NO. 06-351 JJF
    v.                                       :
                                               :        **JURY TRIAL DEMANDED**
CITY OF WILMINGTON,                            :
                                               :
      Defendant.                          :

## APPENDIX TO DEFENDANT'S OPENING BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

### VOL. I

Alex J. Mili, Jr., Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendant City of Wilmington

Dated:  November 14, 2007

## TABLE OF CONTENTS

**Volume I**

Departmental Memorandum regarding Lynch's Written Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1

City of Wilmington Personnel Policy 101.1 Harassment Free Work Environment  . . . . . . . . . . . . . . .  A-2

Departmental Information to Michael Szczerba from Fray Lynch  . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-4

Memorandum to Romain L. Alexander from Monica Gonzalez-Gillespie dated December 7, 2004 . .  A-6

Memorandum to Michael Brown from Monica Gonzalez-Gillespie dated December 7, 2004 . . . . . . .  A-9

Memorandum to Fray Lynch from Monica Gonzalez-Gillespie dated December 7, 2004 . . . . . . . . . .  A-6

Letter to Monica Gonzalez-Gillespie from Victor F. Battaglia dated March 11, 2005 . . . . . . . . . . . .  A-11

Memorandum to Michael A. Brown from Romain L. Alexander dated December 13, 2004 . . . . . . .  A-12

Policy and Procedure Manual Training Form signed by Michael Brown dated November 4, 2004 . .  A-14

Investigative Memorandum of Monica Gonzalez-Gillespie dated November 29, 2004 . . . . . . . . . . .  A-16

Memorandum to Michael Brown from Monica Gonzalez-Gillespie dated March 9, 2005 . . . . . . . . .  A-20

Deposition Transcript of Fray Lynch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-22

Deposition Transcript of Marsha Starks  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-60

**Volume II**

Deposition Transcript of Michael Brown  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-97

Deposition Transcript of Monica Gonzalez-Gillespie  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-223

RECEIVED
JUN 0 8 2004
BY: _____

OFFICE OF PUBLIC SAFETY

DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

## DEPARTMENTAL INFORMATION

**TO:**     **Elinza D. Cain**
            City Personnel

**FROM:**   Inspector James H. Wright
            Inspector of Uniform Operations

**DATE:**   **08 June 04**

**RE:**     **Sexual Harassment Complaint**

**Per City of Wilmington, Personnel Policy, under section 101.1, I am
forwarding you this date, a complaint received by our department regarding
a sexual harassment complaint.**

**Said complaint was received on June 2, 2004 from Sergeant Deborah
Donahue regarding Officer Fray Lynch. Said complaint alleges that Michael
Brown, a City employee made offensive remarks, which were sexual in
nature to Officer Lynch.**

**This complaint was hand delivered to you this date, for follow-
up/investigation per city policy.**

**cc: Chief Michael Szczerba**
   **Inspector Martin Donohue**
   **Officer of Professional Standards**

A-1



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

## POLICY 101.1  Harassment-Free Work Environment

**PURPOSE:**

To provide a work environment in which all individuals are treated with respect and dignity. The City of Wilmington expects that all internal and external relationships among persons in the workplace will be free of harassment.

**POLICY:**

It is the policy of the City of Wilmington to promote a productive work environment. Verbal or physical conduct by any employee that harasses, disrupts, or interferes with another's work performance will not be tolerated. Creating an intimidating, offensive, or hostile environment is prohibited.

The City of Wilmington reserves the right to conduct searches and inspections if a violation of this policy is suspected and if there are reasonable grounds to suspect that the search will find evidence that the employee is guilty of work-related misconduct.

**PROCEDURES:**

### Definitions of Harassment

1.  Sexual harassment constitutes discrimination and is illegal under federal, state, and local laws. For the purposes of this policy, sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when, for example: (i) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (ii) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; (iii) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

A-2

| Supercedes | Approved | Effective Date | Approval(s): Administrative Board | Page 1 of 6 |
|---|---|---|---|---|
| 10/03/00 | 11/06/02 | 11/06/02 | *Monica Gonzalez-Gillespie* | |

J:\10116011\W0017301.WPD\2/12/03

000157



CITY OF WILMINGTON, DELAWARE
## PERSONNEL POLICY MANUAL

---

### POLICY 101.1  Harassment-Free Work Environment

Sexual harassment may include a range of subtle and not so subtle behaviors and may involve individuals of the same or different gender. Depending on the circumstances, these behaviors may include, but are not limited to, unwanted sexual advances or requests for sexual favors; sexual jokes and innuendos; verbal abuse of a sexual nature; commentary about an individual's body, sexual prowess, or sexual deficiencies; leering, catcalls, or touching; insulting or obscene comments or gestures; display or circulation in the workplace of sexually suggestive objects or pictures (including through e-mail); and other physical, verbal, or visual conduct of a sexual nature. This includes harassment involving an individual's sexual orientation.

2. Harassment on the basis of any other protected characteristic is also strictly prohibited. Under this policy, harassment is verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her race, color, religion, sex, age, national origin, disability, or another characteristic protected by law or that of his/her relatives, friends, or associates, and that: (i) has the purpose or effect of creating intimidating, hostile, or offensive work environment; (ii) has the purpose or effect of unreasonably interfering with an individual's work performance; or (iii) otherwise adversely affects an individual's employment opportunities. Harassing conduct includes, but is not limited to, epithets, slurs, or negative stereotyping; threatening, intimidating, or hostile acts; denigrating jokes and display.

3. Harassment in this policy is also defined as verbal or physical conduct that disrupts or interferes another's work performance or creating an intimidating, offensive, or hostile environment.

4. Work Place Violence is a form of harassment. Unacceptable behavior under this policy is that which causes an individual to reasonably fear for his personal safety or that of others. It includes, but is not limited to, oral or written statements, gestures, expressions, and actions that communicate a direct or indirect threat to an individual's physical or psychological well-being.

A-3

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 2 of 6 |
|---|---|---|---|---|
| 10/03/00 | 11/06/02 | 11/06/02 | | |

J:\10116011\W0017301.WPD\2/12/03

000158



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

## POLICY 101.1  Harassment-Free Work Environment

### Individuals and Conduct Covered

These policies apply to all applicants and employees and prohibit harassment and retaliation whether engaged in by fellow employees by a supervisor, manager, or by someone not directly connected to the City of Wilmington.

Conduct prohibited by these policies is unacceptable in the workplace or in any work-related setting outside the workplace, such as during business trips, business meetings, and business-related social events.

Retaliation is prohibited. The City of Wilmington prohibits retaliation against any individual who reports harassment or participates in an investigation of such reports. Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and like harassment or discrimination itself will be subject to disciplinary action.

### Reporting an Incident of Harassment, Discrimination, or Retaliation

The Administration strongly urges the reporting of all incidents of harassment regardless of the offender's identity or position. Individuals who believe they have experienced conduct that they believe is contrary to this policy or who have concerns about such matters should file their complaints with the City's Employee Relations Advisor/EEO Compliance Officer, their immediate supervisor, their department head, the Director of Personnel, or any member of the Personnel Department. Individuals should **not** feel obligated to file their complaints with their immediate supervisor first before bringing the matter to the attention of one of the other designated representatives identified above.

In the event of imminent threat or danger, an employee should proceed as follows: (a) retreat immediately to safety, (b) contact 911, and (c) contact the department supervisor, director, and the Director or Deputy Director of Personnel as soon as possible.

The availability of this complaint procedure does not preclude individuals who believe they are being subjected to harassing conduct from promptly advising the offender that his or her behavior is unwelcome or requesting that it be discontinued.

A-3(a)

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 3 of 6 |
|---|---|---|---|---|
| 10/03/00 | 11/06/02 | 11/06/02 | | |

000159



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

## POLICY 101.1  Harassment-Free Work Environment

---

Early reporting and intervention have proven to be the most effective method of resolving actual and perceived incidents of harassment. Therefore, while no fixed reporting period has been established, prompt reporting of complaints or concerns so that rapid and constructive action can be taken is encouraged.

### The Investigation

If the supervisor or department head receives the report, the Personnel Department should be immediately notified through either the Employee Relations Advisor, the Deputy, or Director of Personnel. Any Personnel Department staff receiving a harassment report is to notify the Employee Relations Advisor. The Law Department will be notified of all reports and filing of harassment complaints and kept informed throughout the investigative process until resolution.

All department heads, managers, and supervisors are responsible for insuring that this policy is implemented and communicated to their employees. They are also responsible for documenting the incident as appropriate. If there are reasonable grounds to suspect that a search is necessary and will produce evidence that the employee is guilty of work-related conduct under this policy, the supervisor <u>must</u> contact the Personnel Department prior to conducting any search. Such searches will be reasonably related to the objective of the search and not excessively intrusive in light of the nature of the misconduct. This includes, but is not limited to, any employee's or volunteer's personal effects, such as lunch containers, briefcases, purses, backpacks, company-issued computers, e-mail boxes, lockers, desks, filing cabinets, and personal or City of Wilmington property located on City of Wilmington premises.

Any reported allegations of harassment will be investigated promptly. The investigation may include individual interviews with the parties involved and, where necessary, with individuals who may have observed the alleged conduct or may have other relevant knowledge.

Confidentiality will be maintained throughout the investigatory process to the extent consistent with adequate investigation and appropriate corrective action.

A-3(b)

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 4 of 6 |
|------------|----------|----------------|------------------------------------|-------------|
| 10/03/00 | 11/06/02 | 11/06/02 | | |

000160



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## POLICY 101.1 Harassment-Free Work Environment

If it is determined during the course of the investigation that the complaint or information provided was false and/or malicious, the individual who provided such information may be subject to disciplinary action up to and including termination.

### Responsive Action

Misconduct constituting harassment will be dealt with appropriately. Responsive action may include, training, retraining, referral to counseling, and/or disciplinary action up to and including termination.

Individuals who have questions or concerns about these policies should talk with Employee Relations Advisor/EEO Compliance Officer.

Finally, these policies should not, and may not, be used as a basis for excluding or separating individuals of a particular gender, or any other protected characteristic, from participating in business or work-related social activities or discussions in order to avoid allegations of harassment. The law and the policies of City of Wilmington prohibit disparate treatment on the basis of sex or any other protected characteristic, with regard to terms, conditions, privileges, and perquisites of employment. The prohibitions against harassment and retaliation are intended to complement and further these policies, not to form the basis of an exception to them.

A-3(c)

| Supercedes | Approved | Effective Date | Approval(s): Administrative Board | Page 5 of 6 |
|---|---|---|---|---|
| 10/03/00 | 11/06/02 | 11/06/02 | | |

000161



## CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

### POLICY 101.1  Harassment-Free Work Environment

---

**HARASSMENT-FREE WORK ENVIRONMENT INCIDENT REPORT**

Please fill out this report and submit it to your immediate supervisor or designated personnel outlined in the policy after experiencing or witnessing an incident of harassment. All reports will be held in strict confidence, except as required by law.

Your Name: _____     Date of Incident: _____

Job Title: _____

Department: _____

Name(s) of the alleged perpetrator(s), if known: _____
_____
_____

Describe in detail what happened: _____
_____
_____
_____
_____
_____
_____

List the names of any witnesses: _____
_____
_____

Your Signature: _____     Date: _____

**(This form must be forwarded to the Personnel Department)**

A-3(d)

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 6 of 6 |
|---|---|---|---|---|
| 10/03/00 | 11/06/02 | 11/06/02 | | |

J:\I0116011\W0017301.WPD\2/14/03

000162

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## DEPARTMENTAL INFORMATION

TO:        Michael J. Szczerba
           Chief of Police

FROM:      Patrolwoman Fray M. Lynch
           Patrol Division / "F" Platoon

DATE:      2 June 2, 2004

RE:        Harassment Complaint


Sir,

      This officer is currently assigned to the Weed and Seed area of "F" platoon. As part of the assignment, this officer has to make contact with the community. I and my partner (Curry) frequently stop in the William Hicks Anderson Community Center to make contact with Mike Brown. On one of the occasions, Mike Brown had told these officers during small talk that he was going to Miami for the weekend. It was brought up that this officer was also going to Miami for the Memorial Day weekend.

      This officer made contact with Mike Brown after the above listed community contact. On this day, I was working by herself due to Cpl. Curry being on vacation. As soon as I entered the lobby, I was approached by Mike Brown. Mike Brown greeted me with a hug and then asked me into his office. I did so and had a seat at the round table. Mike Brown began engaging in small talk and eventually asking me about Miami. Mike Brown asked me if he could go to Miami with me. I responded "no." Mike Brown asked why not. I replied because it was a girl's trip. Mike Brown then asked to meet my girlfriend that was going on the trip with me. I told Mike Brown "no." Mike Brown wanted to know why not. I advised him because my girlfriend does not like married men and you are married. Mike Brown replied that no one will have to know. There was a long awkward period of silence between the two of us. Mike Brown then broke the silence by reiterating that I was not going to "hook" him up with my girlfriend. I responded "no." Mike Brown then asked what was up with me. I shook my head as if to say nothing. Mike Brown then asked what kind of bathing suit I would be wearing while in Miami. I stated a regular bathing suit. Mike Brown said in question form, "a thong?" I responded with emphasis, "No, a regular bathing suit. I was looking at Mike Brown with a dumbfounded look on my face; confused as

to why he was asking these questions

I stood up from the chair in an attempt to leave and Mike Brown told me that he still needed to talk to me. At this point, Gene (an employee at the community center) came to the doorway of Mike Browns office and asked Mike Brown for keys. Mike Brown told Gene not to interrupt him while he was talking to this fine police officer. Gene began joking with Mike Brown telling him that he would interrupt whenever. The two began joking amongst each other; Gene saying that he would kick Mike Brown's ass. Mike Brown stated not with this officer sitting right here. Mike gave Gene the keys and Gene left. Mike began talking about the issues that had taken place with the Spring Break basketball tournament. Gene returned a few moments later to ask another question. The two (Gene and Mike) began verbally harassing one another in a joking matter. Gene cut off the lights and told Mike that he was going to come in the room and beat Mike's ass in the dark (jokingly.) Mike stated that if Gene came into the room with the lady cop here, she can do both of us. Gene's demeanor changed after Mike made that comment. He stopped joking and became serious. He turned the lights back on, shook his head and let out a sigh and said, "That wasn't right." Gene walked out and I got up to leave also. Mike asked me where I was going? I advised that I needed to handle some other things in the district and left.

It should be noted that I informed my partner (Curry) of what took place the day before when he was on vacation. I also advised Sgt. Donohue of the incident while away on a Weed and Seed conference in Buffalo, NY. Mike Brown has made several comments to me making suggestions that he wanted to get to know this officer on a personal level. Mike Brown has told me that the pants being worn while on duty were fitting rather nicely or those pants look good on you; you can see everything. Some of the comments made have been compliments however the majority of them have a sexual overtone that makes me feel uncomfortable to be around Mike Brown by myself. Mike Brown only makes these comments when I am by myself and not in the company of anyone else; other than that one incident with Gene. These comments are not always made while at the Hicks Community Center but also if I see Mike while in the course of the day performing my daily duties. This kind of harassment started a few months after I was transferred to the Weed and Seed unit. I have been humiliated and belittled by the comments made by Mike Brown.

Respectfully Submitted,
Ptlw. Fray M. Lynch

*Lt. M. Fol  4/4/04*

*Geo Mayo W Dw3  6/4/04*

*Chief Michael J. Szczerba  6-7-0*

A-5

**CITY OF WILMINGTON**
**DEPARTMENT OF PERSONNEL**

Administrative Division    Wilmington, Delaware 19801

## CONDFIDENTIAL MEMORANDUM

**TO:**      Romain Alexander
            Director, Department of Parks & Recreation

**FROM:**    Monica Gonzalez-Gillespie *MGG*
            Director, Department of Personnel

**DATE:**    December 7, 2004

**RE:**      **Conclusion of Harassment Complaint II**
            **Michael Brown**

---

Please find the conclusions and recommendations from the investigation conducted on the Harassment complaint against Michael Brown, Executive Director of WHACC, by Fray Lynch, Police Officer.

Also attached are copies of the resulting communications to each of the parties listed above. Please forward a copy of the Disciplinary Action.

If you have any questions, please contact me.

cc:    William Montgomery, Administrative Assistant to the Mayor
       Alex Mili, Assistant City Solicitor
       Elinza Cain, Employee Relations Advisor

A-6

**PRIVILEDGED AND CONFIDENTIAL**

| | |
|---|---|
| Complaint: | Harassment |
| By: | Fray Lynch, Police Officer, Wilmington Police Department |
| Against: | Michael Brown, WHAAC, Department of Parks & Recreation |

**Background:**

1.  Officer Lynch is assigned to the Weed N' Seed program (hereafter 'the program"), which designates the police officer's deployment to a geographical location that includes the William Hicks Anderson Community Center (hereafter "the center"). Michael Brown is the Executive Director of the center.
2.  As part of the program, police officers regularly visit the center. Upon receiving the complaint, Officer Lynch was asked to continue with the program, but to avoid visiting the center.
3.  Mr. Brown had complained that the police officers assigned to this program did not visit the center as often as intended by the program.

**Findings:**

1.  When asked about the specifics of the incident cited in Lynch's complaint, Brown stated that he had a conversation with the officer about her going away to an island or such. He denied saying anything ever about her pants that day or any other day.
2.  Brown did admit asking Lynch whom she was going with her on her vacation, to which Lynch replied a girlfriend from Philadelphia. Brown then admitted to asking the officer to "hook a brother up," referring to Lynch's female friend. Brown described her reply, as "We don't do married men." His response was "Not you, your friend from Philadelphia."
3.  Brown admitted asking Lynch to bring pictures of her vacation. He denies asking about a bathing suit.
4.  Brown states that she did not seem upset when she left that day.
5.  Inspector Wright verified that Mr. Brown has complained that police officers assigned to the Weed N' Seed program were not visiting the center as Mr. Brown wanted. The Inspector denied having any conversations with Mr. Brown that included the comment "whitey is out to get you and me", regarding Officer Lynch's alleged discussion with Mr. Brown.
6.  When asked if he hugged females when greeting them, Brown stated that he shakes hands and then pulls the person towards him shoulder to opposite shoulder.
7.  Gene Brown, who Michael Brown supervises, was not able to corroborate Lynch's version of the incident.

Lynch Complaint
December 3, 2004
Page 2

8. Brown did have to correct an answer when asked if he knew Lynch prior to her being assigned to the Weed N' Seed program; first denying, then acknowledging knowing her.

**Conclusion:**

There was not enough evidence to substantiate all of the allegations made by the complainant. Michael Brown did admit to certain comments that were sexually suggestive and deemed offensive to Officer Lynch. He did not admit to all of the comments that Lynch described in her complaint.

This is the second documented incident in which female employees found comments made by Brown offensive. In neither of these incidents could all of the allegations be proven or demonstrated; however, these complaints do raise concern and the City needs to ensure appropriate actions are taken. It does seem Brown exhibits poor judgment at times when conducting business with female employees.

After the last incident, Brown was directed to attend the Harassment-Free Work Environment training again within 60 days of the conclusion of the investigation. He did not attend until November of 2004, more than two years after he was instructed to do so. Harassment complaints are serious and should be taken as such, and more so if the complaint is against a person in a management position. The following recommendations should be implemented.

**Recommendations**

1. Administer a Written Disciplinary Action to Michael Brown for violating the City's Harassment-Free Work Environment Policy & Procedure by using sexually suggestive language with another female employee. This inappropriate behavior is made worse by the fact that is was exhibited by Mr. Brown while employed in a position of authority. This action should direct Mr. Brown to refrain from this behavior.

2. Instruct Mr. Brown to use the Police Department chain of command if he needs to discuss an issue with Officer Lynch.

3. Instruct Mr. Brown to have a higher-ranking police officer or official of the City present when communicating with Officer Lynch.

4. Direct Mr. Brown to attend the Harassment-Free Work Environment training and reaffirm his receipt of the Code of Ethics policy statement and associated code provision through signature.

A-8



**CITY OF WILMINGTON**
**DEPARTMENT OF PERSONNEL**

Administrative Division    Wilmington, Delaware 19801

## CONFIDENTIAL MEMORANDUM

**TO:**      Michael Brown, Executive Director, William Hicks Anderson Community Center
             Department of Parks & Recreation

**FROM:**    Monica Gonzalez-Gillespie, Director of Personnel
             Department of Personnel

**DATE:**    December 7, 2004

**RE:**      **Harassment Complaint Filed By Fray Lynch**

It is the policy of the City of Wilmington to promote a productive work environment, where all relationships among persons in the workplace will be free of any type of harassment.

Officer Lynch has complained that you used sexually explicit language on several occasions and was specifically offended during an interchange in your office earlier this year. During our interview, you admitted asking Officer Lynch to "hook a brother up" referring to a female friend of hers from Philadelphia. The investigation did not reveal sufficient evidence to substantiate other sexually suggestive comments that were included in the complaint by Officer Lynch.

The comment that you did make, however, was inappropriate and not acceptable under the City's Harassment-Free Work Environment Policy. As a result, recommendations have been forwarded to your Department Head, who will be contacting you shortly to review.

Harassment complaints are serious and should be taken as such especially if the complaint is against person in a management position. Please find attached copies of the Harassment-Free Workplace Environment Policy, the Code of Ethical Conduct Policy Statement, and the Wilmington City Code Division 6 - City Employees' and Elected and Appointed Officials Code of Conduct, which details the types of behavior that are unacceptable in the City of Wilmington workplace. All City employees are required to adhere to these policies and code provisions, specifically refrain from using any language or behavior that may be offensive or appear improper to other employees. Also be advised that any type of retaliation is illegal and unacceptable.

If you should have any questions, please contact me at 576-2460.

MGG
Attachments (3)

cc:    Romain Alexander, Director of Parks & Recreation
       Alex Mili, Assistant City Solicitor
       Elinza Cain, Employee Relations Advisor
       Personnel File                                           A-9

---

**CITY OF WILMINGTON**
**DEPARTMENT OF PERSONNEL**

Administrative Division   Wilmington, Delaware 19801

## CONFIDENTIAL MEMORANDUM

**TO:**       Fray Lynch, Police Officer, Police Department

**FROM:**    Monica Gonzalez-Gillespie, Director of Personnel, Personnel Department

**DATE:**    December 7, 2004

**RE:**       **Harassment Complaint Filed Against Michael Brown**

Thank you for your patience regarding the response to your complaint of harassment against Michael Brown, Executive Director of the William Hicks Anderson Community Center.

It is the policy of the City of Wilmington to promote a productive work environment, where all relationships among persons in the workplace will be free of any type of harassment.

The investigation did not reveal sufficient evidence to substantiate all of the allegations in your complaint of harassment. However, the City was able to substantiate that Mr. Brown made a comment to you, which was sexually suggestive and against City policy. Appropriate actions will be taken as it relates to this issue with Mr. Brown. In addition, Mr. Brown has been instructed to work through the Police Department chain of command if he has an issue to discuss with you directly. At no point, is he to meet with you alone without having a higher-ranking police officer or official of the City present.

It is my understanding that you have continued your assignment to the Weed N' Seed Program with the exclusion of visiting the William Hicks Anderson Community Center. The Chief of Police and I have discussed your continuance of this deployment until the end of the calendar year, when Mr. Brown will no longer be employed in the position of Executive Director for the Center. At this time, it is expected you will resume visiting the Center as part of the Program.

Again, I apologize for the delay in responding and hope this brings resolution to your complaint. If you should have any questions, please contact me at 576-2460.

cc:     Michel Szczerba, Chief of Police
        Romain Alexander, Director of Parks & Recreation
        Alex Mili, Assistant City Solicitor
        Elinza Cain, Employee Relations Advisor
        Personnel File

A-10

MAR 1 1 2005

## BIGGS AND BATTAGLIA

**ATTORNEYS AT LAW**

VICTOR F. BATTAGLIA
ROBERT D. GOLDBERG
PHILIP B. BARTOSHESKY
VICTOR F. BATTAGLIA, JR.

**921 NORTH ORANGE STREET**
**P.O. BOX 1489**
**WILMINGTON, DELAWARE 19899**
**(302) 655-9677**
**TELECOPIER (302) 655-7924**
writer's e-mail address: VictorSr@batlaw.com

OF COUNSEL
JOHN BIGGS III
GERARD P. KAVANAUGH, SR.
S. BERNARD ABLEMAN

March 11, 2005

**HAND DELIVER**
Ms. Monica Gonzalez-Gillespie
Director of Personnel
Department of Personnel
City of Wilmington
800 North French Street, 4th Floor
Wilmington, DE 19801

> **RE:**  *Michael Brown - Hostile Work Environment Complaint filed by Fray Lynch*

Dear Ms. Gonzalez-Gillespie:

Michael Brown has delivered your letter of March 9, 2005 to me for reply.

It is important in a discussion of the content of your letter that it be put into context. Mr. Brown advises the meeting about which Officer Lynch complains was not a work place occurrence for him. it was a meeting which he attended as a public spirited citizen. Mr. Brown was not attending the meeting in his capacity as a City employee.

Serious questions were raised at the meeting about possible improper removal of police officers who were assigned to the Weed and Seed area.

A question was raised as to when the officers were removed from the Weed and Seed area and assigned outside that area.

Officer Lynch responded by stating that the "We (the officers) have not been moved in about a year." Mr. Brown knew that response was not true.

His comments that called the issue into question were within his First Amendment rights and he believes his comments were factual. Your letter seeks to impose some sanction for the exercise of those constitutional rights.

A-11

BIGGS AND BATTAGLIA

Ms. Monica Gonzalez-Gillespie
Director of Personnel
March 11, 2005
Page 2

     I demand that you withdraw your letter immediately and apologize to Mr. Brown for the accusation. I will expect a reply to this request by March 16, 2005.

                Very truly yours,

                Victor F. Battaglia

VFB/fkb
cc:    Mr. William Montgomery
       The Honorable Michael Brown
       The Honorable Theodore Blunt, President City County
       Alex Mili, Esquire
       Ms. Elinza Cain

A-11 (a)

# MEMORANDUM

TO:    Michael A. Brown, Sr., Executive Director
           William "Hicks" Anderson Community Center
           Department of Parks and Recreation

FROM:  Romain L. Alexander, Director
           Department of Parks and Recreation

DATE:  December 13, 2004

RE:     **WRITTEN DISCIPLINARY WARNING**

It is the policy of the City of Wilmington to promote a productive work environment were all relationships among persons in the workplace will be free of any type of harassment.

This is to memorialize the meeting held on December 12, 2004 regarding a harassment complaint filed by Officer Fray Lynch. As you are aware, an investigation was done to determine the validity of the complaint.

As a result of the investigation, it was determined that you used sexually suggestive language that violates the **City's Harassment-Free Environment Policy.** You are hereby issued a written warning, and must comply with the following directives:

1. Refrain from this type of behavior in the future.

2. If you need to discuss an issue with Officer Lynch, you must use the Police Department chain of command.

3. If there is a need to meet or have direct communication with Officer Lynch, you must have a higher ranking police officer or official of the city present.

4. You are required to attend the next **Harassment-Free Work Environment and Policy** training; you must immediately contact Elinza Cain to schedule an appointment.

5. Review the attached Code of Ethics Policy Statement and City Code Provision and affirm to such by signing the statement; and returning this document to my office by December 28, 2004.

Page 2
December 13, 2004

Any future substantiated incidents of this nature may lead to further disciplinary action.

If you have any questions regarding this matter, feel free to contact me.

Cc:    Monica Gonzalez-Gillespie, Director of Personnel
       Alex Mili, Assistant City Solicitor
       Elinza Cain, Employee Relations Advisor
       Personnel file
RLA/lpj

*A-13*

# CITY OF WILMINGTON
## PERSONNEL DEPARTMENT
## POLICY AND PROCEDURE MANUAL TRAINING

Instructor's Name: *Elinza Cain*     Instructor's Signature: _____

Instructor's Name: _____     Instructor's Signature: _____

Instructor's Name: _____     Instructor's Signature: _____

Length of Training: 2 hours

Orientation objective:
To provide managers/supervisors with pertinent information that will assist them with being knowledgeable regarding the City's policy and procedures.

Training outline:

1. Mayor's Letter
2. Code of Ethics (sign signature form)
3. Vision, Mission, Our Values
4. City of Wilmington – Constituent Bill of Rights
5. City of Wilmington – Organization Chart
6. Rules of Conduct:
   - EEO/AA Policy – Discrimination video
   - Harassment-free Work Environment – Sexual Harassment Video & Workplace Violence video
   - Drug Free workplace
   - Drug and Alcohol Abuse
   - No Smoking
   - Internet/Network Acceptable use (sign signature form)
7. Employment:
   - Personnel Requisition
   - Employee Criminal Background Review
   - Pre-Employment Drug Testing
   - CDL
   - Identification card
   - Post Resignation/Post Termination Procedures
   - Counseling/Discipline
8. Pay Practices:
   - Out of Class Pay
   - Advance Vacation Payment Request
9. Benefits/Programs:
   - Education Reimbursement
   - Employee Assistant Program

DEPOSITION
EXHIBIT
*Brown    4*
*10/30/07  asg*
PENGAD 800-631-6989

A-14

000025

10.   Leaves:
- Leaves of Absence
- Military Leave
11.   Health & Safety:
- Executive Order – Threat Incident Management Plan (sign signature form).
- Medical AIDS
- Return to Work
- Employee Incident
12.   Miscellaneous:
- Travel & Entertainment
- Inclement Weather

**I affirm that I attended this policy & procedures manual training.  I affirm that I have received a copy of the City of Wilmington's Policy and Procedures Manual and I understand that it is my responsibility to uphold and observe all information contained within the manual.**

*Michael A. Blowal R.*       *8 ???*                    *11-04-04*
Employee Name (Print)        Employee Signature         Date

*Ex. D. Doctor*              *Parks*
Employee Job Title           Department

A-15                        000026



*City of Wilmington*
*Delaware*

JAMES M. BAKER
MAYOR

LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801 - 3537

## PERSONAL AND CONFIDENTIAL

| | |
|---|---|
| Complaint: | Hostile Work Environment |
| By: | Fray Lynch, Police Officer, Wilmington Police Department |
| Against: | Michael Brown, WHAAC, Department of Parks & Recreation/Council Member-Elect |
| Date of Complaint: | November 29, 2004 |

## Background:

1. Officer Lynch is assigned to the Weed N' Seed program (hereafter 'the program"), which designates the police officer's deployment to a geographical location that includes the William Hicks Anderson Community Center (hereafter "the center"). At the time of the complaint, Michael Brown was the Executive Director of the center.
   a. As part of the program, police officers regularly visit the center.
   b. Mr. Brown had complained that the police officers assigned to this program did not visit the center as often as intended by the program.
2. Officer Lynch brought forth a formal complaint against Michael Brown alleging he used sexually explicit language on several occasions, which were offensive and was particularly offended during an interchange in Mr. Brown's office around the Memorial Day holiday. Upon receiving the complaint, Officer Lynch was asked to continue with the program, but to avoid visiting the center.
3. *Following an investigation, the finding concluded that Mr. Brown did use sexually explicit language and that these comments were inappropriate.*
4. Mr. Brown was trained on the City's Sexual Harassment policy and procedure on August 29, 2001. He also participated in training on the City's Personnel Policy & Procedure manual which contains the Harassment-Free Work Environment Policy & Procedure, the Code of Ethical Conduct Policy Statement and the Wilmington City Code Division 6 – City Employees' and Elected and Appointed Officials Code of Conduct November 4, 2004. *The City also provided Mr. Brown with copies of these rules with the complaint resolution of the Officer Lynch's first complaint.*

A-16

Page 1 of 1

5.    Community meetings are regularly held by Block Captains to discuss issues of concern in their immediate neighborhood.  This meeting was of the WCNPAC group, *which is* .....  Police Officers may be requested to attend these community meetings.

**Findings:**

1. A WCNPAC meeting was held on November 23, 2004 at a location on 6th and Madison Streets.  Present at that meeting were Fray Lynch, Police Officer; Michael Groark, Police Officer;  Michael Brown, Executive Director of WHAAC and Council Member-Elect;  Marcia Starks, Mayor's Office representative; Hanifa Shabazz, Council –Member-Elect; and Bud Freel, Council Member among other community members.

2. There were six (6) witnesses interviewed including the complainant and the employee accused.  The two Police Officers, the Council Member and a Mayor's Office staff member describe the behavior by Mr. Brown towards Officer Lynch during the community meeting of November 23, 2004 similarly as follows:

    a. Upon being asked a question by a community member about the deployment of Weed N' Seed officers, Officer Lynch began to respond that they were only pulled when an emergency situation arose, when Mr. Brown interrupted and with a raised voice tone demanded that she "Tell the truth!"  The officer ignored the comment and continued her response to the community member.  Mr. Brown again interrupted Officer Lynch citing a time when the officers were pulled from the area and accusing the Officer once again of lying and not telling the truth.

    b. At this time, Officer Groark tried to intervene and address the question; Mr. Brown persisted in aiming his comments exclusively at Officer Lynch.  He demanded, "Officer Fray, answer the question!"  Officer Lynch did not respond.  Officer Groark once again began to respond. Then without further interruption, he explained that Mike Brown knows the chain of command for deployment and that rank and file officers simply follow the assignments from their superiors.

3. Michael Brown denied that he singled Officer Lynch out for his comments.  Mr. Brown's attorney, Victor Battaglia, did acknowledge that his client does raise his voice when feels strongly about a subject.

4. Hanifa Shabazz, another witness, does not recall Mr. Brown's comments being directed at Officer Lynch.  She remembers the exchange being between Mr. Brown and the male officer.

A-17

5. The result of this incident is that Officer Lynch no longer feels comfortable attending these types of meetings for fear of Mr. Brown once again challenging her in front of the public.

**Conclusion:**

The evidence suggests Michael Brown accused Fray Lynch of lying in a public forum with members of the community and other City officials. During this exchange, Mr. Brown used a tone and demeanor, which were intimidating and belittling of the officer as he repeatedly accused of Officer Lynch of not being truthful.

From this information the City has concluded that Mr. Brown exhibited unacceptable behavior that evening towards Officer Lynch.

This incident is compounded by the fact that Mr. Brown was found to have exhibited inappropriate behavior towards this officer in a previous complaint. Therefore, Mr. Brown's behavior, during that public meeting, could be viewed as retaliatory. Retaliation is prohibited and a violation of Personnel Policy #101.1.

Since Mr. Brown, WHAAC Executive Director at the time of the incident, worked with Officer Lynch, this behavior could also be termed harassment. Per policy 101.1(3), "Harassment in this policy is also defined as verbal or physical conduct that disrupts or interferes with another's work performance or creating an intimidating, offensive or hostile work environment."

This is the third documented incident in which female employees found comments made by Mr. Brown offensive. Not all of the allegations have been proven, however, these complaints do indicate a pattern of inappropriate behavior. Although retraining has been taken and the seriousness of these violations has been communicated, the pattern seems to continue.

The City finds this type of behavior unacceptable, however, Mr. Brown is no longer under the jurisdiction of the City of Wilmington as he became an elected official on January 4, 2005. Therefore, these findings will be forwarded to Theodore Blunt, President of City Council, for follow up. Recommendations for next actions should be referred to the City Solicitor's Office.

A-18

Complaint:          Hostile Work Environment
By:                 Fray Lynch
Department:         Police Department
Status:             Regular
Against:            Michael Brown
Title:              Executive Director, William Hicks Anderson Community
                    Center/Council Member-Elect
Date of Incident:   November 23, 2004

List of Employees Interviewed
Fray Lynch
Michael Brown
Michael Groark, Police Officer
Hanifa Shabazz, Council Member-Elect
Bud Freel, Council Member
Marcia Starks, Mayor's Officer Constituent Services Liaison

A-19



JAMES M. BAKER
MAYOR

# City of Wilmington
## Delaware

LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801 - 3537

## MEMORANDUM

**DATE:**     March 9, 2005

**TO:**     Michael Brown, Council Member
         City Council

**FROM:**     Monica Gonzalez- Gillespie, Director of Personnel
         Department of Personnel

**RE:**     **Hostile Work Environment Complaint file by Fray Lynch**

---

It is the policy of the City of Wilmington to promote a productive work environment, where all relationships among persons in the workplace will be free of any type of harassment.

Officer Lynch has filed a hostile work environment complaint against you stemming from an incident in which she alleges that you singled her out during a public community meeting and accused her of being a liar with respect to the deployment of Weed and Seed officers. The complaint also stated that you raised your voice, used a demeaning and belittling tone, and repeatedly interrupted her as she tried to respond to a question from a community member. Officer Lynch feels this treatment was in response due to her pending harassment complaint.

The statements from the witnesses, as a whole, support the complaint as reported by Officer Lynch. The comments you made during that meeting were characterized as demeaning, belittling and aimed directly at this officer. This behavior was inappropriate and not acceptable under the City's Harassment-Free Work Environment Policy. Furthermore, there was a previous complaint from this particular complainant, which was partially substantiated.  As a result, these findings will be forwarded to the President of City Council for follow-up.

A-20

Mr. Michael Brown, Council Member
Page 2
March 9, 2005


      Harassment complaints are serious and should be taken as such, especially if the complaint is against a person in a management position. Please find the attached Harassment-Free Workplace Environment policy, which details the types of behavior that are unacceptable in the City of Wilmington workplace. All City employees are required to adhere to this policy, and specifically refrain from using any language or behavior that may be offensive or appear improper to other employees. Also be advised that any type of retaliation is illegal and unacceptable.

mgg
cc:    Theodore Blunt, President, City Council
      Alex Mili, Assistant City Solicitor
      Elinza Cain, Employee Relations Advisor

A-21

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FRAY LYNCH,                          )
                                     )
            Plaintiff,               )
                                     ) Civil Action No.
v.                                   ) 06-351-JJF
                                     )
CITY OF WILMINGTON,                  )
                                     )
            Defendant.               )


        Deposition of FRAY M. LYNCH taken pursuant
to notice at the City of Wilmington Law Department,
800 North French Street, 9th Floor, Wilmington,
Delaware, beginning at 2:00 p.m. on Wednesday, October
3, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:


        ROBERT T. VANCE, JR., ESQUIRE
        LAW OFFICES OF ROBERT T. VANCE, JR.
          100 South Broad Street, Suite 1530
          Philadelphia, Pennsylvania   19110
          For the Plaintiff


        ALEX J. MILI, JR., SENIOR ASSISTANT CITY
                             SOLICITOR
        CITY OF WILMINGTON LAW DEPARTMENT
          800 North French Street, 9th Floor
          Wilmington, Delaware   19801
          For the Defendant


            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801

            (302) 655-0477

            www.wilfet.com                      A-22



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**ORIGINAL**

Fray M. Lynch

2

1          FRAY M. LYNCH, the deponent herein, having

2     first been duly sworn on oath, was examined and

3     testified as follows:

4     BY MR. MILI:

5     Q.    How long have you been a police officer?

6     A.    Approximately eight and a half years.

7     Q.    Since 1999?

8     A.    Yes.

9     Q.    What is your educational background?

10    A.    I have a bachelor's degree.

11    Q.    In what?

12    A.    In behavioral science.

13    Q.    From where?

14    A.    Wilmington College.

15    Q.    When did you graduate?

16    A.    December '05 I believe.

17    Q.    What other law enforcement training have you

18    had besides the police academy?

19    A.    Whichever ones the department sent me to, none

20    outside of the department.

21    Q.    Tell me each of your assignments in

22    chronological order from the time you started with the

23    police department in 1999 until the present.

24    A.    I was assigned to patrol.  Then, I was

A-23

1    transferred to community policing, Weed and Seed

2    Program, and from Weed and Seed I was just back in

3    regular community policing and now I'm in HR, human

4    resources.

5    Q.    How old are you?

6    A.    Thirty-one.

7    Q.    Are you married?

8    A.    No.

9    Q.    Do you have any other children?

10   A.    Yes.

11   Q.    How many?

12   A.    One and one on the way.

13   Q.    How many arrests have you made as a police

14   officer?  Can you give me an approximation?

15   A.    I can't give you that.  I don't know.  I don't

16   want to say too high or too low.

17   Q.    Is it more than 100?

18   A.    I'm not going -- I can't give you a number.  I

19   don't know.  I would have to research that for you.

20   Q.    If you don't want to tell me --

21   A.    It's not that I don't want to tell you.  It's

22   that I don't have a current answer to give you.

23   Q.    Have you ever disarmed someone with a gun?

24   A.    Yes.



Fray M. Lynch

4

1    Q.    How many times?

2    A.    Once that I recall.

3    Q.    What year?

4    A.    I can't give you the year there.  I would have

5    to research my records.  We make a lot of arrests and

6    to give a date on one specific one I can't do that.

7    Q.    Did it cause you any stress to disarm someone

8    armed with a gun?

9    A.    No.

10    Q.    Have you ever frisked anyone who had a gun on

11    them?

12    A.    Not that I can recall, no.

13    Q.    Have you ever had to use physical force on an

14    arrestee?

15    A.    Yes.

16    Q.    What kind of force?

17    A.    I've used my ASP, I've used mace and I've used

18    my hands.

19    Q.    Tell me about the situations where you had to

20    use an ASP.

21    A.    Every single one?

22    Q.    Yes.

23    A.    Once again, I can't recall all of them.  I can

24    tell you the ones I can recall right now.

5

1    Q.    Please.

2    A.    First one that I can recall is over at

3    Connections on West 10th Street in reference to a

4    call, I believe it came in as a psychotic man, and

5    when we got there to take him over to Wilmington

6    Hospital, he fought and resisted us.  That was one

7    time for resisting arrest.

8              There have been numerous foot chases.

9    People don't comply once they get caught to put their

10   hands behind their back.  I can specifically remember

11   one at I want to say the 200 block of North Broom

12   Street in reference to a robbery suspect that ran from

13   us that fled inside an apartment building.

14             I can tell you one when I first came out

15   of the academy on Lancaster Avenue out by the DAP for

16   attempted burglary from 4th and Union.

17   Q.    Did these incidents cause you any stress?

18   A.    Did they cause me any stress?  Not the ones

19   that I mentioned.

20   Q.    Are there encounters with arrestees that have

21   caused you stress?

22   A.    I can say the couple car accidents I've been in

23   from the car chases.

24   Q.    Tell me about those.

A-26



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    First one was a stolen vehicle that started in

2    the area of 22nd and Market, proceeded onto the west

3    side by St. Anthony's where he rammed my vehicle a

4    couple times and I ended up having surgery on my

5    shoulder from that incident.

6              There was another incident on 95 and they

7    fled south on 95 and he rammed my car trying to get

8    past it and ran me into the median in the center where

9    I injured my back.

10   Q.    Do you find the job of a law enforcement

11   officer to be stressful?

12   A.    Depends what day you are talking about.    There

13   is no set schedule, so.

14   Q.    On days when you are having these car chases

15   you just described do you find the job to be

16   stressful?

17   A.    I wouldn't say stressful.

18   Q.    What was your job assignment in the summer of

19   2004?

20   A.    I was assigned to the Weed and Seed, community

21   policing.

22   Q.    What reason did you have for being at the Hicks

23   Anderson Center for those job duties in summer of

24   2004?



Fray M. Lynch

7

1    A.    Community contacts.

2    Q.    Explain what that is.

3    A.    It is making contact with the representatives

4    in the community to find out what the issues are for

5    the people that are there on a daily basis.

6    Q.    Why specifically do you have to go to the

7    William Hicks Anderson Center to do that?

8    A.    Because it actually fell into my area of the

9    Weed and Seed Program.

10    Q.    What was Michael Brown's position at the Hicks

11    Anderson Center in 2004?

12    A.    I believe he was executive director.

13    Q.    Would you have to speak to him as part of your

14    job duties back then?

15    A.    Because he was the director of the community

16    center where we had to make our contacts for

17    community.  It wasn't just businesses, but personal

18    people too.

19    Q.    What did you have to discuss with him?

20    A.    Any issues that he would see in the community.

21    I didn't work 24 hours a day.

22    Q.    What issues did he discuss with you?

23    A.    A lot of drug dealing.

24    Q.    Where?

A-28

8

1    A.    Fifth and Madison.

2    Q.    Anything else?

3    A.    A lot of AB's in the park at 6th and Madison.

4    Q.    Anything else?

5    A.    And they had a basketball tournament was one of

6  the main things where a lot of fights broke out.

7    Q.    Anything else?

8    A.    Not that I can recall.

9    Q.    You claim that Michael Brown made some comments

10  to you one day in the summer of 2004 at the Hicks

11  Anderson Center that you found to be appropriate.  Can

12  you tell me how you came to the Hicks Anderson Center

13  on that particular day that these comments were made?

14           MR. VANCE:  You mean inappropriate?

15    A.    You mean I found to be inappropriate?

16    Q.    I said inappropriate.

17    A.    Can you rephrase the question?

18           MR. MILI:  I'll ask the court reporter to

19  read it back to you.

20           (The last question was read back by the

21  court reporter.)

22  BY MR. MILI:

23    Q.    Changing the word appropriate to inappropriate

24  please answer the question.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    We used to go there, him being one of the

2  community centers in the Weed and Seed Program.  Weed

3  and Seed Program was not all of, quote/unquote, 16th

4  district.  It was a portion of that taken out and our

5  job as Weed and Seed officers was to make contact with

6  the people in there that saw the issues of whether it

7  be crime or AB juveniles, whatever their issues were.

8  He was the point of contact in reference to the

9  community center.

10    Q.    How did you encounter him on that particular

11  day?  What reason on that particular day did you have

12  for coming to see him?

13    A.    On the day with my partner or by myself?

14    Q.    The day of the incident that you are

15  complaining that he made some comments to you.

16    A.    I was instructed to make contact with him

17  because I hadn't been going there.

18    Q.    By whom were you instructed?                A-30

19    A.    Sergeant Debbie Donohue.

20    Q.    Why hadn't you been going there before?

21    A.    Because he had made comments to me before that

22  made me feel uncomfortable.

23    Q.    Putting aside this particular day that I just

24  asked you about the comments before did you complain

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Tray M. Lynch

10

1    to anyone about those comments?

2    A.    Before, no, not on record.

3    Q.    Getting back to this day in the summer of 2004

4    did you make any complaints about those comments?

5    A.    Not at that time, no.

6    Q.    Did you eventually?

7    A.    Yes.

8    Q.    To whom?

9    A.    Sergeant Donohue and also spoke to my partner

10    when he came back from vacation.

11    Q.    Who was the partner?

12    A.    Rob Curry.

13    Q.    Anybody else?

14    A.    No.

15    Q.    Did you file a complaint with of the city

16    personnel department?

17    A.    I brought the DI incident up through the chain

18    of command.

19    Q.    Were you eventually interviewed by someone from

20    the city personnel department?

21    A.    Yes.

22    Q.    Do you know who interviewed you?

23    A.    No.                                          A-31

24    Q.    Do you remember what you discussed in that

11

1    interview?

2    A.    Just the incident.

3    Q.    Did you mention any eyewitnesses when you went

4    to that interview?

5    A.    Yes.

6    Q.    What eyewitnesses?

7    A.    Gene Brown.

8    Q.    Who is he?

9    A.    At the time he was an employee of Hicks

10   Anderson.

11   Q.    You say "at the time," do you know where he

12   works now?

13   A.    I have no idea.

14   Q.    Do you have reason to believe he no longer

15   works there?

16   A.    I couldn't -- I don't know.  I haven't worked

17   that area in a while.

18   Q.    His last name is Brown, do you know if he is a

19   family relation to Michael Brown?

20   A.    I don't know that either.

21   Q.    Do you know if he worked under Mike Brown?

22   A.    I believe that he did, but I can't say for

23   sure.

24   Q.    What did Gene Brown witness?

A-32

12

1    A.    The comment as far as, "She can do both of us."

2    Q.    Did he witness anything else?

3    A.    When he came into the room and requested the

4    keys him and Mike Brown were joking amongst each

5    other.  The only thing that I can recall at this time

6    that Mike Brown said then -- I think Gene Brown said

7    something about fighting Mike or beating his ass like

8    in a joking manner and he said, "Not with this fine

9    police officer sitting here."

10    Q.    Did Gene Brown witness anything else besides

11    that?

12    A.    He witnessed me leave when he left after the

13    last comment was made.

14    Q.    Are you aware of whether Gene Brown was

15    interviewed by anyone in the personnel department?

16    A.    I have no idea.

17    Q.    Michael Brown was elected to city council in

18    November of 2004, correct?

19    A.    I believe so.

20    Q.    After taking office do you know if Michael

21    Brown continued to work at the William Hicks Anderson

22    Center?

23    A.    I don't know.                        A-33

24              MR. VANCE:  Could you read that question



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   back.

2           (The last question and answer was read back

3   by the court reporter.)

4   BY MR. MILI:

5   Q.   Do you know if Gene Brown continued to work

6   under Michael Brown after Michael Brown became a city

7   council member?

8   A.   I don't know.

9   Q.   Do you know if Michael Brown was interviewed in

10  response to your complaint about this incident at the

11  community center?

12  A.   I don't know.  I mean, you can hear things, but

13  I don't know if it happened or not.

14  Q.   When you say "you can hear things," did you

15  hear things?

16  A.   I heard that he was interviewed.

17  Q.   By whom?

18  A.   I don't know.

19  Q.   From whom did you hear this from is what I'm

20  asking?

21  A.   Oh, I don't know, just people at work talking

22  about it.  I don't recall any specific names.

23  Q.   At some point did you get a letter or

24  correspondence from the personnel department

A-34

14

1    explaining to you what the decision was on your

2    complaint?

3       A.   Eventually.

4       Q.   What was the nature of that correspondence?

5       A.   That they found him guilty of sexual comments,

6    but not sexual harassment.

7       Q.   How long was this correspondence?

8       A.   About a page.

9       Q.   Did it say anything about whether Michael Brown

10   would be disciplined?

11      A.   I don't recall.

12      Q.   Are you aware of whether Michael Brown was

13   indeed disciplined for this incident?

14      A.   I believe he was disciplined, yes.

15      Q.   Why do you believe that?

16      A.   To the best of my knowledge I believe I have a

17   paper in my packet that says he had to take the sexual

18   harassment class over again.

19      Q.   You said you have a paper in your packet?

20      A.   Just from everything that the city has sent to

21   me.

22      Q.   Did the city send you something saying that

23   Michael Brown --

24      A.   I believe so.  I don't have everything in front

15

1    of me, but I believe so.

2    Q.    Do you know whether Gene Brown has corroborated

3    your version of the events of this summer 2004

4    incident at the Hicks Anderson Center?

5    A.    I don't know.

6    Q.    After you reported this incident were you still

7    required to go to the Hicks Anderson Center?

8    A.    No.

9    Q.    Were you required to have any contact with

10   Michael Brown after you reported this incident?

11   A.    A community meeting, I was ordered to go to a

12   community meeting.

13   Q.    I'm going to ask you about that in a few

14   minutes.

15   A.    But to have direct contact, no.

16   Q.    Were there any restrictions on Mike Brown

17   having contact with you?

18   A.    Yes.

19   Q.    What restrictions?

20   A.    He was not to have contact with me unless there

21   was a superior officer present at the time.

22   Q.    And has there been any contact with a superior

23   officer since that time?

24   A.    No.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Fray M. Lynch

16

1    Q.    The summer of 2004 incident did this incident

2    cause you any stress?

3    A.    Yes.

4    Q.    What kind of stress?

5    A.    From that, from June of 2004?  We haven't

6    gotten to November yet.

7    Q.    We'll get there, I'm just asking about the

8    summer of 2004 incident.

9    A.    Well, I felt very humiliated.  I had asked him

10   before he even went on the record from June that I

11   wasn't comfortable with the comments he made and he

12   still, you know, said what he wanted to say.

13   Q.    You didn't sue him in this case, did you?

14   A.    He is part of it.

15   Q.    You did sue him in this case?

16   A.    Well, I don't know if I sued him as an

17   individual or as a representative of the city.

18   Q.    Do you want him to be -- okay.  Is it your

19   understanding that you did sue him in some capacity

20   and you are just not sure if it was as an individual?

21   A.    Correct.

22   Q.    Or a representative?

A-37

23   A.    Correct.

24   Q.    For the summer of 2004 incident are you taking



1    any medications as a result of that incident?

2    A.    No.

3    Q.    Are you seeing any medical professionals as a

4    result of the summer of 2004 incident?

5    A.    No.

6    Q.    Did you miss any time from work as a result of

7    the summer of 2004 incident?

8    A.    No.

9    Q.    Let's fast forward to I guess it would have

10   been late 2004, the community meeting.  You claim at

11   some point that there were some words exchanged at a

12   community meeting that you attended with your then

13   partner, Mike Groark, is that correct?

14   A.    Yes.

15   Q.    Let me ask you, first of all, what was the

16   purpose of this meeting?

17   A.    For the community, block captains and anybody

18   that wanted to attend with their issues in their

19   community.

                                              A-38

20   Q.    What are block captains?

21   A.    People that are chosen to became the, quote/

22   unquote, president of their block to keep an eye on

23   things and the other block people would report to if

24   they had issues.

Fray M. Lynch

18

1    Q.    You had this meeting obviously with your

2    partner, Mike Groark, and Mike Brown and a few others

3    were there.  Can you tell me who else was there?

4    A.    Marsha Starks, Hanifa Shabazz, Bud Freel.

5    There were others, I can't recall the block captains'

6    names and all that.

7    Q.    Do you know -- I wouldn't hold you to an exact

8    date -- do you approximately when this meeting was?

9    A.    End of November.

10    Q.    Of what year?

11    A.    2004.

12    Q.    Do you remember what time of the day it was?

13    A.    It was an evening meeting, six, 6:30 maybe,

14    around there.

15    Q.    Is that outside of the city's normal business

16    hours?

17    A.    Depends in what capacity you work in the city.

18    Q.    Is the city county building open after five

19    o'clock to the public?

20    A.    No.                              A-39

21    Q.    What was the location of this meeting?

22    A.    It was the building on the corner of 6th and

23    Madison.  I think it's 634 West 6th Street.

24    Q.    Do you know if that's city property?

**W&F**

19

1    A.    I'm not sure whose property it is.

2    Q.    Why were you specifically at this community

3    meeting?

4    A.    Because I was ordered to do so by my

5    lieutenant.

6    Q.    Which lieutenant?

7    A.    Mitchell Rock.

8    Q.    What was discussed at the meeting?

9    A.    The first issue that came up was why Weed and

10   Seed officers were being pulled from their assigned

11   areas to do other assignments within the city.

12   Q.    Who brought this issue up?

13   A.    One of the block captains.

14   Q.    Did you have to give an explanation for that?

15   A.    Yes.

16   Q.    What was your explanation?

17   A.    That we were not pulled to do other assignments

18   unless it's an officer's safety or a crime in

19   progress, robbery, burglary, shooting, anything like

20   that.

21   Q.    After you gave that explanation then give me

22   the rest of the discussion.

23   A.    I didn't get through the whole explanation

24   before I was interrupted by Mr. Brown.

**W&F**

20

1    Q.   What did Mr. Brown say when he interrupted you?

2    A.   He told me I was lying and if I was going to

3    tell it to tell it like it was and that he knew for a

4    fact that officers were pulled from Weed and Seed to

5    do other assignments because he had seen them within

6    the city.

7    Q.   What was your response to that comment?

8    A.   I reiterated what I had tried to say in the

9    beginning, same thing, we weren't pulled; however, if

10   something serious comes in and there is no one else to

11   respond, then, yes, we would go.

12   Q.   Then, what happened?

13   A.   He did the same thing again, at which time I

14   looked at my partner and kind of gave him the nod to

15   go ahead and take up the questions because I wasn't

16   going to engage in it anymore.

17   Q.   Anybody else speak at this meeting?

18   A.   Marsha Starks.

19   Q.   What did she say?                    A-41

20   A.   She pretty much defended what me and my partner

21   were trying to say, that we weren't pulled unless it

22   was for officer safety or serious crimes in progress.

23   Q.   Did anybody else speak at this meeting?

24   A.   Other than Mr. Brown?



21

1    Q.    Yes.

2    A.    I'm sure the other councilmen spoke.  I can't

3    recall exactly what was said.

4    Q.    Was this after the city council election?

5    A.    I don't know when the city council election

6    was.  It might have been after the election, but

7    before sworn in.

8    Q.    Is it your understanding that Michael Brown was

9    speaking as a citizen or as a city employee?

10    A.    At the time he was representing -- in my

11    opinion was represented west center-city.

12    Q.    You say he represented west center-city?

13    A.    Because he was talking about the issues of not

14    having police presence or uniforms in and around at

15    night.

16    Q.    When he is saying this, is it your

17    understanding he is saying this in his capacity as a

18    city employee --

19    A.    Yes.

20    Q.    -- or as a citizen of Wilmingtn?

21    A.    As a city employee.

22    Q.    What makes you believe that?

A-42

23    A.    Because, like I just said, the complaints were

24    that there weren't enough uniform presence in and

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    around west center-city.

2    Q.    What was Michael Brown's job at the time he

3    made this comment?

4    A.    He was still executive director for the center,

5    I believe.

6    Q.    As executive director of the Hicks Anderson

7    Center how does that relate to this issue of police

8    presence in the surrounding west center-city area?

9    How does that fall under his domain?

10    A.    Say that again.

11    Q.    This concern that he raised about police

12    presence in the west center-city area how does that

13    fall under the job responsibilities of the person in

14    charge of the William Hicks Anderson Center?

15    A.    Because it's his responsibility to keep the

16    children safe there.

17    Q.    In all of west center-city?

18    A.    No.    I'm talking about in front of the center,

19    to come and go in and out of the center.

20    Q.    Was he responsible for any area in addition to

21    the Hicks Anderson Center or right outside of it?

22    A.    Is he responsible for that?

23    Q.    Was he responsible for it at that time?

24    A.    I don't know what his job responsibilities

23

1  were.

2  Q.   What made you think that Mike Brown's

3  complaints at this community meeting were aimed toward

4  you specifically?

5  A.   Because he was pointing his finger at me and

6  looking directly at me and every time someone else

7  tried to answer the question he said, "No, I'm not

8  asking the question to you, I'm asking it to Officer

9  Fray."

10  Q.   Aside from that community meeting did you have

11  any other contact with Michael Brown?

12  A.   He used to come into the building all the time,

13  the police building.

14  Q.   He came in there, but, more specifically, did

15  you have any contact with him aside from him just

16  being in the same building with you?

17  A.   Aside from him coming into my office for no

18  other reason?

19  Q.   He came into your office?  When?

20  A.   I can't give you exact dates, but it was

21  documented that he had access from Captain Nancy

22  Dietz.

23  Q.   It was documented that he came into your

24  office?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-44

24

1    A.    No, documented that he had access to the

2    building unlike any other city council member.

3    Q.    Let me ask you about him coming into your

4    office, when did he do this?

5    A.    It had to be after I came back off of my leave.

6    Q.    When was that?

7    A.    Sometime maybe March, April, '05.

8    Q.    Were you in your office when he came in?

9    A.    Yeah, it's a common office area as far as for

10   community policing, yes.

11   Q.    Who else was present when he came into your

12   office?

13   A.    Sergeant Dennis O'Connor was present a few

14   times.

15   Q.    Is he a higher ranking officer?

16   A.    Than myself?

17   Q.    Yes.

18   A.    Yes, he is a master sergeant.

19   Q.    Any other times when Michael Brown came into

20   your office?

21   A.    Corporal Groark has been in there before.

22   Q.    No.   Any other times when Michael Brown came

23   into your office?

24   A.    Not that I can recall.



A-45

Fray M. Lynch

25

1    Q.    Just this one time --

2    A.    No, not one time, this was several times.   I

3    can give you exact dates that it happened on this date

4    or that date, but he would make it known that he was

5    in the building by coming into the office.

6    Q.    The office or your office?

7    A.    You have to understand the way it's set up.

8    When you come in the door, there is five small offices

9    off of the main room.   So, me being community policing

10   didn't have one of those small offices, we were all in

11   a common area.

12   Q.    Did you file another complaint after this

13   community meeting back in November of 2004?   When I

14   say "complaint," I mean an internal complaint.

15   A.    I verbally expressed it and the supervisors

16   wrote it up.

17   Q.    Which supervisors?

18   A.    Dennis O'Connor and Captain Nancy Dietz.

19   Q.    Were you interviewed about that complaint by

20   anyone?

21   A.    Other than talking to them, no.        A-46

22   Q.    When you say "other than talking to them --"

23   A.    I mean, when I talked to them, but I don't know

24   if you call that an interview or not.   To actually sit

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Fray M. Lynch

26

1    down and have an interview like this, no.

2    Q.    Did you ever receive a written response to this

3    complaint?

4    A.    No.

5    Q.    Did this incident at the community meeting

6    cause you stress?

7    A.    Yes.

8    Q.    What kind of stress?

9    A.    By the end of that I was very -- I felt

10   humiliated because he had done that in front of

11   everybody that was at the meeting.  He totally

12   belittled me and called me a liar in front of everyone

13   and in my opinion tried to damage my character, my

14   reputation, with the people within the community.

15   Q.    Did you have to take any medication in response

16   to this incident?

17   A.    Yes, I saw a doctor for that.

18   Q.    Which doctor?

19   A.    I saw my primary care physician, Dr. Pahwa,

20   P-A-H-W-A.

21   Q.    Any other medical professionals?

22   A.    Dr. Ram, R-A-M, and Gail Levinson,

23   L-E-V-I-N-S-O-N.

24   Q.    Is she a doctor?



A-47

27

1    A.    No, I believe she is maybe like a clinical

2    psychologist or something, but she doesn't have doctor

3    status.

4    Q.    Did you have to take any medication after this

5    incident?

6    A.    Yes.

7    Q.    What medication?

8    A.    I believe it was Effexor.

9    Q.    Anything else?

10   A.    No.  I experimented with a lot before I got it

11   right.  I don't recall the other names.

12   Q.    Experimented with a lot of what?

13   A.    Different medications from the doctor, not on

14   my own personal use.

15   Q.    Did you miss any time from work after this

16   community meeting incident?

17   A.    Yes.

18   Q.    How much time?

19   A.    From the end of November sometime in March of

20   '05.

21   Q.    End of November 2004 until March '05?

22   A.    Yeah, I don't know exact dates.

23   Q.    What did you do during that time?

A-48

24   A.    I didn't do anything.  I got help for myself.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

28

1    Q.    Did you go back to school during that time?

2    A.    I don't think I was back.  I might have been

3    already in school, I didn't go back to school.

4    Q.    Did you increase your course load during that

5    time?

6    A.    I don't believe so.

7    Q.    Do you know if you took more credits during the

8    time you were off than in previous semesters?

9    A.    I don't believe I did.

10    Q.    Did you lose any pay from this time off?

11    A.    Initially, yes.  No, I didn't lose any pay.

12    I'm sorry, I didn't lose pay.  Initially I lost sick

13    and vacation time.

14    Q.    You say "initially," does that mean at some

15    point you got it back?

16    A.    Yes.

17    Q.    All of it?

18    A.    Yes.                                    A-49

19    Q.    This is a copy of what is called a Disclosure

20    Statement.  You gave a list or your attorney gave a

21    list of people who might have relevant information

22    about the case and I want to go through them one-by-

23    one skipping Mike Brown obviously because we already

24    discussed him at length.  I want to know about each of

29

1    these people.  Tell me what information they have

2    about the case.  Start with Monica Gonzalez-Gillespie.

3    A.    She was the investigating, I guess, person that

4    took the initial complaint back in June.

5    Q.    Is that the one that interviewed you in the

6    summer of '04 after the Hicks Anderson incident?

7    A.    I think she was there.  I don't know if she

8    actually asked the questions.

9    Q.    Did someone ask you questions?

10    A.    Yes.

11    Q.    Do you know who?

12    A.    No.

13    Q.    Next person is Theodore Blunt.  What

14    information does he have on this case?

15    A.    Just being the president of city council.  I'm

16    not sure if Mike Brown fell under city council at the

17    time or fell under just the city employee.

18    Q.    When you say "at the time," what time are you

19    referring to?

20    A.    At the meeting, the end of November time.

21    Q.    Michael Szczerba, he is obviously the chief of

22    police.  What information did he have relevant to this

23    case?

24    A.    All the paperwork that went through the chain

1    of command he had to sign this and send it up here.

2    Q.    Did he discuss any of these incidents with you

3    personally?

4    A.    No.

5    Q.    Flip the page, please, Elinza Cain, who is she?

6    A.    Employee relations advisor.

7    Q.    What information does she have about this case?

8    A.    I guess she would be pertinent to the fact of

9    making sure that each employee of the City of

10   Wilmington doesn't have to operate in a hostile work

11   environment, but I didn't have any contact with her.

12   Q.    Do you know why her name is listed as someone

13   having information in this case?

14   A.    Yeah, probably to make sure that each city

15   employee doesn't have to work in a hostile work

16   environment.  So, I'm sure once the DI came up of

17   working in a hostile work environment she is added

18   into the mix.  Like I said, I never spoke to her

19   directly or one-on-one about the incident.

20   Q.    Gail Levinson, what information does she have?

21   A.    That was the lady I was talking to.  I think

22   she is a social psychologist or something, licensed

23   social worker.

24   Q.    What specific information does she have about

A-51

31

1    this case?

2    A.    I talked to her about all my thoughts and

3    feelings and emotions and everything that had gone on

4    at that time.

5    Q.    Nellie Moore, what information does she have

6    about the case?

7    A.    She has all the documentation of the doctor's

8    office being as she works at the city dispensary.

9    Q.    Captain Michael Maggitti, what information does

10    he have?

11    A.    I'm not sure.

12    Q.    Do you know why he would be listed as someone

13    having information relevant to this case?

14    A.    I'm sure it's something pertinent, but I don't

15    have an answer right now on why he is listed.

16    Q.    These people were listed on your behalf so

17    that's why I'm asking.  You have no idea?

18    A.    At this time, no.                                    A-52

19    Q.    Kylenae Stribling, what information does she

20    have?

21    A.    I think she was the one that actually put the

22    time back on my books or gave the okay to put the time

23    back on my books.

24    Q.    Do you know why she gave the okay to put the

32

```
 1   time back on your books?

 2      A.    Haven't talked to her.  I don't know her.

 3      Q.    Bobbie DiVirgilio, what information does he

 4   have?

 5      A.    It's a female.  She actually had my case at the

 6   Industrial Accident Board when we tried to come to

 7   some kind of mediation with the city and they refused.

 8      Q.    How about David Raskin?

 9      A.    It's the city's doctor that I had a DI

10   evaluation with.

11      Q.    Did you see the results of that evaluation?

12      A.    I may have.  I don't recall what they were at

13   this time.

14      Q.    Michael Groark, what information does he have?

15      A.    He was a witness at the community meeting that

16   night at the end of November.

17      Q.    Lieutenant Mitchell Rock?

18      A.    He was my supervisor at the time.  Well, the --

19   well, not my sergeant, but my lieutenant at the time.

20      Q.    Who was your sergeant at the time?

21      A.    Debbie Donohue.

22      Q.    For both incidents or just the summer of '04

23   incident?

24      A.    No, I believe -- no, she was there for
```

A-53

Tracy M Lynch

33

1    November.

2    Q.   How long did you work under Debbie Donohue's

3    supervision?

4    A.   I don't recall when she came up.  Had to be

5    over a year.

6    Q.   Turn the page, please.

7    A.   (Witness complies.)

8    Q.   I think we discussed Eugene Brown?  Debbie

9    Donohue, we discussed her at length.  Captain Marlyn

10   Dietz, what information does he have?

11   A.   He was the commander of my division, community

12   policing, at the time.  He was Lieutenant Rock's

13   supervisor.

14   Q.   What specific information does he have about

15   this case?

16   A.   He actually wrote a hostile work environment on

17   my behalf because nothing was done the first time I

18   filed my complaint in June.

19   Q.   When did he write that?

20   A.   I don't know the date.

A-54

21   Q.   Do you know to whom he addressed it?

22   A.   Chief Szczerba where everything is addressed to

23   and it goes through the chain.

24   Q.   The last one is a doctor?

34

1    A.    That's my primary physician who prescribed my

2  meds during that time.

3              MR. MILI:   I think we are finished.   Your

4  attorney has the right to supplement the record if he

5  chooses; if not, we are done.

6  BY MR. VANCE:

7    Q.    I believe you testified that Mr. Michael Brown

8  had made some comments to you that were inappropriate

9  prior to June of 2004?

10   A.    Yes.

11   Q.    Can you just state for the record what you

12  recall those comments were.

13   A.    They were in effect of my pants were fitting me

14  nice, you could see everything, things of that nature.

15  Those are the only two I can recall at this time

16  specifically.

17   Q.    And when he made these comments, was he still

18  the executive director of the recreation center?

19   A.    Yes.

20   Q.    And did he make these comments on more than one

21  occasion?

22   A.    Yes.                              A-55

23   Q.    And on these occasions when he would make these

24  comments, did you inform him that you believed his

35

1    comments to be inappropriate?

2    A.    Yes, and that I was involved in a relationship.

3    Q.    Did he continue to make the comments after you

4    informed him that they were inappropriate?

5    A.    Yes.

6    Q.    Do you recall whether anyone else was present

7    when any of these comments were made?

8    A.    No.   He would never say that in front of

9    anybody else.   That's why it was shocking that he said

10   it in front of Gene Brown that one day.

11            MR. VANCE:   I don't have any other

12   questions.

13            MR. MILI:   That prompts a few follow-up

14   questions.

15   BY MR. MILI:

16   Q.    You were just asked about comments prior to the

17   June 2004 incident where Gene Brown was present.   Did

18   you complain to anyone about those comments?

A-56

19   A.    No, I didn't, no.

20   Q.    Did Mike Brown have a boss or supervisor?

21   A.    Not that I ever met that I was aware of, not at

22   the center.

23   Q.    Isn't the Hicks Anderson Center part of the

24   Department of Parks and Recreation?

Pray M. Lynch

36

1    A.    Yes.

2    Q.    Do you know who the director of the Department

3  of Parks and Recreation is?

4    A.    I believe it's Romaine Alexander.

5    Q.    Isn't he Mike Brown's boss?

6    A.    I guess.

7    Q.    Did you ever complain to him about these

8  comments prior to the incident that Gene Brown

9  witnessed?

10    A.    No, I didn't make any waves.  I wasn't trying

11  to be transferred back to what we call the pit, which

12  is patrol.

13    Q.    Why do you call that the pit?

14    A.    Everybody calls it the pit because of the shift

15  work and working weekends and you are just at the

16  bottom of the barrel.

17           MR. MILI:  That's it.

18           MR. VANCE:  I don't have any other

19  questions.

20           (The deposition was concluded at 2:38 p.m.)

21

22

23                      A-57

24



```
1                    I N D E X

2   DEPONENT:  Fray M. Lynch                    PAGE

3       Examination by Mr. Mili              2, 35

4       Examination by Mr. Vance               34

5                  E X H I B I T S

6

7
    (There were no exhibits marked for identification.)
8

9

10  CERTIFICATE OF REPORTER                PAGE 38

11

12

13

14

15

16

17

18

19

20

21

22

23                                           A-58

24
```

```
 1   State of Delaware    )
                          )
 2   New Castle County    )

 3
                     CERTIFICATE OF REPORTER
 4
 5          I, Christina M. Vitale, Certified Shorthand
     Reporter and Notary Public, do hereby certify that
     there came before me on Wednesday, October 3, 2007,
 6   the deponent herein, FRAY M. LYNCH, who was duly
     sworn  by me and thereafter examined by counsel for
 7   the respective parties; that the questions asked of
     said deponent and the answers given were taken down by
 8   me in Stenotype notes and thereafter transcribed by
     use of computer-aided transcription and computer
 9   printer under my direction.

10          I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
11   examination of said witness.

12          I further certify that reading and signing of
     the deposition were waived by the deponent and
13   counsel.

14          I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
15   interested in the event of this suit.

16

17

18               Christina M. Vitale, CSR

19               Certification No. 261-RPR

20               Expires January 31, 2008)

21

22   DATED:
                                          A-59
23

24        Christina M Vitale
```

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


FRAY LYNCH,                          )
                                     )
                  Plaintiff,         )
                                     )    Civil Action
            v.                       )     No. 06-351
                                     )       (JJF)
                                     )
CITY OF WILMINGTON,                  )
                                     )
                  Defendant.         )


         Deposition of MARCIA A. STARKS taken
pursuant to notice at the law offices of the City of
Wilmington Law Department, 800 North French Street,
City/County Building, Ninth Floor, Wilmington,
Delaware, beginning at 9:05 a.m. on Thursday,
October 11, 2007, before Kathleen White Palmer,
Registered Merit Reporter and Notary Public.


APPEARANCES:

            ROBERT T. VANCE, JR., ESQUIRE
            LAW OFFICES OF ROBERT T. VANCE, JR.
              100 South Broad Street - Suite 1530
              Philadelphia, Pennsylvania  19110
              for the Plaintiff

            ALEX J. MILI, JR., ESQUIRE
            CITY OF WILMINGTON LAW DEPARTMENT
              800 North French Street
              City/County Building - Ninth Floor
              Wilmington, Delaware  19801
              for the Defendant
------------------------------------------------------
            WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477

            www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



A-60

```
 1                     MARCIA A. STARKS,

 2          the witness herein, having first been

 3          duly sworn on oath, was examined and

 4          testified as follows:

 5   BY MR. VANCE:

 6     Q.    Could you state and spell your name for the

 7   record, please?

 8     A.    Marcia Starks, M-a-r-c-i-a S-t-a-r-k-s.

 9     Q.    Good morning, Ms. Starks.  I'm Robert Vance.  I

10   represent Fray Lynch in the lawsuit that she's brought

11   against the City of Wilmington.

12               Have you ever had your deposition taken

13   before?

14     A.    I can't remember.  I'm not sure.

15     Q.    I will be asking you questions related to the

16   lawsuit that she has brought, so I just want to go

17   over a few brief instructions.

18               When I ask you a question, just make sure

19   that you give verbal answers to the questions because

20   a record is being made of the proceedings and the

21   court reporter has to be able to take down your

22   responses.  So don't shake your head up and down and

23   from side to side or anything like that.

24               Do you understand that?
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Marcia A. Starks

3

1    A.    Yes.

2    Q.    During the deposition, and we won't be here

3    very long, but if you don't understand a question that

4    I ask you, please tell me that you don't understand it

5    and I'll rephrase the question because when I ask you

6    a question and you answer it, I'm going to presume

7    that you understood the question and that your answer

8    is responsive to the question that I posed.

9              Do you understand that?

10    A.    Okay.  Yes, I do.

11    Q.    In the last day or so, have you taken any kind

12    of medication or any substance that might interfere

13    with your ability to understand my questions or to

14    answer them?

15    A.    No.

16    Q.    You understand you're testifying under oath

17    subject to the penalties of perjury?

18    A.    Yes.

19    Q.    Who is your current employer?

20    A.    City of Wilmington.

21    Q.    What's your current position?

22    A.    Director of constituent services.

23    Q.    How long have you had that position?

24    A.    About -- been about two years now.

A-62

Marcia A. Starks

4

1    Q.   Since about 2005?

2    A.   Maybe about a year and a half.  About a year

3  and a half.

4    Q.   Do you recall when you first became director of

5  constituent services?

6    A.   Yes, yes.

7    Q.   When was that?

8    A.   I couldn't give you the exact date about that

9  because I was interim director and then went into

10  directorship.

11    Q.   When did you become the interim director?

12    A.   Latter part of 2005, if I remember.

13    Q.   Did you work for the city prior to that?

14    A.   Yes.

15    Q.   What position did you hold?

16    A.   Community affairs advisor.

17    Q.   How long did you hold that position?

18    A.   Since 2001.

19    Q.   Did you work for the city before that?

20    A.   About 15, 20 years ago.

21    Q.   Did you come back to the city in 2001 as the

22  community affairs advisor?

23    A.   Yes.                     A-63

24    Q.   What were your duties as the community affairs

5

1    advisor?

2    A.    The mayor had charged us to proactively go

3    throughout the city identifying problems that we may

4    encounter.  Also attending civic and community group

5    meetings.

6    Q.    In your capacity as the community affairs

7    advisor, who did you report to?

8    A.    The director at that time and to our chief of

9    staff.

10   Q.    Who were they?

11   A.    Carolyn Martin Pettaway.

12   Q.    Carolyn --

13   A.    Carolyn Martin Pettaway.

14   Q.    What was she?

15   A.    She was director of constituent services.

16   Q.    You reported to someone else, also?

17   A.    Our chief of staff, Bill Montgomery.

18   Q.    How is it that you obtained the position of

19   community affairs advisor?

20   A.    I came in with the Baker administration.  I'm a

21   political appointee.

22   Q.    As political appointee, do you have any

23   understanding what rules and regulations you were

24   subject to?

A-64

Marcia A. Starks

6

1    A.    (No response.)

2    Q.    Do you want me to restate the question?

3    A.    Yes.

4    Q.    Let me ask it this way:  Is there a process by

5    which someone who is not a political employee becomes

6    an employee in the city in Wilmington?

7    A.    I don't know.

8    Q.    What was your last position with the city prior

9    to 2001?

10   A.    Worked as the account clerk in the finance

11   department.

12   Q.    In that position, were you subject to any kind

13   of civil service regulations or other rules regarding

14   your conduct as an employee?

15   A.    Just the rules that were stated at the time of

16   hire.

17   Q.    You said you were a political appointee as the

18   community affairs advisor?

19   A.    Correct.

20   Q.    Did you supervise any people as the community

21   affairs advisor?

22   A.    Basically no.

23   Q.    Did you have regular work hours as the

24   community affairs advisor?



Marcia A. Starks

7

1    A.    Our work hours were basically coming in at 8:00

2    and meetings were in the evenings and on Saturdays.

3    And so, you know, depending upon what the meetings

4    were for that day would depend upon the hours that you

5    were working.  But under a normal day, it would be

6    eight to five.

7    Q.    Were you paid by the hour?

8    A.    No.

9    Q.    You received a salary?

10   A.    Yes.

11   Q.    Did you get overtime?

12   A.    No.

13   Q.    So if you attended a community meeting at, say,

14   7:00, you weren't paid extra for that?

15   A.    No.

16   Q.    Would you take the time off during the day to

17   compensate for the time --

18   A.    No.

19   Q.    -- that you spent in the community meeting?

20   A.    No.

21   Q.    Have you ever worked for the Department of

22   Recreation for the City of Wilmington?

23   A.    No.                            A-66

24   Q.    Do you know current Councilman Michael Brown?

Marcia A. Starks

8

1    A.    Yes.

2    Q.    When did you first meet him?

3    A.    In 2000, I believe it was.  2000.

4    Q.    Under what circumstances did you meet him?

5    A.    He was having a meet-and-greet at his home and

6    I went with a friend.

7    Q.    You were not working for the city at the time?

8    A.    No.

9    Q.    Was he running for office at the time?

10   A.    No.

11   Q.    Do you know what the purpose of the

12   meet-and-greet was?

13   A.    I don't remember.

14   Q.    Who was the friend that you went with?

15   A.    I went with my daughter and also -- what was

16   the person's name?  I can't even remember who it was

17   at the time.

18   Q.    How many people attended the meet-and-greet?

19   A.    Probably 50 people.

20   Q.    Did you get an opportunity to speak with

21   Mr. Brown?

22   A.    I met him, you know.                          A-67

23   Q.    Did you form an impression about him when you

24   met him?

**W&F**

Marcia A. Starks

9

1    A.    No.

2    Q.    When's the next time you had any contact with

3    him?

4    A.    I can't remember.  I really don't know how long

5    after that.

6    Q.    At some point did you become aware that he was

7    an employee of the Department of Recreation?

8    A.    At that time, no.

9    Q.    At some point after 2000 did you become --

10   A.    Yes.

11   Q.    -- aware he was running a recreation center?

12   A.    After 2000?

13   Q.    Yes.

14   A.    No, because he wasn't.

15   Q.    No, he wasn't in 2000; correct?

16   A.    Right.

17   Q.    Do you know what he was doing in 2000?

18   A.    I was not sure, but I knew that he was not

19   parks and recs as I've come to find out.

20   Q.    Was he a city employee in 2000 to your

21   knowledge?

22   A.    Yes.

A-68

23   Q.    You don't recall what capacity he worked in at

24   that point?



WILCOX & FETZER LTD.

Registered Professional Reporters

Marcia A. Starks

10

1    A.   No.

2    Q.   At some point in time you became aware that

3    Mr. Brown was an executive director at a city

4    recreation center; is that right?

5    A.   Yes.

6    Q.   When is it that you came to that knowledge?

7    A.   That was in 2001.  I believe it was 2001,

8    latter part or middle of 2001.  I don't remember

9    exactly.

10   Q.   How is it that you came to know that Mr. Brown

11   was running a rec center at that point in time?

12   A.   I worked for the City of Wilmington and that

13   was a part of the City of Wilmington.  I was aware of

14   the appointments and job placements.

15   Q.   Did you understand that Mr. Brown was the

16   executive director of the city recreation center?

17   A.   Yes.

18   Q.   Did you have any understanding as to whether

19   the executive director position was an appointed

20   position like yours?

21   A.   As far as I knew it wasn't.

22   Q.   It was not?

23   A.   No.                                    A-69

24   Q.   Do you have any understanding as to how

Marcia A. Starks

11

1   Mr. Brown became the executive director of a city

2   recreation center?

3     A.    No personal knowledge.

4     Q.    Now, you were an attendee at a meeting, I

5   believe, in November of 2004 attended by Mr. Brown and

6   Officer Lynch.  Do you recall that?

7     A.    Yes.

8     Q.    I don't want to ask you about that right now,

9   but I want to ask you about the time prior to that

10  meeting.

11           So prior to that November 2004 meeting, had

12  you been to any community meetings attended also by

13  Mr. Michael Brown?

14    A.    Yes.

15    Q.    How many meetings had you been to where he had

16  also been in attendance?

17    A.    Probably about ten.

18    Q.    What kinds of meetings were these?

19    A.    Civic and community group meetings.

20    Q.    Do you recall where the meetings took place?

21    A.    Variety of places.

22    Q.    What kinds of places?                    A-70

23    A.    Churches, senior centers, community centers,

24  yes.

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Marcia A. Starks

12

1    Q.    When you say "community centers," do you mean

2    recreation centers?

3    A.    Some of them would be considered recreational

4    centers.

5    Q.    Some were just other community centers?

6    A.    Exactly.

7    Q.    Do you know whether the senior centers where

8    you attended meetings that Mr. Brown also attended

9    were city property, were city buildings?

10   A.    I wouldn't know if they were or not.

11   Q.    Do you recall the names of any of the senior

12   centers where both you and Mr. Brown attended meetings

13   prior to November of 2004?

14   A.    Sacred Heart, Claymoor Senior Center -- so

15   many.  Those are the ones that come to mind.

16   Q.    Do you know whether Sacred Heart Senior Center

17   is a city facility?

18   A.    I don't believe so.

19   Q.    Do you know whether Claymoor Senior Center is a

20   city facility?

21   A.    I don't believe so.                    A-71

22   Q.    Do you recall the names of any of the community

23   centers where prior to November 2004 you attended

24   meetings that Mr. Brown also attended?

Marcia A. Starks

13

1    A.    No.   The only other place that I can think of

2   would be Fournier Hall.

3    Q.    Fournier Hall?

4    A.    Yes.

5    Q.    Is that F-o-u-r-n-i-e-r?

6    A.    I believe so.

7    Q.    Is Fournier Hall a city property?

8    A.    No.

9    Q.    Do you recall the names of any of the

10   recreation centers where prior to November of 2004 you

11   and Mr. Brown attended meetings?

12   A.    No.

13   Q.    In these meetings, do you know whether

14   Mr. Brown was attending as the executive director of a

15   city recreation center?

16   A.    I can't really say, you know.   I can't really

17   say.

18   Q.    Do you recall whether he spoke at any of these

19   meetings prior to November 2004?

20   A.    Some of them he did and some of them he might

21   have after I left.

22   Q.    Focusing on the ones where you recall --

23                (Interruption.)

24                (Fray Lynch is now present in the

A-72

14

1    deposition room.)

2    BY MR. VANCE:

3        Q.    Focusing on the meetings where Mr. Brown spoke,

4    do you know in what capacity he was speaking?

5        A.    I can't really say.  At some of the meetings it

6    might have -- it was as the director of Hicks

7    Anderson.

8        Q.    Hicks Anderson Recreation Center?

9        A.    Yes.

10        Q.    Did he introduce himself as the executive

11    director --

12        A.    I don't remember how he introduced himself.

13    And let me say this:  A lot of the times he would be

14    speaking after I left.  He would be in attendance, but

15    he would be speaking after I left, I would imagine,

16    because...

17        Q.    Well, I want you to focus on, if you can

18    remember the meetings where he spoke when you were

19    present.  And you say at some of those meetings he

20    spoke as the executive director of the Hicks Anderson

21    Recreation Center?

22        A.    Yes.                            A-73

23        Q.    But you don't recall whether he prefaced his

24    comments by saying, I'm Michael Brown, executive

Marcia A. Starks

15

1    director of the Hicks Anderson Recreation Center?

2    A.    I don't remember.

3    Q.    So why do you think on those occasions he was

4    speaking as the executive director of the Hicks

5    Anderson Recreation Center?

6    A.    I'm just remembering that he would be speaking

7    about activities that were going on at the center.

8    Q.    At any of the meetings that you attended prior

9    to November 2004 where Mr. Brown spoke, did he ever

10   say I am not speaking in my capacity as the executive

11   director of the Hicks Anderson Recreation Center?

12   A.    I can't remember if he said that or not.

13   Q.    Do you recall whether at any of the meetings

14   prior to November 2004 where Mr. Brown spoke he said

15   I'm speaking in my capacity as a private citizen?

16   A.    I don't remember that.

17   Q.    Prior to November of 2004, had you formed an

18   opinion about Mr. Brown as a person based on your

19   observations of him?

20   A.    Yes.

A-74

21   Q.    What was that opinion?

22   A.    That he was a very vocal person, very

23   passionate, and abrasive.

24   Q.    Prior to November of 2004, had you had the

Marcia A. Starks

16

1  opportunity to observe Mr. Brown interacting with

2  women?

3  A.    Yes.

4  Q.    Based on those observations, prior to November

5  of 2004, had you formed any opinion about him with

6  respect to the way he treated women or how he viewed

7  women?

8  A.    No.

9  Q.    Now I want to focus your attention on November

10  2004 and the meeting that you attended, Mr. Brown

11  attended, Officer Lynch and others attended.   All

12  right?

13        Where did that meeting take place?

14  A.    That took place at WCCCNPAC Center.   5th and

15  Madison I believe it is.

16  Q.    Is WCCCNPAC a recreation center?

17  A.    WCCCNPAC -- I don't know what they use their

18  center for other than meetings.   That was my first

19  time there.

20  Q.    But it's not called WCCCNPAC Recreation Center?

21  A.    No.

22  Q.    It's just called WCCCNPAC Center; is that

23  correct?

24  A.    As far as I know.

A-75



17

1    Q.    Do you know whether WCCCNPAC Center was a

2    city-owned building?

3    A.    I don't know.

4    Q.    What time did the meeting start?

5    A.    I can't remember if it was six or seven.    It

6    was an evening meeting.

7    Q.    Why were you at the meeting?

8    A.    As a community affairs advisor.

9    Q.    Who had asked you to attend the meeting?

10    A.    It was just a group that we attend all the

11   meetings for the City of Wilmington, all community and

12   civic organizations.  So it's on the calendar.

13    Q.    Which is my next question.

14          How did you know that the meeting was going

15   to even take place?

16    A.    We have a calendar of all meetings that take

17   place in the City of Wilmington for community and

18   civic organizations and they contact our office to ask

19   for representation.

20    Q.    Was there a particular group or group that

21   sponsored the meeting that night?

22    A.    WCCCNPAC group.

23    Q.    What is WCCCNPAC group?                         A-76

24    A.    West Center City Community Action -- something

Marcia A. Starks

18

1    or other.

2    Q.    That's an acronym, WCCCNPAC?

3    A.    Yeah.

4    Q.    What is WCCCNPAC?  Is it a city agency?

5    A.    I don't believe so.  It is a community

6    organization.

7    Q.    Do you know how far in advance the WCCCNPAC

8    group meeting had been put on the schedule?

9    A.    The -- as far as I know, they meet monthly.

10    Q.    Do you recall what the purpose of the meeting

11    was that evening?

12    A.    I don't remember what the focus of the agenda

13    was.

14    Q.    Did you attend the meeting with any other --

15    let me ask this question:  Were there other community

16    affairs advisors at the time?

17    A.    There were others, yes.

18    Q.    Did you attend the meeting with other community

19    affairs advisors?

20    A.    No.

21    Q.    The meeting occurred in November 2004 after the

22    general election; is that right?

23    A.    I believe it was.                    A-77

24    Q.    As of that date, were you aware of whether

1    Mr. Brown had been elected to the Wilmington City

2    Council?

3        A.    Yes.

4        Q.    He had been?

5        A.    As far as I remember, yes.

6        Q.    Now, you said that the WCCCNPAC meeting was put

7    on a calendar that you had access to; is that right?

8        A.    There's a community directory that has all of

9    that information in it.

10       Q.    Who has access to that community directory?

11       A.    Anyone in the city.

12       Q.    Any person in the City of Wilmington?

13       A.    Yes.

14       Q.    Where can the directory be found?

15       A.    In the constituent service office, City of

16   Wilmington.  We mail it out to all communities and

17   churches and agencies in the city and any resident

18   that wants one.

19       Q.    When you arrived at the meeting that evening,

20   was Mr. Brown already there?

21       A.    No.

22       Q.    Was Officer Lynch there?                    A-78

23       A.    We got there about the same time.

24       Q.    Can you tell me how that meeting proceeded?

20

1    A.    It wasn't a good meeting.  And I can't remember

2    what the issue at hand was, but the -- there was an

3    issue that the community was concerned about.  I don't

4    remember exactly what that issue was.

5    Q.    Do you recall how many people attended the

6    meeting?

7    A.    It was about 15.  I think around 15.

8    Q.    By the time Mr. Brown arrived, were there

9    approximately 15 people at the meeting?

10   A.    Mm-hmm.

11   Q.    Yes?

12   A.    Yes.  Sorry.

13   Q.    Do you recall who was running the meeting?

14   A.    If I remember correctly, one of the officers of

15   the WCCCNPAC Center was heading up that meeting.  I

16   think his name is Jerry.  I can't remember.  I think

17   it's Jerry.

18   Q.    Other than Officer Lynch, was there any other

19   police officers present at the meeting?

20   A.    Yes.

21   Q.    Do you know how many?

22   A.    One.

23   Q.    Do you know who that person was?

24   A.    Oh, I think it was Officer Groark, I believe.

A-79

Marcia A. Starks

21

1 Q. Had you known Officer Groark prior to that

2 meeting?

3 A. Yes.

4 Q. Other than yourself and Officer Lynch and

5 Officer Groark, were there any other city employees

6 present at the meeting before Mr. Brown arrived?

7 A. City employees?

8 Q. Right, that you were aware of.

9 A. Not that I was aware of.

10 Q. Do you know Eugene Brown?

11 A. No.

12 Q. So at what point during the meeting did

13 Mr. Brown arrive?

14 A. I would say about 15 or -- about 15 minutes

15 after it had started, after I arrived.

16 Q. What did he do when he entered the meeting?

17 A. Came in and sat down.

18 Q. Was someone speaking when he entered the

19 meeting?

20 A. There might have been.

21 Q. You don't remember?

A-80

22 A. I don't remember.

23 Q. At some point Mr. Brown spoke at the meeting?

24 A. Yes.

1    Q.   Before he spoke, was he introduced by anybody

2  at the meeting?

3    A.   I don't remember.

4    Q.   When Mr. Brown spoke, first spoke at the

5  meeting, what did he say?

6    A.   I don't remember his words that he initially

7  spoke.  I don't remember the words that he initially

8  spoke.

9    Q.   To whom was he speaking when he first spoke at

10  the meeting?

11    A.   To the general -- general crowd there, I

12  believe.

13    Q.   Was someone else talking when Mr. Brown first

14  spoke?

15    A.   I don't remember.

16    Q.   You don't recall whether he interrupted someone

17  else who was speaking during the meeting?

18    A.   I don't remember.

19    Q.   At some point during the meeting do you recall

20  Mr. Brown addressing Officer Lynch?

21    A.   Yes.                    A-81

22    Q.   At what point did he address Officer Lynch?

23    A.   What do you mean?

24    Q.   At what point during the meeting did he address

23

1  her?

2  A.    Just during the course of the meeting.

3  Q.    What had Officer Lynch said before Mr. Brown

4  addressed her, if you remember?

5  A.    Nothing.

6  Q.    What did he say to her when he addressed her?

7  A.    I don't remember his words.  I don't remember

8  his words, just his tone.

9  Q.    What was his tone?

10  A.    Abrasive and loud.

11  Q.    Was Officer Lynch standing when he addressed

12  her?

13  A.    No.

14  Q.    She was seated?

15  A.    Yes.

16  Q.    Seated at a table?

17  A.    Yes.

18  Q.    Was the meeting around a conference table of

19  some kind?

A-82

20  A.    Yes.

21  Q.    Was Mr. Brown seated when he addressed Officer

22  Lynch?

23  A.    Yes.

24  Q.    At any point did he stand up when he addressed

Marcia A. Starks

24

1   her?

2   A.   I don't remember.

3   Q.   So you said his tone was abrasive?

4   A.   Yes.

5   Q.   Why do you say that?

6   A.   The tone of voice was abrasive.

7   Q.   How did Officer Lynch react to Mr. Brown's

8   statements?

9   A.   She didn't.  She didn't.

10   Q.   She didn't react at all?

11   A.   I don't know what you mean by "react."

12   Q.   Did the expression on her face change when he

13   began to direct his comments to her?

14   A.   Yes.

15   Q.   How did it change?  From what to what?

16   A.   Shock.

17   Q.   Did she say anything in response to Mr. Brown's

18   statements to her?

19   A.   I don't remember.                    A-83

20   Q.   Did anyone else say anything in response?  Did

21   anyone else say anything to Mr. Brown in response to

22   his statements to Officer Lynch?

23   A.   I don't remember.

24   Q.   Would you say that Mr. Brown was yelling at

Marcia A. Starks

25

1   Officer Lynch?

2   A.    His tone was very loud.

3   Q.    For what period of time was he addressing

4   Officer Lynch in that tone of voice?

5   A.    I can't say -- I can't give you minutes or -- I

6   can't give you minutes or seconds or anything like

7   that.

8   Q.    Did he yell at her on more than one occasion

9   during the meeting?

10  A.    At that point it became a blur to me.

11  Q.    What became a blur?

12  A.    The meeting itself.

13  Q.    Why is that?

14  A.    Just the tone of the meeting.

15  Q.    Were other people in the meeting yelling at

16  that point in time?

17  A.    (No response.)

18  Q.    Or speaking in loud tones?

19  A.    Yes.                                          A-84

20  Q.    Who else was speaking in loud tones?

21  A.    I don't even know the names.

22  Q.    Do you recall the substance of anything that

23  Mr. Brown said?

24  A.    I believe it was against the police officers.

Marcia A. Starks

26

1    Q.    Officer Lynch and Officer Groark?

2    A.    Police officers, period.

3    Q.    In general?

4    A.    In general.

5    Q.    Did the other police officer address Mr. Brown?

6    A.    I believe Officer Groark did, but I don't

7    remember what he said.

8    Q.    Did Mr. Brown direct any other comments at

9    Officer Lynch that you recall?

10    A.    I believe he did.

11    Q.    Do you recall what he said?

12    A.    No, no.

13    Q.    At that meeting did Mr. Brown preface his

14    remarks by saying I'm speaking as a private citizen?

15    A.    I don't remember him saying that.

16    Q.    Did he preface his remarks by saying, I am

17    Michael Brown, executive director of the Hicks

18    Anderson Recreation Center?

19    A.    I don't remember him saying that, either.

20    Q.    Did he say, I'm Michael Brown, newly elected

21    city councilperson-at-large for the City of

22    Wilmington?                                          A-85

23    A.    I don't remember him saying that, either.

24    Q.    Did you have any understanding of what capacity

Marcia A. Starks

27

1    Mr. Brown was attending that meeting in?

2        A.    Really, I can't say.  I really can't say

3    truthfully.  I can't say.

4        Q.    Did you know any of the other people who

5    attended the meeting other than Officer Lynch and

6    Officer Groark and Mr. Brown?

7        A.    Yes.

8        Q.    Did you speak with any of them about what

9    occurred at the meeting that night?

10       A.    Yes.

11       Q.    Who did you talk to about that?

12       A.    Councilman Bud Freel.

13       Q.    What did you discuss with Councilman Freel?

14       A.    What a horrible meeting it was.

15       Q.    Did he respond to that comment?

16       A.    He felt that it was, also.

17       Q.    Did he tell you why he felt it was a horrible

18   meeting?

19       A.    It got out of hand.

20       Q.    Did he tell you why he thought it got out of

21   hand?

22       A.    A variety of reasons.

23       Q.    What were those reasons?                    A-86

24       A.    The attack on our -- on the police officers and

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Marcia A. Starks

28

1    the general consensus as to what was happening in that

2    area.

3       Q.   When you say "the attack" on the police

4    officers, do you mean Mr. Brown's comments directed to

5    Officer Lynch?

6       A.   Verbal attack.

7       Q.   But Mr. Brown's comments; is that correct?

8       A.   Mr. Brown's comments.

9       Q.   And that --

10      A.   And also the comments of someone else that was

11   there, and I don't remember who it was.

12      Q.   What were those comments?

13      A.   They were just not -- they were negative

14   comments about the police.

15      Q.   By someone other than Mr. Brown?

16      A.   Mr. Brown and someone else.

17      Q.   Who was the other person?

18      A.   I don't remember who that was.

19      Q.   Did Councilman Freel criticize Mr. Brown's

20   conduct during that meeting?

21      A.   To me?

22      Q.   Yes.                                    A-87

23      A.   Not to me.

24      Q.   Do you know whether he criticized his conduct

Marcia A. Starks

29

1    to others?

2    A.    I don't know.

3    Q.    Did you know anybody else at the meeting other

4    than Councilman Freel?

5    A.    Yes.

6    Q.    Did you speak to that person about what

7    occurred at the meeting?

8    A.    No.

9    Q.    Did anyone at the meeting talk to you about

10   their impressions of the meeting other than Councilman

11   Freel?

12   A.    And Fray and I spoke about that.

13   Q.    When did you speak with Officer Lynch?

14   A.    It might have been a couple days later.

15   Q.    What --

16   A.    Or right outside of the meeting.  Right outside

17   of the meeting first.

18   Q.    Can you tell me about that conversation?

19   A.    Just were both in a state of shock.

20   Q.    What did Officer Lynch say to you?

21   A.    She just couldn't believe it.  "I can't believe

22   that."

23   Q.    What did you say to her?                    A-88

24   A.    I really can't give you my exact words or even

Marcia A. Starks

30

1    close to it, but I just expressed my shock at things

2    that were being said.

3        Q.   Getting back to the actual meeting, after

4    Mr. Brown directed his comments at Officer Lynch, did

5    the meeting end at that point?

6        A.   We got up and left.

7        Q.   When you say "we," who is "we"?

8        A.   The two officers, Fray and Groark, Bud Freel,

9    and myself.  I can't remember if the meeting ended or

10   us leaving ended it.  I don't -- I don't recall that.

11   I just know that very shortly after that we left.

12       Q.   Did you speak with Mr. Brown about that meeting

13   at any point after the meeting?

14       A.   No, no.

15       Q.   Have you ever had any conversations with him

16   about that meeting --

17       A.   No.

18       Q.   -- since then?

19       A.   No.

20       Q.   Has he attempted to contact you about the

21   meeting?

22       A.   No.

A-89

23       Q.   During your conversation with Officer Lynch

24   after the meeting, after that incident involving

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Mr. Brown, did she indicate to you that she and

2    Mr. Brown had had prior conflict?

3    A.    Yes.

4    Q.    What did she tell you?

5    A.    That there had been an incident that her and

6    Mr. Brown had had around this incident, there had been

7    some problems.

8    Q.    Were you aware of Mr. Brown having problems

9    with any other city employees prior to that meeting?

10    A.    No.

11    Q.    Excuse me?

12    A.    No.

13    Q.    How about subsequent to that meeting?

14    A.    Not to my knowledge.

15    Q.    Now, at some point after the meeting, were you

16    contacted by anyone from the city to give a statement

17    about what occurred at the meeting?

18    A.    Yes.

19    Q.    Who contacted you?

20    A.    Our personnel department and law department.

21    Q.    Who contacted you from the personnel

22    department?                                    A-90

23    A.    I believe it was Monica Gonzalez-Gillespie, our

24    director.



32

1    Q.    Who contacted you from the law department?

2    A.    Alex was the person that I met with at that

3    time, Alex Mili.

4              MR. MILI:    Before you go any further, I

5    want to say for the record she's instructed not to

6    answer any questions about conversations that she had

7    with myself or any of the attorneys from the law

8    department.    That is attorney/client privilege.

9              So if Mr. Vance decides to ask you any

10   questions about this conversation, I'm going to

11   instruct you not to answer.

12             THE WITNESS:    Okay.

                                                A-91
13   BY MR. VANCE:

14   Q.    I want to ask you about your conversations with

15   Monica Gonzalez-Gillespie.

16             What did you discuss with her?  And I want

17   to make sure that in responding you tell me what you

18   discussed with her outside the presence of either

19   Mr. Mili or any other attorney for the city.

20   A.    I didn't meet with her or discuss anything with

21   her outside of the presence of Mr. Mili.

22   Q.    All right.  So on each occasion when you and

23   Miss Gonzalez-Gillespie discussed the November 2004

24   incident involving Officer Lynch and Michael Brown,

Marcia A. Starks

33

1   either Mr. Mili or another attorney from the city was

2   present; is that correct?

3      A.    That's correct.

4      Q.    Did you have any conversations with any city

5   employee other than Miss Gonzalez-Gillespie or

6   Mr. Mili concerning that November 2004 incident that

7   we haven't already discussed during the deposition?

8      A.    No, no.

9      Q.    Did you sign any document related to what

10  occurred at the November 2004 meeting between Officer

11  Lynch and Mr. Brown?

12     A.    I don't remember if I signed a document after I

13  gave a statement.  I don't remember if I signed --

14  it's been awhile, but I don't remember.

15     Q.    You don't recall after any discussions you had

16  whether you actually signed a document, any

17  discussions you had with Miss Gonzalez-Gillespie and

18  Mr. Mili, whether you signed a document?

19     A.    I don't recall.                        A-92

20     Q.    Just give me a minute and I think I might be

21  finished.

22           As a city employee, or prior to November

23  2004, had you received any kind of training related to

24  sexual harassment, racial harassment, and harassment

Marcia A. Starks

34

```
 1   at work?

 2     A.    Yes.

 3     Q.    What kind of training had you received?

 4     A.    The city has a class for that and I attended it

 5   and received certification for that.

 6     Q.    And that was after you were appointed as a

 7   community affairs advisor?

 8     A.    That's correct.

 9     Q.    Did you attend that class on one occasion or

10   were you required to attend it every year or on some

11   other periodic basis?

12     A.    No.  I attended the one.

13     Q.    You obtained a certificate for successfully

14   attending the class?

15     A.    Yes.

16     Q.    Was it an all-day class?

17     A.    It was a half-a-day class.

18     Q.    What took place during the class?

19     A.    Instruction, interaction.  Rules and

20   regulations were discussed.  The city code was

21   distributed at that time about sexual harassment.

22     Q.    When you say "the city code," what do you mean

23   by that?

24     A.    The personnel code, I guess, to that.
```

A-93

Marcia A. Starks

35

```
 1    Q.    A portion of the personnel manual relating
 2   to --
 3    A.    Yes.
 4    Q.    -- sexual harassment?
 5    A.    Yes.
 6    Q.    Anything else you recall about the class?
 7    A.    No.
 8    Q.    Is it your understanding that that class was
 9   required of all city employees?
10    A.    I don't know.  I believe it was.
11    Q.    Is it your understanding that city employees
12   were required to take the class only once and
13   successfully complete it?
14    A.    Oh, I don't know.
15    Q.    For the record, the center that Mr. Brown was
16   the executive director of was the William Hicks
17   Anderson Community Center; is that correct?
18    A.    That's correct.                          A-94
19    Q.    At any point during the meeting in November
20   2004, do you recall Mr. Brown stating that he was not
21   attending the meeting in his capacity as a city
22   employee but as a private citizen?
23          MR. MILI:  Objection.  Asked and answered.
24          You can still answer.
```

Marcia A. Starks

36

1    Q.    You can answer the question.

2    A.    I don't remember.  I don't remember.

3    Q.    Okay.

4              MR. VANCE:   I don't have any other

5    questions for you.

6              MR. MILI:   Neither do I.

7              You can read the transcript when it's ready

8    or you can waive reading if you trust her to take the

9    transcript accurately.

10             THE WITNESS:   Waive reading.

11             (The deposition was then concluded at

12   9:55 a.m.)

13                    - - - - -

14

15                 INDEX TO TESTIMONY

16
     MARCIA A. STARKS                          PAGE
17

18   Examination by Mr. Vance                    2

19

20                    - - - - -

21                 INDEX TO EXHIBITS            A-95

22

23       (No exhibits marked for identification.)

24                    - - - - -

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

```
1    State of Delaware )
                      )
2    New Castle County )
```

3

4

## CERTIFICATE OF REPORTER

5          I, Kathleen White Palmer, Registered
Professional Reporter, do hereby certify that there
6    came before me on the 11th day of October, 2007, the
deponent herein, MARCIA A. STARKS, who was duly sworn
7    by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
8    deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed into
9    typewriting under my direction.

10         I further certify that the foregoing is a
true and correct transcript of the testimony given at
11   said examination of said witness.

12         I further certify that reading and signing
of the deposition were waived by the deponent and
13   counsel.

14         I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
15   interested in the event of this suit.

16

17

18              COPY

19              ___  _                          A-96

20              Kathleen White Palmer, RPR, RMR, CLR
                Certification No. 149-RPR
21              (Expires January 31, 2008)

22

23

     DATED:  October 11, 2007
24
```

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

FRAY LYNCH,                          :
                                     :
           Plaintiff,                :
                                     :
                                     :    C.A. NO. 06-351 JJF
     v.                              :
                                     :    JURY TRIAL DEMANDED
CITY OF WILMINGTON,                  :
                                     :
           Defendant.                :

**CERTIFICATE OF SERVICE**

     I, Alex J. Mili, Jr, Esquire, hereby certify that on this 14th day of November, a copy of the Appendix

to Defendant's Opening Brief in Support of its Motion for Summary Judgment Volume I was served with

the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and that

these documents are available for viewing and downloading from CM/ECF

G. Kevin Fasic, Esquire                    Robert T. Vance, Jr., Esquire
Law Office of G. Kevin Fasic               Law Offices of Robert T. Vance, Jr.
1225 King Street, Suite 200                100 South Broad Street , Suite 1530
Wilmington, DE 19801                       Philadelphia, PA 19110

                              CITY OF WILMINGTON LAW DEPARTMENT

                               /s/ Alex J. Mili, Jr.
                              ALEX J. MILI, JR., ESQUIRE (I.D. #4125)
                              Senior Assistant City Solicitor
                              Louis L. Redding City/County Building
                              800 N. French Street, 9th Floor
                              Wilmington, DE 19801
                              (302) 576-2175

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FRAY LYNCH,                          :
                                     :
          Plaintiff,                 :
                                     :          C.A. NO. 06-351 JJF
     v.                              :
                                     :          JURY TRIAL DEMANDED
CITY OF WILMINGTON,                  :
                                     :
          Defendant.                 :

APPENDIX TO DEFENDANT'S OPENING BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT

VOL. II

Alex J. Mili, Jr., Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendant City of Wilmington

Dated:  November 14, 2007

## TABLE OF CONTENTS

**Volume I**

Departmental Memorandum regarding Lynch's Written Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

City of Wilmington Personnel Policy 101.1 Harassment Free Work Environment . . . . . . . . . . . . . . A-2

Departmental Information to Michael Szczerba from Fray Lynch . . . . . . . . . . . . . . . . . . . . . . . . . A-4

Memorandum to Romain L. Alexander from Monica Gonzalez-Gillespie dated December 7, 2004 . . A-6

Memorandum to Michael Brown from Monica Gonzalez-Gillespie dated December 7, 2004 . . . . . . . A-9

Memorandum to Fray Lynch from Monica Gonzalez-Gillespie dated December 7, 2004 . . . . . . . . . . A-6

Letter to Monica Gonzalez-Gillespie from Victor F. Battaglia dated March 11, 2005 . . . . . . . . . . . . A-11

Memorandum to Michael A. Brown from Romain L. Alexander dated December 13, 2004 . . . . . . . A-12

Policy and Procedure Manual Training Form signed by Michael Brown dated November 4, 2004 . . A-14

Investigative Memorandum of Monica Gonzalez-Gillespie dated November 29, 2004 . . . . . . . . . . . A-16

Memorandum to Michael Brown from Monica Gonzalez-Gillespie dated March 9, 2005 . . . . . . . . A-20

Deposition Transcript of Fray Lynch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22

Deposition Transcript of Marsha Starks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-60

**Volume II**

Deposition Transcript of Michael Brown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-97

Deposition Transcript of Monica Gonzalez-Gillespie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-223

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FRAY LYNCH,                          )
                                     )
            Plaintiff,               )
                                     )    Civil Action
v.                                   )    No. 06-351 JJF
                                     )
CITY OF WILMINGTON,                  )
                                     )
            Defendant.               )


            Deposition of MICHAEL BROWN taken
pursuant to notice at the offices of the City of
Wilmington Law Department, 9th Floor, City/County
Building, 800 N. French Street, Wilmington, Delaware,
beginning at 2:00 p.m. on Friday, October 26, 2007,
before Vincent J. Bailey, Registered Professional
Reporter and Notary Public.

APPEARANCES:

        ROBERT T. VANCE, JR., ESQ.
        LAW OFFICES OF ROBERT T. VANCE, JR.
          100 S. Broad Street - Suite 1530
          Philadelphia, Pennsylvania, 19110
          For the Plaintiff

        ALEX J. MILI, JR., ESQ.
        CITY OF WILMINGTON LAW DEPARTMENT
          800 N. French Street - Ninth Floor
          Wilmington, Delaware  19801
          For the Defendant

ALSO PRESENT:
        Fray Lynch



                    WILCOX & FETZER
        1330 King Street -  Wilmington, Delaware 19801
                    (302) 655-0477

                    www.wilfet.com                    A-97



**WILCOX & FETZER LTD.**
Registered Professional Reporters



Michael Brown

2

1                      MICHAEL BROWN,

2              the deponent herein, having first

3              affirmed, was examined and

4              testified as follows:

5                      EXAMINATION

6  BY MR. VANCE:

7      Q.    Good afternoon, Mr. Brown.  I'm Robert Vance.  I

8  respect Fray Lynch in this lawsuit she's brought against

9  the City of Wilmington.  Have you ever had your

10 deposition taken before?

11     A.    Yes.

12     Q.    Let me run over some of the rules briefly.  Make

13 sure when you give a response to my questions that your

14 response is verbal.  Don't shake your head up and down,

15 anything like that, because Mr. Bailey, the reporter, is

16 making a record and he can't interpret your body

17 movements, sounds and things like that that are not

18 words.  Do you understand that?

19     A.    I do.                              A-98

20     Q.    Secondly, when I ask you a question, make sure

21 that you understand the question.  If you don't

22 understand it, tell me that you don't understand.  I'll

23 rephrase it.  Because when I ask you a question and you

24 answer it, I'm going to presume that you understood the

Michael Brown

3

```
1   question and that your answer is responsive to the

2   question that I posed.  Do you understand that?

3        A.   I do.

4        Q.   If during the deposition for whatever reason you

5   want to change an answer that you previously gave, please

6   feel free to do that, because I want your testimony to be

7   as accurate as possible.  Do you understand that?

8        A.   I do.

9        Q.   If you want to take a break at any point in the

10  deposition, let me know, I'll accommodate you.  But if

11  I've asked you a question, make sure you answer the

12  question first and then you can take your break.  Do you

13  understand that?

14       A.   I do.

15       Q.   You understand that you are testifying under oath

16  and subject to the penalties of perjury?

17       A.   I understand, sir.

18       Q.   And in the last day or two have you taken any

19  kind of medication or any drug that might interfere with

20  your ability to understand my questions or to answer

21  them?

22       A.   No, sir.

23       Q.   Okay.  Can you tell me about your educational

24  background?
```

A-99



4

1    A.    I graduated from high school, 1973.

2    Q.    What high school was that?

3    A.    Louis D. Brandeis High School in New York City.

4    Q.    Did you attend college?

5    A.    Yes, I have, sir.

6    Q.    Go ahead.

7    A.    Graduated with a B.S. from Springfield College.

8    Q.    What year was that?

9    A.    1999.

10   Q.    Where is Springfield College?

11   A.    The main campus is in Massachusetts, but we have

12   an annex here in Wilmington.  It was located at 5th and

13   Shipley, but they moved to the Nemours Building on 10th

14   Street.

15   Q.    What was your degree in?

16   A.    Human services.                          A-100

17   Q.    Did you have a postgraduate degree?

18   A.    No, sir.

19   Q.    Do you have any certifications of any kind?

20   A.    None to speak of.

21   Q.    Okay.  How long have you worked or how long did

22   you work for the City of Wilmington?

23   A.    I'm still employed.  Since 1994 I believe, April

24   1994.

5

| 1 | Q. | What was your first position with the city? |

1   Q.   What was your first position with the city?

2   A.   Worked out of a grant, SALLE grant for youth

3   intervention through the Wilmington Police Department.

4   Q.   What was your position?

5   A.   Youth intervention specialist.

6   Q.   But you were a city employee.  Is that right?

7   A.   That's correct.

8   Q.   How long were you a youth intervention

9   specialist?

10   A.   Until 1997 -- I'm sorry.  Until 2000.

11   Q.   April of 1994 to 2000?

12   A.   That's correct.

13   Q.   Do you recall when in 2000 you stopped being a

14   youth intervention specialist?

15   A.   I believe it was June 30th, 2000.

16   Q.   What was your next position with the City of

17   Wilmington?

18   A.   Executive director, William Hicks Anderson

19   Community Center.

20   Q.   Did you begin that position in July of 2000?

21   A.   My apologies, it was 2001.  The mayor was elected

22   in 2000 and sworn in 2001.  They eliminated the position

23   of youth intervention in 2001, so I went to Hicks

24   Anderson in 2002.

A-101

Michael Brown

6

1    Q.    When in 2002?

2    A.    July, July 1, 2002.

3    Q.    Were you employed by the city between June 30,

4    2001 and July 1, 2002?

5    A.    June 30 what?

6    Q.    2001.  Is that when you stopped being a youth

7    intervention specialist?

8    A.    Yes.

9    Q.    July 1, 2002 you said you became the executive

10   director?

11   A.    That's correct.  My employment with the city is

12   from 1994 until present, 2007.

13   Q.    I'm trying to find out what you did for the city

14   between June 30, 2001 and July 1, 2002?

15   A.    I had -- if you remember I said I was sorry.  I

16   didn't mean to use the word sorry, I apologize.  I worked

17   as a youth intervention up to June 30, 2002.  My

18   apologies.

19   Q.    All right.  Okay.  So you were the executive

20   director of the William Hicks Anderson Community Center

21   from July 1, 2002 until when?

22   A.    December 31st, 2004.                A-102

23   Q.    All right.  What was your next position with the

24   City of Wilmington?



Michael Brown

7

1      A.    I ran for office and I got sworn in as a city

2  councilman January 4th I believe it was of 2005,

3  officially as an elected official then.

4      Q.    That's your current role?

5      A.    That is correct.

6      Q.    Who did you work for just prior to coming to work

7  with the city as the youth intervention specialist?

8      A.    I believe it was Gary Hayman, Hayman Enterprise,

9  and Christina School District as a paraprofessional, I

10  believe.

11      Q.    Gary Hammond?

12      A.    H-A-Y-M-A-N.

13      Q.    Enterprise?

14      A.    Hayman Enterprise, that is correct.

15      Q.    The Christiana School District?

16      A.    Christina.

17      Q.    What was your position there?

18      A.    Where?

19      Q.    Gary Hayman Enterprise and Christina?

20      A.    I ran property management, I did property

21  management for him and his company.

22      Q.    When you became the executive director of William

23  Hicks Anderson Community Center, was that a political

24  appointment?

A-103

Michael Brown

8

```
 1      A.    No, sir.

 2      Q.    Civil service position?

 3      A.    It was a merit position, sir.

 4      Q.    Were you appointed by the mayor?

 5      A.    No, sir.  It was a merit position, sir.

 6      Q.    Excuse me?

 7      A.    That was a merit position, sir.

 8      Q.    You competed with other candidates for that

 9 position?

10      A.    No, sir.

11      Q.    Who appointed you to that position?

12      A.    It was a merit position, sir.

13      Q.    How did you get that position?

14      A.    Youth Intervention, as I was explaining to you

15 when we were trying to get the dates right, you remember,

16 I was saying that I worked up until 2002 I believe it was

17 and the mayor eliminated, his office eliminated Youth

18 Intervention.  I had bumping rights, so I bumped into

19 that position.                              A-104

20      Q.    The mayor of Wilmington is James Baker, correct?

21      A.    Mayor James M. Baker, that is correct, sir.

22      Q.    Did you know Mr. Baker before you became a youth

23 intervention specialist?

24      A.    I knew a little of Mr. Baker, yes, sir.
```

9

1    Q.   Did you ever serve as Mr. Baker's driver in any

2    capacity?

3    A.   No, sir.  No, sir.  In any capacity?  I drove him

4    around with friends.  I drove him around on several

5    occasions.

6    Q.   At what point in time?

7    A.   I would have to go back each year and think about

8    what point in time.  I do know I drove him around on

9    several occasions.

10   Q.   Were you driving him around as part of your

11   duties as either a youth intervention specialist or

12   executive director of the William Hicks Anderson

13   Community Center?

14   A.   No, sir.  As a friend.

15   Q.   Was it, were you driving him around while he was

16   running for office or --

17   A.   I did that as well, that's correct.

18   Q.   Driving?

19   A.   As a friend.

20   Q.   The mayor you said was elected in 2001?

21   A.   Yes.  That is correct, sir.

22   Q.   Were you driving him in 2001?

23   A.   No, sir.  He took office in 2001.

24   Q.   You were driving him in 2000?



WILCOX & FETZER LTD.
Registered Professional Reporters

Michael Brown

10

1    A.    I drove him occasionally throughout our

2    friendship, so that was one of the times, yes, some of

3    that time.

4    Q.    When is the first time you drove the mayor as a

5    friend for a political purpose?

6    A.    I don't remember exactly, sir.

7    Q.    Was it before you became a youth intervention

8    specialist?

9    A.    No, sir.

10    Q.    Was it during that time?

11    A.    Yes, sir, but I don't remember the year.

12    Q.    What were your responsibilities as a youth

13    intervention specialist?

14    A.    Dealing with at promising youth.  Some say at

15    risk, I like to say at promising.

16    Q.    What do you mean when you said you dealt with at

17    promising youth?

18    A.    We would go and advocate for them in the

19    community and in the schools, speak on their behalf and

20    in courts.  When some had court cases, we would go.

21    Q.    How many other youth intervention specialists

22    were there?

23    A.    No more than five total.           A-106

24    Q.    In that capacity what was the title of the person



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

11

1    that you reported to, your direct supervisor?

2        A.    I was the supervisor.

3        Q.    Did you report to anyone?

4        A.    Romaine -- Jana Lane Brown and Romaine Alexander.

5    J-A-N-A, Lane, L-A-N-E, Brown, no relations.    Romaine

6    Alexander.

7        Q.    What was Ms. Brown's title at the time?

8        A.    Director of Youth and Families at one point until

9    they eliminated the department.

10        Q.    After they eliminated that department, did you

11    still report to her?

12        A.    She became the deputy director of Parks and

13    Recreation where we were assigned.

14        Q.    What was Mr. Alexander's title when you reported

15    to him as youth intervention specialist?

16        A.    Director of Parks and Recreation, which he still

17    holds that position.

18        Q.    At any time were the youth interventional

19    specialists part of the police department?

20        A.    They were.

21        Q.    At what period of time?                    A-107

22        A.    When I first got hired in 1994.

23        Q.    Do you recall for what period of time the youth

24    intervention specialists were part of the police



Michael Brown

12

1   department?

2        A.   They were already in existence when I got there,

3   when I got hired.   Again, I was hired in '94 under then

4   Mayor Sills.   You are really asking me to stretch my

5   memory.   I'm going to try to do the best that I can,

6   because I think you already know and you can help me out,

7   if you want to.

8        Q.   Actually, I don't know.

9        A.   I'm quite sure you do, but, anyway, 1994 to 1997

10  we were at the police department and then they sent us to

11  Parks and Recreation.

12       Q.   Do you have any knowledge as to why in 1997 the

13  youth intervention specialists were reassigned from the

14  police department to the Parks and Recreation department?

15       A.   Had to do, something with the budget I believe.

16       Q.   Do you know Gilbert Howell?

17       A.   I know him well, sir.   He's my best friend -- one

18  of my best friends.

19            Will you do me a favor?   What's your name,

20  sir?

21       Q.   My name is Robert Vance.                    A-108

22       A.   Will you do me a favor and -- Mr. Howell spent 37

23  years, 32 years with the police department, he worked his

24  way up.   Would you address him as Mr. Howell, he deserves

Michael Brown

13

1    that, for me please?  He's my friend and deserves that.

2        Q.   I thought I called him Mr. Howell.

3        A.   No.  You said Gilbert Howell.

4        Q.   That's his first name.  I wanted to make sure you

5    know who I'm talking about.

6        A.   Okay.

7        Q.   You say that Mr. Howell is one of your best

8    friends?

9        A.   That's correct, sir.

10       Q.   Do you know James Stallings?

11       A.   Yes, I do, sir.

12       Q.   How long have you known James Stallings?

13       A.   Since 1994.  Knew of him before I came to the

14   police department in '94.  He was a sergeant in '94.  And

15   so '94 I got to know him.

16       Q.   Would you describe Mr. Stallings as one of your

17   personal friends?

18       A.   Yes.

19       Q.   Do you know Jim Wright?

20       A.   Yes.  I know Mr. Wright.                    A-109

21       Q.   How long have you known Mr. Wright?

22       A.   He too -- knew of him before I came to work for

23   the police department, but I got to know him as well in

24   1994.  He too was a sergeant.



WILCOX & FETZER LTD.
Registered Professional Reporters

Michael Brown

14

```
 1        Q.   Do you consider Mr. Wright to be one of your
 2    personal friends?
 3        A.   No.
 4        Q.   A professional relation?
 5        A.   Yes.
 6        Q.   Do you know Eugene Brown?
 7        A.   Yes, I do, sir.
 8        Q.   Is Mr. Eugene Brown related to you?
 9        A.   Not at all, sir.
10        Q.   How long have you known Eugene Brown?
11        A.   Late '80s, early '90s.
12        Q.   Would you consider Mr. Eugene Brown to be a
13    personal friend of yours?
14        A.   Yes.
15        Q.   At some point Mr. Eugene Brown worked for you,
16    correct?
17        A.   Yes.  I was his supervisor, that's correct.
18        Q.   You were his supervisor?
19        A.   That's correct.                       A-110
20        Q.   For what period of time were you Mr. Eugene
21    Brown's supervisor?
22        A.   Through my extension with William Hicks Anderson
23    Community Center, so approximately two years.
24        Q.   The entire time that you were the executive
```

Michael Brown

15

1    director, Mr. Eugene Brown was your subordinate, correct?

2        A.    He was one of 32, that's correct.

3        Q.    Do you know Andrea Horisak?

4        A.    Who?

5        Q.    Andrea Horisak.

6        A.    No, I don't, sir.  Not unless I see a face.

7        Q.    Do you know Sharnette Handy?

8        A.    Yes.

9        Q.    How do you know Ms. Handy?

10       A.    I was a board member for Jackson Street Boys Club

11   and she initially started, she initially volunteered

12   there and don't ask me what year because I really don't

13   remember.  Then -- so that's how I met her.  She

14   subsequently became a police officer.

15       Q.    Did you know Sharnette Handy before you became a

16   youth intervention specialist?

17       A.    That wasn't the name you just asked me.

18       Q.    Handy?  Sharnette Handy?

19       A.    Yes.

20       Q.    Did you know Sharnette Handy before you became a

21   youth intervention specialist?

22       A.    Yes.

23       Q.    Do you consider her to be a personal friend?

24       A.    No.

A-111

Michael Brown

16

| | | |
|---|---|---|
| 1 | Q. | Do you know Tracey Hammond? |
| 2 | A. | Yes. |
| 3 | Q. | How do you know Tracey Hammond? |
| 4 | A. | She was a former police officer. |
| 5 | Q. | Did you know Ms. Hammond prior to becoming a |

6  youth intervention specialist?

| | | |
|---|---|---|
| 7 | A. | No. |
| 8 | Q. | Do you consider her to be a personal friend? |
| 9 | A. | No. |
| 10 | Q. | Do you recall when you first met her? |
| 11 | A. | When she became a police officer, I was a youth |

12  intervention specialist.

| | | |
|---|---|---|
| 13 | Q. | Do you know Debbie Tymes, now known as Debbie |

14  Tymes Holden?

| | | |
|---|---|---|
| 15 | A. | Yes. |
| 16 | Q. | How long have you known Ms. Tymes Holden? |
| 17 | A. | When she became a police officer. |
| 18 | Q. | Did you know her prior to that? |
| 19 | A. | No, sir. |
| 20 | Q. | Do you consider her to be a personal friend? |
| 21 | A. | No, sir. |
| 22 | Q. | Do you know Elizabeth Ticknor? |
| 23 | A. | No, sir. |
| 24 | Q. | Do you know Eileen Target? |

A-112

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

17

1    A.    No, sir.

2    Q.    Do you know Stacie Jimenez?

3    A.    No, sir.

4    Q.    Do you know Deborah Donohue?

5    A.    Yes, I do.

6    Q.    When did you first meet Ms. Donohue?

7    A.    When I became a youth specialist I believe she

8  worked in the radio room at the Wilmington Police

9  Department.  Or if not when I became a intervention

10 specialist, shortly thereafter.

11   Q.    Do you consider her to be a personal friend?

12   A.    No, sir.

13   Q.    Do you recall an incident at the police academy

14 where you performed an inspection on the female recruits

15 at the police academy?

16   A.    No, sir.

17   Q.    Is it that you do not recall that incident or

18 that incident never happened?

19   A.    That incident never happened.        A-113

20   Q.    You were aware that Sergeant Donohue contends

21 that on two occasions you summoned only the female

22 recruits at the police academy into the hallway and

23 performed an inspection of them?  Are you aware that she

24 contends that you did that?

Michael Brown

18

1    A.    I heard just recently that she came up with that

2  fabrication of a lie.  So, yes, it's a lie and I didn't

3  do it.

4    Q.    As a youth intervention specialist, did you have

5  access to the police recruits?

6    A.    No, sir.

7    Q.    Was Mr. Stallings involved with the police

8  academy at any time when you were a youth intervention

9  specialist to your knowledge?

10    A.    He was lieutenant, but I don't -- he was in HR,

11  but I don't recall what class they came out of that that

12  he oversaw.  Captain Donohue, which is Sergeant Donohue's

13  brother, was the captain in charge of HR and I believe,

14  understanding what I heard, he was in charge of that

15  particular class and lieutenant at the time Stallings was

16  his subordinate.

17    Q.    Are you familiar with an Officer Cummings?

18    A.    Yes, I am.

19    Q.    When you were a youth intervention specialist,

20  did Officer Cummings have any relationship to the police

21  academy?

22    A.    I believe he did.  And, again, at what class, you

23  know, they come out in class numbers, I don't recall.  I

24  cannot recall unless we summons the records.  But he was



Michael Brown

19

1  at that time a sergeant in HR doing, assisting and

2  assigned to the training, Sergeant Cummings at that time,

3  who is now a captain.

4      Q.   Do you recall summoning the female recruits at

5  the police academy into the hallway and telling them that

6  you were largely responsible for the number of female

7  recruits in the particular class that they were in?

8      A.   No, sir.

9      Q.   Do you believe that you at any time had any role

10 in increasing the number of female recruits in the police

11 department?

12     A.   No, sir.

13     Q.   Do you know an employee of the City of Wilmington

14 by the name of Jerri Cherry?

15     A.   Yes, I do.

16     Q.   How do you know Ms. Cherry?

17     A.   When I was youth intervention specialist, it goes

18 back to that, during that time, she had a niece or

19 goddaughter or some relative that we did, gave service

20 to.  So that's when I first met Ms. Cherry.

21     Q.   Do you recall the niece or goddaughter or

22 relative who you gave service to?

23     A.   Oh, no, sir.                          A-115

24     Q.   Are you aware of -- do you know whether this



**WILCOX & FETZER LTD.**
Registered Professional Reporters

20

1    niece or goddaughter worked in the parks department?

2        A.    No.    She was a minor when I first encountered

3    Mrs. Cherry.

4        Q.    Was she -- how minor was she?

5        A.    She was a juvenile.    I work with juveniles as a

6    youth intervention specialist.

7        Q.    Younger than 21 years old?

8        A.    Mrs. Cherry's niece or goddaughter, whichever one

9    it was, she was a juvenile.    So, yes, she was under 21.

10        Q.    Do you know whether she was working for the city

11    as an intern in any capacity while you were a youth

12    intervention specialist?

13        A.    No, she was not.

14        Q.    Are you aware of any complaint made against you

15    by a relative of Ms. Cherry that you had sexually

16    harassed this woman or a woman?

17        A.    I was made aware of that through the personnel

18    department.

19        Q.    When were you made aware of the complaint?

20        A.    When I was -- when I was executive director of

21    Hicks Anderson Community Center.    So it had to be 2002 or

22    2003.    I don't recall exactly what year.

23        Q.    Who made you aware of the complaint?

24        A.    Personnel department.

A-116



Michael Brown

21

```
1      Q.    Who in the personnel department?

2      A.    Monica Gillespie I believe it was -- one of the

3  staff, but I believe it was Monica.

4      Q.    What did Monica tell you?

5      A.    That the allocations were made against me for

6  sexual harassment.

7      Q.    What were the allegations that she told you were

8  made against you?

9      A.    I don't remember.

10     Q.    Did she ask you about the allegations?

11     A.    Yes, she did.

12     Q.    Did she tell you she was asking you about the

13  allegations in the context of investigating the

14  allegations?

15     A.    Yes, she did.

16     Q.    Did she say she had spoken to the woman who had

17  made the complaint against you?

18     A.    Yes, she did.

19     Q.    Did she tell you she had interviewed anybody else

20  in connection with investigating the allegations?

21     A.    I don't recall that.

22     Q.    What was the result of her investigation, if you

23  know?

24     A.    I recall it being unfounded.
```

A-117



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

22

1    Q.    How do you have a recollection of that?

2    A.    How do I have a recollection of that?  I just do.

3    Q.    Were you given a memo from Ms. Gillespie --

4    A.    Yes.

5    Q.    Let me finish.

6          Were you given a memo from Ms. Gillespie

7    saying the complaint was investigated and it was found

8    not to be substantiated?

9    A.    That is correct.

10   Q.    Did you receive that memo while you were the

11   executive director of the Hicks Anderson Community

12   Center?

13   A.    That is correct.

14   Q.    Other than Officer Lynch, have any other

15   employees of the city made sexual harassment complaints

16   against you to your knowledge?

17   A.    To my knowledge there's no other employee who has

18   lied on me, no.

19   Q.    That was not my question.  Other than Officer

20   Lynch, are you aware of whether any other employees of

21   the city have made sexual harassment complaints against

22   you?                                       A-118

23   A.    To my knowledge, there has been no one else who

24   has made unsubstantiated comments or allegations against

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

23

1    me for sexual harassment.

2        Q.    Let me ask you the question again.    To your

3    knowledge, other than Officer Lynch, has any city

4    employee made a complaint against you that you sexually

5    harassed them?

6        A.    To my knowledge there has been no employee other

7    than your client who has made false allegations against

8    me.

9        Q.    Let me say this to you, under the Federal Rules

10   of Civil Procedure --

11       A.    Yes, sir.

12       Q.    -- I have up to 7 hours to depose you.

13       A.    Okay.    I have no place to go, but I'm answering

14   your question.

15       Q.    No, you are not.

16            MR. MILI:    He has.

17            MR. VANCE:    No, he hasn't.

18   BY MR. VANCE:                                        A-119

19       Q.    Your contention is that Officer Lynch made

20   unsubstantiated allegations.    My question is regardless

21   of whether you believe the allegations were substantiated

22   or unsubstantiated, to your knowledge have any other

23   employees of the city made a sexual harassment complaint

24   against you?    Very simple, yes or no?

Michael Brown

24

1    A.   As an officer of the court what answer do you

2  want me to give other than the one I just gave you?

3    Q.   Yes or no.  Other than Officer Lynch, has any

4  other employee of the city made a complaint of sexual

5  harassment against you?  I don't care whether you believe

6  it was substantiated or unsubstantiated.  My question is

7  whether you know of other complaints.  We can get into

8  whether it was substantiated or unsubstantiated after you

9  tell me yes or no.

10             Do you understand the question?

11    A.   As an officer of the court you want me to answer

12  the way you want to answer.  I'm answering the way I feel

13  comfortable in answering.

14    Q.   No.  I want an answer to the question I put to

15  you.  I understand that you believe that Officer Lynch's

16  complaint was fabricated.  I understand that's what you

17  believe.  I'm not getting into that.  My question is very

18  simple:  To your knowledge, has any other employee of the

19  city made a complaint against you that you sexually

20  harassed them?  Either you are aware of it or not.

21    A.   To my knowledge there has been no other

22  complaints of sexual harassment by anyone who has falsely

23  accused me of any sexual harassment.

A-120

24    Q.   Don't you understand that your answer implies

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Michael Brown

25

1    that there may have been complaints by someone made

2    against you that were not false?  I'm giving you the

3    opportunity to answer the simple question.

4        A.    As an officer of the court --

5            MR. MILI:  Move to strike your testimony.

6    You are not the deponent.

7        Q.    That's true, I'm not the deponent.  I'm not

8    trying to argue with you.

9            MR. MILI:  I object to you repeating the

10   same question.  I'm sorry it is not the answer you might

11   want to help your case.

12       Q.    No.  You are just not answering the question.

13   Mr. Brown, I understand your position regarding Officer

14   Lynch's complaint.  But my question is very simple.  It

15   is a very simple question.  It has nothing to do with

16   whether you believe the complaint that you may be aware

17   of was fabricated, was made for political -- whatever.

18   That's not the issue that I'm getting at.  It is a very

19   simple question.

20            Are you aware of any city employee having

21   made any complaint of sexual harassment against you other

22   than Officer Lynch and this other complaint you just

23   discussed that was found to be unsubstantiated?  Are you

24   aware of any other?

**W&F**

A-121

Michael Brown

26

1      A.   To my knowledge there has been no other

2  allegations of sexual harassment allegedly made against

3  me falsely by anyone else other than your client, Officer

4  Lynch.  As an officer of the court that's how I'm going

5  to answer the question.  I'm not being disrespectful to

6  you, sir.

7      Q.   I think you are.

8      A.   No, sir.  I've been very cooperative since we

9  started this --

10     Q.   It is called a deposition?

11     A.   I was trying to find the correct word, because I

12  was going to say something else.  But I've been very

13  cooperative and very pleasant with you.  I'm trying to be

14  that way.

15     Q.   Okay.

16     A.   I hope you can respect that, because I respect

17  you.

18     Q.   Okay.  All right.  So, Mr. Brown, you are

19  familiar with the concept of sexual harassment, are you

20  not?

21     A.   Yes, I am, sir.         A-122

22     Q.   How would you define sexual harassment?

23     A.   Sexual harassment is inappropriate behavior

24  towards an individual that is not warranted or not

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

27

1    accepted by that individual.

2        Q.    The inappropriate behavior I take it must be of a

3    sexual nature in order to constitute sexual harassment?

4        A.    No, sir.

5        Q.    Is that what you believe?

6        A.    No, sir.  Verbal, it could be verbal.  It can

7    come in all kinds of ways, sir.  It can be verbal.  It

8    can be physical.

9        Q.    Give me an example of verbal, inappropriate

10   verbal behavior that you think make constitute sexual

11   harassment?

12       A.    I don't have one at the top of my head right now.

13       Q.    My question to you is the inappropriate verbal,

14   does the inappropriate verbal behavior have to have a

15   sexual connotation in order for it to constitute sexual

16   harassment?

17       A.    It is my belief it does.

18       Q.    Okay.  The inappropriate physical behavior has to

19   have a sexual connotation in order for it to constitute

20   sexual harassment.  Is that your belief?

21       A.    It is my belief it does.

22       Q.    Okay.  So if you said to a female that maybe we

23   both can do you, do you believe that that is

24   inappropriate verbal behavior that would constitute

Michael Brown

28

1  sexual harassment?

2      A.   Are you asking the question in terms of saying

3  that I said that?  Or are you asking me a question in

4  terms of the way you just described it, as a hypothetical

5  question?

6      Q.   Did you not understand the question I asked you?

7      A.   I understood that it could -- if I answer the way

8  you asked, it could certainly be misconstrued that I

9  agree to your question, so would you ask it again.

10                 MR. VANCE:  Would you read back the

11  question.

12                 (The record was read back as requested.)

13                 THE WITNESS:  I don't know, because I would

14  never say that to a female.

15  BY MR. VANCE:

16      Q.   Okay.  So assuming you would never say that, do

17  you believe that statement would be inappropriate?

18      A.   Please don't assume.  I'll telling you I would

19  not say that to a female.

20      Q.   Mr. Brown, would that statement in your view

21  constitute sexual harassment?

A-124

22      A.   Yes, it would.  It is a verbal statement.

23      Q.   If you inquire of a female whether she was going

24  to wear a thong when she went to the beach, would that

Michael Brown

29

1   inquiry in your view constitute sexual harassment?

2       A.   If the individual -- if the conversation was a

3   part of the beach scenery, I don't know what people ask,

4   but I don't have any objections to asking an individual

5   what type of swim suit they are wearing if we are on the

6   beach and we are all together.

7       Q.   Okay.  If a person asks a female, if a male

8   person asks a female person out on a date repeatedly and

9   the female says no repeatedly and the male continues to

10  ask her out on a date, in your view does that constitute

11  inappropriate or behavior that's sexual harassment?

12      A.   In my view no, because some people don't get the

13  word no.  Some people don't understand the word no.  Some

14  people go beyond that limitation or that line that is

15  drawn.  Continuously can be, I guess they continuously

16  seek after what they want until they get the answer yes.

17          I don't know if I answered that right, but

18  that's the way I feel about it.

19      Q.   If a male kisses a female without her consent, in

20  your view does that constitute sexual harassment?

21      A.   Of course.  I would think so.

22      Q.   If a male hugs a female without her consent, in

23  your view would that constitute sexual harassment?

24      A.   No.



Michael Brown

30

1    Q.    Why not?

2    A.    It all depends on the circumstances and the

3    situation and the environment.

4    Q.    Give me an example.

5    A.    Well, in church, you walk up to someone in church

6    and you hug a sister or a sister hugs the brother.    Is

7    that considered sexual harassment?    So that's my example.

8    Q.    If a male asks a female to go on a vacation with

9    her and the female says no, is that conversation sexual

10   harassment in your view?

11   A.    No.

12   Q.    If a man asks a woman to arrange a date for him

13   with the woman's friend, in your view does that

14   constitute sexual harassment?

15   A.    Nope.                                          A-126

16   Q.    If a man jokes with a woman in a suggestive

17   manner and the woman tells him that she doesn't

18   appreciate those kinds of jokes, but the man continues to

19   joke with her in that manner, do you believe that

20   constitutes sexual harassment?

21   A.    No.    I believe you can consider that as being

22   disrespectful to the individual.

23   Q.    Now, since you have been a city employee have you

24   received any kind of training on the issue of sexual



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

31

1    harassment?

2        A.    Yes.

3        Q.    Can you tell me about that training?

4        A.    New hires, whenever -- as far as I remember, when

5    you are a new hire you go through, personnel goes through

6    a lot of things that is in the personnel code and one of

7    them is sexual harassment.

8        Q.    When you were newly hired by the city in 1994 did

9    you receive training on any kind of sexual harassment

10   policy or procedure?

11       A.    Yes.

12       Q.    Can you tell me about that training, if you

13   remember?

14       A.    I don't remember.

15       Q.    Did you receive a copy of the city's personnel

16   manual --

17       A.    Yes.

18       Q.    -- when you were hired in 1994?

19       A.    That's correct.

20       Q.    Did that personnel manual have a harassment or

21   sexual harassment policy in it?

22       A.    Yes, it did.

23       Q.    Did you read it?

24       A.    Yes, I did.                                    A-127

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Michael Brown

32

```
 1     Q.   Did I understand it?

 2     A.   Yes, I did.

 3     Q.   Do you understand what that policy, the conduct

 4   that that policy prohibited?

 5     A.   Yes, I did.

 6     Q.   Since April 1994 did you receive any other

 7   training on sexual harassment or the city's sexual

 8   harassment policy?

 9     A.   Yes.

10     Q.   Do you recall when?

11     A.   You are not going to like this answer, but I'm

12   going to tell you.  Since your client made false

13   accusations against me the first time about the

14   allegations of sexual harassment and it was investigated

15   by the personnel department and they wrote back with

16   their recommendation, I had to go through training on

17   sexual harassment.  I believe that was in 2003 or 2004.

18     Q.   Did you object to going through that training?

19     A.   No.

20     Q.   Did you think you needed the training?           A-128

21     A.   No.

22     Q.   You had no training between 1994 and some time in

23   2004?  Is that your --

24     A.   There was some other training, but I don't recall
```

Michael Brown

33

1    what they were.  We have had trainings.

2              MR. VANCE:  Can you mark this as Brown 1.

3              (Brown Deposition Exhibit No. 1 marked for

4    identification.)

5    BY MR. VANCE:

6      Q.   Mr. Brown, the document in front of you is marked

7    Brown 1.  It is entitled "Policy 101.1 Harassment Free

8    Work Environment."  It has Bates numbers in the lower

9    right-hand corner, 72 through 77.

10     A.   That's correct, sir.

11     Q.   Okay.  Have you ever seen this policy before?

12     A.   Yes.  It is part of the personnel policy manual.

13     Q.   You were familiar with this policy and what it

14   prohibited as of January 1, 2004, correct?

15     A.   January 1.

16     Q.   2004.

17     A.   Yes.

18     Q.   Prior to that?

19     A.   In 1994, yes.                          A-129

20     Q.   Now, when you were the executive director of the

21   Hicks Anderson Center, can you tell me what your duties

22   were?

23     A.   My duties were to oversee the day to day

24   operations of the city's only funded community center,

Michael Brown

34

1   where I supervised approximately 32 full- and part-time

2   employees, and in the summertime ran summer employment

3   with youth, oversaw a budget, oversaw programs.  And

4   basically that was the gist of my duties there.

5        Q.   Did you have a job description?

6        A.   Yes.

7        Q.   It was in writing?

8        A.   Yes.

9        Q.   Was that job description given to you when you

10   started the job?

11       A.   Yes.

12       Q.   Who gave the job description to you?

13       A.   Personnel department.

14       Q.   Is that job description an official city document

15   to your knowledge?

16       A.   Yes, it should be.

17       Q.   Are you married, Mr. Brown?

18       A.   Yes, I am.

19       Q.   How long have you been married?

20       A.   Eighteen years, 21 including the dating -- 18

21   years married.  I add the three years we were dating, so

22   21 years with my wife.

23       Q.   Do you have any children?

24       A.   Yes.

A-130

Michael Brown

35

1        Q.    What are their genders?

2        A.    Two males, one female.

3        Q.    When you were the executive director of the Hicks

4    Anderson Center did you have assigned work hours?

5        A.    Yes.

6        Q.    What were your assigned work hours?

7        A.    Per the job description, 9:00 to 5:00.

8        Q.    Were you paid a salary or were you paid by the

9    hour?

10       A.    Salary.

11       Q.    If you worked beyond 5:00 p.m. were you paid

12   overtime?

13       A.    No.

14       Q.    Did you get comp time if you worked past 5:00

15   p.m. or more than 40 hours a week?

16       A.    They didn't like to give comp time, so I didn't

17   really do it.

18       Q.    Did the city offer comp time?

A-131

19       A.    No.

20       Q.    Were you ever required as part of your duties as

21   the executive director of the Hicks Anderson Center to

22   attend community meetings?

23       A.    Yes.

24       Q.    Were you ever required to attend those meetings



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

36

1    after 5:00?

2        A.   By -- yes, per directive from the director of

3    Parks and Rec, there would be occasions when he would

4    send me.

5        Q.   If the director would send you to a meeting after

6    5:00, how would he communicate that to you?

7        A.   Call me up and tell me he can't make a meeting,

8    would I go.

9        Q.   Did you receive a schedule from the director of

10   meetings that he wanted you to attend on a weekly basis

11   or monthly basis?

12       A.   No, sir.

13       Q.   When you went to these meetings after 5:00 --

14       A.   They weren't all after 5:00.

15       Q.   I'm talking about the ones that were after 5:00,

16   were you able to come in to work late for the period of

17   time that you spent at the meeting the night before?

18       A.   At times we would discuss that.

19       Q.   Were you able to do that?                   A-132

20       A.   At times we would, the director and I would work

21   out something.

22       Q.   When you went to community meetings after 5:00 at

23   the direction of the director of Parks and Recreation,

24   did you communicate that to the people who attended the

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

37

1    meeting?

2        A.    Yes, I would.    I would always tell them I was

3    there representing the director.

4        Q.    Did you ever attend community meetings after 5:00

5    in your capacity as the executive director of the Hicks

6    Anderson Center, not at the invitation of the or the

7    direction of the Parks and Recreation director?

8        A.    Yes, through invites from community groups.

9        Q.    Was it your understanding that those community

10   organizations were inviting you because you were the

11   executive director of the Hicks Anderson Center?

12       A.    No.    Not all the time.

13       Q.    What would be the difference or the distinction?

14       A.    I'm quite sure you have heard about my background

15   and reputation.    I'm --

A-133

16       Q.    No, I haven't.

17       A.    I'm going to tell you.    I'm a community activist

18   and I advocate for youth and seniors.    And I advocate for

19   justice and for what's right.    I always advocated, so

20   there would be a lot of times that I show up for meetings

21   and I say a lot of times that I show up for meetings

22   after 5:00 clock when I got off from work on my own

23   having nothing to do with the city.

24              If I showed up and I was not assigned to



Michael Brown

38

1    show up by the director or I wasn't invited by a

2    community organization and I might have heard about a

3    meeting, I might show up and just put my head in the door

4    and find out what the discussions is all about.  Or I

5    might already know what the discussion is going to be and

6    might want to show up and give my own.

7        Q.    In those occasions would you come into the

8    meeting and say, I'm Mr. Brown -- or I guess people knew

9    you -- but I'm not here as the executive director of

10   Hicks Anderson, I'm just here as Mike Brown, private

11   citizen?

12       A.    Basically those were some of the times that I had

13   to say that, yes, because I couldn't answer for the city.

14   There would be conversations regarding situations about

15   the city and they would look my direction or my way.  I

16   said I'm not here representing the city, I'm here

17   representing me, not the city.  So I wouldn't make

18   decisions for the city is what I was telling them.

19       Q.    I'm not asking you basically.  I'm asking you

20   when you went to community meetings after 5:00 where you

21   believe you were attending in your capacity as a private

22   citizen, when you went to these meetings did you announce

23   to the people at the meeting, I'm here just on my own,

24   I'm not here representing the city?

A-134



Michael Brown

39

1      A.    Based on, if I was identified there and asked

2    certain questions that pertain to city government, I

3    would tell them I'm not there as a city employee.   I'm

4    there as an advocate, I'm there just to hear and listen.

5    Because if I told them that, they would expect me to give

6    them some sort of remedy to their problem and I can't

7    represent the city and speak for the city unless I was

8    told to.

9      Q.    If you were not asked a question in that type of

10   meeting where you were attending as private citizen,

11   would you still nonetheless say I'm not here representing

12   the city, I'm just here on my own?

13     A.    But again, based on if I was identified as Mike

14   Brown from Hicks Anderson Community Center and the issues

15   was about youth or the issues was about crime, in the

16   community, whatever issue was dealing with and I sat

17   there and they asked me a question pertaining to that, I

18   could not answer to them as an employee of the city,

19   because I wasn't there representing the city.   I'd be

20   there representing me as a private citizen and advocating

21   for what was right and what was wrong in the community at

22   that time.                              A-135

23     Q.    So would it be fair to say, then, at community

24   meetings that you attended after 5:00 p.m. where you were

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Michael Brown

40

1   not directed to attend by the Parks and Recreation

2   director or you were not otherwise attending in your

3   official capacity as the executive director of the Hicks

4   Anderson Center, you would not disclose to the attendees

5   that you were appearing as a private citizen unless

6   someone asked you something that would require you to

7   make that distinction?  Would that be correct?

8           MR. MILI:  Object to form.

9       Q.    You can answer the question.

A-136

10      A.    For the third time, if there's a conversation

11  pertaining to something in the community, and you are

12  right when you open the statement and questions about you

13  guessed everybody would know who I was, you are correct.

14  Everybody, majority, 99 percent of them know who Mike

15  Brown was.  So when there was an issue about youth,

16  issues about crime, issues about police, issues about

17  anything pertaining to an answer that I had, that they

18  thought that I was there representing them, representing

19  the city on, I would make clear to them that I was not

20  there -- it was after 5:00, I was on my own time.  So I

21  was representing me as an advocate to the community.

22      Q.    In November 2004 when you attended a WCCNPAC

23  meeting which was concerned with youth or crime or police

24  issues, did you disclose to the people attending that

Michael Brown

41

1    meeting that you were attending that meeting as a private

2    citizen and not a representative of the city?

3        A.    Didn't disclose anything, because no one asked

4    me.  No one had a direct conversation to me or direct

5    question to me pertaining to a city issue that I would

6    have to respond to.  There were certain issues discussed

7    there, but it wasn't that I was representing the city to

8    give them a definitive answer or the answer that they

9    were looking to hear for the city to give.

10        Q.    Everybody there knew you, right, because

11    everybody knows you?

12        A.    Well, I won't say everybody --

13        Q.    99 percent?

14        A.    Yeah.  Even you know me now, sir.

15        Q.    Not really, but --

16        A.    You will get to know me.

17        Q.    Probably not.

18            So I take that answer to be, no, you did not

19    disclose to the people at the meeting in November 2004 at

20    the WCCNPAC organization that you were appearing as a

21    private citizen.  Is that correct?

22        A.    The way I explained it to you is the way I said

23    it happened.  No, I did not introduce myself as the

24    executive director of William Hicks Anderson Center.



Michael Brown

42

1    Q.    You did not introduce yourself as Mike Brown

2    private citizen tonight?

3    A.    I did not do that, either.

4    Q.    Okay.   As the executive director of the Hicks

5    Anderson Community Center did you have an assigned

6    jurisdiction of the city that you were responsible for?

7    A.    Would you say that again for me?

8    Q.    As executive director of the Hicks Anderson

9    Center, did you have a particular jurisdiction of the

10   city that you were responsible for?

11   A.    No.   I was responsible for the only public

12   facility for, that paid tax -- was paid by tax dollars at

13   the William Hicks Anderson Community Center.   But because

14   my job description dealt with the youth, we dealt with

15   youth throughout the city, but it was a city entity.

16   Q.    All right.   You are aware I am certain that

17   Officer Lynch filed a complaint against you alleging that

18   in June of 2004 you engaged in conduct that she contended

19   constituted sexual harassment, correct?

20   A.    I am aware that she, Officer Lynch, fabricated --

21   Q.    Go ahead.

22   A.    -- statements stating, being accusatory that I

23   did some sexual harassment to her, which is strictly flat

24   out a lie.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-138

Michael Brown

43

1    Q.    All right.  Why don't you tell me what happened

2    on the particular day that gave rise to the complaint?

3    A.    Ask me what you want to know.

4    Q.    All right.  We can do it that way if you want.

5    A.    Yes.

6    Q.    Okay.  Officer Lynch says that she was assigned

7    to weed and seed in June 2004.  Is that right?

8    A.    That is correct.

9    Q.    Did you know that to be the fact?

10    A.    She was an officer over in that area.  I assume

11    that's what she was.

12    Q.    Why did you assume that?

13    A.    Because she was there every day in that capacity

14    as the assigned officer, one of three assigned officers

15    in the area, so I just assumed that she was one of the

16    WCCNPAC officers.

17    Q.    What do you mean "there"?  Where is "there"?

18    A.    Weed and seed area, the specific area of weed and

19    seed.

20    Q.    In June 2004 did you tell some of the police

21    officers that you were going to Miami for the weekend?

22    A.    No, sir.

23    Q.    You never said that?

24    A.    No, sir.

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

Michael Brown

44

1    Q.    Did you learn that Officer Lynch was going to go

2    to Miami for the Memorial Day Weekend?

3    A.    She shared that with me in a conversation that we

4    had standing in the lobby of Hicks Anderson.

5    Q.    Just you and her?

6    A.    In the lobby, yes, it was.

7    Q.    Did anybody else hear the conversation between

8    the two of you?

9    A.    No, sir.

10    Q.    Okay.  On that particular occasion did you greet

11    Officer Lynch with a hug?

12    A.    I greeted Officer Lynch with an extended hand and

13    a -- for the record, I am demonstrating, I extended my

14    hand to her, embraced her in a greet where it would be

15    construed as a greeting that men and women do when they

16    see each other, particularly those of African American

17    descent.

18          So I confused you now?

19    Q.    I'll leave that alone.

20    A.    When we go to court I will ask the judge to let

21    me demonstrate exactly what I mean by that.

22          MR. MILI:  Just answer his questions,

23    please.

24    Q.    Had you greeted Officer Lynch in that fashion



Michael Brown

45

1    prior to that day?

2        A.    Yes.

3        Q.    On how many occasions?

4        A.    I don't recall.

5        Q.    More than 10?

6        A.    I don't recall.

7        Q.    Was that your normal greeting with Officer Lynch?

8        A.    It is my normal greeting with everybody.

9        Q.    Okay.  Let me ask the question again.  Was that

10   your normal greeting with Officer Lynch?

11       A.    It had become my greeting with her when she was

12   along with her partners when I saw them.

13       Q.    When did it start becoming your normal greeting

14   with Officer Lynch and her partners whenever you saw

15   them?

16       A.    As I would see them when they came in the

17   building I would greet them that way.

18       Q.    Beginning in July of 2002?

19       A.    I don't know when she was assigned over there.

20       Q.    Okay.  All right.  So that particular day after

21   you greeted Officer Lynch with a hug --

22       A.    Excuse me.  It was not a hug as you would --

23       Q.    I stand corrected.  After you greeted Officer

24   Lynch in the manner that you are going to demonstrate to

46

1    the jury at trial, you asked Officer Lynch to go to your

2    office, into your office, correct?

3        A.    I was summoned to a phone call by the office

4    staff and I told her she can come in the office if she

5    wants.  So I went to the office to answer a phone call.

6        Q.    You had a round table in your office?

7        A.    Yes.

8        Q.    Officer Lynch had a seat at the table?

9        A.    That is correct.

10        Q.    While she was seated there you began to talk to

11    her about her trip to Miami, correct?

12        A.    No.  That's not correct.

13        Q.    No?  Did you ask Officer Lynch if you could go to

14    Miami with her?

15        A.    No.

16        Q.    You did not?

A-142

17        A.    No, I did not.

18        Q.    Do you recall Officer Lynch telling you that the

19    trip to Miami was a women's trip?  That she was going

20    with a girlfriend?

21        A.    I remember the conversation about a girlfriend,

22    but I don't specifically remember that about a women's

23    trip.

24        Q.    Did you ask Officer Lynch to, if she would



47

1    introduce you to her girlfriend that was going on the

2    trip with her?

3        A.    Yes.

4        Q.    Officer Lynch told you no, correct?

5        A.    No.

6        Q.    She didn't tell you no?

7        A.    No.

8        Q.    Did she say yes?

9        A.    No.  But she didn't tell me no, either.

10       Q.    She didn't say anything?

11       A.    No.

12       Q.    Do you recall Officer Lynch telling you that her

13   girlfriend does not like married men and you are married?

14       A.    Yes.

15       Q.    Do you have any idea why she came out with that

16   statement, why she said that to you?

17       A.    Because I made the statement -- I'm quite sure

18   you got it there -- you ought to introduce me to your

19   girlfriend.

20       Q.    Well, that's not what you said, is it?

21       A.    That's the beginning of what I said and then as

22   the conversation progressed I said you ought to hook the

23   brother up.

24       Q.    The brother being you?                    A-143

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

48

1    A.    Being me, that's correct.

2    Q.    Hook the brother up with who?

3    A.    Her girlfriend.  That's what we were talking

4    about.

5    Q.    Did Officer Lynch tell you, no, she was not going

6    to hook you up with her girlfriend?

7    A.    No.  I don't recall that.

8    Q.    Did she respond at all?

9    A.    Yes.  She said she would talk to her girlfriend.

10    Q.    She was contemplating hooking you up with her

11    girlfriend?

12    A.    Her comment was I will talk to my girlfriend, but

13    she does not date married men.

14    Q.    Do you recall asking Officer Lynch what kind of

15    bathing suit she would be wearing while in Miami?

16    A.    No, sir.

17    Q.    You don't recall asking her that?

18    A.    No, sir.

19    Q.    You don't recall her telling you that she was

20    going to wear a regular bathing suit?

21    A.    No, sir.

22    Q.    You don't recall -- is it that you don't recall

23    this or you did not ask her?

24    A.    I don't recall asking her.

A-144



Michael Brown

49

1    Q.   Well, that's two different things.  Is your

2  testimony that you did not ask Officer Lynch what kind of

3  bathing suit that she was going to be wearing while in

4  Miami or you don't recall whether you asked her what kind

5  of bathing suit she was going to be wearing in Miami?

6    A.   In the beginning of your question, sir, you said

7  do I recall.

8    Q.   I know, but this is a new question.  So -- did

9  you ask Officer Lynch what kind of bathing suit she was

10  going to be wearing in Miami?

11    A.   No, sir.

12    Q.   Do you recall Officer Lynch telling you that she

13  was going to be wearing a regular bathing suit in Miami?

14    A.   No, sir.

15    Q.   Did you ask Officer Lynch whether she was going

16  to be wearing a thong?

17    A.   No, sir.

18    Q.   Did Officer Lynch attempt to leave the office and

19  you asked her not to leave when she was going to leave?

20    A.   No, sir.

21    Q.   Did Gene Brown come into the doorway of your

22  office at any time while Officer Lynch was there?

23    A.   Yes, sir.  He stuck his head in the door.

24    Q.   He asked for keys.  Is that right?

A-145



Michael Brown

50

1    A.   He asked for something.  I don't recall exactly

2  what it was.

3    Q.   Did you tell Gene Brown not to interrupt you

4  while you were talking to this fine police officer?

5    A.   No, sir.

6    Q.   You didn't say that?

7    A.   No, sir.

8    Q.   Did Mr. Gene Brown tell you that he would kick

9  your ass?

10    A.   Say again.

11    Q.   Did Gene tell you that he would kick your ass in

12  a joking manner?

13    A.   No, sir.

14    Q.   Did you tell or say to Officer Lynch and Gene

15  that he wouldn't do that with Officer Lynch sitting

16  there?

17    A.   To go back to your original question, he never

18  made the statement in the first place.

19    Q.   Did you give Gene the keys that he inquired

20  about?

21    A.   Again, I don't recall what it was that he asked

22  for, as I stated earlier.                    A-146

23    Q.   Did you and Officer Lynch talk about certain

24  issues regarding the spring break basketball tournament?

Michael Brown

51

1      A.    Yes.   Upcoming federal funded, federal sponsored

2    basketball game, yes.

3      Q.    Did Mr. Brown come back a few minutes later and

4    ask you another question?

5      A.    I don't recall him coming back in the office for

6    me to ask him another question.

7      Q.    Did you and Gene Brown start joking with each

8    other and Gene Brown cut off the lights and tells you

9    that he was going to come in the room and beat your ass

10   in the dark?

11     A.    I don't recall that, so the answer is no.

12     Q.    Did you tell Gene Brown that if he came into the

13   room with Officer Lynch there, that Officer Lynch could

14   do both of you?

15     A.    No, sir.

16     Q.    Were the lights ever off at any point when you

17   were in the office with Officer Lynch that day?

18     A.    No, sir.   And neither door was even closed.

19     Q.    I didn't really ask that, but if that's what you

20   would like to contribute.

21           At some point Officer Lynch left.   Do you

22   recall?

23     A.    Yes, sir.                            A-147

24     Q.    Did you say anything to her when she left?

Michael Brown

52

1      A.    If anything, see you later, be safe.

2      Q.    All right.  You were advised a few weeks after

3  that point that Officer Lynch had made a harassment

4  complaint against you.  Do you recall that?

5      A.    No, sir.  Not a few weeks later.  A couple months

6  later.

7      Q.    Couple months later?

8      A.    Yes, sir.

9      Q.    Are you sure about that?

10     A.    It wasn't a few weeks later, so, no, I'm not sure

11 about that, but it wasn't a few weeks later.  But it all

12 depends on what you call a few weeks.

13     Q.    What do you call a few weeks?

14     A.    You are the one that made the statement.

15     Q.    But you made the answer.

16     A.    I'm not going to argue with you.

17     Q.    That's my question:  What do you call a few

18 weeks?

19     A.    Mine is different than yours, so...

20     Q.    I want to know what yours is.

21     A.    A month, four weeks.

22     Q.    Okay.

23     A.    What is yours?

24     Q.    I'm not being deposed here, Sir.          A-148



**WILCOX & FETZER LTD.**
Registered Professional Reporters

53

1          MR. VANCE:  Could you mark that as Brown 2.

2          (Brown Deposition Exhibit No. 2 marked for

3    identification.)

4    BY MR. VANCE:

5      Q.   Mr. Brown, in front of you is a document marked

6    Brown 2, which is a letter, dated June 17, 2004, from

7    Monica Gonzalez Gillespie, to you, regarding a complaint.

8    It has a Bates number of 7 in the lower right-hand

9    corner.  Could you read this letter?

10     A.   Did I read it?

11     Q.   Could you read it to yourself right now?

12     A.   I did.

13     Q.   Do you recall receiving this letter?

14     A.   Yes.

15     Q.   Dated June 17, 2004, correct?

16     A.   That is correct.

17     Q.   That's not a month after the beginning of June,

18   is it?

19     A.   Well, in my recollection of this whole          A-149

20   fabrication that your client has made, I thought that at

21   some point this happened back in -- the allegations were

22   made in June, but this had to happen back in the last of

23   April, early May.  That's my thought, so that's why I

24   used the terms of more than a few weeks.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Michael Brown

54

1    Q.   All right.

2    A.   Understandable, isn't it?

3    Q.   Do you want to take your break?

4    A.   Understandable, isn't it?

5    Q.   Do you want to take your break?

6          THE WITNESS:  Yes.

7          (Recess taken.)

8  BY MR. VANCE:

9    Q.   All right.  Mr. Brown, do you recall being

10  contacted by someone from the personnel director's office

11  to schedule an appointment to meet with you about Officer

12  Lynch's complaint?

13    A.   Yes.

14    Q.   Do you recall that you were scheduled to meet

15  with Monica Gonzalez Gillespie around the end of June

16  2004?

17    A.   I don't recall exactly when, sir, but, yes, I

18  recall having to meet with her.

19    Q.   Did she cancel an appointment with you?

20    A.   I don't recall that.

21    Q.   Did you ever make any comments to Officer Lynch

22  about her being too pretty to be a cop?

23    A.   No, sir.          A-150

24    Q.   Did you ever make a comment to Officer Lynch

Michael Brown

55

1    about her pants fitting nice?

2        A.    No, sir.

3        Q.    Did you ever tell Officer Lynch that you wanted

4    to get to know her?

5        A.    No, sir.

6        Q.    Did Officer Lynch ever tell you that she had a

7    boyfriend?

8        A.    I don't think we got that personal, so I don't

9    recall that, sir.

10        Q.    After the discussion that you had with Officer

11    Lynch about the spring break basketball tournament, was

12    there a period of time when she was not visiting the

13    center?  She stopped visiting the center?

14        A.    The weed and seed officers, which she was part

15    of, didn't visit on a regular basis anyway.  So --

16        Q.    I don't know, does that mean yes or no or what?

17        A.    I don't know how to answer that question, because

18    her assignment was the weed and seed area and she didn't

19    come in there every day anyway, "she" meaning Officer

20    Lynch.

21        Q.    Was it your understanding that Officer Lynch's

22    assignment was to come by the Hicks Anderson Center every

23    day as parts of her duties?

24        A.    No, sir.  It wasn't my understanding.

A-151



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

56

1    Q.    What was your understanding as to how frequently

2    she was supposed to stop by the Hicks Anderson Center?

3    A.    There was no understanding as far as I remember.

4    Q.    So then why are you complaining that they never

5    came by the center?  You had no understanding about how

6    frequently they were supposed to come by the center.

7    A.    Because Hicks Anderson was a part of the weed and

8    seed area and -- because Hicks Anderson was part of the

9    weed and seed area.

10    Q.    Was it your hope that the officers would come by

11    every day?

12    A.    It was my hope, yes, that officers from the weed

13    and seed area would come by every day.

14    Q.    They were not coming by every day?

15    A.    No.

16    Q.    How frequently were they coming by?

17    A.    I don't recall.

18    Q.    Was it less than once a week?

19    A.    I don't recall.

20    Q.    You don't recall at all?

21    A.    I don't recall.

22    Q.    Do you recall an interview with Monica Gillespie

23    about Officer Lynch's complaint?

24    A.    Yes.  Vaguely, but yes.

A-152



Michael Brown

57

1      Q.    Who was present in that interview, if you

2   remember?

3      A.    I really don't recall.

4                I'm going to have to go and pick up my

5   granddaughter and come back in about 15 minutes.  I'm not

6   going to leave my granddaughter out in the rain, so I'll

7   come back, if you don't mind.

8                MR. MILI:  How much more do you have to go?

9   If everybody could stay focused and move on.

10                MR. VANCE:  Certainly more than 15 minutes

11   worth.

12                MR. MILI:  Can we continue to Monday or

13   another day?  I don't want to be here all night.

14                MR. VANCE:  Off the record.

15                (Discussion off the record.)

16                MR. VANCE:  The deposition is going to be

17   adjourned right now, because the witness has some

18   personal obligations and needs to take care of them, and

19   we will reconvene the deposition at sometime during the

20   week of October 29th.  That's it.

21                (The deposition adjourned at 3:40 p.m.)

22

23

24

A-153

```
 1                    I N D E X

 2   DEPONENT:  MICHAEL BROWN                        PAGE

 3       Examination by Mr. Vance                       2

 4                  E X H I B I T S

 5   BROWN'S DEPOSITION EXHIBITS                      MARKED

 6       1                                            33
         2                                            53
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                             A-154
```

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1

2

3              REPLACE THIS PAGE

4              WITH THE ERRATA SHEET

5              AFTER IT HAS BEEN

6              COMPLETED AND SIGNED

7              BY THE DEPONENT.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                      A-155

24

```
 1   State of Delaware)
                     )
 2   New Castle County)

 3

 4                  CERTIFICATE OF REPORTER

 5

 6        I, Vincent J. Bailey, Registered Professional
     Reporter and Notary Public, do hereby certify that there
     came before me on Friday, October 26, 2007, the deponent
 7   herein, MICHAEL BROWN, who was duly sworn by me and
     thereafter examined by counsel for the respective
 8   parties; that the questions asked of said deponent and
     the answers given were taken down by me in Stenotype
 9   notes and thereafter transcribed by use of computer-aided
     transcription and computer printer under my direction.

10

11        I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
     examination of said witness.

12

13        I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
     interested in the event of this suit.

14

15

16

17                  Vincent J. Bailey, RPR
                    Certification No. 171-RPR
18                  (Expires January 31, 2008)

19   DATED:  10-31-07

20

21

22

23                                            A-156

24
```





IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FRAY LYNCH,                          )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )     Civil Action No.
                                     )        06-351 JJF
CITY OF WILMINGTON,                  )
                                     )
          Defendant.                 )

Volume 2

          Continued deposition of MICHAEL BROWN taken
pursuant to notice at the offices of City of Wilmington
Law Department, City/County Building, 800 N. French
Street, 9th Floor, Wilmington, Delaware, beginning at
10:00 a.m. on Tuesday, October 30, 2007, before Anne L.
Adams, Registered Professional Reporter and Notary
Public.


APPEARANCES:


          ROBERT T. VANCE, JR., ESQ.
          LAW OFFICES OF ROBERT T. VANCE, JR.
            100 South Broad Street - Suite 1530
            Philadelphia, Pennsylvania  19110
            for the Plaintiff,

          ALEX J. MILI, JR., ESQ.
          ASSISTANT CITY SOLICITOR
            City of Wilmington Law Department
            800 North French Street
            Wilmington, Delaware  19801
            for the Defendant.

                                        A-157
------------------------------------------------------
            WILCOX & FETZER
  1330 King Street – Wilmington, Delaware 19801
                 (302) 655-0477
                www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



Michael Brown

62

1                         MICHAEL BROWN,

2          the witness herein, having first been

3          duly sworn on oath, was examined and

4          testified as follows:

5                      EXAMINATION

6     BY MR. VANCE:

7       Q.   Good morning, Mr. Brown.  We are continuing the

8     deposition from the 26th.  I think where we left off, at

9     least one of the points that we left off at is that you

10    recall being interviewed by Monica Gillespie Gonzalez in

11    connection with the June, 2004, complaint that Officer

12    Lynch filed against you; is that right?

13      A.   Yes, I recall being interviewed by

14    Miss Gillespie.

15                  MR. VANCE:  Can you mark that as Brown 3?

16                  (Brown Exhibit No. 3, Letter from Monica

17    Gonzalez-Gillespie Dated 7/26/04, was marked for

18    identification.)

19    BY MR. VANCE:                              A-158

20      Q.   Mr. Brown, Brown 3 is a letter dated July 26th,

21    2004, from Monica Gonzalez-Gillespie to you regarding an

22    interview that had been scheduled in her office for

23    July 26, 2004, at 10:30 a.m. that you canceled.  Do you

24    recall receiving this letter?

Michael Brown

63

1      A.    No, I don't recall receiving it.  But I do

2  recall a meeting, having scheduled a meeting.  But I

3  believe I received it.  But I don't recall receiving it.

4  Let me put it that way.

5      Q.    At the bottom of the letter, there is a mention

6  that you had legal counsel.  Do you see that?

7      A.    Yes.

8      Q.    You stated that you had legal counsel.

9      A.    Yes.

10     Q.    When did you obtain an attorney to represent you

11  in connection with the complaint against you made by

12  Officer Lynch?

13     A.    This is not a -- I did not specifically attain

14  the attorney for the specific reason.  But I brought him

15  in, asked him to come with me at the time for this

16  meeting.

17     Q.    To the interview with Miss Gonzalez-Gillespie?

18     A.    That is correct.

19     Q.    Who is that attorney?

20     A.    Victor Battaglia, Sr.

21     Q.    Did he attend the meetings you had with Monica

22  Gonzalez-Gillespie?

23     A.    Yes, he did.                        A-159

24     Q.    Did he participate in the interview or was he

Michael Brown

64

```
1    just an observer?

2        A.    Just an observer.

3              MR. MILI:    Before you continue with this

4    line of questioning, the deponent needs to be reminded

5    that he has an attorney/client privilege with

6    Mr. Battaglia that he is not obligated to waive at this

7    time.

8              THE WITNESS:    Thank you.

9    BY MR. VANCE:

10       Q.    Understanding that you don't have to waive your

11   privilege, can you tell me why you retained

12   Mr. Battaglia or why you asked Mr. Battaglia to

13   accompany you to the interview with Monica

14   Gonzalez-Gillespie?

15             MR. MILI:    I'm going to be object to that

16   question.    You are getting into the heart of whatever he

17   discussed with his attorney.    That's clearly violating

18   attorney/client privilege.

19   BY MR. VANCE:                                    A-160

20       Q.    You can waive it if you want.    It's up to you.

21       A.    The attorney for the City has spoken for me.

22       Q.    Meaning that you are not going to answer that

23   question because you think it intrudes upon the

24   attorney/client privilege; is that right?
```

Michael Brown

65

1    A.    That is correct.

2    Q.    Did you learn about the Weed N' Seed Program

3    other than in your capacity as the executive director of

4    the Hicks Anderson Community Center?

5    A.    Ask that again, please.

6    Q.    Did you learn about the Weed N' Seed Program

7    other than in your capacity as the executive director of

8    the Hicks Anderson Community Center?

9    A.    No, sir.

10    Q.    Now, during your interview with Monica

11    Gonzalez-Gillespie, did you admit to any of the

12    statements that Officer Lynch said that you had made to

13    her related to the June, 2004, complaint?

14    A.    Hook the brother up was the statement that I

15    made that I admit making.

16    Q.    And you denied all of the other statements?

17    A.    That is correct.

18    Q.    Did you tell Miss Gonzalez-Gillespie that you

19    had not asked Officer Lynch to bring back pictures from

20    her vacation to Miami?

21    A.    I don't recall.

22    Q.    You don't recall whether you asked her to bring

23    back pictures or not?

24    A.    I don't recall that conversation.

A-161

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

66

1    Q.   Were you planning a vacation at some point in

2    2004 to travel to Miami?

3    A.   No, sir.

4    Q.   Did you complain to anyone who was a

5    representative of the United States Government related

6    to the Weed N' Seed Program and whether officers were

7    being deployed appropriately?

8    A.   Yes, sir.

9    Q.   Who did you complain to?

10    A.   U.S. Attorney Colm Connolly, a couple of his

11    designees.  I don't remember their names.

12    Q.   You complained to the U.S. Attorney --

13    A.   Personally at a meeting.

14    Q.   Who is the U.S. Attorney?

15    A.   Colm, C-O-L-M, Connolly.

16    Q.   When did you complain to -- is that a man?

17    A.   Yes, it is.

18    Q.   When did you complain to Colm Connolly?

19    A.   I don't remember the exact date and time, sir.

20    Q.   How much earlier than the incident with Officer

21    Lynch did you complain to Mr. Connolly about the Weed N'

22    Seed Program?

23    A.   I don't remember.        A-162

24    Q.   Did you put any of your complaints to

Michael Brown

67

1    Mr. Connolly or any of his designees in writing?

2    A.    No, sir.

3    Q.    These were all verbal complaints?

4    A.    Yes, sir.

5    Q.    Do you know whether they made any kind of

6    written memorial of your complaints about the Weed N'

7    Seed Program?

8    A.    Each time that we discussed this was at our

9    monthly meetings with Weed N' Seed.  So there was

10   someone there taking notes.  I'm quite sure there is

11   notes out there somewhere.

12   Q.    Where were the monthly meetings held?

13   A.    At the U.S. Attorney's office in the conference

14   room.

15   Q.    When did these monthly meetings begin?

16   A.    They had been in existence.  I just, when I took

17   over as executive director, that was part of the

18   meetings that I attended as executive director.  Because

19   Weed N' Seed, the community set right in the middle of

20   Weed N' Seed.  And they furnished some of the funds for

21   programs for the community center.                    A-163

22   Q.    Who attended the Weed N' Seed monthly meetings?

23   A.    Chief of police, captain of vice, I believe

24   D.E.A agent in charge, F.B.I. agent in charge.  So it's

Michael Brown

68

1  a whole list of federal agencies.

2      Q.   How many people -- go ahead.

3      A.   A list of federal agencies.

4      Q.   How many people generally attended the monthly

5  meeting about the Weed N' Seed Program?

6      A.   I really don't know how many.

7      Q.   More than ten?

8      A.   I would say.  There was a lot of people around

9  the table.

10     Q.   And your recollection is that somebody was

11  taking notes about what was being said at the meetings?

12     A.   Either that or it was a recorder.  I'm not sure.

13     Q.   Did you ever see minutes from the monthly Weed

14  N' Seed meetings?

15     A.   No, sir.

16     Q.   Did you ever ask to see minutes from the monthly

17  Weed N' Seed meetings?

18     A.   No, sir.

19     Q.   Do you recall how often you complained about the

20  deployment of officers during these monthly Weed N' Seed

21  meetings?

22     A.   No, sir, I don't recall.              A-164

23     Q.   Was it a constant complaint of yours?

24     A.   I don't recall.



Michael Brown

69

1    Q.    Now, I asked you in the earlier deposition

2    whether you had any understanding as to how frequently

3    the Weed N' Seed officers were supposed to visit the

4    center.  And I think you said you had no understanding;

5    is that right?

6    A.    That is correct.  I think -- that's correct.

7    Q.    So you didn't understand that they were to come

8    around once a day?

9    A.    No, sir.

10   Q.    Had Officer Lynch ever worked extra duty jobs at

11   the Hicks Anderson Center?

12   A.    I don't recall.

13   Q.    What is an extra duty job?

14   A.    Sir, you have to ask Officer Lynch.  I don't

15   know what their terminology for extra duty is.

16   Q.    Well, do you recall telling Monica

17   Gonzalez-Gillespie that Officer Lynch had worked extra

18   duty jobs at the Hicks Anderson Center?

19   A.    I don't recall the full conversation.  It's been

20   since 2004 I believe.  Yes, since 2004.  So I don't

21   recall.

22   Q.    Did you complain to anyone in the police

23   department above Officer Lynch's rank about the

24   deployment of officers in the Weed N' Seed Program?

A-165

Michael Brown

70

1     A.   Yes, I did.

2     Q.   To whom did you complain?

3     A.   Public safety director and the chief there at

4  the monthly meetings.

5     Q.   Outside of that?

6     A.   No, sir, not that I could recall.

7     Q.   Did you ever complain to Inspector Wright about

8  the Weed N' Seed officers?

9     A.   He would be at the meeting, so --

10    Q.   He would be at the monthly meetings?

11    A.   He would be at some of those monthly meetings.

12    Q.   Did you ever complain to Lieutenant Mitchell

13  Rock about the deployment of the Weed N' Seed officers?

14    A.   I don't recall.

15    Q.   Did you ever complain to Sergeant Deborah

16  Donohue about the deployment of the Weed N' Seed

17  officers?

18    A.   I don't recall.

19    Q.   Did you ever complain to Maryln Dietz about the

20  deployment of the Weed N' Seed officers?

21    A.   I don't recall.

22    Q.   Did you ever complain to Nancy Dietz about the

23  deployment of Weed N' Seed officers?

24    A.   I don't recall.



A-166

Michael Brown

71

1    Q.   Did you tell Miss Gonzalez-Gillespie that you

2  had had a meeting with Inspector Wright and Lieutenant

3  Rock and Sergeant Donohue about the deployment of Weed

4  N' Seed officers and that meeting got very heated?

5    A.   I don't recall.  I mean, again, this is 2004.

6  And now it's 2007.  So I really don't recall.  I would

7  have to see it in writing if there was some notes made.

8    Q.   Do you recall asking Sergeant Donohue during

9  that meeting to be excused from the meeting?

10   A.   I don't recall.

11   Q.   Do you recall asking Lieutenant Rock and

12  Inspector Wright whether they had said fuck Mike Brown,

13  don't give him nothing?

14   A.   Again, I don't recall.                    A-167

15   Q.   You don't have any recollection of you having

16  asked that question of Inspector Wright and Lieutenant

17  Rock?

18   A.   Again, since July of 2004, sir, we are in 2007

19  going two months out of the year.  If you have it in

20  writing and I can look at my statements, if there was

21  any notes taken, I would certainly have no problems.

22   Q.   I'm going to let you read a document that was

23  produced by the City.  It's a memo dated August 2, 2004,

24  to the file from Monica Gonzalez-Gillespie and it has

**W&F**

Michael Brown

· 72

1   Bates Numbers 16 and 17.

2       A.    Thank you.   Okay.

3       Q.    Having read the August 2, 2004, memo from

4   Miss Gonzalez-Gillespie, does that refresh your

5   recollection about the substance of the meeting you had

6   with her, Mr. Battaglia, Miss Gonzalez-Gillespie and

7   Mr. Mili?

8       A.    It doesn't really enhance my memory.   But

9   reading it, I remember now having that meeting.   But I'm

10  still not clear of the substance of that meeting.   But

11  I'm reading.   So notes were taken.   So, apparently, I

12  would have had to say those things if notes were taken.

13      Q.    So you don't challenge any of the statements in

14  here?

15      A.    No, I do not.

16      Q.    Miss Gonzalez-Gillespie wrote in this memo that

17  it was a concern of yours that Officer Lynch would get

18  an inside job with weekends off after complaining that

19  you had sexually harassed her.   Do you recall reading

20  that?

21      A.    I recall reading it, yes.

22      Q.    Do you recall saying that?                   A-168

23      A.    I'm not clear on the extension of that

24  conversation.   But if it's, again, if it's written, then

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

73

1   we had the conversation.  But I don't recall it.

2   Q.   You don't recall why that might have been a

3   concern of yours?

4   A.   No.

5   Q.   She also wrote in the memo that you had a police

6   officer that would come forward when the time was right

7   to support your statement.  Did you tell

8   Ms. Gonzalez-Gillespie that?

9   A.   Again, I don't recall it.  But if it's written,

10  we had the conversation.  So I don't challenge the

11  validity of that.

12  Q.   Who was the officer?

13  A.   I'd rather not say.

14  Q.   Now is the time.

                                                A-169
15  A.   I still would rather not say.

16  Q.   What knowledge does this police officer have?

17  A.   I don't remember.  I really don't recall.

18  Q.   But you remember who the officer was but you

19  don't remember what knowledge they have; is that what

20  your testimony is?

21  A.   I would rather not say who the officer was.

22  Q.   Why?

23  A.   Well, because it's my, privy to my right.

24  Q.   I don't know about that.

Michael Brown

74

1      A.    Okay.

2      Q.    But you remember the officer's name today but

3    you don't know what knowledge that officer has about the

4    incident involving Officer Lynch; is that your

5    testimony?

6      A.    I remember who the officer is.  And I'm not

7    going to tell that officer's name.  And the officer did

8    relay something to me once this incident, the alleged

9    allegations came out.  And that's to the extent that I'm

10   going to take this conversation.

11     Q.    And what did the officer relay to you an

12   incident about?

13     A.    I'm not going to share that with you, sir.  In

14   other words, I would rather take the fifth.  As an

15   officer of the court, you can understand that right now.

16     Q.    No, not really.  The fifth amendment applies to

17   criminal proceedings.  Unless you are worried about

18   being prosecuted criminally, that's what the fifth

19   amendment applies to.

20     A.    I'm not going to say the officer's name.

21     Q.    Did this officer have a statement related to

22   Officer Lynch?  Was the statement related to Officer

23   Lynch?

24     A.    I'm not sure what he was going to say.

A-170

Michael Brown

75

1     Q.   You don't know what he was going to say, you

2  remember who is or who she is, but you don't want to say

3  who it is and you don't remember what they were going to

4  say and you don't remember whether it involved Officer

5  Lynch; is that your testimony today?

6     A.   Yes, sir.

7     Q.   You testified earlier, I think, that you worked

8  for the Christina School District?

9     A.   Christina School District.

10     Q.   When you were an employee there, did anyone make

11  any complaint of sexual harassment against you?

12     A.   I was never told if there was.

13     Q.   And did you, at one point, have a cable

14  television program?

15     A.   Yes, I did, sir.

16     Q.   What was the name of the program?

17     A.   Conversation with Mike Brown.

18     Q.   When did the program start?

19     A.   When?

20     Q.   When was your first episode or program?

21     A.   '95.  Yeah, '95.

22     Q.   What channel was the program on?

23     A.   Local cable channel 28.

24     Q.   When did the program come on?       A-171

Michael Brown

76

1    A.   At various times.  2 to 3 on second Sundays and

2   3 to 4 on fourth Sundays.  And every now and then I

3   would have a Sunday night episode based on who had that

4   slot and didn't, couldn't make it and wanted to sell the

5   time.  I bought the time.

6    Q.   Was it a live program?

7    A.   Yes.

8    Q.   And you said that you bought the time.  Did you

9   pay to have your program broadcast?

10    A.   Yes.

11    Q.   How much did you pay for each broadcast?

12    A.   $200 I believe.

13    Q.   How long was your show?

14    A.   It was an hour show on Sunday and a half hour

15   Sunday nights when I got it.

16    Q.   What was the format of your show?

17    A.   What was the format?

18    Q.   Yes.

19    A.   Community conversations, political conversation.

20    Q.   You would have guests and you would have

21   discussions with them?

22    A.   Sometimes guests and sometimes just be me and my

23   cohost.

24    Q.   Cohosts or cohost?

A-172



Michael Brown

77

1      A.    Cohost.

2      Q.    Who was your cohost?

3      A.    Reverend Calvin Brown.

4      Q.    And what church is reverend Calvin Brown

5   associated with?

6      A.    New Life Christian Fellowship.

7      Q.    Is that in Wilmington?

8      A.    Yes, it is.

9      Q.    Did you ever discuss Officer Lynch's complaint

10   on your television program?

11      A.    No, sir.

12      Q.    Did you ever complain about the deployment of

13   Weed N' Seed officers on your program?

14      A.    No, sir.

15      Q.    Why not?

16      A.    Why should I?

17      Q.    Why didn't you?                          A-173

18      A.    Why should I though?  I don't understand that

19   question.

20      Q.    Did you believe that the Weed N' Seed Program

21   was designed to help the community in Wilmington?

22      A.    I was a supporter of the Weed N' Seed Program

23   since it's come into existence.

24      Q.    Didn't you believe there was a problem with the

78

1   deployment of officers in the Weed N' Seed Program?

2      A.   That wasn't a conversation I had on TV.  That

3   was a conversation I had with U.S. Attorney Colm

4   Connolly and the folks that was around the table.

5      Q.   Did you discuss any issues related to the police

6   department your cable TV program?

7      A.   Yes, police department and police officers,

8   chain of command.  Higher up rather, never rank and

9   file.

10     Q.   Did you ever complain about Nancy Dietz on your

11  cable TV show?

12     A.   Yes, I did.

13     Q.   What complaints did you make about her?

14     A.   Had nothing to do with Weed N' Seed.  Had

15  nothing to do with this conversation that we are having

16  right now.  So --

17     Q.   What complaints did you make against her?

18          MR. MILI:  I'm going to object to the

19  question based on relevance.  You are getting far off

20  track here.  You to still have to answer it.

21          THE WITNESS:  She was a captain in the

22  police department.  And just had conversations about not

23  just her but others that was captains also.

24  BY MR. VANCE:



WILCOX & FETZER LTD.
Registered Professional Reporters

A-174

Michael Brown

79

1      Q.    Did you complain that she was transferring

2  police officers because of their race?

3      A.    Again, I would not have said that on television.

4  So I know I didn't say that.  I'm quite sure I didn't

5  say that.

6      Q.    Do you know where Rodney Square is?

7      A.    Of course, yes, sir.

8      Q.    Okay.

9      A.    Yes, sir.

10     Q.    We don't all know Rodney Square.

11     A.    You are from out of town.  I apologize.

12     Q.    Did you ever meet, run into Captain Dietz at

13  Rodney Square and give her a hug and apologize for

14  criticizing her on your TV program?

15     A.    I remember having a conversation with her at a

16  fair that the City had in Rodney Square, that is

17  correct.

18     Q.    Did you apologize to her for criticizing her on

19  your TV program?

20     A.    We had a conversation in regards to things that

21  was said on both sides, her against me, me against her.

22  And I extended my hand and we both apologized to each

23  other and said we will start a new day.

A-175

24     Q.    Was this before you became aware that Officer

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

80

1   Lynch made a sexual harassment complaint against you?

2       A.   I don't recall when I did it.  I just know I did

3   it.

4       Q.   After you were interviewed by Monica

5   Gonzalez-Gillespie, did you make any inquiries about

6   what was going to be the result of the investigation?

7       A.   I'm not sure if I did or not.

8       Q.   Did it matter to you what the result of the

9   investigation was going to be?

10      A.   Knowing me and knowing that those allegations

11  are false and erroneous and a bunch of lies, it bothered

12  me for a moment.  But I don't recall asking what is the

13  next step.  I don't.

14      Q.   But you are aware that Miss Gonzalez-Gillespie's

15  investigation resulted in you being disciplined,

16  correct?

17      A.   That a written -- yes.                    A-176

18      Q.   So she concluded that there was some validity to

19  Officer Lynch's complaint.  Do you recall that?

20      A.   I recall receiving a letter that stated that I

21  should not have used the words "hook the brother up,"

22  that it was offensive.  And that letter she gave me, I

23  don't know if you have a copy of it, but I recall that

24  that's what the letter insinuated, that I should not

81

1    have used that language, hooked a brother up, on City

2    time on and on City property.   That wasn't appropriate

3    to use.

4       Q.    Did you agree with her conclusion?

5       A.    In the beginning I did not and, to some degree,

6    I don't now.   It was just a conversation.   And in the

7    beginning, I didn't see where it would be offensive.

8    And today I still don't see where it could be offensive.

9       Q.    So you disagree with her conclusion?

10      A.    I would say, yes, I do, yeah.

11      Q.    Was there a mechanism for you to appeal the

12   discipline that was given to you?

13      A.    There was.   But I don't recall appealing.

14      Q.    Why didn't you appeal if you disagreed with the

15   conclusion?

16      A.    Because to me it was tedious I believe.   I said

17   that to myself, that it was a tedious situation,

18   tedious, small.   I wanted to get it just behind me and

19   move on.

A-177

20      Q.    You believe that a City investigation finding

21   that you had engaged in some inappropriate conduct and

22   resulting in discipline to you was a small thing?

23      A.    Well, I believe that because of the nature of

24   the complaint, the false, felonious lies that was stated

Michael Brown

82

1   by your client, I tried my best and I still try my best

2   to put it in the back of my mind so I can move on with

3   my life.

4      Q.   But if you believe they are false and felonious

5   and fabricated, why didn't you appeal the finding of

6   Miss Gonzalez-Gillespie to try to clear your name?

7            MR. MILI:   Objection.  Asked and answered

8   several times.

9   BY MR. VANCE:

10     Q.   I didn't hear you.

11     A.   I answered it already.

12     Q.   You don't have anything else to add?

13     A.   No, sir.                              A-178

14     Q.   So you underwent some training prior to the time

15  that you learned what the resolution of the

16  investigation was.  Do you recall that?

17     A.   Please, ask that again, sir.

18     Q.   Well, let me show you this.

19            MR. VANCE:   Can you mark this as Brown 4?

20            (Brown Exhibit No. 4, Policy and Procedure

21  Manual Training, was marked for identification.)

22  BY MR. VANCE:

23     Q.   Brown 4 is a document entitled City of

24  Wilmington Personnel Department Policy and Procedure

Michael Brown

83

```
 1   Manual Training.  And it Bates Numbers 25 and 26.  It's

 2   also dated November 4, 2004.  On the second page, is

 3   that your signature?

 4       A.   That is, sir.

 5       Q.   Do you recall this training?

 6       A.   Yes, sir.

 7       Q.   Was this regular training or something that was

 8   specifically ordered that you participate in?

 9       A.   That was part of my discipline.

10       Q.   You say this training was part of your

11   discipline?

12       A.   This retraining, whatever they call it,

13   retraining for going over the policy and procedures from

14   this specific area in the policy and procedure manual.

15       Q.   You are sure about that?

16       A.   I'm not sure about anything.  But this is, this

17   looks like this was what was part of my --

18       Q.   Go ahead.  Part of what?

19       A.   Part of my training from the policy and

20   procedures manual that you just showed me.

21       Q.   Are you aware of the City's Code of Ethical

22   Conduct?
                                              A-179
23       A.   Yes, sir.

24            MR. VANCE:  Can you mark that as Brown 5?
```

Michael Brown

84

1              (Brown Exhibit No. 5, Code of Ethical

2     Conduct, was marked for identification.)

3     BY MR. VANCE:

4        Q.    Mr. Brown, Brown 5 is a document entitled Policy

5     Statement, Code of Ethical Conduct, Bates Numbers 27 and

6     28.  And on the second page is your signature dated

7     November 4, 2004; is that correct?

8        A.    That is correct, sir.

9        Q.    And this was part of the training that you

10    undertook related to the other document, Brown 4?

11       A.    I believe so, sir.  I believe so.

12       Q.    When were you elected to the city council in

13    Wilmington?

14       A.    Elections were November.  General election was

15    November 4th or 6th or 3rd.  It cycles.  So this year I

16    think it's the 6th.  One year it was the 4th.  One year

17    it was the 3rd.  I'm not sure.  But it was the first

18    week in November.

19       Q.    You don't remember the day you were elected to

20    city council?                                    A-180

21       A.    I don't.  All I know is the first week in

22    November, general election.  Specific date, no.  And

23    then I was sworn in January 3rd, 4th, somewhere there,

24    in '05, to assume office, to take office.



Michael Brown

85

1          MR. VANCE:  Okay.  Can you mark this as

2    Brown 6?

3               (Brown Exhibit No. 6, Memorandum from

4    Michael Brown Dated 11/18/04, was marked for

5    identification.)

6    BY MR. VANCE:

7      Q.   Brown 6 is a letter, is a memorandum dated

8    November 18, 2004, from you to Mr. Sheridan.  Is that

9    your signature?

10     A.   Yes.

11     Q.   It has Bates Number 24.  Do you recall writing

12   this memo?

13     A.   Can I take a moment to read it, please?

14     Q.   Sure.

15     A.   Okay.

16     Q.   Do you recall writing that?

17     A.   Yes.

18     Q.   Who is Mr. Sheridan?

19     A.   He's the city solicitor here, City of

20   Wilmington.

21     Q.   What is his first name?                    A-181

22     A.   I believe it's John Sheridan.

23     Q.   Why did you write this memo to Mr. Sheridan?

24     A.   Why did I write it?

Michael Brown

86

1     Q.   Yes.

2     A.   There had been some, when I first ran for

3 office, the conversation was I couldn't hold both city

4 worker, as an employee with the City and employ, and be

5 an elected official.  Before I could be sworn in as the

6 city councilman at large, I would have to resign my

7 position as the executive director of William Hicks

8 Anderson Community Center.  And I think I was told one

9 too many times that I had to resign.  And I just wanted

10 to let them know that I would in this letter at the

11 appropriate time before the swearing in took place.

12     Q.   Now, did you have a card that gave you access to

13 the police building?

14     A.   Yes, I do.  Had it since 1994.

15     Q.   How did you get it?

16     A.   As an employee with the City of Wilmington Youth

17 Intervention housed at the Wilmington Police Department.

18 It was authorized by then Chief Stan Pratcher.

19     Q.   Did that card give you access to the entire

20 police building?

21     A.   No, sir.          A-182

22     Q.   After you became the Hicks Anderson Center

23 director, why did you need access to the police

24 building?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

87

1    A.    I still had some ties to the police department.

2    And so I kept my card.  And this card, I've had this

3    card under three chiefs, Stan Pratcher, Michael Boykin

4    and Michael Szczerba, the current chief now.

5    Q.    What were the times that you just referred to?

6    A.    As a city employee, as an executive to the City

7    of Wilmington.  I also volunteered with community

8    parents when their youngsters got in trouble.  I still

9    did some youth intervention work along with my title,

10   unofficially youth intervention work along with my title

11   as executive director.

12   Q.    Now, did that card give you access to the work

13   area of Officer Lynch?

14   A.    Yes.  It gave me access to the first, second and

15   top floor.

16   Q.    Did you continue to use the card after you knew

17   that Officer Lynch had made a sexual harassment

18   complaint against you?

19   A.    Yes, I did, sir.                          A-183

20   Q.    Did you continue to use that card to access her

21   work area after you were aware that she had made a

22   sexual harassment complaint against you?

23   A.    When I used that card, it wasn't done purposely

24   knowing that she was in the work area.  It was done

Michael Brown

88

1   purposely because I needed to come in the building or I

2   was in the building.

3       Q.   For the reasons you testified earlier, youth

4   intervention?

5       A.   What I was doing, again, I had a relationship

6   with the police department.  I had access to the entries

7   of the ground floor, the second floor and the top floor.

8   What I did not have entrance to secured areas such as

9   the EDU, Evidence Detection Unit.  I didn't have access

10  to personnel -- I'm sorry, for records department.  I

11  didn't have access to evidence room.  I didn't have

12  access to the chiefs area after 5:00 in the afternoon.

13  And on Saturdays and Sundays I didn't have access.

14      Q.   Did you believe that your access to Officer

15  Lynch's work area after she had made this sexual

16  harassment complaint against you might have made her

17  feel uncomfortable?

18      A.   I couldn't see how that would be, sir.  So, no.

19  No, sir.
                                          A-184
20      Q.   Did anyone ever tell you that your access to

21  Officer Lynch's work area after she made the sexual

22  harassment complaint against you was inappropriate

23  because it put her in an uncomfortable position?

24      A.   No, sir.  I was just told that she had made

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

89

1    another complaint that I walked in looking for a captain

2    and a lieutenant in her work area.  And I did not know

3    that she was there and did not say anything to her once

4    I discovered she was in there with her back turned.  I

5    went right to the door that I was looking for the

6    individuals of.  They were not there and I turned around

7    and I walked right back out leaving not in a fast and

8    hurried way.

9        Q.  Is it your recollection that you only

10   encountered Officer Lynch in her work area on one

11   occasion after she made a sexual harassment complaint

12   against you?

13       A.  No, I believe it was more than one, sir.

14   Sitting out in the hallway talking to a couple officers

15   on a bench and she would come by.  Going over to H&R and

16   she was there, human resources area.  So, no, no, it was

17   more than once that she would pass.  I was getting on

18   the elevator one time.  I remember it.  And others were

19   there.  And she came through.

A-185

20       Q.  Did you, at any time, attempt to limit your

21   access to the police building so that you would not run

22   into Officer Lynch after she made the sexual harassment

23   complaint against you?

24       A.  I wouldn't say attempt to.  But, you know, right

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

90

1    now today, it's very rare that I go down there.  So I

2    wouldn't use the term attempt to.  There were just times

3    I went because I had a need to go and there was times I

4    didn't need to go and I didn't go.

5        Q.    And you don't have any recollection of anyone

6    telling you that your key access to the police building

7    put Officer Lynch in an uncomfortable position?

8        A.    Oh, no one ever told me that.

9        Q.    And you didn't believe that to be the case?

10       A.    I didn't think anything of it, sir.

11       Q.    Do you also have a police radio?

12       A.    Yes, I do, sir.

13       Q.    How long have you had that?

14       A.    Since 1995 as well.

15       Q.    How did you get that?                    A-186

16       A.    As a youth intervention specialist, we were

17   assigned those radios by then Chief Pratcher and again

18   under the three chiefs, Chief Pratcher, Chief Boykin and

19   now sitting Chief Mike Szczerba.  I still have the

20   radio.

21       Q.    Why did you need it after you left the youth

22   intervention position?

23       A.    I was working in an area where -- west, city

24   city area of the town -- where it's deemed one of the

Michael Brown

91

1    hot spots of the City on the City list.  And it was a

2    deterrent and it was a support mechanism that I used in

3    case I needed to call the police right away.  Instead of

4    doing it by phone, I did it by air.  I had training on

5    the radio.

6        Q.    And did you use the radio only for emergency

7    purposes?

8        A.    When I was first given it, that was the reason

9    why I was to have the radio.  And there was occasion

10   where I would call to get up with a sergeant, lieutenant

11   or captain and asked them to switch to another channel.

12   And then after they switched to the other channel, asked

13   them to call me by cellphone.  So not all the time was

14   it an emergency when I used the phone.  But I used the

15   phone to reach and touch, to contact other officers and

16   have them call me by phone.

17       Q.    Do you recall, in the November of 2004 after the

18   general election, attending a meeting of WCNPAC where

19   Officer Lynch and Corporal Groark were also in

20   attendance?

21       A.    Yes, I do, sir.                    A-187

22       Q.    Do you recall how many people were in attendance

23   at that meeting?

24       A.    I don't know.  They usually have a pretty good

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

92

1    following at that community meeting.  So about 15, 20.

2        Q.    Did you know everybody there?

3        A.    No.

4        Q.    Did you know most of the people there?

5        A.    Yeah, I would say so.

6        Q.    Were you invited to the meeting?

7        A.    No.

8        Q.    How did you find out about the meeting?

9        A.    It was right across the street from William

10   Hicks Anderson Community Center, which I was executive

11   director at the time.  And the meeting started at 6:00.

12   And I was off work.  And I wanted to know what was going

13   on since I didn't know it was a meeting.  So I stuck my

14   head in the door.

15       Q.    Did you frequently attend WCNPAC community

16   meetings?

17       A.    No.  Only if I was told to do so, one, by the

18   director himself, Romain Alexander, or if there was a

19   particular subject on the agenda that the WCNPAC folks

20   wanted to discuss pertaining to Hicks Anderson and/or

21   the Helen Chambers Park.

22       Q.    Who is Jerry Ortega?  Do you know that person?

23       A.    I believe he's the president of WCNPAC.

24       Q.    Do you know who Adrian Bay is?

Michael Brown

93

1    A.    Dr. Adrian Bay now.  She was the coordinator for

2    the Weed N' Seed under the Ministry of Caring.  She

3    was -- Ministry of Caring oversaw the grant.  And she

4    was hired to be the coordinator.

5    Q.    Do you know who Shinekqua Baines is?

6    A.    Shinekqua Baines was the assistant to the

7    executive director of WCNPAC.

8    Q.    And can you describe for me the setup of the

9    meeting?  Were people seated around a conference table

10   or were there rows of chairs or was it an auditorium?

11   A.    I believe they had a table.  I believe they had

12   a table.  But in some of them meetings, because they

13   hold meetings there for AA and NA, they usually have the

14   chairs in rows.  But this particular time they had a

15   table I believe.

16   Q.    Did you, when you entered the meeting, take a

17   seat at a table?

18   A.    Yes.  After saying hello to folks by the door

19   that came in.

20   Q.    And what was going on when you sat down at the

21   table?

22   A.    They were having a meeting.

23   Q.    What were they talking about?        A-189

24   A.    I don't recall that particular subject when I

94

1    first down what they were talking about.

2        Q.    Did you notice Officer Lynch in the room?

3        A.    And her partner as well, yes.

4        Q.    And, at that time, you had not heard what the

5    resolution of the complaint was that Officer Lynch had

6    filed against you; is that right?

7        A.    That is correct.

8        Q.    So at some point the Weed N' Seed Program came

9    up as a topic at the meeting; is that right?

10       A.    At that particular meeting, I wouldn't say the

11   Weed N' Seed itself -- yeah, it was.  Weed N' Seed came

12   up in terms of the deployment of the Weed N' Seed

13   officers.  When I sat down, that was the next question

14   that someone had asked.

15              MR. MILI:  I'm going to object to this line

16   of questioning which was already asked on Friday.  If we

17   have to repeat the same questions again, I see no basis

18   for doing so.  Having voiced that objection on the

19   record, you can continue.

20   BY MR. VANCE:                                  A-190

21       Q.    Officer Lynch responded to a question about the

22   deployment of Weed N' Seed officers.  Do you recall

23   that?

24       A.    Yes, along with her partner as well.  They both

Michael Brown

95

 1    answered some questions.

 2        Q.    And did you accept their answer as being true

 3    and correct and accurate?

 4        A.    Me personally?

 5        Q.    You personally.

 6        A.    No, no, sir.  I accepted some of their answer

 7    but I didn't accept all their answer.

 8        Q.    Did you respond to the answer or the statement

 9    of Officer Lynch?

10        A.    Which particular part of the question?  But I

11    did respond to her.

12        Q.    Well, how did you respond to her?

13        A.    There was a question asked about the deployment

14    of the Weed N' Seed officers.  And her and her partner

15    gave the answers, her partner first and her second.  And

16    I said, no, that's not true.  Stop lying.  That's not

17    true.  Tell the truth.

18        Q.    Why did you say that?                    A-191

19        A.    Because that's what I felt, that they were not

20    telling the truth.  Her and her partner were not telling

21    the folks at the table the truth about the question that

22    was asked, whether they were in the area all the time.

23    And when they gave an answer, I said that's not true.

24    They were just pulled out of the area on mischief night.

Michael Brown

96

1    Q.    And how did you know that?

2    A.    Because I was informed by other officers that I

3    wouldn't have any coverage over there at the Hicks

4    Anderson Community Center.  And if I needed them, to

5    call, not the Weed N' Seed officers per se, but police

6    because they were pulled out to go other places in the

7    city.

8    Q.    And did that concern you?

9    A.    Of course it did.

10   Q.    Why?

11   A.    Because, one, you are leaving my community,

12   which the problems that we have had over there, Bear,

13   and, secondly, the grant from the Weed N' Seed stated

14   that officers had to stay within the boundaries of the

15   Weed N' Seed unless there was, one, a call for help by

16   another officer or, B, that they were in chase of a

17   suspect or shots fired.  There was some criteria there

18   for them to leave the area.

A-192

19   Q.    And when you were responding to Officer Lynch,

20   would you say that your tone of voice was calm and your

21   demeanor was calm?

22   A.    No, sir.  I'm always calm.  I'm always calm.  I

23   wouldn't say it.  You say would I say it.  I'm saying,

24   no, sir, I'm always calm.

Michael Brown

97

1   Q.   So if other people thought you were loud and

2   boisterous and speaking to the officers in a demeaning

3   tone, they would be wrong; is that your --

4   A.   I think they would, sir, because I always speak

5   loud.  I'm known to have a heavy voice.  And you can

6   tell I'm coming just by me talking.  You can stand

7   around the corner and know that I'm coming.

8   Q.   You are aware that Officer Lynch filed another

9   complaint against you as a result of this incident?

10   A.   I was told that, yes, sir.

11   Q.   How did you find that out?

12   A.   Personnel department.

13   Q.   Miss Gonzalez-Gillespie?

14   A.   Yes.

15   Q.   And were you interviewed by her about this

16   particular incident?

17   A.   Yes.

18   Q.   Do you recall when you were interviewed by

19   Miss Gonzalez-Gillespie?

A-193

20   A.   I truly don't.  I honestly don't.

21   Q.   Did you directly address Officer Lynch and call

22   her Officer Fray?

23   A.   I don't recall calling her Officer Fray.

24   Q.   Were you gesticulating, pointing your finger at

98

1    her when you were talking?

2       A.   No, sir.   That's communicating a threat to me,

3    sir.   I don't want anybody doing that to me.

4       Q.   So if you had been pointing at Officer Lynch,

5    you believe that would have been interpreted as a

6    threat, properly so?

7       A.   I would think that when you're talking to

8    somebody that you -- I'm talking and I'm using my hands,

9    but I'm not pointing at you.   So but if I was pointing

10   at you now, talking to you, I think I would be

11   disrespectful and could be construed as a hostile

12   situation.

13               MR. VANCE:   Can you mark this as Brown 7?

14               (Brown Exhibit No. 7, Complaint, was marked

15   for identification.)

16   BY MR. VANCE:

17      Q.   Mr. Brown, I handed you a document dated, a

18   memorandum dated November 29, 2004, by Monica

19   Gonzalez-Gillespie.   It has Bates Number 65 through 67.

20   Have you ever seen this document before?

21      A.   I don't recall, sir.   May I take a moment to

22   read it?

23      Q.   Sure.

24      A.   Okay.                                    A-194



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

99

1    Q.    Have you had an opportunity to read this

2    document?

3    A.    Yes, I have, sir.

4    Q.    I want to just direct your attention to

5    Paragraph 4.  It says that Mr. Brown was trained on the

6    City's Sexual Harassment Policy and Procedure on

7    August 29, 2001.  Do you recall that training?

8    A.    I recall training.  I don't recall the exact

9    date.

10    Q.    Okay.  And you read the conclusion section of

11    this document?

12    A.    I did, sir.

13    Q.    And the first sentence says that the evidence

14    suggests that you accused Officer Lynch of lying in a

15    public forum of members of the community and other city

16    officials and that, during the exchange, you used a tone

17    and demeanor that were intimidating and belittling of

18    Officer Lynch as he repeatedly accused Officer Lynch of

19    not being truthful.  Do you agree with that conclusion?

20    A.    That I accused her of lying?  I admit I said to

21    her that she was lying, to stop lying.

22    Q.    Okay.  Do you agree with the fact that you used

23    a tone and demeanor that were intimidating and

24    belittling?

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

100

1    A.    No, sir.

2    Q.    In the third paragraph, Miss Gonzalez-Gillespie

3  writes that this incident is compounded by the fact that

4  Mr. Brown was found to have exhibited inappropriate

5  behavior towards this officer in a previous complaint.

6  Therefore, Mr. Brown's behavior, during that public

7  meeting, could be viewed as retaliatory.  Retaliation is

8  prohibited in a violation of Personnel Policy Number

9  101.1.  Do you see that?

10    A.    Yes.

11    Q.    Do you agree with that finding?

12    A.    No, sir.

13    Q.    Why not?                          A-196

14    A.    Again, if I agree to that, then I agree that my

15  tone and my demeanor was derogatory towards Officer

16  Lynch.  And I didn't agree to that.  And I don't agree

17  to that.

18    Q.    The next paragraph says since Mr. Brown, WHAAC

19  executive director at the time of the incident, worked

20  with Officer Lynch, this behavior could also be termed

21  harassment per Policy 101.1(3).  Harassment in this

22  policy is also defined as verbal or physical conduct

23  that disrupts or interferes with another's work

24  performance or creating an intimidating, offensive or

101

1    hostile work environment.  Do you agree with that

2    conclusion?

3        A.    No, sir.

4        Q.    Why not?

5        A.    Because it says the behavior could.  It didn't

6    say it was.  Also could be termed harassment, and I did

7    not harass your client.

8        Q.    The next paragraph says this is the third

9    documented incident in which female employees found

10   comments made by Mr. Brown offensive.  Two of those

11   incidents involve Officer Lynch.  What was the third

12   one?

13       A.    I think you discussed that on Friday about a

14   young lady by the name of Cherry.  I don't know her

15   first name.

16            MR. VANCE:  Okay.  Can you mark this as

17   Brown 8?

18            (Brown Exhibit No. 8, Memorandum from Monica

19   Gonzalez-Guillespie Dated 12/7/04, was marked for

20   identification.)

21   BY MR. VANCE:                              A-197

22       Q.    Brown 8 is a memo dated December 7, 2004, from

23   Monica Gonzalez-Gillespie to you regarding the June,

24   2004, harassment complaint.  Do you recall receiving

Michael Brown

102

1    this document?

2       A.   May I read it first?  I don't -- let me see.  I

3    might have.  May I read it though, please?

4       Q.   Sure.

5       A.   Okay, sir.

6       Q.   Do you recall receiving this memo?

7       A.   I think so, sir.

8       Q.   What action did you take, if any, after you

9    received the memo?

10      A.   I was given training through the Department of

11   Personnel.

12      Q.   Do you know who inspector Martin Donohue is?

13      A.   Yes, I do, sir.

14      Q.   Were you ever advised that Captain Nancy Dietz

15   had written a memorandum to Inspector Donohue, Martin

16   Donohue, related in part to your interactions with

17   Officer Lynch?

18      A.   Could you ask that again?

19      Q.   Were you ever advised or made aware of the fact

20   that Captain Nancy Dietz had written a memo to Inspector

21   Martin Donohue that related, in part, to interactions

22   between you and Officer Lynch?

23      A.   I don't recall, sir.              A-198

24      Q.   You don't recall whether you were made aware of

Michael Brown

103

1   that or you were not?

2       A.    I was not.  So I don't recall being aware of

3   that.

4       Q.    Do you know who Captain Ayala is, sir?

5       A.    Yes, I do, sir.

6       Q.    Did you ever go for a ride-along with Captain

7   Ayala?

8       A.    I have, sir, along with other officers as well.

9       Q.    Did you have a conversation with Captain Ayala

10  relating to the Officer Lynch incident and Captain

11  Maryln Dietz and Lieutenant Mitchell Rock in which you

12  told Captain Ayala that you thought Captain Dietz and

13  Lieutenant Rock should be fired?

14      A.    No, sir, I don't recall saying that to Captain

15  Ayala.

16      Q.    You never told him that you thought Maryln Dietz

17  and Mitch Rock should be fired?

18      A.    I don't recall making that statement to Captain

19  Ayala, sir.

20      Q.    Were you made aware of the fact that Captain

21  Maryln Dietz had complained to Chief Szczerba that the

22  City Personnel Department was not acting fast enough on

23  Officer Lynch's sexual harassment complaint against you

24  that had been made in June of 2004?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

104

1      A.    No, sir.

2      Q.    Do you recall telling anyone that you thought

3   Captain Maryln Dietz should have squashed the complaint

4   that Officer Lynch had against you, the sexual

5   harassment complaint?

6      A.    No, sir.

7      Q.    You never told them it should have been squashed

8   or it never should have gotten out of the police

9   department?

10     A.    No, sir.

11     Q.    Did you ever tell Lieutenant Rock that you

12  believed that Maryln Dietz and Lieutenant Rock had sent

13  Officer Lynch to the meeting in November of 2004 to set

14  you up?

15     A.    At the WCNPAC meeting?

16     Q.    Yes.

17     A.    I didn't say the WCNPAC meeting, sir.  But I did

18  have, I do remember having a conversation with

19  Lieutenant Rock when he approached me out on Market

20  Street someplace.  And he was doing something that I had

21  asked him to do for business.  And we had conversation.

22  But it wasn't about her at, Officer Lynch setting me up

23  at the WCNPAC meeting.

                                        A-200

24     Q.    Where did you tell him that you thought Officer

Michael Brown

105

1   Lynch had been sent to set you up?

2       A.   I think the conversation started off by with

3   Lieutenant Rock saying that he had nothing to do with

4   Officer Lynch's complaint and that he wished that it had

5   never gotten to that point.  And I told him don't worry

6   about it because I didn't do anything.  And, at one

7   point, I did say to him I thought you and Maryln had

8   something to do with her coming after me.

9       Q.   Why did you say that?

10      A.   Well, I'm very vocal, very, very vocal.  I talk.

11  You know, I don't mind saying what I have to say.  And,

12  at some point, without divulging that officer earlier

13  that we were talking about, I felt that the only way to

14  shut me up was to embarrass me or come after me in some

15  kind of way.  And I felt certain police officers were

16  coming at me in some kind of way.

A-201

17      Q.   Why did you think that Maryln Dietz and

18  Lieutenant Rock were coming after you?

19      A.   Lieutenant Rock brought that conversation up,

20  that he and Captain Maryln had nothing to do with it.

21      Q.   So why did you think that they were setting you

22  up?  Why did you think they were coming after you?

23      A.   Because of, in the past, I thought that they

24  were -- excuse my language -- I thought they were

106

1    knuckle heads.  Not knuckle heads.  I thought they were

2    being big heads with their positions in patrol.  And

3    there was a lot of complaints coming out of control

4    about their leadership.  And it was coming to me.  And I

5    was addressing that.

6        Q.    And this anonymous officer is the one who

7    provided you some information in this regard?

8        A.    I think that he could have or she could have put

9    some light on my feelings the way I felt.

10       Q.    When do you plan on disclosing the name of this

11   officer?

12       A.    I'm not.

13       Q.    Ever?

14       A.    I will probably use it later on down the line.

15       Q.    Down what line?

16       A.    Well, I've got to clear my name.  And I think my

17   name has been smeared in this whole thing, that I have

18   been falsely accused, as I said to you on Friday, by

19   your client.  And there has been statements made by

20   other officers, captains and sergeants that is certainly

21   not true.  And so somewhere down the line, if I decide

22   to pursue this, then that might have to come out.  That

23   officer, he or she, may have to come out and reveal

24   themselves.



Michael Brown

107

1    Q.    You mean down the line like in the trial of this

2    lawsuit?

3    A.    Probably.

4    Q.    Let me tell you something.  You better disclose

5    that name now or you are never going to be able to use

6    that person.

7    A.    Then I probably won't use it at the trial.

8    Q.    Have you informed your attorney of the identity

9    of this person?

10    A.    No, sir.

11         MR. MILI:  I think you know better than to

12    ask someone what he's informed the City attorney about.

13    That was way out of line.

14         MR. VANCE:  I disagree with you.

15         MR. MILI:  You disagree that you can ask an

16    employee of the City whether he has informed an attorney

17    employed by the City to represent the City and its

18    agents about any conversations that he may or may not

19    have had?  That's a serious breach --

20         MR. VANCE:  No.  You are absolutely

21    ridiculous.  If he's intending on using a person as a

22    defense in this case that you are not disclosing and you

23    know who that person is, then that's a problem that you

24    are going to have.  So it's certainly appropriate to ask

Michael Brown

108

1    whether you are aware of the identity of that person.

2            MR. MILI:  You never, ever ask someone what

3    they discussed with the attorney.  You know better than

4    that.

5            MR. VANCE:  Well, all right.  That's your

6    view of the attorney/client privilege, which is

7    certainly incorrect.

8            MR. MILI:  It's correct.

9            MR. VANCE:  If you think it's correct.

10           MR. MILI:  I know it's correct.

11           MR. VANCE:  You do what you think you have

12   to do.  But let me tell you, if you know the identity of

13   the person he's talking about and you do not disclose

14   it, you know you can't use this person at trial.  And

15   he's already alluded to the fact that down the line,

16   i.e., at this trial, he intends to do that.  So it's

17   perfectly appropriate to inquire as to whether you know

18   the identity of the person.  Because if you do and you

19   are not disclosing it, you certainly can't use him or

20   her at trial.

21           MR. MILI:  Move on and ask your next

22   question.                                        A-204

23           MR. VANCE:  There is nothing inappropriate

24   about that.  You go back and speak to your solicitor

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

109

1    about that.

2            MR. MILI:   Move on and ask your next

3    question.

4            MR. VANCE:   And you have him educate you

5    about that as to the federal rules.

6    BY MR. VANCE:

7        Q.   Do you know who Jim Mosley is?

8        A.   James Mosley.

9        Q.   James Mosley.

10       A.   He's the public safety director currently.

11       Q.   Did you have any discussions with James Mosley

12   about Officer Lynch's complaint, sexual harassment

13   complaint against you?

14       A.   I don't recall.

15       Q.   Again, you don't recall or you did not?

16       A.   I don't recall.

17       Q.   So you may have?

18       A.   I don't recall.

19       Q.   Okay.   Do you recall telling Public Safety

20   Director Mosley that you were going to get Nancy Dietz?

21       A.   I don't recall that as well.

22       Q.   Were you ever contacted by anyone who wanted to

23   register a complaint against Lieutenant Rock?

24       A.   That has anything to do with this?

Michael Brown

110

1                    MR. MILI:  I make an objection based on

2  relevance.  You still have to answer but the objection

3  stands on the record.

4                  THE WITNESS:  Yes, I was contacted by the

5  family of an individual.

6  BY MR. VANCE:

7     Q.   When was that?

8     A.   I don't recall exactly when, sir.

9     Q.   Was it after you received notice of the results

10  of the City investigation of Officer Lynch's complaints,

11  sexual harassment complaint against you?

12     A.   Honestly, I don't recall.

13     Q.   Was it when you were a councilperson or when you

14  were the executive director of the Hicks Anderson

15  Center?

16     A.   I honestly don't recall.

17     Q.   Okay.  I'm just trying to pin it down.  Now, I

18  think I asked you before whether you know Inspector

19  James Wright.  And you do know Inspector Wright,

20  correct?

21     A.   That is correct, sir.  Retired.     A-206

22     Q.   Did you tell Monica Gonzalez-Gillespie in

23  connection with her investigation of Officer Lynch's

24  complaints that Officer Lynch had made a comment to you

Michael Brown

111

1  that whitey was trying to get her and you?

2     A.   I read that in one of your exhibits.  So if it's

3  in there, I would have had to have a meeting and say it.

4  So --

5     Q.   But you don't have any independent recollection

6  of it other than what's stated in the document?

7     A.   No, sir.  That's correct.

8             MR. VANCE:  This would be Brown 9.

9             (Brown Exhibit No. 9, Memo from Romain

10  Alexander Dated 12/13/04, was marked for

11  identification.)

12  BY MR. VANCE:

13     Q.   Mr. Brown, Brown 9 is a memo dated December 13,

14  2004, from Romain Alexander to you entitled written

15  disciplinary warning.  And it has Bates Numbers 48

16  through 49.  Do you recall receiving this document?

17     A.   Yes, I do, sir.  May I take a moment to read it?

18     Q.   Certainly.  Do you recall receiving this?

19     A.   Yes, I did, sir.               A-207

20     Q.   And did you complain to Mr. Alexander about this

21  written disciplinary warning?

22     A.   I don't recall if I complained to him or not.  I

23  don't recall.  But I received this.  So I don't recall

24  complaining to him about it or not.

Michael Brown

112

1          MR. VANCE:  All right.  Can you mark that

2    Brown 10?

3          (Brown Exhibit No. 10, Letter from Monica

4    Gonzalez-Gillespie Dated 12/21/04, was marked for

5    identification.)

6    BY MR. VANCE:

7    Q.    Brown 10 is a letter dated December 21, 2004,

8    from Monica Gonzalez-Gillespie to you.  It has Bates

9    Number 53.  Do you recall receiving this letter?

10   A.    Yes.

11   Q.    Is this the first notice that you received that

12   Officer Lynch had made a complaint against you related

13   to the WCNPAC meeting?

14   A.    I don't recall.  But I recall receiving this.

15   So I don't recall if this is the first notification or

16   not.

17          MR. VANCE:  Can you mark that Brown 11?

18          (Brown Exhibit No. 11, Letter from Romain

19   Alexander Dated 12/23/04, was marked for

20   identification.)

21   BY MR. VANCE:                                A-208

22   Q.    Brown 11 is a letter dated December 23, 2004,

23   from Victor Battaglia to Romain Alexander regarding you.

24   It has Bates Number 50 on it and carbon copy.  There is

Michael Brown

113

1    a carbon copy addressed to you.  Do you recall receiving

2    a copy of this letter?

3        A.    Yes, I do.

4        Q.    And is it still your position that you were

5    libeled by the quoted portion of the memo from

6    Mr. Alexander to you that your attorney describes in

7    this letter?

8        A.    Please repeat.

9        Q.    Is it still your position today that you were

10   libeled by Romain Alexander when he wrote in the memo

11   that was marked, I think, Brown 9, quote, that you used

12   sexually suggestive language, et cetera, et cetera?

13       A.    After discussing this with Mr. Battaglia, it was

14   suggested through this letter that that type of language

15   be taken out of the letter that Mr. Alexander gave me.

16   So on behalf of Mr. Battaglia, he was representing me to

17   ask that this, that I not be held liable for that word.

18       Q.    Do you know what libel is, L-I-B-E-L?

19       A.    What do you mean?  I'm being held liable for a

20   comment per the personnel director and the director of

21   parks and recreation for the alleged allegations.

22       Q.    Do you know what defamation is?

23       A.    No.  Would you explain that to me?

A-209

24       Q.    Do you understand the sentence that Mr. Brown

Michael Brown

114

1    complains that you have libeled him by writing that

2    investigation determined what he stated?  Do you know

3    what your attorney meant when he said in this letter

4    that Mr. Brown complains that you have libeled him?

5        A.    No.  Would you explain that part for me?

6        Q.    No.  I'm asking:  Did you understand it?

7        A.    My attorney, I have strong confidence in him, so

8    I accepted this letter to be sent to personnel.

9        Q.    Mr. Brown, do you recall an interview with

10   someone from the personnel department in January, 2005,

11   related to the WCNPAC incident?

12       A.    Who is the someone?

13       Q.    I don't know.  It's unsigned.  But do you

14   recall?

15       A.    No.

16       Q.    Let me show you a document produced by your

17   attorney -- it has Bates Number 59 -- entitled complaint

18   against Michael Brown, III, dated January 5, 2005.

19              MR. MILI:  When you say your attorney, to

20   whom are you referring?

21              MR. VANCE:  You.                    A-210

22              MR. MILI:  I'm actually the attorney for the

23   City.

24              MR. VANCE:  You are a City employee at this

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Michael Brown

115

1   time, so your attorney.

2          THE WITNESS:  I'm reading this.  But I don't

3   know who wrote it.  So --

4   BY MR. VANCE:

5     Q.   Nor do I.  But my question is:  Having read this

6   document, does it refresh your recollection about an

7   interview that you had with someone in the personnel

8   department related to Officer Lynch's complaint against

9   you arising out of the WCNPAC meeting in November, 2004?

10    A.   No.

11    Q.   You have no recollection of saying the things

12  that whoever wrote this document says that you said by

13  putting them in quotes?

14    A.   No, sir, I don't have any recollection.

15          MR. VANCE:  This would be Brown 12.

16          (Brown Exhibit No. 12, Memo From Monica

17  Gonzalez-Gillespie Dated 3/9/05, was marked for

18  identification.)

19  BY MR. VANCE:                                    A-211

20    Q.   Brown 12 is a memo dated March 9, 2005, from

21  Monica Gonzalez-Gillespie to you regarding the hostile

22  work environment complaint filed by Fray Lynch.  It has

23  Bates Numbers 70 and 71.  Would you take a moment and

24  look at this document?



Michael Brown

116

1    A.    Thank you.  Okay, sir.

2    Q.    Do you recall receiving this document?

3    A.    I believe so, sir, yes.

4    Q.    Do you disagree with the findings of Miss Monica

5    Gonzalez-Gillespie as stated in this document?

6    A.    Yes, I do, sir.

7    Q.    Did you have any avenue of appeal of those

8    findings?

9    A.    No, sir.

10   Q.    No?  Why not?

11   A.    As you stated earlier -- as I stated earlier, I

12   didn't want to appeal it, didn't need to appeal it.

13   Q.    No, my question was:  Was there an avenue of

14   appeal available to you with respect to this finding of

15   this investigation?

16   A.    I believe I could have asked for a second

17   opinion or another appeal.

18   Q.    And you did not?

                                          A-212
19   A.    That is correct.

20   Q.    Why did you not appeal this, the finding on this

21   particular complaint?

22   A.    Just like I didn't appeal the first finding,

23   sir, they were lies.  Your client made allegations that

24   were false and I wanted to just go ahead and move on.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

117

1    Q.    Let me show you this document.  It's marked 59

2    or Bates stamped 59 again.  Do you have any reason to

3    doubt the accuracy of the quotes that are attributed to

4    you in this document?

5    A.    Again, without knowing who wrote this document,

6    I cannot respond to this document.

7                    MR. VANCE:  Can you mark this as Brown 13?

8                    (Brown Exhibit No. 13, Letter From Victor

9    Battaglia Dated 3/11/05, was marked for identification.)

10   BY MR. VANCE:

11   Q.    Mr. Brown, Brown 13 is a letter dated March 11,

12   2005, from Victor F. Battaglia to Monica

13   Gonzalez-Gillespie.  It has Bates Numbers 78 and 79.

14   And you are listed as having received a carbon copy of

15   the letter.  Would you take a minute and read through

16   it?

17   A.    Thank you.  Okay, sir.

18   Q.    Have you had a chance to read through it?

19   A.    Yes, sir.

20   Q.    Do you recall receiving a copy of the letter?

21   A.    I believe so, sir.

22   Q.    Okay.  On the last page or the second page of

23   the letter, Mr. Battaglia demanded that

A-213

24   Miss Gonzalez-Gillespie withdraw the letter and

Michael Brown

118

1    apologize to you for what he characterized as an

2    accusation.  And he also wrote that he expected a reply

3    by March 16, 2005.  Do you see that?

4       A.   I do, sir.

5       Q.   Do you have any information as to whether or not

6    a reply to the request was received?

7       A.   No, sir, I have no information.

8       Q.   And as far as you know, the March 9, 2005,

9    letter was not withdrawn; is that right?

10      A.   As far as I know, sir.

11      Q.   And Mr. Gonzalez-Gillespie did not apologize to

12   you?

13      A.   No, sir.                          A-214

14              MR. VANCE:  This would be 14.

15              (Brown Exhibit No. 14, Memo From Theodore

16   Blunt Dated 3/16/05, was marked for identification.)

17   BY MR. VANCE:

18      Q.   Brown 14 is a memo dated March 16, 2005, from

19   Theodore Blunt to John Sheridan regarding resolution of

20   harassment complaint against Michael A. Brown, Sr.  And

21   you are listed as having received a copy of and it has

22   Bates Number 81.  Can you read through this?

23      A.   Yes.  You are saying take your time and read?

24      Q.   Yes.



Michael Brown

119

1        A.    I have read, sir.

2        Q.    Do you disagree with any of the statements made

3    by Theodore Blunt in this memorandum?

4        A.    No, sir.

5        Q.    Were you disciplined in any way by Mr. Blunt in

6    connection with the complaint that Officer Lynch made

7    against you arising out of the WCNPAC meeting?

8        A.    As stated in the letter, sir, he has no power to

9    do that, sir.

10       Q.    So, no, then, you were not?

11       A.    As is stated in the letter, no.  Yes, sir.

12             MR. VANCE:  Let me meet with Officer Lynch

13    and we may be finished.

14             (Discussion off the record.)

15    BY MR. VANCE:

16       Q.    Okay.  Mr. Brown, a couple more questions.  In

17    the fall of 2004, did you ever seek the removal of

18    Captain Maryln Dietz as commander of the patrol

19    division?                                          A-215

20       A.    Could you tell me what this has to do with this?

21       Q.    Could you answer the question?

22             MR. MILI:  Objection.  Relevance.  You could

23    answer.

24             THE WITNESS:  I personally, no.  Removal of

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

120

1    Maryln Dietz, no.

2    Q.    You never suggested that he should be removed as

3    commander of the patrol division in the fall of 2004?

4    A.    No.  Council, council body, we suggested it.  I

5    was one of 13 council members.

6    Q.    But you were not a member of city council in the

7    fall of 2004.

8    A.    Oh, in 2004.

9    Q.    Yes.

10    A.    I don't recall that, no.

11    Q.    But from your answer, I take it after you became

12    a member of council, council requested his removal?

13    A.    There was some issues, yes, or concerns.

14    Q.    Were you a member of the Public Safety Committee

15    of council?

16    A.    I am still a member of Public Safety, yes.

17    Q.    Did you, in the fall of 2004, seek the removal

18    of Lieutenant Mitchell Rock?

19    A.    In 2004?  No.

20    Q.    Did you ever attempt to get Maryln Dietz

21    transferred from patrol division?

22    A.    In what year?

23    Q.    At any time while you were the executive

24    director of the Hicks Anderson Center.

Michael Brown

121

1    A.    No.

2    Q.    How about since you have been on city council?

3    A.    There has been some issues and concerns that

4    council had to address.  So, yes, I was one of 13.

5    Q.    And your testimony is that all members of

6    council requested that Captain Maryln Dietz be removed

7    from the patrol division?

8    A.    I won't say all.  No, I won't say all.

9    Q.    You were one of 13 --

10   A.    I was one of 13 council members that had to

11   address some concerns.

12   Q.    In addressing those concerns, did you request

13   that Captain Maryln Dietz be removed from the patrol

14   division?

15   A.    There was a suggestion and through Public

16   Safety, which is public record, that there was concerns

17   about the leadership of Captain Maryln Dietz and it was

18   brought to our attention so we addressed it.

19   Q.    The Public Safety Committee of city council?

20   A.    Yes.

21   Q.    And you said that's part of the meetings or

22   proceedings of the Public Safety Committee?

23   A.    Oh, yeah, it's open documents.  Yes.

A-217

24   Q.    Were certain anonymous letters delivered to you

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael Brown

122

1    that attacked Maryln Dietz and Lieutenant Rock as being

2    racist?

3        A.    Again, what --

4        Q.    Just answer the question.

5        A.    But I want to say that it has no bearing on

6    this.

7                MR. VANCE:    That's fine.

8                MR. MILI:    I have a standing objection for

9    relevance to this entire line of questioning.    You still

10   have to answer.

11               THE WITNESS:    I will answer it.    There were

12   complaints and letters written to council members in

13   regards to some concerns that dealt with the patrol

14   division in which Captain Dietz, Maryln at that point,

15   and Lieutenant Rock was leaders of.

16   BY MR. VANCE:

17       Q.    Were those letters turned over to the police

18   department?

19       A.    Yes, copies of them were.

20       Q.    And I think earlier I asked you about an

21   individual who had made a complaint against Lieutenant

22   Rock that you were aware of.    Do you recall that?

23       A.    I recall you just asked me that question

24   earlier, yes.



WILCOX & FETZER LTD.
Registered Professional Reporters

A-218

1    Q.    Did the City Council Public Safety Committee

2    suggest that Captain Gilbert Howell investigate the

3    complaint of this person?

4    A.    I don't know who the public safety chairperson

5    suggested.  It would have come from her.

6    Q.    Stephanie Holden?

7    A.    Stephanie Bolden.

8          MR. VANCE:  I'm sorry.  All right.  I don't

9    have any other questions.

10          MR. MILI:  That's it for me.  He's going to

11    read and sign and we would like to have an expedited

12    transcript as quickly as possible.

13    (Thereupon, the deposition concluded at 12:00 p.m.)

14          - - - - -
                   INDEX TO TESTIMONY

15    MICHAEL BROWN                                    PAGE
          Examination by Mr. Vance                    62
16          - - - - -
                   INDEX TO EXHIBITS
17    BROWN DEPOSITION EXHIBIT NO.                     PAGE

18    Brown Exhibit No. 3, Letter from Monica          62
          Gonzalez-Gillespie Dated 7/26/04
19    Brown Exhibit No. 4, Policy and Procedure        82
          Manual Training
20    Brown Exhibit No. 5, Code of Ethical Conduct     84
          Brown Exhibit No. 6, Memorandum from Michael 85
21    Brown Dated 11/18/04
          Brown Exhibit No. 7, Complaint              98
22    Brown Exhibit No. 8, Memorandum from Monica     101
          Gonzalez-Guillespie Dated 12/7/04
23    Brown Exhibit No. 9, Memo from Romain           111
          Alexander Dated 12/13/04
24    Brown Exhibit No. 10, Letter from Monica        112
          Gonzalez-Gillespie Dated 12/21/04
          Gonzalez-Gillespie Dated 1

1   Brown Exhibit No. 11, Letter from Romain        112
    Alexander Dated 12/23/04
2   Brown Exhibit No. 12, Memo From Monica          115
    Gonzalez-Gillespie Dated 3/9/05
3   Brown Exhibit No. 13, Letter From Victor        117
    Battaglia Dated 3/11/05
4   Brown Exhibit No. 14, Memo From Theodore        118
    Blunt Dated 3/16/05
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8          REPLACE THIS PAGE

9

10         WITH THE ERRATA SHEET

11

12         AFTER IT HAS BEEN

13

14         COMPLETED AND SIGNED

15

16         BY THE DEPONENT.

17

18

19

20

21

22

23

24                                              A-221

State of Delaware )
                 )
New Castle County )

### CERTIFICATE OF REPORTER

    I, Anne L. Adams, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 30th day of October, 2007, the deponent herein, MICHAEL BROWN, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed into typewriting under my direction.

    I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

    I further certify that I am not counsel,

attorney, or relative of either party, or otherwise

interested in the event of this suit.

                Anne L. Adams

                Certification No. 105-RPR

                (Expires January 31, 2008)

DATED:   November 2, 2007

A-222




1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

-    -    -

FRAY LYNCH,                          )
                                     )
            Plaintiff,               )
                                     )  Civil Action
v.                                   )  No. 06-351 JJF
                                     )
CITY OF WILMINGTON,                  )
                                     )
            Defendant.               )

            Deposition of MONICA GONZALEZ-GILLESPIE,
taken pursuant to notice at the City of Wilmington Law
Department, Louis L. Redding City/County Building, 800
North French Street, 9th Floor, Wilmington, Delaware,
beginning at 2:40 p.m., on Thursday, October 18, 2007,
before Terry Barbano Burke, RMR-CRR and Notary Public.

APPEARANCES:

        ROBERT T. VANCE, JR., ESQUIRE
        Law Offices of Robert T. Vance, Jr.
          100 South Broad Street, Suite 1530
          Wilmington, Delaware  19801
          For the Plaintiff

        ALEX J. MILI, JR., ESQUIRE
        Senior Assistant City Solicitor
          City of Wilmington Law Department
          Louis L. Redding City/County Building
          800 North French Street, Ninth Floor
          Wilmington, Delaware  19801
          For the Defendant

ALSO PRESENT:
        FRAY LYNCH

            WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477

            www.wilfet.com

                                          A-223

Lynch v. City of Wilmington

**2**

1          MONICA GONZALEZ-GILLESPIE,
2     the deponent herein, having first been
3     duly sworn on oath, was examined and
4     testified as follows:
5   BY MR. VANCE:
6     Q.   Good afternoon, Miss Gonzalez-Gillespie.
7     A.   You don't have to say that every time.  How
8   about Monica?
9     Q.   How about Miss Gonzalez?
10    A.   That's fine.
11    Q.   I apologize for being late.  Thank you for
12  being on time.
13         I am representing Miss Lynch in her
14  lawsuit against the City of Wilmington, and I will be
15  taking your deposition this afternoon.
16         Have you ever been deposed before?
17    A.   Yes.
18    Q.   So you're familiar with the ground rules, but
19  just to run over a few important ones, just make sure
20  that you give verbal answers to my questions so that
21  the reporter can make a record.
22         If you don't understand a question that
23  I ask, just make sure you tell me that and I will
24  rephrase the question for you, because when I ask you a

**3**

1   question and you answer it, I'm going to presume that
2   you understood the question and that your answer was
3   responsive to the question that I posed.
4          Do you understand that?
5     A.   Yes.
6     Q.   In the last day or two, have you taken any
7   kind of drug or any medication that might interfere
8   with your ability to understand my questions or to
9   answer them?
10    A.   No.
11    Q.   You are employed by the City of Wilmington?
12    A.   Yes.
13    Q.   What's your current position?
14    A.   Director of personnel.
15    Q.   How long have you held that position?
16    A.   Since January of 2001.
17    Q.   How long have you worked for the City of
18  Wilmington?
19    A.   Since May of 2000.
20    Q.   Are you a political appointee?
21    A.   Yes.
22    Q.   First let me just ask you, generally, what are
23  your responsibilities as the director of personnel?
24    A.   I oversee the recruitment, employment, risk

**4**

1   management, benefits, employee and labor relations.
2     Q.   Can you tell me a little bit about your
3   educational background?
4     A.   I have an undergraduate in communications and
5   a master's in business administration.
6     Q.   Do you have a BA in communications?
7     A.   Yes.
8     Q.   Where did you get that?
9     A.   University of Delaware.
10    Q.   And when did you get that?
11    A.   That's kind of personal, isn't it?  '84.
12    Q.   You said you have a master's in business
13  administration?
14    A.   Yes.
15    Q.   When did you get that?
16    A.   I think I finished in 2001.
17    Q.   Where did you get that?
18    A.   Wilmington College.
19    Q.   Are you responsible in any respect for
20  training new city employees?
21    A.   Yes.
22    Q.   What aspect of the training of new city
23  employees are you responsible for?
24    A.   Well, I have an employee relations adviser who

**5**

1   basically reviews policies and -- well, she coordinates
2   it, actually.  There are several people who are
3   involved.  But basically all the employment
4   documentation, reviewing policies.  What else is in
5   there?  I guess that's primarily it.
6     Q.   As part of the training that employees go
7   through, is there training on sexual harassment?
8     A.   Yes.
9     Q.   And the city does have a sexual harassment
10  policy?
11    A.   Yes.  We call it a harassment-free work
12  environment policy.
13    Q.   How frequently are employees required to
14  participate in training on that policy?
15    A.   Upon hire, and then I believe it's every three
16  years.
17    Q.   Does your department maintain records of the
18  employees who participate in the training?
19    A.   Yes.
20    Q.   I want to focus your attention on the year
21  2004.  You were advised of a complaint that Officer
22  Lynch had made against Michael Brown, who at the time
23  was the executive director of a city recreation center;
24  is that correct?

2  (Pages 2 to 5)

A-224

Lynch v. City of Wilmington
Monica Gonzalez-Gillespie

**6**

1    A.   Yes.

2    Q.   How were you advised of the complaint?

3    A.   I believe there was a formal written document

4    that Officer Lynch provided to, I believe it might have

5    been someone in the police department, but it came to

6    the employee relations adviser in my staff, and she

7    forwarded it to me.

8    Q.   Did that chain of events follow the normal

9    course with respect to complaints by city employees

10   against another city employee?

11   A.   Well, normally out of the police ranks, the

12   employee can go directly to our personnel adviser.  In

13   this particular situation, Officer Lynch, I guess, went

14   through the police department first.

15   Q.   And then the complaint was forwarded to you?

16   A.   Yes.  Through our person who takes the

17   complaints, the employee relations adviser.

18   Q.   Typically what do you do when you receive

19   complaints in that manner?

20   A.   Well, it depends on the level of complaint.

21   Our employee relations adviser first screens them.

22   We'll usually talk with the complainant first.  If it's

23   against a manager, she usually will just give it to

24   either myself or the deputy director of personnel for

**7**

1    us to decide whether we want her to handle it or we

2    want to handle it, because it's a member of management.

3    I believe that's what may have happened here.  She gave

4    it to us and I decided that I was going to handle it.

5    Q.   When you say "us," who is the us?

6    A.   Either myself or the deputy director of

7    personnel.

8    Q.   Who is that?

9    A.   His name is Sam Pratcher.

10   Q.   Why did you decide that you were going to

11   handle the complaint that Officer Lynch made against

12   Michael Brown?

13   A.   Well, because he was a manager.

14   Q.   But as between you and Mr. Pratcher, why did

15   you decide you would investigate the complaint as

16   opposed to him investigating the complaint?

17   A.   I don't recall.

18   Q.   Did you know Mr. Brown prior to the time that

19   Officer Lynch had made the complaint against him?

20   A.   Only as an employee of the city.

21   Q.   What do you mean by that?

22   A.   I had seen him at meetings.

23   Q.   What kinds of meetings?

24   A.   I don't know.  I don't recall exactly.  He was

**8**

1    an employee of the city basically, that's how I know

2    him.

3    Q.   You didn't know him personally?

4    A.   No.

5    Q.   Did you know him on a first name basis?

6    A.   No.

7    Q.   Had you received any prior complaints about

8    him?

9    A.   Actually, there was one other complaint.

10   Q.   Who had made that complaint?

11   A.   It was an employee of the parks department.

12   Q.   What was that person's name?

13   A.   I cannot recall her name.

14   Q.   It was a woman?

15   A.   Yes, it was a female.

16   Q.   What was the nature of her complaint?

17   A.   I don't recall.

18   Q.   Did you investigate that complaint?

19   A.   Yes.

20   Q.   When was the complaint investigated?

21   A.   Again, I don't recall.  I didn't go back and

22   look at it recently.  It was early, though.  It was

23   probably a year or two before this incident.

24   Q.   So that would be some time in 2002 or 2003?

**9**

1    A.   That would be a best guess, yes.

2    Q.   Did anyone other than yourself investigate the

3    complaint?

4    A.   I don't recall if there was another member of

5    my staff that was involved.

6    Q.   And was Mr. Brown a member of management at

7    the time the complaint was made?

8    A.   I believe he was the manager.  I believe he

9    still had that same position.

10   Q.   And you don't recall any of the substance of

11   the complaint?

12   A.   No, I really don't.

13   Q.   Or the name of the complaining person?

14   A.   No.

15   Q.   How long did it take you to investigate the

16   complaint?

17   A.   I don't recall.

18   Q.   What did you conclude after investigating the

19   complaint?

20   A.   I don't recall the conclusion.  I'm sorry.

21   Q.   Do you have any records related to this

22   complaint?

23   A.   I probably do, yes.

24   Q.   In your office?

A-225

3 (Pages 6 to 9)

Lynch v. City of Wilmington
Monica Gonzalez-Gillespie

**10**

1    A.   I'm going to assume so, yes.

2    Q.   Would you provide them to Mr. Mili?  Do you
3  have any objection to that?

4         MR. MILI:  I do.  You didn't make a
5  discovery request.  At the status conference, you said
6  you didn't want to do any paper discovery.  You just
7  wanted to do depositions.

8         MR. VANCE:  But now she is making
9  reference to documents and she can't remember the
10  facts, so I think I'm going to need those reports.

11  BY MR. VANCE:

12    Q.   Do you have any objection to giving those
13  documents to Mr. Mili?

14    A.   Not unless my attorney objects.

15         MR. MILI:  I object.

16         MR. VANCE:  Well, we'll have to have the
17  judge resolve the issue.

18         MR. MILI:  We will.

19  BY MR. VANCE:

20    Q.   You don't recall the name of the complainant,
21  you don't recall the exact date --

22    A.   I --

23    Q.   Let me get everything on the record you don't
24  recall.

**11**

1         You don't recall the name of the person
2  who made the complaint against Mr. Brown; is that
3  correct?

4    A.   That's correct.

5    Q.   You don't recall the date and when this person
6  made the complaint against Mr. Brown; is that right?

7    A.   That's correct.

8    Q.   You don't recall the resolution of the
9  complaint; correct?

10    A.   That's correct.

11    Q.   You don't recall any of the findings of the
12  complaint?

13    A.   That's correct.

14    Q.   Do you recall who you interviewed in
15  connection with the complaint?

16    A.   I believe I interviewed the person who made
17  the complaint and Mr. Brown.

18    Q.   Just the two of them?

19    A.   I don't know if I interviewed.  I don't recall
20  if I interviewed anyone else.  I know I interviewed
21  those two.

22    Q.   You do recall that you were the only person
23  who interviewed anyone in connection with the
24  complaint; is that correct?

**12**

1    A.   No, that's not what I said.  I said I don't
2  remember if there was anyone else of my staff that was
3  involved.

4    Q.   And you believe you have documents related to
5  the complaint?

6    A.   I believe I do, yes.

7    Q.   Are you required to maintain documents in your
8  file for any particular length of time?

9    A.   Not these particular documents, no.

10    Q.   What do you mean by that?

11    A.   Well, we have rules for medical files.  We
12  have rules for personnel files.  I don't have any
13  documented or stated rules for investigative files.

14    Q.   The city has no policy with respect to how
15  long you have to retain files related to the
16  investigation of employee complaints; is that right?

17    A.   I believe that's what I just said, yes.

18    Q.   I'm asking you the question, is that correct?

19    A.   Yes.

20    Q.   Were there any other prior complaints against
21  Mr. Brown?

22    A.   Not that I know of, no.

23    Q.   Do you know how long Mr. Brown had served as
24  the executive director of the Hicks Recreation Center?

**13**

1    A.   No.

2    Q.   Do you know how long he had been a city
3  employee?

4    A.   No.

5    Q.   When you received Officer Lynch's complaint,
6  do you recall who you interviewed in connection with
7  that complaint?

8    A.   Yes.  I interviewed Officer Lynch, Mike Brown
9  and Jean Brown.

10    Q.   Did you interview anybody else?

11    A.   I am trying to think if I may have -- I didn't
12  interview.  I just talked to Chief Szczerba to get more
13  information about the weed and seed program.

14    Q.   What information did you need to get from the
15  chief?

16    A.   Just how police officers are assigned and what
17  the assignment is or was at the time, I guess, of the
18  weed and seed patrol, where they had to go.

19    Q.   Did you interview anybody else in connection
20  with Officer Lynch's complaint?

21    A.   I don't recall anyone else.

22    Q.   The complaint that you investigated related to
23  an incident that occurred in June of 2004; is that
24  right?

Lynch v. City of Wilmington
Monica Gonzalez-Gillespie

14

1    A.    Yes.
2    Q.    How long did it take you to complete your
3    investigation?
4    A.    I believe I furnished a final document the
5    beginning of December.
6    Q.    Of 2004?
7    A.    Yes.
8    Q.    Why did it take you six months to interview three
9    people?
10   A.    It didn't.
11   Q.    Why did it take you six months to complete an
12   investigation?
13   A.    At the time I had a lot of work to do, and I
14   wasn't sure how actually to resolve the issue.
15   Q.    What do you mean by that?
16   A.    Well, based on the information that I had, how
17   to best resolve the situation. So it took me awhile to
18   figure it out.
19   Q.    What was your role in the investigation, to
20   simply find the facts or find the facts and then figure
21   out what action to take in response to your finding?
22   A.    To find the facts and then recommend specific
23   actions.
24   Q.    How long did it take you to find the facts?

15

1    A.    I don't believe I recall exactly when the
2    interviews were completed, but I believe the last
3    interviews were some time during the summer, maybe
4    August.
5    Q.    August of 2004?
6    A.    Yes.
7    Q.    At the conclusion of August 2004, did you
8    believe that you knew the facts related to the
9    June 2004 incident?
10   A.    I knew what the people I interviewed had told
11   me.
12   Q.    And at some point did you conclude or develop
13   your own narrative of what had occurred?
14   A.    I'm not sure if I would put it that way.
15   Q.    Well, how would you put it?
16   A.    What is the question you're actually asking
17   me?
18   Q.    You testified that by the end of August you
19   had learned from whoever you interviewed what their
20   version of the event was, and my question is, did you
21   determine a version that you were going to say is what
22   happened and then decide the resolution from that
23   point?
24   A.    Yes.

16

1    Q.    So when did you determine your version of what
2    happened?
3    A.    Some time during those months.
4    Q.    During which months, the months between June
5    and August or the months between August and December?
6    A.    The months between, I guess --
7    Q.    August and December. I'm sorry.
8    A.    Yes, August and December.
9    Q.    Why did it take you four months to figure out
10   your version of the June 2004 incident?
11   A.    I believe I answered that already, that I had
12   work and I wasn't really sure how to resolve it.
13   Q.    How did you develop your version of what
14   occurred on June 2004?
15   A.    I basically just read over the material once
16   again and decided that there were no -- that more
17   interviews were not going to probably elicit any more
18   information, and then I reviewed policies and if any
19   infraction of policy had been done. And then I
20   recommended to the department head what should be done
21   or what I thought should be done.
22   Q.    In completing the process you just described,
23   did you consult with anyone else?
24   A.    I believe I probably talked with our attorney.

17

1         MR. MILI: Yes. And she's instructed not
2    to answer any questions about discussions she had with
3    the law department.
4    BY MR. VANCE:
5    Q.    When you say "your attorney," do you mean
6    Mr. Mili?
7    A.    Yes.
8    Q.    Did you discuss this or your development of a
9    narrative with anyone else?
10   A.    I don't think so.
11   Q.    Why did you conclude that Mr. Brown's actions
12   did not constitute sexual harassment?
13   A.    I actually did not conclude that.
14   Q.    What do you think you concluded?
15   A.    I concluded that there was some sexual
16   innuendo in what he said, he admitted to, but that I
17   couldn't substantiate through his interview all of the
18   facts or the information that Officer Lynch had given
19   me.
20   Q.    So is it your testimony that when you
21   concluded that there was sexual innuendo in what
22   Mr. Brown had said that you were concluding that he had
23   sexually harassed Officer Lynch?
24   A.    I don't believe that's the language that I

A-227

5 (Pages 14 to 17)

Lynch v. City of Wilmington
Monica Gonzalez-Gillespie

18

1   used.
2   Q.   And that's my question.  So why didn't you use
3   that language?
4   A.   Because what I could verify from his
5   interview, what he was admitting to, I don't think,
6   rose to the level of substantiating sexual harassment.
7   Q.   Why not?
8   A.   Because he did not admit to all the
9   information that Officer Lynch gave me.
10  Q.   Is that the only reason why you concluded that
11  his conduct did not rise to the level of sexual
12  harassment, that he didn't admit everything that
13  Officer Lynch said that he did?
14  A.   They were the only two witnesses I had, yes.
15  Q.   Is there any other reason why you concluded
16  that his actions did not rise to the level of sexual
17  harassment?
18  A.   I didn't have the evidence to substantiate
19  that.
20  Q.   Meaning what, no corroborating witness?
21  A.   That's correct.
22  Q.   Well, did you understand that the incident
23  took place when just the two of them were present?
24  A.   Yes.

19

1   Q.   So what other corroborating witness did you
2   expect to find?
3   A.   Well, there was a Mr. Brown, or Gene Brown
4   that Officer Lynch mentioned came into the room and
5   witnessed some of the discussion.  Mr. Gene Brown did
6   not corroborate the information that Officer Lynch gave
7   me.
8   Q.   And did you investigate the relationship
9   between Mr. Gene Brown and Michael Brown?
10  A.   Only in that Mike Brown was Gene Brown's
11  supervisor.
12  Q.   Did that fact have any bearing on whether you
13  concluded that Mr. Gene Brown was being truthful in his
14  testimony?
15  A.   I considered it, yeah, I think it was a
16  factor.
17  Q.   And how was it a factor in your decision?
18  A.   There was not a factor in my decision.  There
19  was a factor, I believe it was a factor in what Gene
20  Brown may have told me.
21  Q.   Did you believe that Gene Brown may have been
22  less than truthful about what he observed between his
23  boss, Michael Brown, and Officer Lynch because Michael
24  Brown was his boss?

20

1   A.   I don't know if I went to that extent, but I
2   certainly thought that having Mike Brown be Gene
3   Brown's supervisor would affect or might affect what he
4   told me, yes.
5   Q.   Is there any other fact or factor that you
6   believe might have affected what Gene Brown told you
7   about what he observed of the interaction between
8   Michael Brown and Officer Lynch?
9   A.   I don't know of any other factor.
10  Q.   What did you recommend with regard to
11  discipline, if any, for Michael Brown as a result of
12  the June 2004 incident?
13  A.   As I recall, I advised the department head to
14  provide him with a written discipline regarding
15  violation of policy and to attend the next
16  harassment-free work environment training.  To reread
17  the code of ethics and the associated -- there's a code
18  of ethics policy and then the associated code.
19       And basically to, we formalized the
20  piece that Mr. Brown was not to contact Officer Lynch
21  directly in any way, and if for some reason he needed
22  to communicate with Officer Lynch, he had to use the
23  chain of command and/or have somebody present.
24  Q.   Who was the department head that you made this

21

1   recommendation to?
2   A.   Romain Alexander.
3   Q.   And he's the head of what department or he was
4   the head of what department at that time?
5   A.   Parks and recreation.
6   Q.   Prior to investigating Officer Lynch's
7   complaint against Michael Brown, how many sexual
8   harassment complaints had you investigated?
9   A.   This would be a wild guess, but 15.
10  Q.   15 sexual harassment complaints since you were
11  appointed director of personnel?
12  A.   No.  That would be including my previous
13  employer.
14  Q.   Let's talk about the City of Wilmington first.
15  How many sexual harassment complaints did you
16  investigate between the time you were appointed the
17  director of personnel and when you investigated Officer
18  Lynch's complaint?
19  A.   I would say half of that, seven, eight.
20  Q.   Seven or eight?
21  A.   Uh-huh.
22  Q.   Did you receive any training after you became
23  the director of personnel on how to investigate
24  complaints?

6  (Pages 18 to 21)

Lynch v. City of Wilmington
Monica Gonzalez-Gillespie

22

1   A.   No.
2   Q.   Prior to working for the City of Wilmington,
3   you investigated sexual harassment complaints?
4   A.   Uh-huh, yes.
5   Q.   In what capacity?
6   A.   I was the director of HR for a hospital.
7   Q.   What hospital?
8   A.   Meadowwood Hospital.
9   Q.   Where is that?
10   A.   It's in New Castle.
11   Q.   New Castle, Delaware?
12   A.   Yes.
13   Q.   And you investigated seven or eight sexual
14   harassment complaints there?
15   A.   Yes.
16   Q.   Did you receive any training on how to
17   investigate sexual harassment complaints from that
18   employer?
19   A.   Actually, I believe I did go to training while
20   I was there.
21   Q.   When did you go to that training?
22   A.   I don't recall.  I was there for nine years.
23   Q.   From --
24   A.   '89 to '98.

23

1   Q.   Do you have any law enforcement background of
2   any kind?
3   A.   No.
4   Q.   Do you have any other investigative background
5   of any kind?
6   A.   No.
7   Q.   In the seven to eight other sexual harassment
8   complaints that you investigated since being appointed
9   director of personnel for the City of Wilmington, were
10   these incidents where the only witnesses were the
11   complaining witness and the alleged harasser?
12   A.   I don't recall the details of those.
13   Q.   In your experience investigating sexual
14   harassment complaints, would you say that in most cases
15   the event that the complaining witness contends
16   constitutes sexual harassment occurred when only the
17   complaining witness and the alleged harasser were
18   present so there were no other witnesses?
19   A.   Yes.
20   Q.   And in those circumstances, have you found
21   sexual harassment in any of these other prior seven to
22   eight complaints?
23   A.   I don't recall the details of those.
24   Q.   At all?

24

1   A.   No.
2   Q.   If you had concluded that Michael Brown had
3   sexually harassed Officer Lynch, would the discipline
4   you recommended have been any different?
5   A.   Yes.
6   Q.   What would you have recommended if you had
7   concluded that he had sexually harassed Officer Lynch?
8   A.   I'm not sure what I would have done, but it
9   would have been more severe.
10   Q.   Such as what?  What options were available to
11   you?
12   A.   Well, he could have been terminated as far as
13   discipline is concerned.
14   Q.   What would have caused you to make such a
15   recommendation?
16   A.   I don't know that.
17   Q.   But you would have recommended more than a
18   letter to his file and attending training, is that what
19   your testimony is?
20   A.   Yes.
21   Q.   Have you ever recommended that an alleged
22   harasser be terminated since you have been working for
23   the City of Wilmington?
24   A.   I don't recall.

25

1   Q.   Did you come up with your recommendation on
2   your own or did you discuss that with counsel before
3   you came up with that recommendation with respect to
4   Officer Lynch's June 2004 complaint?
5   A.   I believe I may have discussed it with
6   counsel.
7   Q.   Did the department of parks and recreation's
8   head agree with your recommendation?
9   A.   Yes.
10   Q.   You're aware that there was a separate
11   incident in November of 2004 between Officer Lynch and
12   Mr. Brown?
13   A.   Yes.
14   Q.   Did you investigate that?
15   A.   Yes.
16   Q.   How were you made aware of that particular
17   complaint?
18   A.   I'm not sure if it came from Officer Lynch or
19   if it came from her supervisor, a Sergeant Donahue.
20   Q.   And why did you investigate that complaint as
21   opposed to Sam Pratcher?
22   A.   I had done the first investigation.  I thought
23   I would follow through on the second since I was
24   involved with the first.

A-229

7 (Pages 22 to 25)

Lynch v. City of Wilmington
Monica Gonzalez-Gillespie

26

1   Q.  You weren't finished the first yet; is that
2   right?
3   A.  I think they crossed paths.
4   Q.  What does that mean?
5   A.  I believe that particular incident occurred at
6   the end of November.
7   Q.  Okay.
8   A.  And at that point, I was finalizing my
9   documentation on the first one.
10  Q.  So at that point, you had not yet recommended
11  that Mr. Brown stay away from Officer Lynch?
12  A.  Oh, no, that was recommended when she first
13  complained.
14  Q.  That he stay away from her?
15  A.  Oh, yes.
16  Q.  Who recommended that?
17  A.  I recommended that.
18  Q.  To who?
19  A.  To him and to -- well, I let the chief, the
20  police chief know and let Romain know, the department
21  head.
22  Q.  How did you recommend that to Mr. Brown?  Did
23  you write him a memo?  Did you call him on the phone?
24  Did you pass in the hallway?  How did you do it?

27

1   A.  I believe -- well, it was done verbally and
2   then it was also reiterated when I did the interview
3   with him.
4   Q.  Did you ever send him a formal memo telling
5   him to stay away from Officer Lynch and laying out the
6   protocol he should follow if he had to communicate with
7   her prior to November of 2004?
8   A.  I'm not sure.
9   Q.  If you had, would that have been part of your
10  investigative file?
11  A.  Possibly, yeah.
12  Q.  Why would it not have been part of your file
13  if you had put that in memo form?
14  A.  It probably would.
15  Q.  How did you communicate to the head of the
16  parks and recreation department that Mr. Brown was to
17  follow a particular protocol in communicating with
18  Officer Lynch?
19  A.  I believe that was verbal also.
20  Q.  You never put that in writing?
21  A.  No.
22  Q.  And how did you communicate this protocol to
23  the chief of police, I believe you said?
24  A.  The same way.

28

1   Q.  Verbal?
2   A.  Uh-huh.
3   Q.  Yes?
4   A.  Yes.
5   Q.  You didn't put that in writing either;
6   correct?
7   A.  No.
8   Q.  So when did you begin investigating the
9   November 2004 incident?
10  A.  Within a few days of getting it, I suppose.
11  Q.  And what did you conclude after that
12  investigation?
13  A.  I believe that there were other witnesses who
14  basically described the behavior of Mr. Brown as
15  intimidating and belittling of the officer.
16  Q.  Do you recall who you interviewed in
17  connection with that incident in November of 2004?
18  A.  Officer Lynch, Mike Brown.  There was Marsha
19  Starks from the Mayor's Office.  Bud Freel, another
20  council member.  Counsel Member Shabazz.  That's all I
21  can recall right now.
22          Oh, I'm sorry, and also the other
23  officer who was present.  I think the name was Groak.
24  Q.  Had Mr. Brown been involved in any other

29

1   incidents that you investigated between the June 2004
2   incident and the November 2004 incident?
3   A.  No.
4   Q.  What recommendation did you make with respect
5   to the November 2004 incident?
6   A.  I don't recall the recommendations at this
7   point in time.
8   Q.  Did you make the recommendations to the head
9   of the parks and recreation department?
10  A.  No.  I believe at that time, by the time that
11  investigation concluded, it was January or February,
12  and he had moved from that position to City Council.
13  So they would have gone to the City Council president.
14  Q.  Why?
15  A.  That was his immediate supervisor.
16  Q.  That was Mr. Brown's immediate supervisor?
17  A.  Yes.
18  Q.  His department head is the president of City
19  Council?
20  A.  Yes.
21  Q.  Was Mr. Brown still on the city payroll in
22  January, or whenever you concluded your investigation
23  of the November 2004 incident?
24  A.  Yes.

8 (Pages 26 to 29)

A-230

Lynch v. City of Wilmington
Monica Gonzalez-Gillespie

---

30

1    Q.   During the investigation of the November 2004
2  incident, did you determine why Mr. Brown was at that
3  meeting in the first place?
4    A.   No.
5    Q.   Was that an issue in any respect for you in
6  the investigation?
7    A.   No.
8    Q.   Did it matter to you in your investigation of
9  the November 2004 incident whether Mr. Brown was at the
10  meeting in November 2004 as a private citizen or as the
11  executive director of the Hicks Center?
12    A.   No.
13    Q.   Why didn't that make a difference to you?
14    A.   I just investigated the behavior and whether
15  it was intimidating and belittling.
16    Q.   Why would you assume that you had jurisdiction
17  to investigate the behavior of a private citizen?
18    A.   I didn't assume that.  I didn't think about
19  that piece of it.
20    Q.   Do you think you have the jurisdiction to
21  investigate the behavior of a private citizen?
22    A.   No.
23    Q.   Do you have jurisdiction to investigate the
24  behavior of city employees?

---

31

1    A.   I have jurisdiction to investigate a complaint
2  from a city employee, and that's what I did.
3    Q.   Do you believe you have jurisdiction at that
4  time to investigate the conduct of a private citizen
5  who may have been involved in a complaint filed by a
6  city employee?
7    A.   I don't know.
8    Q.   Did anyone ever communicate to you that they
9  believed that Mr. Brown could do whatever he wanted to
10  do or could have done whatever he wanted at that
11  meeting because he was appearing in his capacity as a
12  private citizen?
13    A.   No.
14    Q.   Did you interview Mr. Brown in connection with
15  your investigation of the November 2004 incident?
16    A.   Yes.
17    Q.   Did he ever tell you that he was appearing at
18  that meeting in November 2004 as a private citizen and
19  not as a city employee?
20    A.   Yes.
21    Q.   He did tell you that?
22    A.   Yes.
23    Q.   And how did you respond to that?
24    A.   I didn't respond.

---

32

1    Q.   Why not?
2    A.   I was still investigating the same complaint
3  from an employee.
4    Q.   Did Mr. Brown tell you that he could do
5  whatever he wanted to at that meeting because he was a
6  private citizen, he wasn't appearing as a city
7  employee?
8    A.   I don't recall him making that comment.
9    Q.   When you made your recommendation to
10  Mr. Blunt, did Mr. Blunt or anyone else representing
11  City Council tell you that your recommendations were
12  irrelevant because at the time Mr. Brown was acting as
13  a private citizen?
14    A.   I believe there was a communication to that
15  effect.
16    Q.   From --
17    A.   No, not from a private citizen.  Is that what
18  you asked?
19    Q.   Yes.
20    A.   No.
21    Q.   What communication are you referring to?
22    A.   That he, that the incident occurred while he
23  was not a City Council member.
24    Q.   And therefore what?

---

33

1    A.   That's all he basically said.
2    Q.   You don't remember what the recommendation was
3  that you made with respect to the November 2004
4  incident?
5    A.   I'm not sure I made recommendations.
6    Q.   Go ahead.
7    A.   I'm not sure I made recommendations on the
8  second incident.
9    Q.   But in that circumstance, who, in your view,
10  would have been responsible for disciplining Mr. Brown
11  for conduct that occurred before he joined City
12  Council?
13    A.   I'm not sure.
14    Q.   Or did it make any difference because he's
15  still a city employee; correct?
16    A.   That's correct.
17    Q.   So it doesn't matter whether he's disciplined
18  by the department head in the department in which he
19  was working at the time of the incident or the
20  department head where he was working at the time you
21  came to your conclusion; is that correct?
22    A.   That's correct, yes.
23    Q.   Has Mr. Brown been involved in any subsequent
24  sexual harassment complaints?

---

A-231

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Lynch v. City of Wilmington
Monica Gonzalez-Gillespie

| 34 | | 36 |
|---|---|---|

**34**

1  A.  Not that I know of, no.

2  Q.  Does the city have a policy about the

3  activities of city employees when they are not working

4  on their regularly scheduled hours?

5  A.  I don't believe so.

6  Q.  Is there any policy, to your knowledge, that

7  the city has in place with respect to when a city

8  employee is acting as a city employee as opposed to a

9  private citizen?

10  A.  No, I don't think so.

11  Q.  As part of the training that your department

12  administers to city employees, do you discuss that

13  issue with city employees?

14  A.  No, I don't think so.

15  Q.  In any of your investigations, with respect to

16  sexual harassment or otherwise, since you have been

17  appointed director of personnel, have you had to

18  address the issue of whether a city employee was acting

19  in their capacity as a city employee or in their

20  capacity as a private citizen?

21  A.  I don't recall any other, any instances like

22  that.

23  Q.  Did you maintain a file of your investigation

24  of the November 2004 incident?

**36**

1  complaint?

2  A.  Can you repeat the question?

3  Q.  Sure.

4      Did the issue of whether the

5  November 2004 incident occurred in a building that was

6  or was not owned by the city have any impact on your

7  investigation?

8  A.  I don't believe the issue ever came up.

9  Q.  But in your capacity as director of personnel,

10  does that issue, in your view, have any impact on

11  whether you have the jurisdiction to investigate a

12  complaint of a city employee against either a private

13  citizen or another city employee?

14  A.  No.

15  Q.  With respect to the November 2004 incident,

16  your best recollection is that you did not --

17  A.  I don't recall.

18  Q.  -- make any recommendations?

19  A.  I don't recall whether I did or not.

20  Q.  And do you recall whether in the city

21  harassment policy there is any standard of time set

22  forth regarding how long it would take or should take

23  to investigate complaints?

24  A.  I don't believe there is any time frame.

**35**

1  A.  Yes.

2  Q.  You turned that over to Mr. Mili?

3  A.  No.

4  Q.  You haven't?

5  A.  No.

6  Q.  Do you still have that?

7  A.  Yes.

8  Q.  And do you have your file from the June 30,

9  2004 incident?

10  A.  Yes.

11  Q.  Did you turn that over to Mr. Mili?

12  A.  No.

13  Q.  Do you still have that?

14  A.  Yes.

15      MR. VANCE:  Let me take a couple minutes

16  and speak with Officer Lynch.

17      (Recess.)

18  BY MR. VANCE:

19  Q.  Just a couple more questions.

20      In connection with your investigation of

21  the November 2004 incident, did the issue of whether

22  the incident took place in a building that was owned by

23  the city or not have any bearing on what you believed

24  was your ability to investigate Officer Lynch's

**37**

1  Q.  There's nothing like 30 days we'll get back to

2  the complaint or anything like that?

3  A.  No.

4      MR. VANCE:  I don't have any other

5  questions for you.  Thank you.

6      MR. MILI:  I don't have any either.

7      You can read and sign or waive reading

8  and signing.

9      MR. VANCE:  While we are on the record,

10  are you objecting to turning over her file relating to

11  the June 2004 incident and the November 2004 incident?

12      MR. MILI:  No.

13      When was the discovery request filed?

14      MR. VANCE:  It hasn't been.  If you want

15  me to do that.  If it comes up in a deposition, we

16  still have a right to ask for it.  I will send out a

17  formal request if that's what you want.

18      MR. MILI:  I will give it to you.  I

19  thought we disclosed a stack of documents in the Rule

20  26 disclosures.  I am asking.

21      MR. VANCE:  I'm not sure.  I thought so

22  too.

23      MR. MILI:  Don't you have those

24  documents?

10 (Pages 34 to 37)

A-232

Lynch v. City of Wilmington
Monica Gonzalez-Gillespie

38

1        MR. VANCE:  This is her document.
2        MR. MILI:  Don't you have the documents
3    that I sent in the Rule 26 disclosures?
4        MR. VANCE:  Did you send them to me or
5    Kevin Fasic?
6        MR. MILI:  Kester Cross was the local
7    counsel at the time.
8        MR. VANCE:  Then I don't have them.
9        MR. MILI:  He was the attorney of record,
10    the Delaware attorney of record.
11        MR. VANCE:  Then I will get them from
12    him.
13        MR. MILI:  I will get them again.  I will
14    get you whatever I turned over in the Rule 26
15    disclosure.  That's not a problem.
16        MR. VANCE:  I don't think I have them.
17    But you are objecting to records relating to the other
18    complaint?
19        MR. MILI:  I'm objecting to irrelevant
20    records that aren't related to this case, absolutely.
21        MR. VANCE:  But that's your position,
22    that they are not relevant?
23        MR. MILI:  Right.
24        MR. VANCE:  Okay.  Thank you.

39

1        COURT REPORTER:  Reading and signing?
2        THE WITNESS:  Should I just waive it?
3        MR. MILI:  You can waive it, that's fine.
4        THE WITNESS:  Okay.
5        (Witness excused.)
6        (The deposition concluded at 3:35 p.m.)
7            I N D E X
8    DEPONENT: MONICA GONZALEZ-GILLESPIE        PAGE
9      Examination by Mr. Vance            2
10            E X H I B I T S
11    (There were no exhibits marked for identification.)
12

    CERTIFICATE OF REPORTER        PAGE 40
13
14
15
16
17
18
19
20
21
22
23
24                    A-233

40

1    State of Delaware   )
                        )
2    New Castle County  )
3
        CERTIFICATE OF REPORTER
4
5        I, Terry B. Burke, RMR-CRR and Notary Public,
    do hereby certify that there came before me on
    Thursday, October 18, 2007, the deponent herein, MONICA
6    GONZALEZ-GILLESPIE, who was duly sworn  by me and
    thereafter examined by counsel for the respective
7    parties; that the questions asked of said deponent and
    the answers given were taken down by me in Stenotype
8    notes and thereafter transcribed by use of
    computer-aided transcription and computer printer under
9    my direction.
10        I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
11    examination of said witness.
12        I further certify that reading and signing of
    the deposition were waived by the deponent and counsel.
13
14        I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
    interested in the event of this suit.
15
16
17        Terry Barnes Burke, RMR-CRR
18        Certification No. 233-RPR
19        (Expires January 31, 2008)
20
21    DATED:
22
23
24

11 (Pages 38 to 40)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FRAY LYNCH,                          :
                                     :
            Plaintiff,               :
                                     :     C.A. NO. 06-351 JJF
      v.                             :
                                     :     JURY TRIAL DEMANDED
CITY OF WILMINGTON,                  :
                                     :
            Defendant.               :

## CERTIFICATE OF SERVICE

I, Alex J. Mili, Jr, Esquire, hereby certify that on this 14th day of November, a copy of the Appendix to Defendant's Opening Brief in Support of its Motion for Summary Judgment Volume II was served with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and that these documents are available for viewing and downloading from CM/ECF

G. Kevin Fasic, Esquire                Robert T. Vance, Jr., Esquire
Law Office of G. Kevin Fasic           Law Offices of Robert T. Vance, Jr.
1225 King Street, Suite 200            100 South Broad Street , Suite 1530
Wilmington, DE 19801                   Philadelphia, PA 19110


CITY OF WILMINGTON LAW DEPARTMENT

/s/ Alex J. Mili, Jr.
ALEX J. MILI, JR., ESQUIRE (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175