IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Fray Lynch,                          :
                                     :
              Plaintiff,             :
                                     :
      v.                             :      Civil Action No. 06-351 JJF
                                     :
City of Wilmington,                  :
                                     :
              Defendant.             :

## PLAINTIFF'S APPENDIX IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Robert T Vance Jr
Law Offices of Robert T Vance Jr
100 South Broad Street, Suite 1530
Philadelphia PA 19110

G. Kevin Fasic
Law Office of G. Kevin Fasic
1225 King Street, Suite 200
Wilmington DE 19801

Attorneys for the Plaintiff

Dated: November 27, 2007

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Progress Notes from Dr. Anjala B. Pahwa | PA-1 |
| Memo dated January 20, 2005 from Captain Nancy S. Dietz to Michael J. Szczerba | PA-5 |
| Memo dated July 20, 2004 from Monica Gonzalez-Gillespie to File | PA-9 |
| Memo dated August 2, 2004 from Monica Gonzalez-Gillespie to File | PA-11 |
| Departmental Information dated November 23, 2004 from Patrolwoman Fray M. Lynch to Chief Michael J. Szczerba | PA-13 |
| Departmental Information dated November 23, 2004 from Sergeant Deborah Donohue to Michael J. Szczerba | PA-15 |
| Departmental Information dated November 23, 2004 from Cpl. Michael J. Groark to Michael Szczerba | PA-17 |
| Memo dated March 9, 2005 from Monica Gonzalez-Gillespie to Theodore Blunt | PA-19 |
| Memo dated December 7, 2004 from Monica Gonzalez-Gillespie to Michael Brown | PA-24 |
| Memo dated December 3, 2004 re: Harassment Complaint by Fray Lynch against Michael Brown | PA-25 |
| Memo dated March 9, 2005 from Monica Gonzalez-Gillespie to Michael Brown | PA-27 |
| Memo dated March 16, 2005 from Theodore Blunt to John R. Sheridan | PA-29 |
| Departmental Information dated November 29, 2004 from Inspector James H. Wright to Elinza D. Cain | PA-30 |
| Memo dated November 24, 2004 from Capt. Marlyn W. Dietz to Michael J. Szczerba | PA-31 |

Memo dated December 21, 2004 from Marcia Starks to Whom It May Concern    PA-32

Memo dated December 30, 2004 from Alex J. Mili, Jr. to Brenda James-Roberts    PA-33

Memo dated January 13, 2005 from Alex J. Mili, Jr. to Brenda James-Roberts    PA-34

Memo dated January 14, 2005 from Alex J. Mili, Jr. to Brenda James-Roberts    PA-35

Transcript of the deposition of Marlyn Dietz    PA-36

Transcript of the deposition of Michael J. Groark    PA-47

Transcript of the deposition of Deborah A. Donohue    PA-53

Transcript of the deposition of Nancy Dietz    PA-61

F. LYNCH

| DATE - TIME CPT CODE | HT WT | BMI | BP | P | T | ALLERGIES | **Formedic** |
|---|---|---|---|---|---|---|---|

Done 2/22/05 (TP)

**PHONE CALL**

FOR: P

M: Fray Lynch

OF: 313176

PHONE/MOBILE: 764.7999   FAX: cell 293.3622

MESSAGE: Pt has a medication w/ Court can she get a note saying she's being treated for depression and the med

SIGNED: treatment and previous treatments & length of time for current med

- [ ] TELEPHONED
- [ ] RETURNED YOUR CALL
- [ ] PLEASE CALL
- [ ] WILL CALL AGAIN
- [ ] CAME TO SEE YOU
- [ ] WANTS TO SEE YOU

a. 1154

---

3-22-05   Ht   Weight 154   BP 110/70   P 96   Temp 99²

Evaluation of Depression

Effexor XR 75mg qhs

Karen Heim, NP

Feeling better on Effexor - take @ bedtime

↑ 150mg qhs
30x3

- starting to feel improvement - Still sad deep - improving
- sleep - variable -
- conc good.
- app still poor

O/E   J/S. good eye contact
× thought disorder

A/P   For Depression - improved - RTW 4-4-05 -
light duty, daywork only.
- ↑ Effexor 150 + shot 30x3
for 4wks.
OP

**HELPING YOU MASTER** *osteoarthritis* MOVEMENT

**mobic** [meloxicam] tablets

7.5 mg once daily ★ Specially priced ★ - MOBIC is indicated for relief of the signs and symptoms of osteoarthritis ★ MOBIC is contraindicated in patients with known hypersensitivity to meloxicam. MOBIC should not be given to patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. Severe, rarely fatal, anaphylactic-like reactions to NSAIDs have been reported in such patients.

Copyright © 2000, Boehringer Ingelheim Pharmaceuticals, Inc. All rights reserved.   Please see full Prescribing Information.   MB-7415   ABBOTT

LITHO IN CANADA

P4 - 1



| DATE - TIME CPT CODE | HT WT | BMI | BP | P | T | ALLERGIES | Formedic |
|---|---|---|---|---|---|---|---|

FEB 02 2005   T ⁰²   WT 164   BP 140/8   P:102   L6   Temp 97.2

4 week F/U

SS MA

Paxil CR 25

anxiety/better on Paxil — on two now
feeling agitated on Paxil as well — mom noticed
still feeling emotional    seems social worker
Depression "bad."    affiliated a city

2/E USS

Not otherwise examined

A/P  Depression — Δ to Effexor 37.5 qd 1 wk
then ↑ 75 mg qd
RTC 2 wks

DS

FEB 14 2005   T ⁰²   Wt 161   BP 130/86   Pulse 72   Temp 97.0

2 week check up

Effexor XR 75 mg qd

on for 2 wks

SS MA

Effexor — working better — No sig. med
effects    some nausea

No longer feeling agitated — tolerably
Still feeling depressed    Effexor better
— has not been long    ↑ less side effects
enough to check effectiveness

O/E  USS
good eye contact
A/P  Depression — continue Effexor
F/U ↑ MO to check effectiveness
Will come back & physical for
work.

DS

HELPING YOU MASTER
osteoarthritis  MOVEMENT →    PA-2
7.5 mg once daily · Specially priced · MOBIC is indicated for relief of the signs and symptoms of osteoarthritis · MOBIC is contraindicated in patients with known hypersensitivity to meloxicam. MOBIC should not be given to patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. Severe, rarely fatal, anaphylactic-like reactions to NSAIDs have been reported in such patients.
Boehringer Ingelheim  Copyright © 2000, Boehringer Ingelheim Pharmaceuticals Inc. All rights reserved.   Please see full Prescribing Information.   MB-7436   ABBOTT LABORATORIES

mobic [meloxicam] tablets

LITHO IN CANADA

**PROGRESS NOTES**

**Medi-Forms** ™
BY MEDI-SCRIPTS®
1-800-387-3636  © 1998

NAME   Lynch, Fray
DATE _____ SS# _____
ADDRESS _____
OCCUPATION _____ PHONE (HOME) _____
(WORK) _____ DATE OF BIRTH 2-3-76 AGE _____
DRUG ALLERGIES _____

DATE                                    NOTES

**PHONE CALL**

FOR _D & P_      DATE 12/13   TIME 830  A.M. / P.M.
M  _Fray Lynch_
OF _____
PHONE/MOBILE 293-3622 (cell)   FAX _____
MESSAGE _Requesting note for_
_work to RTW 1/5/05._
_Started ō Zoloft for_
_depression_
_will give ___ at full ___ wks ___ ____

☐ TELEPHONED
☐ RETURNED YOUR CALL
☐ PLEASE CALL
☑ WILL CALL AGAIN
☐ CAME TO SEE YOU
☐ WANTS TO SEE YOU

SIGNED _____                1154

JAN 0 5 2005        Hct 120/76      80      97.1

4 WEEK CHECK UP

Zoloft 50mg, d                          (SS) MA

on Zoloft ac'e feels agitated & more
anxious on med
– ac'e feeling dizzy.
No sig. improvement ē depression – still crying
episodes ⊕ suicide    empty
+ anxious about situation at work – felt "panic attacks"
– does not feel can go back
O/E  USS                                        to police job
extend disability    Th ⊕ oropharynx ⊖ nodes
to 4-5-05           Thyroid Nl. Chest clear  CVS S₁S₂ ⊕ murmur
                    Abd benign                          25mg × 1wk
Rx 4wks            DID major depression – D/C Zoloft – will taper
                   Start Paxil (12.5 × 1wk) 25mg qd      then 1/2

**Medi-Forms™**
BY MEDI-SCRIPTS®
1-800-387-3636 © 1998

| DATE | NOTES |
|------|-------|

DEC 1 0 200  Ht   Wt 168   RP 120/80   Pulse 64   Temp 96 8

- Depression, No motivation, High Stress
at Work. No energy, Appetite down.
Karen Heene, MA

meds    Filed sexually harassment complaint June '04
Desogen    - Not moved anywhere
works on    - Not moving anywhere
police dept    - Stress leave - come into contact ? individual →
was berated publicly
① motivation / lack of    by this man in public.
× few weeks    appetite    11/23/04 → last day of
No longer "laughing, smiling"    work
① up a lot
⊘ suicidal    Sixal: single   1 child - 8 y.o. ♀
ideation    - ⊘ relationships or siblings issues at
↑ sleeping a lot    home    ⊖ smoke ⊖ Etoh- prego....
flat mood?    - missed class last week    ⊖ no desire to go    ⊕ drugs
depression    ⊖ hearing voices.
⊖ hx depression
O/E    VSS   PERM cont ①
⊖ nodes   Thyroid N
Lungs clear w/s S.S. ①
Abd CBSW   ⊘ edema
A/D  Situational depression - samples
Paxil 20 tab 1 #35 → 250pd
- aware side effects
RTC 4 wks
OP

MFR12H10    PA-4

Indicated for COPD

**Serevent** COPD
salmeterol xinafoate
Inhalation Aerosol
Choose 12-hour efficacy
Give BID convenience

SEREVENT Inhalation Aerosol is indicated for maintenance treatment of bronchospasm associated with COPD. SEREVENT INHALATION AEROSOL SHOULD NOT BE USED TO RELIEVE ACUTE COPD SYMPTOMS. SEREVENT Inhalation Aerosol should be used with caution in patients with cardiovascular disorders. Some patients may experience an increase in blood pressure or heart rate. SEREVENT should be...

Please consult accompanying complete Prescribing Information.

**OFFICE OF PUBLIC SAFETY**

**DEPARTMENT OF POLICE**

**WILMINGTON, DELAWARE**

<u>MEMORANDUM</u>

TO:        Michael J. Szczerba
           Chief of Police

FROM:      Captain Nancy S. Dietz
           Commanding Officer
           Office of Professional Standards

RE:        Internal Matter

DATE:      January 20, 2005

This memo is being submitted as a result of several issues that have come to my attention that generate negative perceptions relating to the department's integrity, morale and supervision.

During the last two weeks in December, while I was on vacation, Officer Fray Lynch left a message on my voice mail asking to speak with me about a personal matter. Due to several scheduling conflicts, I was not able to meet with her until mid-January. Office Lynch is currently off sick on "stress related" illness. I was aware that she had previously made a complaint about Mike Brown, Director of the William "Hicks" Anderson Community Center and, based on my brief conversation with her on the phone, she indicated that she wanted to speak about her complaint and seek some guidance.

On January 14, I met Officer Lynch for approximately two hours. During our conversation, she informed me about her complaint with Mike Brown and what had transpired over the time period that she was assigned to the Weed and Seed area. Although I was given a copy of her complaint report, I was not aware that she had a history of problems that dated back prior to the incident that occurred at the Center. Officer Lynch advised me that Mike Brown had been "asking her out" since she was assigned on F Platoon and that she made it very clear to him that she was not interested in dating him. She advised that this behavior continued and she felt uncomfortable going to the Center but continued to do so at the request of her supervisors. I asked Lynch if she had previously reported any of these incidents to her Sergeant and she replied that she had not. Lynch advised me that she was hesitant in complaining about Mike Brown because of his apparent friendship with Inspector Wright. She also advised that she heard that he was also friends with Captain Howell as well. Because of his relationships with upper management on the Department, she did not think it was wise to "rock the boat" and tried to resolve the problem on her own.

*PA-5*

Once Officer Lynch did report the incident, she advised that she believed that Mike Brown was informed by someone that she made a complaint. The following day, she saw Mike Brown when she was working and he completely ignored her. This was an opposite response from his normal behavior. She later had a second incident with him in a public forum where she was acting in the capacity of a Weed and Seed officer.

In summary, it was clear to me that Officer Lynch felt unsupported in her decision to report this incident through the proper channels and that her perception is that Mike Brown's relationship with staff officers on the Department will have a negative impact of her career with the Department. She supports this opinion by her belief that Mike Brown has open access to command staff of this Department. She also commented about Mike Brown's access to a police radio and police information that is not normally accessed by personnel employed outside of the Department. In addition, he openly and frequently remarks about his "knowledge" about department business and personnel decisions.

In addition, she was obviously concerned about the delay in the investigation of her first complaint and she thinks that politics may have come into play with how her complaint was handled. She was concerned that the investigation was stalled due to Mike Brown's run for City Council office. She was also concerned that her complaint was not handled by the City's EEO officer, Elinza Cain, who she was told typically investigates sexual harassment complaints.

During our conversation, Officer Lynch informed me that she keeps in contact with her supervisor, Sergeant Deb Donohue who has been very supportive of her since she's been off work. Due to her emotional state, I asked about her welfare and she advised me that she had been seeing a doctor and was on medication for depression.

As a result of my conversation with Officer Lynch, I later spoke to Sergeant Donohue and advised her of my meeting with Lynch. Sergeant Donohue appears to be a positive role model for Officer Lynch and I wanted her to know about our conversation. Sgt. Donohue also relayed to me her concerns regarding Mike Brown's apparent influence on the Department. In addition, Sergeant Donohue advised me of several previous incidents where Mike Brown made inappropriate remarks to her as well.

Sergeant Donohue advised me of her contact with Brown back to when she was in the police academy. She advised me that Mike Brown was a regular visitor to her police academy which was held at P.S. duPont Middle School. During the academy, Brown would come in to the class room several times where the class was called to attention. His business in the academy became social as he was friends with then Lt. James Stallings and Sergeant Cummings who ran the academy at that time. Sgt. Donohue informed me that at least 3 times in the academy class and once when the class was held in the Multi-Purpose Room, she and the other female recruits were called out of class for a separate inspection. Mike Brown would then walk by the female recruits and make remarks to them. Sergeant Donohue specifically recalled an incident where Mike Brown was "inspecting" the female recruits outside the Multi-Purpose Room and made

PA-6

comments to her that he was the influencing reason why there were so many females in the class. He also attempted to hug her, at which time, she held out her arm to prevent him from doing so. She described the incident as demeaning and embarrassing. She did not recall if Lt. Stallings or Sergeant Cummings were present during that incident but advised that both ran the academy and should have been aware of these activities.

Sergeant Donohue also remarked about a recent meeting that she had with Mike Brown in Inspector Wright's office. Donohue advised that she and Lt. Rock were called in to Inspector Wright's office where Mike Brown was seated. Mike Brown proceeded to criticize the actions of the Weed and Seed officers (one of whom is Officer Lynch) for approximately 15 minutes. She was then excused by Inspector Wright from his office. Lt. Rock then stayed in the office after she left. She found the meeting to be unprofessional and demeaning as she and Lt. Rock were not given the opportunity to prepare for the meeting nor were they allowed to interrupt during the barrage of negative comments by Brown.

Several of the comments made by Sergeant Donohue and Officer Lynch bring in to question the influence that Mike Brown has with our Police Department. The perception of those officers indicates that politicians have undue influence on their daily activities and that special treatment is given by those in authority. Certainly, if any of the information relayed by Sgt. Donohue regarding her academy is accurate, then minimally, Academy supervisors allowed a civilian to participate in unauthorized activities. This is unethical and generates negative perceptions about supervision oversight and political influence.

This perception has also been exasperated by Mike Brown's access to a police radio. Brown was given a police radio several years ago when he was employed as a Youth Intervention Specialist. Since that time, several members of the Department, including myself, have written reports regarding the need for him to have a radio and access to confidential police information. Other supervisors have submitted reports indicating irresponsible radio transmissions of his part which potentially endangers officers. Regardless of several reports submitted by police supervisors, he was given continued access to a police radio. Certainly subordinate officers hear Mr. Brown on the radio asking to speak with high ranking officers on the Department. Whether true or not, this leaves the impression that Mike Brown has some degree of authority and power with upper management.

I am particularly concerned with his role as a civilian in the Wilmington Police Academy. Both male and female officers who witnessed his actions in the academy could believe that he has some "informal" authority over their activities. I have heard from other officers that Mr. Brown has been present at crime scenes and attempts to tell officers what to do. Given his role during a police academy, officers may now feel compelled to follow his instructions. I did follow up this information regarding the academy and spoke with Captain Cummings about the matter. He advised that he was never present during an inspection of this nature.

000323

PA- 7

In summary, I am recommending the below listed follow-up actions and recommendations to address these issues.

- Due to the time lapse since the police academy, it would be unreasonable to investigate this type of allegation; however, I would recommend that Mr. Brown's access to police officers be extremely limited and that complaints or issues posed by him be forwarded to one competent staff officer. A policy needs to be developed and administered where requests from citizens, public officials or elected officials are handled in a fair and uniform manner.

- Due to a second complaint made by Officer Lynch, this incident needs to be reviewed by the Criminal Investigations Division as a possible violation of the law. The second incident by Mike Brown may be harassment, in that, Officer Lynch and other civilians reported that he publicly insulted and challenged her during a community meeting. In light of her original sexual harassment complaint, his actions could be viewed as retaliatory in nature.

- I understand that Mr. Brown's access to a police radio has been removed as of this date; however, to prevent radio access to civilians in the future, a policy should be developed by Communications Division that details what personnel should have access to a radio and confidential information that is relayed through radio transmissions.

Due to requests for confidentiality regarding this complaint, I request the opportunity to discuss this further before any follow-up is conducted by personnel.

000324

PA-8

Date:  July 20, 2004

To:      File

From:  Monica Gonzalez-Gillespie
         Director of Personnel

RE:      Complaint by Officer Fray Lynch

Present at the meeting were Fray Lynch, Police Officer, Alex Mili, Assistant City
Solicitor and Monica Gonzalez-Gillespie, Director of Personnel

Gillespie asked Lynch to discuss the incident that led to her complaint. Lynch stated she
had been transferred to the Weed 'N Seed program in early April of 2004. She was to
make community contacts as part of FRANK, community policing. As part of this
program, the officers were instructed to visit WHACC center when they had time or an
activity was taking place.

Lynch stated that Michael Brown, Executive Director of WHACC, had made comments
to her about "being too pretty to be a cop". At first, she took it as a compliment and it did
not offend her. Then he made a comment about her "pants fitting nice", and it bothered
her. After the first few times, Lynch asked Brown to stop making those kinds of
comments. Lynch said Brown stated he wanted to get to know her. To which, she
replied "No, you're married and I have a boyfriend."

Lynch state that she usually went in to the Center with her partner. Then on the date of
the incident, she went into the center alone and Brown asked her to come in to his office.
They were discussing a trip Lynch had planned to Miami the following weekend. He
asked who was going with her on the trip and when she stated a girlfriend, he then asked
the kind of bathing suit Lynch would wear. She stated a regular bathing suit. To which,
he asked if she would be wearing a "thong". She restated a regular bathing suit.

At this time, another Center employee came into the room, Gene Brown. He stated
jokingly that he would "whoop your ass" to Brown and turned the lights off in the room.
Brown then said, "Not with this fine officer here. With the lights out, she can now do
both of us." Gene then became serious, turned the lights back on, said he had things to
take care of and left.

After the incident, Officer Lynch stopped visiting the Center. Brown later complained
that officers were not stopping by the Center as they were supposed to as part of the
program. Lynch also stated that Brown tries to greet female officers with a hug.

When asked what outcome she would like to see, Lynch stated that Brown should be
disciplined. She would like to continue with the Weed 'N Seed program, including
visiting the Center. She said she does not want to be transferred back to routine patrol.

000009

PA-9

Gillespie asked if her assignment had changed after the filing of the complaint. She stated it had not, except for not going to the Center and she is not to have contact with Brown. She also expressed concern that Brown could behave the similarly with other females at the Center, especially if he behaved this way towards a police officer.

000010

PA-10

Date:   August 2, 2004

To:     File

From:   Monica Gonzalez-Gillespie
        Director of Personnel

RE:     Complaint by Officer Fray Lynch

Present at the meeting were Michael Brown, Director of WHACC, Victor Bittaglia, Mr. Brown's attorney, Monica Gonzalez-Gillespie, Director of Personnel (city's investigator), Alex Mili, Asst. City Solicitor (city's counsel).

Gillespie began by explaining that Brown was not being accused of anything by the City. The City had received a complaint and it is our responsibility to investigate this type of complaint.

Gillespie related the substance of the Lynch's complaint, which included Brown paying her complements since she began with the Weed n' Seed program, but that they had become increasingly sexual and offensive. The incident prior to Memorial Day weekend was related in detail for Brown. Brown was asked if he recalled the incident.

Brown stated that he didn't know whether it was before Memorial Day weekend, but that he does recall having a conversation with Lynch about her going away to an island or such. He stated that he greeted her upon her arrival and inquired where her partner but was uncertain as to her reply. Brown asked her into his office and she sat at the round table and he, behind his desk, with the door half open.

Brown relates that they began to discuss his complaint that the assigned officers were not visible enough. Brown then states that Lynch warned him by saying that "the whities are out to get you. Be careful." Brown denies saying anything about her pants that day or any other day. He does recall speaking about an upcoming vacation and asking who she was going with. She replied with her girlfriend from Philadelphia. Then Brown admitted saying, "You ought to hook the brother up." To which, Lynch replied "We don't do married men." To which he replied, "Not you, your friend from Philadelphia."

Brown continued that he did ask her to bring back pictures. He states that's because he wanted to see what it was like as they were planning a vacation. [Ask Romain for his vacation slip] He continued, "I don't recall if Gene came into the office. Then she left. She didn't seem offended or distraught. And I have seen her since."

Gillespie asked if she ever told him that his comments were offensive or if anyone else had relayed that comment about her. Brown replied no to both

000016

PA- 11

Mili reminded Gillespie that the hugs she received from Brown were also offensive. Gillespie asked if the has hugs females as a greeting. He described that his greeting involves a hand shake and then pulling the person into him, touching shoulders and then patting the person's shoulder.

Brown continued that he had complained to the Federal government and that's when she resumed her visits to the center. He described there are 4 officers and one sector car assigned to the Weed n' Seed program. When asked how often they are supposed to come around, he stated daily, but then corrected into the area, not the center, daily. When asked if he had issues with the officers on this program before Lynch, he stated yes, he had complained before. When asked if Brown as acquainted with Lynch prior to her being assigned to this program, he first replied no, but then stated that she had worked extra duty jobs at the center prior. So he changed his answer.

When asked if Brown had anything to add, Brown stated his concern that the complaint was filed after he had complained about these officers not doing their work. He relayed a meeting held with Inspector Wright, Lt. Rock and Sgt. Donahue, about the officer's lack of appearances. He described the meeting as having "heated words". He also he asked if Sgt. Donahue could be excused from the meeting. Then he asked the Lt. And Inspector whether they had said, "F— Mike Brown. Don't give him nothing."

Brown continued that is was a concern that she would get an inside job with weekends off right after this. He also stated that he had a police officer that would come forward when the time is right to support the statement made above.

000017

PA - 12

**OFFICE OF PUBLIC SAFETY**
**DEPARTMENT OF POLICE**
**WILMINGTON, DELAWARE**

## DEPARTMENTAL INFORMATION

TO:             Chief Michael J. Szczerba
                Chief of Police

FROM:           Patrolwoman Fray M. Lynch
                F Platoon

DATE:           23 November 2004

RE:             WCCNPAC Community Meeting w/Mike Brown in attendance

Sir,

This officer went to the WCCNPAC block captain meeting per Lt.Rock. In attendance at this meeting was myself along with my partner Cpl. Groark, Marsha Starks, Shenequa Baines, Haniffa Shabazz, Adrienne Bey, Bud Friel, Jerry Ortega, Mike Brown and the block captains. One of the block captains asked this officer why the weed and seed officers were often pulled from the weed and seed area for other assignments throughout the city? Mike Brown walked into the meeting approximately 5-10 minutes late for the meeting and sat at the opposite end of the table in comparison to where this officer was seated. When this officer observed Mike Brown, thoughts of getting up and leaving the meeting came across my mind but because I have been restricted of performing my duties as a weed and seed officer (because of the current investigation between myself and Mike Brown), I wanted to represent the police department and weed and seed in a positive light. My thoughts were to act professional and because of the turnout of the number of people and the ongoing issue between Mike Brown and myself, I thought that there would not be any contact between the two of us. This officer had no intention on speaking to Mike Brown and tries to avoid same at all costs until the current investigation is complete. This officer answered the block captains question by stating that the weed and seed officers are not pulled from the weed and seed area for other city assignments unless a violent crime occurs and no patrol officers are available to respond; weed and seed officers will respond, secure the scene and respond back to the weed and seed area after a patrol unit takes over the complaint. At this point, Mike Brown raised his voice and stated in a demeaning manner, "Officer Fray, Why are you going to sit here and lie to these people about weed and seed officers not being pulled for other city events? If you're going to tell it, tell it like it is; Weed and seed officers are not always in the weed and seed area. When did this policy change Officer Fray? Tell us when this policy changed!" During the entire time that Mike Brown spoke

he was pointing his finger at this officer and speaking in a belittling tone of voice. This officer reiterated that weed and seed officers are not pulled for other city assignments. Before I could finish my sentence, Mike Brown interrupted and cut this officer off on the response and stated in a high voice tone again pointing his finger at this officer, "When did the policy change? Tell us when the policy changed. Again you are lying to these people about the assignments of the weed and seed officers." At this point, this officer made eye contact with Cpl.Groark and advised him to handle the question. Cpl.Groark began to answer the question with a similar answer just in different terminology when Mike Brown interrupted his response by saying that the question was not directed towards him, but rather to Officer Fray. "Officer Fray, can you answer the question? Answer the question Officer Fray!" Cpl.Groark then interjected and answered the question without further interruption. It should be noted that after the meeting, this officer spoke to Marsha Starks who told this officer that it was "bullshit" that I should have to put up with that kind of treatment.

This officer strongly believes that because of the current sexual harassment complaint, Mike Brown singled this officer out and purposely made me feel very embarrassed and belittled in front of several members of the community. This officer fought back tears of frustration and humiliation during this incident caused solely by Mike Brown. A hostile work environment has been created because of Mike Brown. This officer no longer feels comfortable in attending community meetings for fear that Mike Brown may be in attendance and again challenge anything that this officer has to say. Sgt. Donohue was notified of the facts surrounding this incident. It should be noted that this officer formally filed a complaint of sexual harassment against Mike Brown on 4June 04 and has not yet anything back from the City of Wilmington. All calls to the chief investigator, Monica Gillespie, have gone unnoticed. Messages have been left on numerous occasions by this officer and Lt. Rock; however no return call has ever been placed to either one of us. This officer believes that Mike Brown has already or will try to use his "power" of Councilman at large in retaliation against this officer for lodging a sexual harassment complaint against him.

Respectfully Submitted,
Ptlw. Fray M. Lynch

PA-14

Rec. Sgt Donohue
Lt. m Rok 11/24/04

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## Departmental Information:

**TO:**        Michael J. Szczerba
               Chief of Police

**FROM:**      Deborah Donohue
               Sergeant Uniform Services Division
               F Platoon

**DATE:**      23 November 2004

**RE:**        Community Meeting-Mr. Mike Brown

Sir,

On this date, this officer was contacted by Ptlw. Fray Lynch and Cpl. Mike Groark regarding a verbal confrontation with Mr. Mike Brown of the West Center City Community Center while attending a community meeting. This officer being the first line supervisor of both officers advised that a DI be written to document the incident and would addressed with the commanding officers of the unit.

This officer is aware of an earlier incident involving Ptlw. Fray Lynch and Mr. Mike Brown which has been passed on to City Personnel which occurred in June of 2004. Since this incident has been initiated every effort has been made to assign Ptlw. Fray Lynch to duties which do not involve the West Center Community Center and functions to where Mr. Mike Brown may attend. Unfortunately I was not aware of all who would be in attendance to the community meeting and would not have sent Ptlw. Fray Lynch. At this point I feel that the incident from this night demands attention. I have on many occasions felt very uncomfortable being in the company of Mr. Mike Brown for fear of being addressed in an offensive or abusive manner. This officer has in the past been referred to in some unrelated incident by Mr. Mike Brown which was found to be untrue. I was also made to feel very uncomfortable by Mr. Mike Brown's actions while a recruit in the police academy which was handle immediately by addressing the action myself. Any exchanges between Mr. Mike Brown and I have been with other members of the department present.

000043

PA-15

This officer being the supervisor of the Weed and Seed Project has dealt with many of the issues in the area. Many issues and concerns brought to the attention of the Weed and Seed community are from the immediate area surrounding the Community Center at 5th and Madison Sts. The officers have dedicated time and effort in the immediate area and have succumbed to constant unprofessional criticism for this effort from Mr. Mike Brown.

As an employee of the City of Wilmington's Police Department, I feel I have, along with the officers of the Weed and Seed Program are being harassed and a hostile work environment has been created. I consider myself a dedicated officer to the city and feel strongly that this incident may escalate if not addressed immediately.

Respectfully submitted,

Sgt Deborah Donohue

Sergeant Deborah Donohue

Lt. M. Ro
11/24/04

000044

PA - 16

# WILMINGTON DEPARTMENT OF POLICE
# WILMINGTON, DELAWARE

DEPARTMENTAL INFORMATION

TO:  Michael Szczerba
     Chief of Police

FROM:  Cpl. Michael J. Groark

DATE:  11/23/04

RE:  WCCNPAC Community Meeting

        Sir,

                On this date from 1830 hours until 2020 hours this officer attended the
WCCNPAC meeting located at 634 North Madison Street. Also present at this meeting,
along with several WCCNPAC board members and block captains, were my partner,
Officer Fray Lynch, Marcia Starks from the Mayor's office, councilwoman-elect Hanifa
Shabazz, councilman-elect Mike A. Brown, and Councilman Bud Freel.
                During the meeting, one of the WCCNPAC board members asked about
the weed and seed officer deployment and more specifically, whether there are times the
weed and seed officers are pulled from the weed and seed area for assignments in other
parts of the city. (This board member was a white female and her name escapes me at this
time). Officer Lynch took the initiative to clarify the concern of the board member by
stating the weed and seed officers are not pulled out of the weed and seed area for any
other citywide assignments. Officer Lynch further explained the only time a weed and
seed officer would leave the area would be to respond to a violent crime in progress, no
matter where it occurred in the city, and as a matter of officer safety, to assist another
officer on the street when requested to do so. At this time Mike Brown interrupted
Officer Lynch and stated in an extremely petulant tone of voice she was lying and to tell
the truth regarding the deployment of the weed and seed officers, that in fact he knew that
weed and seed officers were pulled out of the area for other city assignments. Officer
Lynch stated to her knowledge that was not the case; however Mike Brown
contemptuously insisted that Officer Lynch was not being truthful. Officer Lynch asked
this officer to interject at which time I began to speak in an attempt to clarify the
situation. This officer reiterated the fact that weed and seed officers are not pulled from
the area for other assignments, however Mike Brown ignored this officer and stated that
the question was for "Miss Fray." Mike Brown then stated he knew about weed and seed
officers being assigned to patrol for mischief night and the Halloween loop, and he stated
that he once observed weed and seed officers in the riverside area. He further insisted
that he wanted to know when the "policy" on the weed and seed officer deployment had
changed. This officer told Mike Brown that he should speak with a higher ranking

000045

I

PA-17

officer in the department if he has issues with weed and seed; however this officer continued to assert that we are consistently and permanently assigned no matter the circumstances. It was only after this unnecessary exchange that Mike Brown dropped the issue and let the meeting progress to other business.

This officer feels that Mike Brown only entered into this controversy to demean Office Lynch in front of her peers and to make myself, Officer Lynch and the rest of the Wilmington Police Department look incompetent in front of several people we were meeting for the first time. Furthermore, I know Mike Brown raised this issue over the summer and it was dealt with and resolved with at that time, so for him to bring the matter to dispute several months later was not only out of line, it was totally uncalled for. Mike Brown was also unprofessional in his demeanor and he certainly embarrassed this writer, this department and Officer Lynch by implying that we were lying to everyone at the meeting. He also referred to Officer Lynch as "Miss Fray" in front of total strangers. At the conclusion of the meeting, Marcia Starks agreed with these officers that Mike Brown was definitely out of line. This officer demands that I and Officer Lynch not have any further contact with Mike Brown and not attend any meetings where he is present and further, he owes us and the rest of the police department an apology. For Mike Brown to question our integrity in front of total strangers and single out Officer Lynch for abuse was disagreeable, displeasing and offensive and frankly, it made me sick to my stomach.

Respectfully Submitted,

Cpl. Michael J. Groark

000046

PA-18



**City of Wilmington**

**Delaware**

JAMES M. BAKER
MAYOR

LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801 - 3537



## MEMORANDUM

**DATE:**     March 9, 2005

**TO:**       Theodore Blunt
              President, City Council

**FROM:**     Monica Gonzalez-Gillespie
              Director, Department of Personnel

**RE:**       **Conclusion of Harassment Complaint III**
              **Michael Brown**

---

Attached are the findings and conclusion from the investigation conducted by the Personnel Department and City Solicitor's Office on the Hostile Work Environment complaint against Michael Brown, City Council Member, by Fray Lynch, Police Officer.

Also attached are copies of the resulting communications to each of the parties listed above. Recommendations for corrective action should be referred to the City Solicitor's Office.

If you have any questions, please contact me.


mgg
Attachments

cc:    William Montgomery, Chief of Staff
       Alex Mili, Assistant City Solicitor
       Elinza Cain, Employee Relations Advisor




000064


PA-19

# City of Wilmington
## Delaware

JAMES M. BAKER
MAYOR

LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801 - 3537



## PERSONAL AND CONFIDENTIAL

| | |
|---|---|
| Complaint: | Hostile Work Environment |
| By: | Fray Lynch, Police Officer, Wilmington Police Department |
| Against: | Michael Brown, WHAAC, Department of Parks & Recreation/Council Member-Elect |
| Date of Complaint: | November 29, 2004 |

## Background:

1.  Officer Lynch is assigned to the Weed N' Seed program (hereafter 'the program"), which designates the police officer's deployment to a geographical location that includes the William Hicks Anderson Community Center (hereafter "the center"). At the time of the complaint, Michael Brown was the Executive Director of the center.
    a.  As part of the program, police officers regularly visit the center.
    b.  Mr. Brown had complained that the police officers assigned to this program did not visit the center as often as intended by the program.
2.  Officer Lynch brought forth a formal complaint against Michael Brown alleging he used sexually explicit language on several occasions, which were offensive and was particularly offended during an interchange in Mr. Brown's office around the Memorial Day holiday. Upon receiving the complaint, Officer Lynch was asked to continue with the program, but to avoid visiting the center.
3.  *Following an investigation, the finding concluded that Mr. Brown did use sexually explicit language and that these comments were inappropriate.*
4.  Mr. Brown was trained on the City's Sexual Harassment policy and procedure on August 29, 2001. He also participated in training on the City's Personnel Policy & Procedure manual which contains the Harassment-Free Work Environment Policy & Procedure, the Code of Ethical Conduct Policy Statement and the Wilmington City Code Division 6 – City Employees' and Elected and Appointed Officials Code of Conduct November 4, 2004. *The City also provided Mr. Brown with copies of these rules with the complaint resolution of the Officer Lynch's first complaint.*

000065

PA · 20

5.    Community meetings are regularly held by Block Captains to discuss issues of concern in their immediate neighborhood.  This meeting was of the WCNPAC group, *which is .....*  Police Officers may be requested to attend these community meetings.

**Findings:**

1.  A WCNPAC meeting was held on November 23, 2004 at a location on 6th and Madison Streets.  Present at that meeting were Fray Lynch, Police Officer; Michael Groark, Police Officer;  Michael Brown, Executive Director of WHAAC and Council Member-Elect;  Marcia Starks, Mayor's Office representative; Hanifa Shabazz, Council –Member-Elect; and Bud Freel, Council Member among other community members.

2.  There were six (6) witnesses interviewed including the complainant and the employee accused.  The two Police Officers, the Council Member and a Mayor's Office staff member describe the behavior by Mr. Brown towards Officer Lynch during the community meeting of November 23, 2004 similarly as follows:

    a.  Upon being asked a question by a community member about the deployment of Weed N' Seed officers, Officer Lynch began to respond that they were only pulled when an emergency situation arose, when Mr. Brown interrupted and with a raised voice tone demanded that she "Tell the truth!"  The officer ignored the comment and continued her response to the community member.  Mr. Brown again interrupted Officer Lynch citing a time when the officers were pulled from the area and accusing the Officer once again of lying and not telling the truth.

    b.  At this time, Officer Groark tried to intervene and address the question; Mr. Brown persisted in aiming his comments exclusively at Officer Lynch.  He demanded, "Officer Fray, answer the question!"  Officer Lynch did not respond.  Officer Groark once again began to respond.  Then without further interruption, he explained that Mike Brown knows the chain of command for deployment and that rank and file officers simply follow the assignments from their superiors.

3.  Michael Brown denied that he singled Officer Lynch out for his comments.  Mr. Brown's attorney, Victor Battaglia, did acknowledge that his client does raise his voice when feels strongly about a subject.

4.  Hanifa Shabazz, another witness, does not recall Mr. Brown's comments being directed at Officer Lynch.  She remembers the exchange being between Mr. Brown and the male officer.

000066

*PA-21*

5.  The result of this incident is that Officer Lynch no longer feels comfortable attending these types of meetings for fear of Mr. Brown once again challenging her in front of the public.

## Conclusion:

The evidence suggests Michael Brown accused Fray Lynch of lying in a public forum with members of the community and other City officials. During this exchange, Mr. Brown used a tone and demeanor, which were intimidating and belittling of the officer as he repeatedly accused of Officer Lynch of not being truthful.

From this information the City has concluded that Mr. Brown exhibited unacceptable behavior that evening towards Officer Lynch.

This incident is compounded by the fact that Mr. Brown was found to have exhibited inappropriate behavior towards this officer in a previous complaint. Therefore, Mr. Brown's behavior, during that public meeting, could be viewed as retaliatory. Retaliation is prohibited and a violation of Personnel Policy #101.1.

Since Mr. Brown, WHAAC Executive Director at the time of the incident, worked with Officer Lynch, this behavior could also be termed harassment. Per policy 101.1(3), "Harassment in this policy is also defined as verbal or physical conduct that disrupts or interferes with another's work performance or creating an intimidating, offensive or hostile work environment."

This is the third documented incident in which female employees found comments made by Mr. Brown offensive. Not all of the allegations have been proven, however, these complaints do indicate a pattern of inappropriate behavior. Although retraining has been taken and the seriousness of these violations has been communicated, the pattern seems to continue.

The City finds this type of behavior unacceptable, however, Mr. Brown is no longer under the jurisdiction of the City of Wilmington as he became an elected official on January 4, 2005. Therefore, these findings will be forwarded to Theodore Blunt, President of City Council, for follow up. Recommendations for next actions should be referred to the City Solicitor's Office.

000067

PA-22

| | |
|---|---|
| Complaint: | Hostile Work Environment |
| By: | Fray Lynch |
| Department: | Police Department |
| Status: | Regular |
| Against: | Michael Brown |
| Title: | Executive Director, William Hicks Anderson Community Center/Council Member-Elect |
| Date of Incident: | November 23, 2004 |

<u>List of Employees Interviewed</u>
Fray Lynch
Michael Brown
Michael Groark, Police Officer
Hanifa Shabazz, Council Member-Elect
Bud Freel, Council Member
Marcia Starks, Mayor's Officer Constituent Services Liaison

000068

PA-23



**CITY OF WILMINGTON**
**DEPARTMENT OF PERSONNEL**

Administrative Division    Wilmington, Delaware 19801

## CONFIDENTIAL MEMORANDUM

**TO:**    Michael Brown, Executive Director, William Hicks Anderson Community Center
Department of Parks & Recreation

**FROM:**    Monica Gonzalez-Gillespie, Director of Personnel
Department of Personnel

**DATE:**    December 7, 2004

**RE:**    Harassment Complaint Filed By Fray Lynch

It is the policy of the City of Wilmington to promote a productive work environment, where all relationships among persons in the workplace will be free of any type of harassment.

Officer Lynch has complained that you used sexually explicit language on several occasions and was specifically offended during an interchange in your office earlier this year. During our interview, you admitted asking Officer Lynch to "hook a brother up" referring to a female friend of hers from Philadelphia. The investigation did not reveal sufficient evidence to substantiate other sexually suggestive comments that were included in the complaint by Officer Lynch.

The comment that you did make, however, was inappropriate and not acceptable under the City's Harassment-Free Work Environment Policy. As a result, recommendations have been forwarded to your Department Head, who will be contacting you shortly to review.

Harassment complaints are serious and should be taken as such especially if the complaint is against person in a management position. Please find attached copies of the Harassment-Free Workplace Environment Policy, the Code of Ethical Conduct Policy Statement, and the Wilmington City Code Division 6 - City Employees' and Elected and Appointed Officials Code of Conduct, which details the types of behavior that are unacceptable in the City of Wilmington workplace. All City employees are required to adhere to these policies and code provisions, specifically refrain from using any language or behavior that may be offensive or appear improper to other employees. Also be advised that any type of retaliation is illegal and unacceptable.

If you should have any questions, please contact me at 576-2460.

MGG
Attachments (3)

cc:    Romain Alexander, Director of Parks & Recreation
Alex Mili, Assistant City Solicitor
Elinza Cain, Employee Relations Advisor
Personnel File                                    000032

*City/County Building  ♦  800 N. French Street. 4th Floor  ♦  Wilmington, Delaware 19801*
*(302) 571-4280*

*PA-24*

**PRIVILEDGED AND CONFIDENTIAL**

Complaint:      Harassment
By:               Fray Lynch, Police Officer, Wilmington Police Department
Against:        Michael Brown, WHAAC, Department of Parks & Recreation

**Background:**

1. Officer Lynch is assigned to the Weed N' Seed program (hereafter 'the program"), which designates the police officer's deployment to a geographical location that includes the William Hicks Anderson Community Center (hereafter "the center"). Michael Brown is the Executive Director of the center.
2. As part of the program, police officers regularly visit the center. Upon receiving the complaint, Officer Lynch was asked to continue with the program, but to avoid visiting the center.
3. Mr. Brown had complained that the police officers assigned to this program did not visit the center as often as intended by the program.

**Findings:**

1. When asked about the specifics of the incident cited in Lynch's complaint, Brown stated that he had a conversation with the officer about her going away to an island or such. He denied saying anything ever about her pants that day or any other day.
2. Brown did admit asking Lynch whom she was going with her on her vacation, to which Lynch replied a girlfriend from Philadelphia. Brown then admitted to asking the officer to "hook a brother up," referring to Lynch's female friend. Brown described her reply, as "We don't do married men." His response was "Not you, your friend from Philadelphia."
3. Brown admitted asking Lynch to bring pictures of her vacation. He denies asking about a bathing suit.
4. Brown states that she did not seem upset when she left that day.
5. Inspector Wright verified that Mr. Brown has complained that police officers assigned to the Weed N' Seed program were not visiting the center as Mr. Brown wanted. The Inspector denied having any conversations with Mr. Brown that included the comment "whitey is out to get you and me", regarding Officer Lynch's alleged discussion with Mr. Brown.
6. When asked if he hugged females when greeting them, Brown stated that he shakes hands and then pulls the person towards him shoulder to opposite shoulder.
7. Gene Brown, who Michael Brown supervises, was not able to corroborate Lynch's version of the incident.

000033

PA-25

Lynch Complaint
December 3, 2004
Page 2

8. Brown did have to correct an answer when asked if he knew Lynch prior to her being assigned to the Weed N' Seed program; first denying, then acknowledging knowing her.

## Conclusion:

There was not enough evidence to substantiate all of the allegations made by the complainant. Michael Brown did admit to certain comments that were sexually suggestive and deemed offensive to Officer Lynch. He did not admit to all of the comments that Lynch described in her complaint.

This is the second documented incident in which female employees found comments made by Brown offensive. In neither of these incidents could all of the allegations be proven or demonstrated; however, these complaints do raise concern and the City needs to ensure appropriate actions are taken. It does seem Brown exhibits poor judgment at times when conducting business with female employees.

After the last incident, Brown was directed to attend the Harassment-Free Work Environment training again within 60 days of the conclusion of the investigation. He did not attend until November of 2004, more than two years after he was instructed to do so. Harassment complaints are serious and should be taken as such, and more so if the complaint is against a person in a management position. The following recommendations should be implemented.

## Recommendations

1. Administer a Written Disciplinary Action to Michael Brown for violating the City's Harassment-Free Work Environment Policy & Procedure by using sexually suggestive language with another female employee. This inappropriate behavior is made worse by the fact that is was exhibited by Mr. Brown while employed in a position of authority. This action should direct Mr. Brown to refrain from this behavior.

2. Instruct Mr. Brown to use the Police Department chain of command if he needs to discuss an issue with Officer Lynch.

3. Instruct Mr. Brown to have a higher-ranking police officer or official of the City present when communicating with Officer Lynch.

4. Direct Mr. Brown to attend the Harassment-Free Work Environment training and reaffirm his receipt of the Code of Ethics policy statement and associated code provision through signature.

PA-26

**JAMES M. BAKER**
MAYOR

# City of Wilmington
## Delaware



LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801 - 3537

## MEMORANDUM

**DATE:**    March 9, 2005

**TO:**    Michael Brown, Council Member
City Council

**FROM:**    Monica Gonzalez- Gillespie, Director of Personnel
Department of Personnel

**RE:**    **Hostile Work Environment Complaint file by Fray Lynch**

It is the policy of the City of Wilmington to promote a productive work environment, where all relationships among persons in the workplace will be free of any type of harassment.

Officer Lynch has filed a hostile work environment complaint against you stemming from an incident in which she alleges that you singled her out during a public community meeting and accused her of being a liar with respect to the deployment of Weed and Seed officers. The complaint also stated that you raised your voice, used a demeaning and belittling tone, and repeatedly interrupted her as she tried to respond to a question from a community member. Officer Lynch feels this treatment was in response due to her pending harassment complaint.

The statements from the witnesses, as a whole, support the complaint as reported by Officer Lynch. The comments you made during that meeting were characterized as demeaning, belittling and aimed directly at this officer. This behavior was inappropriate and not acceptable under the City's Harassment-Free Work Environment Policy. Furthermore, there was a previous complaint from this particular complainant, which was partially substantiated. As a result, these findings will be forwarded to the President of City Council for follow-up.

000070

PA-27

Mr. Michael Brown, Council Member
Page 2
March 9, 2005

      Harassment complaints are serious and should be taken as such, especially if the complaint is against a person in a management position.  Please find the attached Harassment-Free Workplace Environment policy, which details the types of behavior that are unacceptable in the City of Wilmington workplace.  All City employees are required to adhere to this policy, and specifically refrain from using any language or behavior that may be offensive or appear improper to other employees.  Also be advised that any type of retaliation is illegal and unacceptable.

mgg
cc:    Theodore Blunt, President, City Council
       Alex Mili, Assistant City Solicitor
       Elinza Cain, Employee Relations Advisor

000071

PA-28

THEODORE BLUNT
President – City Case 1:06-cv-00351-JJF Document 46-2 Filed 11/20/2007 LOUIS P REDDING CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DE 19801-3537
(302) 576-2140
(FAX) 571-4071

# City of Wilmington
## Delaware



Residence:
602 West 39th Street
Wilmington, DE 19802-4035
762-6171

Email:
Ted@TedBlunt com

## MEMORANDUM

**TO:**   John R. Sheridan, City Solicitor

**FROM:**   Theodore Blunt, President of City Council *Theodore Blunt*

**DATE:**   March 16, 2005

**RE:**   <u>Resolution of Harassment Complaint against Michael A. Brown, Sr.</u>

I am in receipt of and have enclosed a copy for your review the March 9, 2005 correspondence from Monica Gonzalez-Gillespie, Director of Personnel regarding the November 29, 2004 harassment complaint against Councilman Michael A. Brown, Sr. I am also in receipt of a letter from Councilman Brown's attorney regarding the correspondence sent to him by the Director, and have enclosed a copy for your review as well.

Correspondence sent to Officer Fray Lynch indicated that the findings of the investigation were forwarded to me for follow up since Michael Brown is **now** an elected official. It is my position that this infraction and subsequent complaint was filed **prior** to him becoming a member of Council, and at a time when Mr. Brown was an employee of the City of Wilmington. As such, it is not within my purview or authority to address. In essence, I would be reprimanding and/or disciplining an Administration employee for an alleged infraction. This runs counter to the concept of separation of the powers of the executive and legislative branches of City government, and is a precedent I am certain we do not want to set.

It should be noted that Councilman Brown has, to my knowledge, not violated any Council rules or City of Wilmington policies and procedures since becoming a member of this body on January 4, 2005. Should any occur, they will be addressed as necessary.

If you have questions, feel free to contact me at 576.2140

c:   William S. Montgomery, Chief of Staff (w/o enc.)
   Monica Gonzalez-Gillespie, Director of Personnel (w/o enc.)
   Alex Mili, Assistant City Solicitor (w/o enc.)
   Michael Szczerba, Chief of Police (w/o enc.)
   Fray Lynch, Police Officer, WPD (w/o enc.)
   Elinza Cain, Employee Relations Advisor (w/o enc.)
   Michael A Brown, Sr., Councilman At-Large (w/o enc.)

000081

PA-24

OFFICE OF PUBLIC SAFETY

DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

## DEPARTMENTAL INFORMATION

**TO:**      **Elinza D. Cain**
             City Personnel

**FROM:**    Inspector James H. Wright
             Inspector of Uniform Operations

**DATE:**    **29 November 04**

**RE:**      **Hostile Work Environment Complaint**

Per City of Wilmington, Personnel Policy, I am forwarding you this date, a complaint received by our department regarding a hostile work environment complaint lodged against city worker Michael Brown by Officer Fray Lynch.

Said complaint was received on 24 November 04 from Sergeant Deborah Donahue regarding Officer Fray Lynch. Said complaint alleges that Michael Brown, a City employee made offensive remarks, at a community meeting which were demeaning in nature and humiliating.

This complaint was hand delivered to you this date, for follow-up/investigation per city policy. This is the second complaint received from this Officer and we still do not have a disposition on the original complaint hand delivered to your office dated 8 June 04.

cc: Chief Michael Szczerba
    Inspector Martin Donohue
    Officer of Professional Standards

000039

PA-30

# Office of Public Safety

# Department of Police

# Wilmington, Delaware

**Memorandum:**

**To:**      Michael J. Szczerba
             Chief of Police

**From:**    Captain Marlyn W. Dietz
             Commanding Officer
             Patrol Division

**Date:**    24 Nov 04

**Re:**      **Hostile Work Environment Complaint**


This memorandum is being submitted in reference to the attached three memorandums from officers under my command regarding the actions of Civ. Michael Brown. As you are aware several months ago Officer Fray Lynch made an official complaint to you and city government regarding the actions and comments of Mr. Brown. The officer involved has stated she has made numerous calls to the City Personnel Director to obtain the status of her sexual harassment complaint. According to her she has not received any response from the investigating authorities.

Upon reviewing the memorandums from the officers involved this situation is clearly growing and the actions appear to be getting worse. It is clear to see that the failure of the city to respond in a timely fashion to address this serious issue is leading to further actions being committed against the complainant. I am recommending that immediate action be taken by the City of Wilmington to ensure that one of its employees does not continue to be abused or harassed as stated in this and previous reports. The complainant's supervisor has done her best to prevent any contact between the alleged suspect and complaint however it is impossible for Sgt. Donohue to have any control over where the suspect comes and goes. Any assistance you can provide to the officer would be greatly appreciated.

000040

PA-31

TO:          Whom It May Concern

FROM:        Marcia Starks
             Community Affairs Advisor
             Quality Control Team

DATE:        December 21, 2004

RE:          WCCNPAC Meeting


On Tuesday November 23, 2004 I attended a meeting of the WCCNPAC block captains that was being held at their facility located at 6th & Madison Streets. I had spoken with Lieutenant Mitch Rock earlier that day about the fact that I was a little uncomfortable attending this meeting and he said that he would send two officers with me. Officers Fray Lynch and Officer Michael Groark met me at the location and we proceeded into the meeting. There were approximately fifteen people in attendance along with Councilman Bud Freel, Councilwoman elect Haniffa Shabazz along with members of Quaker Hill and Trinity Vicinity Civic groups whom I had suggested attend this meeting.

About fifteen minutes after the meeting had begun Mike Brown arrived. I was surprised to see that he was a part of this group. Around this time the discussion turned to the Weed & Seed program and the Weed & Seed Officers. He started making statements accusing the officers of being out of the area on a regular basis and said he had observed them in other parts of the City. He demanded to know why this happened and who authorized this action. He started firing off questions and directing them to Officer Fray Lynch. She answered his initial questions but he was not satisfied with her answer. By this time he had raised his voice and was verbally assaulting her. When Officer Groark started to respond Mike Brown stated that he wanted to hear it from Officer Lynch. He then proceeded to shout "tell the truth" while gazing directly at her. Mr. Brown then verbally attached other members of the police department.

I have never witnessed anything this disgraceful and hope to never again see anything like this happen. Mike Brown was obviously grandstanding and trying to intimidate the officer. The situation was so outrageous that I motioned to the officers that we needed to leave this meeting. I felt bad because the officers were only at this meeting because of me. When we got outside we were all upset and stunned by the behavior of Mike Brown. His conduct towards Officer Fray Lynch was outrageous and she did nothing to bring on this attack from Mike Brown.

000052

*PA-32*

**Memorandum**

**To:**    **Brenda James-Roberts**
           **First Assistant City Solicitor**

**From:** Alex J. Mili, Jr.
          **Assistant City Solicitor**

**Re:**    **Fray Lynch - Sexual Harassment Complaint Against Michael Brown;**
           **Meeting with Bud Freel**

**Date:**  **December 30, 2004**


Today Director Gillispie and I met with Bud Freel in his capacity as a witness to the second incident in which Fray Lynch complained the Michael Brown harassed her. According to Lynch, the incident occurred on November 23, at a WCCNPAC community meeting attended by Weed and Seed officers. Freel was present at that meeting. Fray Lynch alleges that Michael Brown harassed her at that meeting.

Freel's version of events is in stark contrast to the version Hannifa Shabazz gave earlier this week. According to Bud, the attendees of the block captain's meeting asked Officers Lynch and (Mike) Gork about Weed and Seed deployment in the West Center City neighborhoods. Both officers explained that Weed and Seed regularly patrols the area, but may sometimes get called away if there is an emergency in another area. Mike Brown kept interrupting Lynch and demanding that she "tell the truth". He kept repeating: "Tell the truth."

Bud thought that Mike Brown's accusatory tone was excessive and unwarranted. The officers were polite and respectful, but Mike Brown was out of line, according to Bud.

*PA-33*

**Memorandum**

**To:**   Brenda James-Roberts
       **First Assistant City Solicitor**

**From:** Alex J. Mili, Jr.
       **Assistant City Solicitor**

**Re:**   Fray Lynch - Marcia Starks

**Date:** January 13, 2005


Today Director Gillispie and I met with Marcia Starks in her capacity as a witness to the second incident in which Fray Lynch complained that Michael Brown harassed her. According to Lynch, the incident occurred on November 23, at a WCCNPAC community meeting attended by Weed and Seed officers. Marcia was present at that meeting. Fray Lynch alleges that Michael Brown harassed her at that meeting.

According to Marcia, the officers were present for the sole purpose of escorting Marcia. The meeting was held at a building on Sixth and Madison Streets known as "the drug house." For that reason, Marcia requested police escorts for her attendance at the meeting. Officers Goark and Lynch were at the meeting for that purpose only. The meeting was not intended to be about policing, but somehow the discussion turned to that topic. Mike Brown repeatedly screamed at Fray Lynch. Marcia describes Mike Brown's conduct as "over the top". Marcia says she has been to many acrimonious community meetings where tempers flared and voices were raised, but Mike Brown's conduct was excessive. Mike Brown called Officer Lynch a "liar" and demanded that she "tell the truth". Officer Groark tried to intervene, but Mike Brown persisted in aiming his comments exclusively at Officer Lynch.

Marcia says that no words can accurately describe the abrasiveness of Mike Brown's conduct at that meeting.

PA-37

**Memorandum**

**To:**     **Brenda James-Roberts**
              **First Assistant City Solicitor**

**From:** Alex J. Mili, Jr.
              **Assistant City Solicitor**

**Re:**     **Fray Lynch - Michael Groark Interview**

**Date: January 14, 2005**

Today Director Gillispie and I met with Officer Mike Groark in his capacity as a witness to the second incident in which Fray Lynch complained that Michael Brown harassed her. According to Lynch, the incident occurred on November 23, at a WCCNPAC community meeting attended by Weed and Seed officers. Officer Groark was Officer Lynch's patrol partner who was present at that meeting. Fray Lynch alleges that Michael Brown harassed her at that meeting.

According to Officer Groark, the meeting was a "gripe session" in which the attendees complained that the police do not do their jobs adequately in West Center City. There were many questions about the Weed and Seed deployment. One attendee (not Mike Brown) asked if Weed and Seed officers were being pulled away from their assigned Weed and Seed area. Fray Lynch attempted to answer this question by explaining that officers assigned to Weed and Seed do not leave the area unless there's an emergency, such as a riot or an officer down. Mike Brown interrupted Lynch's response, called her a liar, and repeatedly demanded that she tell the truth. Officer Groark tried to intercede by explaining that Weed and Seed officers do not leave the area except in emergency.

Officer Groark knows that Mike Brown is outspoken, but he said even this incident was unusual for him. Officer Groak felt very uncomfortable by Mike Brown's hostile tone in calling Officer Lynch a liar, embarrassing her in front of more than two dozen members fo the public.

Officer Groark explained that Mike Brown knows the chain of command for deployment, and he knows that rank and file officers simply follow the deployment assignments of Captains and Inspectors. If Mike Brown has issues about deployment, he knows that rank and file officers can not address those issues. That is why Officer Groark believes that Mike Brown's comments toward Lynch were not made out of genuine concern for deployment of police officers, but only as an excuse to berate Officer Lynch.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FRAY LYNCH,                          :

                    Plaintiff,       :

            vs.                      :    Civil Action No.
                                          06-351 JJF
CITY OF WILMINGTON,                  :

                    Defendant.   :
                          - - -

            Deposition of MARLYN DIETZ, taken
pursuant to notice in the offices of City of
Wilmington Law Department, Ninth Floor, City/County
Building, 800 North French Street, Wilmington,
Delaware, on Tuesday, October 23, 2007, at 10:45 a.m.,
before Lorraine B. Marino, Registered Diplomate
Reporter and Notary Public.


                          - - -


                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Lynch v. City of Wilmington

**2**

1  APPEARANCES:
2      ROBERT T. VANCE, JR., ESQ.
3      Law Offices of Robert T. Vance, Jr.
       100 South Broad Street - Suite 1530
       Philadelphia, PA 19110
4      for Plaintiff
5      ALEX J. MILI, JR., ESQ.
       Assistant City Solicitor
6      City of Wilmington Law Department
       City/County Building - Ninth Floor
7      800 North French Street
       Wilmington, DE 19801
8      for Defendant
9  ALSO PRESENT:
10     FRAY LYNCH
11     - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

**3**

1          MARLYN DIETZ, having been first duly
2  sworn, was examined and testified as follows:
3  BY MR. VANCE:
4  Q.    Good morning, Captain Dietz. I am Robert
5  Vance. I represent Fray Lynch in this lawsuit she has
6  brought against the City of Wilmington. I will be
7  taking your deposition this morning. Have you ever
8  been deposed before?
9  A.    I have.
10  Q.    Okay. I just want to emphasize two rules.
11  Make sure that you give a verbal answer to the
12  questions that I ask you, because a record is being
13  made of the proceedings.
14         And secondly, if you don't understand a
15  question that I ask, make sure that you tell me that
16  you don't understand it, and I will rephrase the
17  question for you. Do you understand that?
18  A.    Yes, sir.
19  Q.    Okay. You are currently a captain with the
20  Wilmington Police Department; correct?
21  A.    Yes, sir, that's correct.
22  Q.    And how long have you been with the
23  Wilmington Police Department?
24  A.    Since January 25, 1982. Just closing out my

**4**

1  26th year.
2  Q.    And how long have you been a captain?
3  A.    I have been a captain since September 8 of
4  '98, so almost ten years, a little over nine years. I
5  am sorry.
6  Q.    Okay. Now, I want you to focus on the year
7  2004. And at that time was Officer Lynch in your
8  chain of command?
9  A.    She was.
10  Q.    Okay. Can you explain to me where she came
11  in your chain of command?
12  A.    During that timeframe Officer Lynch was
13  assigned to the community policing unit. She had been
14  selected by the sergeant and the lieutenant who were
15  in command to come up and be a community policing
16  officer working on neighborhood assignments and
17  problems.
18  Q.    Who was the sergeant at the time?
19  A.    I believe one of the sergeants was Sergeant
20  Deborah Donohue. The lieutenant was Lieutenant
21  Mitchell Rock. There was a couple sergeants in and
22  out in that timeframe, but I remember Debbie Donohue
23  being in her immediate chain of command.
24  Q.    Okay. And in November of 2004 or late

**5**

1  November 2004 do you recall being advised by Officer
2  Lynch of an incident involving her and Michael Brown?
3  A.    I was. I was advised of an incident, but I
4  don't know if it was in November. There was something
5  earlier, maybe like September-ish. I don't know the
6  exact dates, but something -- and then there was a
7  subsequent event.
8  Q.    All right. Let's talk about the first
9  incident. The records indicate that was June of
10  2004 --
11  A.    Okay.
12  Q.    -- where there was an incident involving
13  Officer Lynch and Mr. Brown at a rec center. Do you
14  recall that?
15  A.    I do, very specifically.
16  Q.    Okay. And what action did you take once you
17  were advised by Officer Lynch about that incident?
18  A.    The -- and again, you have the dates, but I
19  would say the June incident we will refer to,
20  Lieutenant Mitchell Rock came into my office, and he
21  advised me -- he said, "Captain, I need to speak to
22  you about a problem." I said, "What's the problem?"
23  He said, "I have a complaint from Officer Lynch," and
24  he said, "It's a very serious complaint." He said, "I

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    *PA-37*    302-655-0477

Lynch v. City of Wilmington
Marlyn Dietz

6

1  believe it deals in the area of sexual harassment."
2  So I said, "All right. Go on."
3      He says that there had been an incident that
4  had occurred at a recreation and community center
5  where at the time civilian Michael Brown, working, I
6  believe, in the capacity as a director at the Hicks
7  Anderson Center, he had apparently over a period of
8  time made some advances on the officer, asking her out
9  on a date and things of that nature. And she had told
10  him she doesn't date married men, as I recall the
11  lieutenant telling me, and she kind of just pushed off
12  his advances.
13      There had been an incident where something
14  happened where he turned off the light switch and made
15  some sexually oriented comments to her about another
16  individual that was present about "now she can do both
17  of us" or something. The officer at that time was
18  very upset by the comments. She reported it to her --
19  through her chain of command, through the lieutenant,
20  and that's when it came to me.
21      And at that point I spoke to the sergeant,
22  Sergeant Donohue, had her come into the office, and I
23  said, you know, "Can you tell me what is going on
24  here?" And she said basically the same thing the

7

1  lieutenant had said. And she said that, you know, she
2  had had experiences also with Mr. Brown in the past,
3  and she related a couple of those incidents.
4      Specifically, she mentioned out one incident
5  where when she was newly hired and there was some
6  event at the police station, I believe like a family
7  night or whatever, get-together, where he, like, tried
8  to come up and hug her or whatever, and she kind of
9  pushed him away and shook his hand. And he made
10  comments to her about how he, you know, he was the
11  main reason all these women were in this recruit class
12  or something of that nature. And she said she just
13  kind of like acknowledged, like, okay, fine.
14      And then went on to say that there
15  was -- she was a little perturbed about several
16  incidents where, when she was in the police academy,
17  where she had been -- her along with other female
18  recruits were called out of -- the academy was being
19  run by then Sergeant Cummings, now Captain Cummings,
20  and Lieutenant Stallings, now retired inspector Jim
21  Stallings. That her along with several other female
22  officers were called out for special inspections, as
23  they were referred to, by then Captain Gilbert Howell
24  and civilian Michael Brown. So she said she was -- so

8

1  she believes that what Fray was relaying was very
2  accurate and consistent with what had transpired with
3  her.
4      So I told her, "Make sure you document your
5  concerns or issues in your report, and we will, you
6  know, go through the matter." I said, "Where is the
7  officer now?" And she said she was over in the
8  lieutenant's office.
9      So we went over to the lieutenant's office,
10  closed the door, and, you know -- I know the officer
11  well enough -- I said, you know, "Fray, can you" --
12  obviously, she looked upset. I said, "I need to get a
13  better understanding of what exactly is going on with
14  you in this particular incident. What do you feel,
15  you know, what are you looking for from me? You know,
16  the city has certain policies, which obviously I will
17  adhere to and follow," because the city has pretty
18  much a zero tolerance for this type of activity.
19      I also told her -- I said, "Be mindful that
20  this individual does have some" -- I used -- I think
21  maybe used the word "thunder" or "clout" with people
22  in city government for years back. I believe when the
23  mayor was first a -- he was council president, this
24  individual was driving him around as he was running,

9

1  you know, politically for mayor. So he does have
2  some -- he did have some connections politically. And
3  also at the time he had now said he was running for
4  city council. "So be mindful that in my experiences
5  and dealings in the past, that, you know, there is
6  going to be some backlash from this. You know, I
7  support you. I stand behind you as your captain from
8  what you are telling me. And, you know, just be
9  mindful that anybody that is involved in this incident
10  will, I suspect, will feel some sort of repercussion
11  or backlash."
12      Fray then went on to tell me that, yes, she
13  wants to move forward with this. She wants it to be
14  an official and she wants the entire thing to go
15  through the formal process, because she felt that --
16  she clearly felt that she was a victim.
17  Q.    And did she, in fact, submit an official
18  complaint through the chain of command in the police
19  department?
20  A.    I believe she did. She wrote reports. I
21  had -- my first response while the reports were being
22  prepared is I went to my boss at that time was
23  Inspector James Wright, and I advised Inspector Wright
24  of what had taken place. He knew Mr. Brown very well.

3 (Pages 6 to 9)

10

1   They were, I would say, acquaintances and friends.
2       So my inspector said, "Well, make sure you
3   document everything. We will take a look at it."
4       So I did exactly that. I had everybody
5   involved write a report, submitted it to Inspector
6   Wright, and told the chief of police and the
7   inspector, "This is obviously a very serious incident.
8   I am not sure whether it could be deemed criminal or
9   not. You know, I am not the expert on that, but
10  somebody needs to look at this. This looks like it
11  could be potentially a criminal matter and/or
12  internally sexual harassment against the officer."
13  Q.    Who was the chief of police at the time?
14  A.    Michael Szczerba.
15  Q.    And after you had obtained the written memos
16  and provided them to Inspector Wright, do you know
17  what action, if any, Inspector Wright took with regard
18  to those memos?
19  A.    The package that was prepared, all I know it
20  was forwarded forward. As to whose hands it got to, I
21  can't really honestly tell you. I know it went from
22  the inspector to the chief, you know. Now, from the
23  chief, I am assuming it went to the director and then
24  up here to city personnel.

11

1   Q.    Now, do you recall when in time you had
2   given to Inspector Wright the package of materials
3   about the June 2004 complaint?
4   A.    It would have been within -- I can't give
5   you exact dates and times, but it would have been
6   within days of this. I deemed personally, my
7   experience and training that I received from the city,
8   I deemed this to be a serious incident and felt that
9   it needed to be immediately addressed.
10      And also, you know, we put some guidelines
11  for the officer to try to ensure her -- I will use the
12  term "safety," but I guess it is not really safe. But
13  just keep her out of the path of Mr. Brown due to the
14  serious nature of this. She was instructed, because
15  part of her duties was to go into the community
16  center, we asked her not to go in the community
17  center, to avoid any contact with him. So we tried to
18  create the best working environment for her to
19  continue with her career and her job and let this have
20  the least amount of impact and hopefully no contact
21  with the individual involved.
22  Q.    Now, after you gave the packet of materials
23  to Inspector Wright, were you contacted by anyone
24  outside of the police department about the June 2004

12

1   incident?
2   A.    I have never been contacted by anybody about
3   it other than Mr. Mili. Once I prepared that first
4   package, sent it through, didn't hear a thing. I
5   actually asked the officer, because I thought, you
6   know -- nobody told me whether it was going to be
7   criminal or not, because I thought it was on the edge
8   of whether or not it could be a criminal. So I don't
9   even know if it made it to the detectives or not.
10      I actually asked the officer. I said, you
11  know, "Fray, have you heard anything about your case?
12  It is very serious, and you know hopefully, you know,
13  we can find -- you know, see what is going on with
14  this." And she had basically said she had made
15  several calls to city personnel and that she has not
16  heard a response back. So this was over a period of I
17  guess a couple months, I probably checked with her two
18  or three times.
19  Q.    Now, is there a particular protocol that a
20  city official has to follow if they want to contact a
21  police officer on an official investigative matter?
22  A.    I don't know about an official. Usually it
23  is done by picking up a phone and contacting internal
24  affairs or contact the chief's office and say, "I need

13

1   to speak to Marlyn Dietz about a case." That's
2   normally what happens. Mr. Mili will call me up or
3   call the department and somebody from internal affairs
4   or -- like through this proceeding, I was contacted by
5   internal affairs, said be prepared to report on the
6   23rd and give a statement.
7   Q.    Okay.
8   A.    So there are certainly avenues or conduits
9   to make contact with officers.
10  Q.    After you gave the packet of materials to
11  Inspector Wright, did anyone contact you and attempt
12  to schedule an interview with Officer Lynch about the
13  June 2004 incident?
14  A.    I have never been interviewed by anybody,
15  and from what I gathered -- I asked my subordinate
16  personnel involved in the incident, and none of them,
17  to the best of my knowledge, during that window of
18  time had been contacted.
19  Q.    Okay. Now I would like you to shift your
20  attention to November of that same year. And do you
21  recall receiving notification that there was another
22  incident involving Officer Lynch and Michael Brown
23  that occurred at a community meeting?
24  A.    I did.

4 (Pages 10 to 13)

PA-39

Lynch v. City of Wilmington
Marlyn Dietz

14

1  Q.    And how was that incident brought to your
2  attention?
3  A.    Through the chain of command. The sergeant
4  and the lieutenant had approached me, and I believe
5  Officer Groark may have even been present. Everybody
6  was very upset, saying that an incident had occurred
7  at a -- don't hold me to it. I want to say like a
8  WCCNPAC community meeting or some community meeting
9  where now councilman-elect -- because during this
10  time, like I said, Mr. Brown had been running for
11  office. He had been a councilman-elect at this point.
12  Councilman-Elect Brown is present, and during this
13  meeting there was some question, as I recall, about
14  something to do with, like, do you get pulled from
15  your assignments or whatever, which occasionally
16  officers do get pulled, even though they are
17  specifically supposed to be in certain grids.
18      The officer responded to I believe it was a
19  woman that made -- asked the question, from what they
20  told me, the best I remember. And Councilman-Elect
21  Brown was in the back, and apparently he just went off
22  is the best way to describe it. As a matter of fact,
23  I think they may have been the words that Marcia
24  Starks, who works here in the city, had told me, that

15

1  he just went off on her and "Don't you lie to these
2  people, Officer Fray," was very demeaning and hostile
3  towards her, and to the point where I believe Officer
4  Groark tried to intervene. And it sounded like from
5  what both -- everybody described, that Councilman-
6  Elect Brown just kind of cut him off, like, "This
7  isn't about you. This is, you know, about her." And
8  he just berated her publicly pretty bad, pretty bad.
9  Q.    Now, once you were advised of that incident,
10  what action did you take?
11  A.    I told everybody the same as the first:
12  Document this. We have got to have documentation. I
13  will take this over and again reiterate the urgency of
14  this matter. We have now had a second incident. And
15  I could tell, you know, Fray was -- Officer Lynch was
16  very -- she was very obviously upset. You could just
17  see it all over her face, her body, her actions. She
18  was very, very upset about what had -- how she had
19  been embarrassed publicly by him.
20  Q.    And did you, in fact, communicate to your
21  superior about the incident?
22  A.    I did. And I wrote a report, I think.
23  That's the only document I have left here, I believe,
24  of mine is I wrote a one-page report around the 24th.

16

1  And again, I told everybody involved, "Just be
2  prepared. There is -- you know, I am sending it up.
3  This is going to -- there is going to be some
4  repercussions here for everybody involved, but we have
5  got to address this issue."
6  Q.    In connection with discovery in this case
7  the city's attorneys provided to me a copy of a memo
8  dated November 24, 2004, from you to Michael Szczerba,
9  the chief of police, regarding a hostile work
10  environment complaint. Is that the document that you
11  are referring to?
12  A.    It is.
13  Q.    And that document has a number that was
14  placed on it by the city of 000040. I just want you
15  to take a look at it.
16  A.    I didn't bring my reading glasses, but this
17  does appear to be the document that I created on
18  November 24.
19  Q.    And that is your signature on the document?
20  A.    It is definitely my signature.
21  Q.    And why did you decide to write this memo to
22  Officer -- I am sorry -- to Chief Szczerba?
23  A.    Well, everybody would, again, have to do a
24  package regardless as a part of the chain of command,

17

1  as her supervisor. Everybody would write on that was
2  involved in the incident and any recommendations or
3  anything else. And anytime there is an investigation
4  or anything, you would write something to provide
5  recommendations, and that's what I did.
6      In this case I was making it, I think, very
7  clear that we have now had a second incident. An
8  officer under my command, a subordinate personnel
9  is -- I used the word "victim." She was a victim
10  again. And you know, from what she was describing to
11  me, she was not getting any phone calls, no return
12  calls, anything about the first incident, the first
13  documented incident, and that somebody needed to
14  immediately respond to this situation in some way,
15  shape, or form.
16      Again, it is out of my hands. You know, I
17  am only a certain cog in the system, but the cogs
18  above me needed to address this. It needed to cease,
19  and the officer needed to be able to work in an -- you
20  know, in an environment conducive to doing police work
21  and doing her job.
22  Q.    Did Chief Szczerba respond to the
23  November 24, 2004 memo?
24  A.    I don't know if he wrote on it or not,

PA - 40

5 (Pages 14 to 17)

Lynch v. City of Wilmington
Marlyn Dietz

---

18

1  whether there was just -- it is not unusual for people
2  to put initials and signatures and forward it through
3  the chain of command.
4  Q.      Did you subsequent to providing that memo to
5  Chief Szczerba hear from anyone outside of the police
6  department about this particular memo or the incident
7  that the memo relates to?
8  A.      The only -- well, there was a lot of things
9  that happened after this package went through.
10  Q.     That's my next question, but --
11  A.     Okay. Everybody that was involved in this
12  has been at some point or another battered around.
13  But I will start with the chief told me that my memo
14  had made it up and that he received a phone call from
15  the director of city personnel, and it wasn't a very
16  favorable phone call. He didn't go into details, but
17  she was not pleased with my report.
18  Q.     Did he explain to you what the director --
19  and that would be Monica Gillespie?
20  A.     That's correct.
21  Q.     Gonzales Gillespie?
22  A.     Yes.
23  Q.     Did he explain to you or did he tell you
24  what she said that made him believe that she was not

---

19

1  pleased with the memo?
2  A.      As I recall, it was something to the extent
3  of what -- wait a minute -- what in the hell or who in
4  the hell is Captain Dietz to send a memo like this or
5  something to that extent. I can't remember the exact
6  verbiage, but it was clear that sending up this memo
7  the way it was written was very upsetting.
8          So I told him I expected myself and the
9  others that were all involved in this to feel it in
10  some way, shape, or form, but we are doing what we had
11  to do for our employee.
12  Q.     Did anything else occur as a result of
13  sending that memo that you recall?
14  A.     Oh, the onslaught started for everybody that
15  was involved in this particular incident. I will
16  start with myself. But it ranges down from myself,
17  Lieutenant Mitchell Rock, Sergeant Donohue, and
18  Captain Nancy Dietz, who Corporal Lynch had spoke to,
19  had submitted a report. So everybody that was
20  involved in this thing felt in some way, shape, or
21  form a repercussion.
22          Prior to this I had been patrol commander
23  since '98. In '01 I became the lone patrol commander,
24  went from three to one. So I was in charge of

---

20

1  approximately 200, 180 to 200 personnel. Never heard
2  anything from Mr. Brown during that time even when he
3  was running for office. I would say within days of
4  this memo right here (indicating), my November 24
5  memo, all of a sudden he was calling out for myself
6  and Lieutenant Rock to be removed, showing up at I
7  want to say a public safety meeting where John
8  Sheridan was present and he went off about -- he
9  didn't say us by name, but he said, "The captain and
10  the lieutenant in charge of patrol need to be removed.
11  They are bad for morale," and just, like, started
12  bashing both of us, actually to the point where I
13  believe Mr. Sheridan, who was in executive session,
14  kind of cut him off and said, "Look, you can't go down
15  that road."
16          He was on a ride-along -- and I don't have
17  the exact dates. Lieutenant Rock has all the files.
18  He has taken them. They are not in the police
19  station, because we had a pretty extensive file about
20  what transpired. But he took -- sometime in December
21  of that year Captain Ayala took Mr. Brown for a ride-
22  along, and during a part of that ride-along I was one
23  of the officers in charge with the highway safety
24  checkpoints. I am out on a checkpoint, and again,

---

21

1  Councilman-Elect now Brown shows up with Captain Ayala
2  and, you know, just some very cordial -- I am always
3  professional, even though it is obvious he has a thing
4  out for me. I just -- very professional: "Yes, sir,
5  Mr. Brown. How are you doing, sir?" you know, that
6  kind of stuff. Some brief interaction: "Look forward
7  to working with you in your capacity as a councilman."
8  Just kind of left it at that.
9          He gets back in the car. Apparently he has
10  some dialogue between Captain Ayala. Captain Ayala
11  comes to me that Monday and said to me, "You and Mitch
12  better watch your ass." I am, like, "What are you
13  talking about?" He said he -- you know, he said, "I
14  asked him, 'Why do you hate Dietz and Rock so bad?'"
15  because apparently he was making derogatory comments
16  about us, the way it was described to me by Captain
17  Ayala. He said, "They had no business sending that
18  package through. They should have squashed it on
19  their desks. They'll see."
20  Q.     And when you said "Mitch," is that
21  Lieutenant Rock?
22  A.     Lieutenant Rock. I am sorry. Yes. And,
23  you know --
24  Q.     And did any other actions occur as a result

---

Lynch v. City of Wilmington
Marlyn Dietz

22

1 of the November 2004 memo specific to you?
2 A.    He several times called for our jobs. One
3 thing that really sticks out in my mind was that he --
4 Lieutenant Rock was involved in an off-duty incident
5 not even in the City of Wilmington, and the individual
6 that was subsequently arrested for his actions, this
7 councilman leaves the city, goes out, brings this guy
8 in to make a complaint against Lieutenant Rock which
9 was totally unsubstantiated and unfounded, but just
10 the constant harassment by him.
11        At one point he finally calls Lieutenant
12 Rock up and says something to Lieutenant Rock about,
13 "Well, listen, I'm really sorry," you know. And this
14 is now like in I want to say May. Mitch has the exact
15 dates and times. But it is a phone conversation where
16 he apologizes to Mitch about the way he had been
17 coming after us. He was trying to get us transferred
18 is what he was trying to do. And he said, "I thought
19 you guys sent her there to set me up."
20        We were like -- Mitch said to him, you know,
21 "Councilman, I wish I had time to do that. You know,
22 I don't have time for that kind of nonsense. We had
23 nothing to do with it. We just forwarded it through
24 the chain of command."

23

1        He goes, "It must have been the sergeant
2 then" was his comment to Lieutenant Rock. If it
3 wasn't Dietz and Rock, then it must have been the
4 sergeant.
5        So during that same timeframe several
6 anonymous letters had come out from November to, like,
7 that incident with Lieutenant Rock where Lieutenant
8 Rock and I were named as racists. We were called all
9 kinds of nasty stuff. It was a vicious attack on
10 Lieutenant Rock, myself, and Nancy Dietz.
11        I get called into my inspector's office, and
12 again, I can't give you the exact dates. Mitch has
13 them. But it was sometime in, like, March. And my
14 boss, Jim Wright, says to me, "Marlyn, listen. There
15 is too much heat on the chief over this stuff with you
16 and Mitch. You know, we need to move you."
17        I was like, "Wait a minute. You are going
18 to transfer me because this guy -- I did the right
19 thing. I followed procedure and protocol. I
20 forwarded a sexual harassment complaint. This guy,
21 you know, is attacking my credibility."
22        He said, "Well, there is a lot of issues
23 here." And I said, "Well, do you find it suspicious
24 that he happens to also be the person that is

24

1 receiving these letters? You know, he is the guy that
2 is showing up, Councilman Brown, showing up with these
3 letters saying he is the spokesperson for this
4 anonymous group." They were anonymous letters. I
5 said, "You don't think that there is some tie there?"
6        He goes, "Well, I am not going to deal with
7 that." He said, you know, "I am just going -- well, I
8 am going to move you guys." And I said, "Well, I
9 disagree with the move and I want to talk to the
10 chief." So he says -- the inspector says, "I will go
11 talk to the chief and I will let you know when you and
12 Victor are going to flip-flop."
13 Q.    Does the police department still have the
14 anonymous letters in its file?
15 A.    Mr. Mili would probably be able to --
16        MR. MILI:    We have them in our file,
17 yes.
18        THE WITNESS:    And/or Lieutenant Rock
19 may still have a copy in our file, because we have a
20 pretty extensive file on most of this action. So it
21 continues on to the Mitch Rock incident.
22        There is a second incident where my
23 boss calls me in and says again --
24

25

1 BY MR. VANCE:
2 Q.    And who is your boss?
3 A.    Jim Wright. Jim Wright says, "Well, we are
4 going to transfer you. You and Victor are going to
5 flip-flop." This is the second attempt to transfer
6 Lieutenant Rock and myself. I said, "Okay. Why am I
7 being transferred now?" because I was opposed to being
8 transferred. And he says -- he said staff -- he said
9 originally it was you have the most powerful job in
10 the organization and other people need an opportunity
11 to work in that job.
12 Q.    And that job being?
13 A.    Patrol commander.
14 Q.    Patrol commander. Okay.
15 A.    And I was, like, "Okay, so is everybody in
16 the police department going to move so we all can get
17 these opportunities?" And he said, "No. Just you and
18 Victor." And I said, "Inspector, this is crap," you
19 know. I may have used a few other adjectives. But
20 "This isn't right. I see what is going on. I am
21 being targeted here."
22        I actually went to the point where I wrote a
23 memo. Lieutenant Rock and I both wrote a memo right
24 around June 5 out of frustration of we were just being

26

1  targeted and beat up over this. Us, Nancy, Debbie
2  Donohue had started feeling things. And I wrote like
3  a one or two-line memo just saying -- somewhere
4  around, like, say, June 5 area, saying, "Listen, I am
5  asking for outside counsel. I want representation.
6  There is a conflict here. This guy is a councilman
7  now. He is clearly using his position to attack us,
8  trying to get us transferred. I am asking for outside
9  counsel and some representation in this matter."
10  Q.     Who did you write the memo to?
11  A.     Chief Szczerba. Chief Szczerba signed it
12  and provided me a copy back, forwarded through the
13  chain of command, and I believe his comments on there
14  were "Please review this. I believe this could be a
15  federal or state statute reference to whistleblower
16  law. These officers, you know, forwarded a sexual
17  harassment complaint." Sends it up to the city law
18  department. I know it makes it to the city law
19  department.
20        The chief gets back to me a week later maybe
21  and says, "Listen, I spoke to Rose Tassone in the city
22  law department, and she advised that they are not
23  going to be able to provide you with any counsel on
24  this matter at this particular time." So I asked for

27

1  it in writing. I said, "Please give me a written
2  response back."
3  Q.     Did you get the response in writing?
4  A.     It is funny you say that. Asked for the
5  written response probably four or five times now, and
6  to the date as we are sitting here today on the 23rd
7  at 11:00, I still have not received a written response
8  back to my correspondence.
9  Q.     Your correspondence to Chief Szczerba was
10  June 5 of 200 --
11  A.     '5.
12  Q.     -- 5. And this is October 23, 2007. You
13  have received no response; is that right?
14  A.     That's right. I asked for it again about
15  maybe three or four months ago, and it was being
16  worked on.
17        Again, Mitch and I had just reached a level
18  of frustration of being -- trying to get transferred,
19  being targeted, trying to get harassed by this guy. I
20  mean, this guy out and outright said, you know,
21  "They'll see." We knew what was coming, and it all
22  started the day after my November or a day or two
23  after my November 24 memo of '04.
24  Q.     Are there any other actions that you can

28

1  recall now that occurred in response to your
2  November 24, 2004 memo?
3  A.     Mitch and I eventually did get transferred.
4  Q.     When was that?
5  A.     Well, we were called in August of 2005. My
6  inspector called me in and said, "Marlyn, you are
7  trading with Victor Ayala on October 1, no questions
8  asked, and it is approved by the chief." And I said,
9  "Okay. Can I ask now why I am being transferred?" I
10  said, "I have heard that it was too much heat. I
11  heard it was the most powerful job in the
12  organization. Now what's the third excuse?" And he
13  says, "It is staff development."
14  Q.     And what -- I am sorry. Go ahead.
15  A.     He said staff development, because I had
16  been a captain for seven years in patrol division or
17  almost seven years in patrol division. And I said,
18  "Staff development. So we are developing our entire
19  staff." And he said, "Well, you and Victor are the
20  only two moving." And I said, "Well, all the other
21  captains have been in place, you know, at this point
22  four or five years. How come they are not moving?"
23  And I said, "I object. Even though the chief said, I
24  object." I wrote a one-liner to the public safety

29

1  director.
2  Q.     Go ahead. Continue.
3        Oh, that was it. You were transferred from
4  patrol commander to what position?
5  A.     I became where I am currently at now,
6  technology and communications.
7  Q.     And as patrol commander how many
8  subordinates did you have responsibility for?
9  A.     Anywhere from 180 to 200 basically. I ran
10  all uniformed operations, all tactical squads,
11  everything, for the city.
12  Q.     And as the technology and communications
13  commander?
14  A.     Yes.
15  Q.     How many people are you responsible for?
16  A.     I have a lieutenant, a sergeant, a corporal,
17  and then about 35 civilians.
18  Q.     And as patrol commander the 180 to 200
19  subordinates were all police officers?
20  A.     All sworn officers. They were in charge of
21  the 24/7 365-day operation.
22  Q.     Are there any other actions that occurred in
23  response to the November 24, 2004 memo that you recall
24  right now?

Lynch v. City of Wilmington
Marlyn Dietz

30

1  A.    There may have been some other things, but
2  off the top of my head, no. I would have to check
3  with Lieutenant Rock. He has most of our -- I haven't
4  been able to catch up with him. He is now employed by
5  a different company, so -- but I do know that Debbie
6  Donohue and Nancy Dietz both have incidents that I am
7  sure that they will be able to enlighten you on.
8  Q.    Do you know when Lieutenant Rock retired
9  from the police department?
10  A.    He retired -- he actually left here around
11  January 1 of this year, and I believe he is officially
12  going onto pension this month. I think his time
13  carried him through till now.
14      MR. VANCE: Okay. All right. Give me
15  a minute and I will speak with Officer Lynch.
16      (Recess taken.)
17  BY MR. VANCE:
18  Q.    Okay, Captain Dietz. I just wanted to
19  confirm, you made reference in your testimony to a
20  police file on the incident. And does the police
21  department still maintain that file?
22  A.    I don't know what happened to the official
23  file that was down there. I have some, you know --
24  all I have personally is my memo that you have there.

31

1  I just brought that up off of my computer.
2  Q.    Right.
3  A.    I am not sure what is still down there.
4  Lieutenant Rock and I have some notes which -- kind of
5  just on different things, when we were being targeted
6  and beat up on, some, you know, little things like, as
7  an example -- I forgot one -- Mitch and I were newly
8  put into this technology and communications division
9  on October 1. Gilbert Howell makes inspector at
10  that -- shortly thereafter. He is announced as the
11  new inspector, who -- he and Mr. Brown have a very
12  close relationship.
13  Q.    Is this Gilbert Howell the same Gilbert
14  Howell --
15  A.    He is the one that was at the police academy
16  having special inspections.
17  Q.    Yes.
18  A.    Yes. He becomes my new boss, and in
19  December, the first week of December, I was off. I
20  usually take off. This is my time of the year. I am
21  a big hunter, outdoors person. I take off for about a
22  month, three and a half weeks, four weeks' vacation.
23  He gets promoted while I am off. I come back. Within
24  a matter of days he tries to transfer Lieutenant Rock

32

1  from the radio room communications, which is an all
2  day-work, Monday through Friday job, he tries to
3  transfer him back to a shift work, 24-hour job, you
4  know, rotation, and the guy has only been in his new
5  job for five weeks. Or I take that back. Maybe eight
6  weeks. Eight weeks. October, November.
7      And the chief of police got the memo,
8  because it was a posting for Mitch's job, and said,
9  "What is this? Does he want to be transferred?" And
10  he said, "No." And he said, "But I think he needs
11  patrol experience." So the chief cited two or three
12  other lieutenants that for years have never gone back
13  to patrol. And on top of that, Lieutenant Rock was my
14  XO on patrol and assisted me with the operations of
15  180 to 200 people, and Mitch was like my lifeline. We
16  work very close together.
17      So the chief told him -- he said, "If you
18  want to transfer Lieutenant Rock, you bring Captain
19  Dietz and Lieutenant Rock in here for a meeting and
20  you explain what is going to take place and why you
21  want to transfer them." And Inspector Howell took the
22  memo back.
23  Q.    You said -- you referred to Lieutenant Rock
24  as your XO.

33

1  A.    Oh, executive officer. I am sorry. In my
2  absence he is the commanding officer of the division.
3  And I had six lieutenants assigned to me at the time.
4  He was one of the six. And again, I refer to him as
5  the XO. He would have full operational powers in my
6  absence.
7  Q.    Okay. Would you, if you have notes that you
8  made about these incidents, would you give them to
9  Mr. Mili?
10  A.    I will get ahold of Lieutenant Rock.
11  Q.    So that -- we can make a request. And if
12  you have notes from Lieutenant Rock also, give them to
13  Mr. Mili.
14  A.    Okay. I will see what Lieutenant Rock has.
15  Again, he has everything. I told him to take it out
16  of the Public Safety Building; I didn't want it
17  around. And he took it to his personal residence. So
18  I am not sure exactly what he has, but there was some,
19  you know, dates and times, like the transfer incident,
20  things of that nature, you know.
21      What else was there? That was -- oh,
22  Councilman Brown stopped Lieutenant Rock on the street
23  one day and said, "You know what? You really need to
24  be back out there. You need to be in the mix. You

PA - 44

9  (Pages 30 to 33)

Lynch v. City of Wilmington
Marlyn Dietz

34

1  need to go back to patrol division so you can be
2  seen." Lieutenant Rock is, like, "Okay. Yes, okay,
3  Councilman. Thank you very much." He is like what --
4  and then at the same timeframe, that is when Gilbert
5  Howell was trying to transfer Mitch out of the job.
6      So, I mean, it was -- it is all intertwined.
7  And when you talk to the other two officers coming in,
8  Nancy can cite several things. In an interview she
9  had with the mayor regarding an upcoming promotion, he
10  made it known that Councilman Brown told him that she
11  has a rebel flag in her office or something like that
12  and that he made comments to the public safety
13  director that he was, referring to Captain Nancy
14  Dietz, he was going to get her, you know, comments
15  like that. So this is just a pattern with this guy.
16  Q.    Michael Brown made comments --
17  A.    Yes.
18  Q.    -- to the public safety director that he was
19  going to get Nancy Dietz?
20  A.    Nancy Dietz.
21  Q.    Related to Officer Lynch's incidents?
22  A.    Well, Nancy, or Captain Nancy Dietz wrote a
23  report about Officer Lynch's things. Officer Lynch
24  apparently had come to her and discussed some issues

36

1  felt that it merited enough that he came over to
2  Captain Nancy Dietz's office in internal affairs
3  division and said, "I want to let you know what this
4  guy said," and told her that, you know, he said he was
5  going to get her.
6  Q.    And who was the public safety director?
7  A.    Jim Mosley.
8      And then Debbie Donohue, I know she had an
9  incident where she was in evidence and got
10  transferred, and I think, if I am not mistaken -- if
11  you speak to her, she can enlighten you a little more,
12  but I think there was comments made on council floor,
13  so it should be on TV or whatever, where he comments
14  about, you know, people not being qualified in the
15  evidence detection job. Shortly thereafter she got
16  transferred on a technicality.
17      She was not a fingerprint expert, as I
18  recall, and that job posting, which was written by a
19  sergeant back years ago who was a fingerprint expert,
20  kind of to protect his job, put that clause in there,
21  and she wound up getting transferred, so she got
22  transferred back to patrol from an all day-work
23  evidence job.
24  Q.    And when you made a reference to the

35

1  that she felt were important, I think the way she was
2  being treated by other officers in the building and
3  around. And I think there may have been a female link
4  there that she kind of looked at her as the senior
5  commanding staff officer, and she had spoke to her.
6      And then she generated a report, because
7  Mr. Brown was walking around the building with full
8  keycard access, just could go anywhere he wanted, when
9  he wanted, as if he was a police officer. And Captain
10  Nancy Dietz tried to address some of those issues but
11  Officer Lynch had brought up to her, because I believe
12  at least on one occasion, if not more, he had just
13  walked in on her in another private office-type
14  setting, you know -- well, it is an open office, but
15  the community policing area, and she was concerned.
16      I remember one time Captain Nancy Dietz said
17  that there was -- her sister was going through some
18  marital issues or whatever, and there was a complaint
19  made that Captain Nancy Dietz was involved in this big
20  incident, and, you know, Mr. Brown provided this
21  information to the public safety director, and there
22  was a special meeting held about it. And Nancy can
23  give you -- or Captain Nancy can give you more
24  details, but at that point the public safety director

37

1  building, you meant the police building, that
2  Mr. Brown had key access to the police building?
3  A.    Yes, sir. He had -- we carry little
4  keycards to click in so it monitors where you are
5  going.
6  Q.    Correct.
7  A.    And he had access all around the building.
8  Q.    Do you have any idea how he obtained key
9  access to the police building?
10  A.    Well, funny you say that. I had wrote -- I
11  had discussed the issue, wrote reports on it that, you
12  know, obviously certain personnel should have limited
13  access, whether he is a councilman or not. Jim
14  Mosley, Director Mosley, was allowing it. Apparently
15  it had come up, that and along with an issue involving
16  him -- he was the only councilman that had a police
17  radio. He was allowed to have a police radio. Tried
18  to address those issues because -- the radio and, B, I
19  am in charge of the keycard access.
20      At the chief's request we removed his access
21  to limited areas, which was the chief's complex area
22  and the front access off the main door. The rest of
23  the areas that are secured, evidence, all those other
24  areas he was removed from access.

PA-45

Lynch v. City of Wilmington
Marlyn Dietz

38

1    I know on at least one occasion Lieutenant
2  Rock witnessed Inspector Howell then with Mr. Brown
3  downstairs trying to get full, complete keycard access
4  again after the chief had ruled that he was only going
5  to have limited access.  And the officer involved did
6  not wind up doing it, allowing that access, for
7  whatever reason.  I think the machine wasn't working
8  or whatever, because the inspector, being the ranking
9  commanding officer -- and the officer came over and
10  told Lieutenant Rock, and we again broached the issue,
11  and Director Mosley was making the determination on
12  what access Mr. Brown was allowed -- Councilman Brown
13  was allowed to have to the building.
14       So today I can't tell you what it is.  It
15  has changed back and forth.  It has been so many
16  times, I can't tell you what access he has right now.
17  He does have a radio and a keycard.
18            MR. VANCE:  All right.  I don't have
19  any other questions for you.  Thank you very much,
20  Captain.
21            MR. MILI:  You know the routine.  You
22  can read and sign or, if you trust her to take it
23  accurately, you can waive reading and signing of the
24  transcript.

39

1            THE WITNESS:  I waive it.
2                - - -
3         (Deposition concluded at 11:27 a.m.)
4                - - -
5         (There were no exhibits marked.)

40

1            CERTIFICATE
2       I, LORRAINE B. MARINO, Registered
3  Diplomate Reporter and Notary Public, do hereby
4  certify that the witness, MARLYN DIETZ, after being
5  duly sworn by me, was examined by counsel for the
6  respective parties and the questions of said witness
7  and his answers were taken down by me in stenotype
8  notes and thereafter transcribed into typewriting at
9  my direction.
10       I certify that the foregoing is a true
11  and correct transcript of the testimony given at said
12  examination of said witness.
13       I further certify that reading and
14  signing of the deposition were waived.
15       I further certify that I am not
16  counsel, attorney, or relative of either party, or
17  otherwise interested in the event of this suit.
18
19
20
         Registered Diplomate Reporter and Notary Public
21         Certificate No. 181PS/Exp.: Permanent
22
    Date:  10/24/07
23
24

Lynch v. City of Wilmington

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FRAY LYNCH,                              :

               Plaintiff,   :

         vs.                 :    Civil Action No.
                              06-351 JJF
CITY OF WILMINGTON,                      :

            Defendant.   :
                  - - -

      Deposition of MICHAEL J. GROARK, taken
pursuant to notice in the offices of City of
Wilmington Law Department, Ninth Floor, City/County
Building, 800 North French Street, Wilmington,
Delaware, on Tuesday, October 23, 2007, at 9:18 a.m.,
before Lorraine B. Marino, Registered Diplomate
Reporter and Notary Public.

                  - - -

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

PA-47

Lynch v. City of Wilmington

2

1  APPEARANCES:
2       ROBERT T. VANCE, JR., ESQ.
        Law Offices of Robert T. Vance, Jr.
3       100 South Broad Street - Suite 1530
        Philadelphia, PA  19110
4         for Plaintiff
5       ALEX J. MILI, JR., ESQ.
        Assistant City Solicitor
6       City of Wilmington Law Department
        City/County Building - Ninth Floor
7       800 North French Street
        Wilmington, DE  19801
8         for Defendant
9  ALSO PRESENT:
10      FRAY LYNCH
11        - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

3

1             MICHAEL JAMES GROARK, having been
2   first duly sworn, was examined and testified as
3   follows:
4   BY MR. VANCE:
5   Q.    Good morning, Officer Groark.  I am Robert
6   Vance, and I represent Fray Lynch in this lawsuit that
7   she has brought against the City of Wilmington.  I
8   will be taking your deposition.  Have you been deposed
9   before or --
10  A.    Years ago in my teens, when I crashed a car
11  into somebody.
12  Q.    Okay.  All right.
13  A.    But no.
14  Q.    All right.  Well, I just want to just go
15  over a few quick rules.  Just make sure that when you
16  answer my questions, you give a verbal response to the
17  questions, because the court reporter, Ms. Marino, is
18  making the record, and she can't interpret your body
19  movements and sounds and things that are not words.
20  Do you understand that?
21  A.    Yes.
22  Q.    And also, if you don't understand a question
23  that I ask you, please make sure that you tell me you
24  don't understand it, and I will rephrase it, because

4

1   when I ask you a question and you answer it, I am
2   going to presume that you understood the question and
3   that your answer is responsive to the question I
4   posed.
5   A.    Okay.
6   Q.    Do you understand that?
7   A.    Yes.
8   Q.    Okay.  All right.  You are a police officer
9   with the City of Wilmington?
10  A.    Yes.
11  Q.    And how long have you been a police officer?
12  A.    Since February 23, 1998.
13  Q.    What is your current rank?
14  A.    Senior corporal.
15  Q.    All right.  And at some point in time were
16  you a partner of Fray Lynch, the plaintiff in this
17  case?
18  A.    Yes, I was.
19  Q.    And do you recall when you first became her
20  partner?
21  A.    I would say sometime between April of 2004
22  up until October, November of 2004.
23  Q.    All right.  And at the time what was your
24  rank?

5

1   A.    I believe at the time I was a corporal.
2   Q.    And are you familiar with the Weed and Seed
3   Program?
4   A.    Yes, I am.
5   Q.    Can you just for the record briefly state
6   what the Weed and Seed Program is?
7   A.    It is a federal grant out of D.C. to fund
8   officers to be assigned to specific neighborhoods.
9   And the Weed and Seed Program works with law
10  enforcement and social service programs in the
11  specific community to literally they say weed out the
12  bad and seed in the good.
13  Q.    And in 2004 were you working in the Weed and
14  Seed Program --
15  A.    Yes, I was.
16  Q.    -- along with Officer Lynch?
17  A.    Yes.
18  Q.    And as part of your duties at that point
19  were you required to attend community meetings?
20  A.    Yes.
21  Q.    Okay.  I want to focus your attention on
22  November of 2004.  Do you recall attending an evening
23  community meeting with Officer Lynch relating to the
24  Weed and Seed Program?

2 (Pages 2 to 5)                PA-48

Lynch v. City of Wilmington
M. J. Groark

6

1    A.    Yes, I do.
2    Q.    And can you tell me; do you recall how many
3    people attended that meeting?
4    A.    I can't recall specifically. I would say
5    maybe about 20-something.
6    Q.    And do you recall where the meeting was
7    held?
8    A.    It was held at 634 North Madison Street.
9    Q.    Is that building owned by the City of
10   Wilmington, to your knowledge?
11   A.    I don't know who the building is owned by.
12   Q.    Do you know who had organized the meeting?
13   A.    There was a WCCNPAC meeting. WCCNPAC is
14   just an acronym. It is West Center City something. I
15   can't remember it all.
16   Q.    And you and Officer Lynch were invited to do
17   what?
18   A.    I think it is just a general community
19   meeting, one of the WCCNPACs, one of the social
20   service programs in that neighborhood. So it was a
21   meeting to discuss crime and law enforcement issues.
22   Q.    Are you familiar with Michael Brown?
23   A.    Yes.
24   Q.    And prior to this November 2004 meeting did

7

1    you know Mr. Brown?
2    A.    Yes.
3    Q.    Had you had any contact with him other than
4    knowing who he was?
5    A.    No. I mean, I knew who -- I only knew who
6    he was from prior being assigned to West Center City.
7    He was the director of the Hicks Anderson Center. So
8    I only knew him on a professional basis.
9    Q.    And did Mr. Brown attend that meeting?
10   A.    Yes, he did.
11   Q.    And at the time that he attended the
12   meeting, do you recall whether he was still the
13   executive director of the Hicks Anderson Center?
14   A.    He was at the time.
15   Q.    Now, were you at the meeting when Mr. Brown
16   entered the meeting?
17   A.    Yes, I was.
18   Q.    Was the meeting going on when he came into
19   the meeting?
20   A.    Yes.
21   Q.    Do you recall who was speaking when he came
22   into the meeting?
23   A.    I believe it was one of the individuals that
24   was at the meeting as a citizen. Couldn't give you a

8

1    name or anything.
2    Q.    And at some point after Mr. Brown entered,
3    did Officer Lynch address the people who were at the
4    meeting?
5    A.    Yes.
6    Q.    And can you tell me what you recall about
7    that incident?
8    A.    A specific question had been asked about how
9    the Weed and Seed officers were assigned to the
10   neighborhood and how they were deployed or whether or
11   not they ever were taken away from the neighborhood,
12   the West Center City neighborhood, for anything else.
13         So the response from Officer Lynch was that
14   we are -- that as officers, we are permanently
15   assigned to that neighborhood, and the only reason we
16   would ever leave West Center City would be to, you
17   know, respond to an emergency crime in progress, if
18   officers were asking for help in another part of the
19   neighborhood, you know, unforeseen things that come up
20   in police work. But we were trying to make the point
21   that we are not going to come into work one day and we
22   are going to be told, "Hey, you and Fray are working
23   the east side today."
24         I believed at the time that's -- I believed

9

1    in the spirit -- that that was the spirit of the
2    question, like, you know, of course, every officer is
3    assigned to a specific neighborhood, patrol, community
4    policing, detectives, vice squad, but the nature of
5    the business, of course, is, you know what? I might
6    be out of West Center City for 30 or 40 minutes
7    helping a fellow officer with something or, you know,
8    taking care of something personal, grab something to
9    eat, grab a cup of coffee, go in there and, you know,
10   taking a break or something like that. So when the
11   question was asked, I believe that Officer Lynch and
12   even myself, we answered it, you know, honestly and
13   truthfully in the context of the nature of our work.
14   Q.    Now, as Officer or after Officer Lynch
15   responded to the question, do you recall Mr. Brown
16   contributing any comments?
17   A.    Yes.
18   Q.    And what did he say?
19   A.    He basically had interjected, referring to
20   Officer Lynch as Ms. Fray, "Ms. Fray, why are you --
21   you know, how come you are not telling these people
22   the truth? Why don't you be honest with these people?
23   I know that you guys get pulled for other assignments
24   and you are not always in West Center City."

PA-49

3 (Pages 6 to 9)

Lynch v. City of Wilmington
M. J. Groark

10

1    And I personally, personally, I had an issue
2    with the tone of his voice; kind of pretty
3    unprofessional, being that we were in this meeting, I
4    believe, for the first time, Fray and I in this
5    meeting, and meeting people, you know, for the first
6    time.
7    Q.    What do you mean the tone of his voice? Was
8    he loud?
9    A.    Yes. You know, just kind of, you know,
10   speaking down to you, like, you know, "You are wrong."
11   You know, "That's not true." You know, "Be honest
12   with these people. Tell them the truth. I know you
13   guys get pulled for assignments. Why don't you talk
14   about that?" which --
15   Q.    And did -- I am sorry. Go ahead.
16   A.    Which, you know, isn't -- you know, which is
17   something that, you know, that we felt like we had
18   addressed already with the individual that asked the
19   question.
20   Q.    Did Officer Lynch respond to Mr. Brown's
21   comment?
22   A.    Yes, yes, she did.
23   Q.    What did she say?
24   A.    Well, she basically held her ground the way

11

1    she had answered the question of the citizen that
2    asked it, you know, and repeated herself.
3    Mike Brown continued to, you know, tell
4    everybody, you know, "Ms. Fray, you are not being
5    honest with these people."
6    And at one point I interjected. Fray looked
7    at me. I spoke up and I said, "Mike, you know, if you
8    have an issue with deployment in this police
9    department, you should speak to the captain or you
10   should speak to the lieutenant, you know. That's what
11   you should do."
12   Q.    And do you recall how long this exchange
13   went on between Officer Lynch and Mr. Brown?
14   A.    At least a few minutes, three or four
15   minutes probably.
16   Q.    And how did it end?
17   A.    Mike finally dropped it after I had
18   interjected, you know, if he has issues with the Weed
19   and Seed Program, he should speak to the Weed and Seed
20   coordinators in the department, you know, it was -- our bosses are the chain of command:
21   know, it was -- our bosses are the chain of command:
22   Sergeant Donohue, Lieutenant Rock, Captain Marlyn
23   Dietz, so --
24   Q.    And did the meeting end after that exchange?

12

1    A.    It did end. I think -- and I can't
2    remember, but I am sure that other issues were spoken
3    about, and the meeting eventually ended. But right
4    then and there after that exchange I don't believe it
5    ended. I believe the meeting continued for however
6    long.
7    Q.    Now, did you speak with anyone -- or let me
8    just withdraw that question.
9    Prior to the November 2004 meeting were you
10   aware of whether there had been any prior issues
11   between Officer Lynch and Mr. Brown?
12   A.    Only what I had heard through the rumor mill
13   but not -- I wasn't privy to anything specific or
14   anything in direct conversation to Mr. Brown or our
15   supervisors or I don't -- I am not sure ever speaking
16   with Fray about anything prior to that.
17   Q.    What had you heard through the rumor mill?
18   A.    An advance, that Mike Brown had made an
19   advance on Officer Lynch --
20   Q.    Okay.
21   A.    -- in the community center, in the Hicks
22   Anderson Community Center.
23   Q.    And had you known of any other issues of
24   that type prior to November 2004 involving Mr. Brown?

13

1    A.    No, I don't think so.
2    Q.    After the -- immediately after the meeting,
3    that same night, did you discuss what had occurred
4    with anyone?
5    A.    After the meeting, the events specific to
6    the meeting?
7    Q.    Yes.
8    A.    Yes, we did.
9    Q.    Who did you discuss it with?
10   A.    Immediately thereafter Marcia Starks, who
11   is -- now she is the director of constituent services,
12   Marcia Starks. You know, Fray was obviously upset. I
13   was upset. And then we had -- we had called our
14   sarge, Sergeant Donohue, on the phone and said, "Hey,
15   we need to talk to you. We need to speak with you
16   about an issue we just had."
17   Q.    And what did you discuss with Sergeant
18   Donohue?
19   A.    Basically, everything that happened at the
20   meeting with Mike Brown and his demeanor and his tone
21   and his unprofessionalism.
22   Q.    And did she say that she was going to do
23   anything in response to that?
24   A.    Yes, she did.

4 (Pages 10 to 13)

*PA-50*

Lynch v. City of Wilmington
M. J. Groark

14

1　Q.　What did she say she was going to do?

2　A.　She was going to take it up the chain of

3　command, notify the lieutenant, the captain, and like

4　kind of internally document everything.

5　Q.　And did you have any conversations with

6　Sergeant Donohue after that evening about the

7　incident?

8　A.　I might have in the days after that. I

9　might have. I can't really remember any specifics

10　other than, you know, the events of that night and

11　then immediately what happened after that.

12　Q.　And as far as you know, did Sergeant Donohue

13　take the incident up the chain of command and document

14　what had happened?

15　A.　Yes.

16　Q.　Were you after that incident ever contacted

17　by anyone else from the city relating to the incident?

18　A.　Yes, I was.

19　Q.　Who contacted you?

20　A.　I believe it was director of personnel

21　Monica Gillespie.

22　Q.　How soon after the incident did she contact

23　you?

24　A.　I came up here to the City/County Building

15

1　within a month, within four or five weeks after the

2　incident, and Monica Gillespie, just from what I can

3　remember of it, just, you know, "Hey, we are aware of

4　this incident. Your version of the story."

5　Q.　And did you tell her what had happened?

6　A.　Yes.

7　Q.　Was anyone else present when you told her

8　what happened?

9　A.　Mr. Mili was present.

10　Q.　And did you sign any kind of statement in

11　connection with the incident?

12　A.　I wrote an internal -- the night of the

13　incident I wrote an internal version of events.

14　Q.　And did you have that with you when you

15　spoke with Ms. Gillespie and Mr. Mili?

16　A.　I don't remember specifically if I had it on

17　me.

18　Q.　Do you know whether either Ms. Gillespie or

19　Mr. Mili had a copy of your internal incident report?

20　A.　I don't -- I can't remember.

21　Q.　Did Ms. Gillespie tell you what the purpose

22　of meeting with her was?

23　A.　From what I understand -- yes, she did. And

24　from what I understood, she basically said, you know,

16

1　it is just trying to gather all the information as to

2　what specifically happened and I believe she said

3　trying to, you know, get a statement from everybody

4　involved.

5　Q.　Did she tell you that she was investigating

6　any other incident between Officer Lynch and

7　Mr. Brown?

8　A.　If she did, I can't recall.

9　Q.　And going back to the meeting in November,

10　at any time during that meeting did Mr. Brown say that

11　he was just attending the meeting as a private citizen

12　and not in his capacity as director of the Hicks

13　Anderson Center?

14　A.　I don't remember. I remember he was a few

15　minutes late for the meeting, but when he came in, he

16　sat down. If he spoke or anything, I can't remember

17　anything specific.

18　Q.　And after your meeting with Ms. Gillespie

19　and Mr. Mili about the November incident, did you have

20　any contact with anybody else from the city relating

21　to that incident?

22　A.　No, I don't believe so.

23　　　　MR. VANCE:　Okay. Give me a minute

24　and just let me talk to Officer Lynch.

17

1　　　　(Recess taken.)

2　　　　MR. VANCE:　All right. I don't

3　have any other questions for you, Officer Groark.

4　Thank you very much.

5　　　　THE WITNESS:　Okay.

6　BY MR. MILI:

7　Q.　Just a few follow-up questions for you.

8　Aside from Michael Brown, did anyone else at the

9　community meeting criticize the police?

10　A.　Yes. Prior to Mike Brown entering, we took

11　a couple questions from citizens, you know: "It seems

12　like we never see the police here. It doesn't seem

13　like there is enough of a presence." Really general,

14　generic stuff like that.

15　　　　And then there was another question. The

16　other question that Officer Lynch had answered, that

17　question was specifically on you guys are the Weed and

18　Seed officers, so you are always here in this

19　neighborhood, you know, specific to us. And that's

20　when Fray had started to answer the question, and Mike

21　Brown had just gotten in, showing up late.

22　　　　But there were general, generic questions on

23　operations, like how we operate and stuff like that,

24　and not seeing us enough.

PA -51

5　(Pages 14 to 17)

Lynch v. City of Wilmington
M. J. Groark

18

1          MR. MILI:  Okay.  Thank you.  I don't
2   have anything further.
3          Do you want to read and sign your
4   transcript or do you trust the court reporter to take
5   it down accurately?
6          THE WITNESS:  I will read and sign.
7   No.  You know what?  I don't need to do that.
8                --
9          (Deposition concluded at 9:38 a.m.)
10               --
11              INDEX
12   WITNESS                          Page
13   MICHAEL J. GROARK
14      By Mr. Vance----------------------  3
        By Mr. Mili------------------------  17
15
             ---
16
17      (There were no exhibits marked.)
18
19
20
21
22
23
24

19

1              CERTIFICATE
2          I, LORRAINE B. MARINO, Registered
3   Diplomate Reporter and Notary Public, do hereby
4   certify that the witness, MICHAEL J. GROARK, after
5   being duly sworn by me, was examined by counsel for
6   the respective parties and the questions of said
7   witness and his answers were taken down by me in
8   stenotype notes and thereafter transcribed into
9   typewriting at my direction.
10          I certify that the foregoing is a true
11   and correct transcript of the testimony given at said
12   examination of said witness.
13          I further certify that reading and
14   signing of the deposition were waived.
15          I further certify that I am not
16   counsel, attorney, or relative of either party, or
17   otherwise interested in the event of this suit.
18
19
20
         Registered Diplomate Reporter and Notary Public
21          Certificate No. 181PS/Exp.: Permanent
22
     Date: 10/24/07
23
24

6  (Pages 18 to 19)                     PA-52

Lynch v. City of Wilmington

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FRAY LYNCH,                           :

                   Plaintiff,   :

            vs.             :   Civil Action No.
                              06-351 JJF

CITY OF WILMINGTON,                   :

              Defendant.   :
                     - - -

          Deposition of DEBORAH A. DONOHUE,
taken pursuant to notice in the offices of City of
Wilmington Law Department, Ninth Floor, City/County
Building, 800 North French Street, Wilmington,
Delaware, on Tuesday, October 23, 2007, at 11:36 a.m.,
before Lorraine B. Marino, Registered Diplomate
Reporter and Notary Public.

                     - - -

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

PA-53

Lynch v. City of Wilmington

2

```
1   APPEARANCES:
2            ROBERT T. VANCE, JR., ESQ.
             Law Offices of Robert T. Vance, Jr.
3            100 South Broad Street - Suite 1530
             Philadelphia, PA  19110
4              for Plaintiff
5            ALEX J. MILI, JR., ESQ.
             Assistant City Solicitor
6            City of Wilmington Law Department
             City/County Building - Ninth Floor
7            800 North French Street
             Wilmington, DE  19801
8              for Defendant
9   ALSO PRESENT:
10           FRAY LYNCH
11             - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

3

```
1            DEBORAH ANNE DONOHUE, having been
2   first duly sworn, was examined and testified as
3   follows:
4   BY MR. VANCE:
5   Q.    Okay.  Good morning, Sergeant Donohue.
6   A.    Good morning.
7   Q.    I am Robert Vance.  I represent Fray Lynch
8   in this lawsuit, and I will be taking your deposition
9   this morning.  I just want to go over two basic rules.
10           First, make sure that you give a verbal
11  answer to my questions, because Ms. Marino, who is the
12  court reporter, is making a record, and she can't
13  understand your body movements, sounds, things that
14  are not words.  Do you understand that?
15  A.    Yes.
16  Q.    And secondly, if I ask you a question and
17  you don't understand it, tell me that you don't
18  understand it, because when I ask you a question and
19  you answer it, I am going to presume that you
20  understood the question and that your answer is
21  responsive to the question that I posed.  Do you
22  understand that?
23  A.    Yes.
24  Q.    All right.  You are currently a sergeant
```

4

```
1   with the City of Wilmington Police Department?
2   A.    Yes.
3   Q.    And how long have you been a sergeant?
4   A.    Since '03, March of '03.
5   Q.    How long have you been an officer with the
6   City of Wilmington Police Department?
7   A.    September of '96.
8   Q.    I want to focus your attention on 2004.  And
9   at that point was Officer Fray Lynch within your chain
10  of command?
11  A.    Yes.
12  Q.    Were you her direct supervisor?
13  A.    Yes, I was.
14  Q.    Okay.  I want to focus you on June of 2004.
15  In that month did Officer Lynch discuss with you any
16  issues that she had with Michael Brown?
17  A.    Yes, she did.
18  Q.    Can you tell me what she had related to you?
19  A.    That she felt that she was being harassed.
20  She would work over at Hicks.  She was in the 16
21  District, our 16 car, which is Center City.  Hicks
22  Anderson Community Center is in that district.  And
23  she would have some either confrontations or
24  statements being made to her while she went over and
```

5

```
1   did some special attentions or had to work over at the
2   Hicks.
3   Q.    Did she describe for you what Mr. Brown was
4   saying or doing?
5   A.    In one instance I remember she had gone over
6   to check -- her duties were to go in there and check
7   on, you know, what was going on, make sure the kids
8   were safe or whatever.  She was in an office, and Mike
9   Brown and I believe someone else was in the office.  I
10  am not sure who it was.  It may have been Mr. Chris.
11  That's all I know his name is.  I am not real sure.
12  He -- I believe vacation issues were coming up or
13  something, and she -- he made a comment, Mike Brown
14  made a comment to her about I believe it was, you
15  know, was she -- what kind of bathing suit or whatever
16  she was going to be wearing.  Lights went out at one
17  point as she was leaving the office, and that's about
18  as much as I can remember.
19  Q.    Did Officer Lynch tell you how she felt when
20  Mr. Brown was making these comments to you?
21  A.    Yes.  She did come right in and explain
22  everything to us, and then I went to my supervisor,
23  and we worked on it from there.
24  Q.    Who was your supervisor at the time?
```

2 (Pages 2 to 5)

PA-54

Lynch v. City of Wilmington
Deborah A. Donohue

6

1    A.    Mitchell Rock. He was a lieutenant.
2    Q.    All right. And what exactly did you report
3    to Mr. Rock, to Lieutenant Rock?
4    A.    That some comments were being made, whether
5    they were sexual or just made her feel like she was
6    working in a hostile environment. And I believe DIs
7    were written, and we took it through the chain.
8    Q.    What is a DI?
9    A.    A departmental information report. It is
10   whenever anything happens, we ask that it be put on a
11   DI, write a report on exactly what happened.
12   Q.    And is it your understanding that Officer
13   Lynch filed a formal complaint against Mr. Brown
14   related to the June 2004 incident?
15   A.    Yes.
16   Q.    And after you provided your DI report to
17   Lieutenant Rock -- is that right?
18   A.    Yes.
19   Q.    -- did you hear from anyone outside of the
20   police department about the June 2004 incident?
21   A.    I don't recall.
22   Q.    Now, had you prior to June 2004 had any
23   experiences with Mr. Brown that made you feel
24   uncomfortable?

7

1    A.    Yes.
2    Q.    Can you tell me about those experiences?
3    A.    There were several. Prior to becoming a
4    police officer, I worked in the department's
5    records -- in police records. And I believe he worked
6    in the youth aid. It was called youth aid. And he
7    would come up and request reports.
8          Well, he wasn't entitled to these reports
9    because of the Freedom of Information Act, that kind
10   of stuff. So he kind of made things difficult between
11   me, my supervisor, the chief or the director. He
12   would go directly to the director or the chief and say
13   that he needed these reports. As in anyone who would
14   request any kind of report, they would have to be
15   subpoenaed or he would only get basic information or
16   victims' copies or something like that. So, you know,
17   he made it very difficult for me. He would just go
18   around and about, not come to me. I was the records
19   supervisor and I issued reports.
20         I had a time when I was in -- when I was in
21   the police academy, and I was just a recruit, as you
22   call it. We had our -- we had a class at the building
23   in the multipurpose room. And he came in. His office
24   was right next to ours, still youth -- I believe he

8

1    was still youth aid specialist or whatever they were
2    called. His office was next to the multipurpose room.
3    And he came into our class, interrupted the class, and
4    he ordered all females to step out into the hallway.
5    So as we are standing at attention -- and that was
6    our, you know, job. Whenever anybody talked to us as
7    a recruit, you know, we were to keep quiet and stand
8    at attention. He walked down the line, and as he was
9    walking, he made suggestions that it was him who
10   was -- I don't know -- he is the one that was able to
11   get the majority of the women in this class. We did
12   have maybe eight or nine females in our class, which
13   was pretty high for the police department.
14         And as he is walking down the line, he is
15   giving everyone a hug and a kiss. Well, I was the
16   last one in line. I was the tallest female, and
17   that's how we lined up. And he got to me, and I put
18   my hand up and told him to stop, there was no need for
19   him to give me a hug or a kiss.
20   Q.    And how did he react to that?
21   A.    He wasn't very happy. I was just a rookie.
22   He made comments about me being just a rookie and that
23   I needed to straighten up or something. I don't know.
24   Q.    Did you report this incident to anyone?

9

1    A.    No, I didn't.
2    Q.    Why did you not report the incident?
3    A.    Being a rookie, not even a rookie, a
4    recruit, I was afraid that I was going to lose my job.
5    Q.    Do you know whether any of the other women
6    who he hugged and kissed reported the incident to
7    anyone?
8    A.    No. Some of them were friends.
9    Q.    Friends of Mr. Brown's?
10   A.    Mr. Brown's, yes. Friends or acquaintances.
11   I don't know. You know, they knew of him. They
12   worked in the city, with the city, in the city also.
13   Q.    Was anyone present with Mr. Brown when this
14   incident occurred other than the other female
15   recruits?
16   A.    I believe it was Lieutenant Stallings, and
17   he may have been walking in and out. Lieutenant
18   Stallings and I am not sure if he is now Captain
19   Cummings, but Captain Cummings was our sergeant in the
20   academy.
21         And that was -- he had done that after that
22   again, but he didn't do hugs or -- you know, he just
23   called all the females out in the hallway. We were at
24   P. S. He would randomly show up at P. S., call you

Lynch v. City of Wilmington
Deborah A. Donohue

10

1  know, just go in, make statements, then leave.  He had
2  done it again at P. S., and we had to stand in the
3  hallway, and he inspected us.
4  Q.    What is P. S.?
5  A.    P. S. duPont High School or Middle School.
6  That's where our academy class was.
7  Q.    Okay.  Focusing on the first incident where
8  he gave the female recruits a hug and a kiss, what is
9  it that you recall Mr. Brown's position was at the
10 time?
11 A.    A youth -- I believe it was a youth aid
12 specialist.
13 Q.    Is that position --
14 A.    That was within the city, and their office
15 was in our building.  It was on the first floor.  It
16 is now where our PREOs are, the parking enforcement
17 regulation officers.  I believe that is what the
18 acronym is.
19        MR. MILI:  PREO, parking regulation
20 enforcement officer.
21 BY MR. VANCE:
22 Q.    Is a youth aid specialist some civilian
23 employee in the police department?
24 A.    Yes.  I don't believe we have it anymore.

11

1  Q.    So that is why -- is that your understanding
2  as to why he had the authority to order the recruits
3  out into the hallway, because he was a civilian
4  employee of the police department?
5  A.    No.
6  Q.    Do you have any understanding as to why he
7  had the authority or if he had the authority to do
8  that?
9  A.    No, no understanding whatsoever.
10 Q.    All right.  You made reference to a second
11 incident where Mr. Brown ordered the female recruits
12 out into the hallway.
13 A.    Yes.
14 Q.    And you said that was for an inspection?
15 A.    Yes.  He did his own inspection on us.
16 Q.    Can you tell me about that incident?
17 A.    Oh, all that one was, he came in early or
18 during a class or a session, whatever we want to call
19 it, and we were ordered out.  Lieutenant Stallings was
20 there and Captain Cummings, who was a sergeant at the
21 time, was there.  We were ordered -- we had to stand
22 at attention, and he did the inspection on us.
23        Every day we had inspection to make sure
24 that, you know, we had creases, our tie was straight,

12

1  and our buttons and pins were on.
2  Q.    And as part of the inspection was Mr. Brown
3  touching any of the recruits?
4  A.    No.
5  Q.    Was he walking around the recruits?
6  A.    Up and down and behind us, in front of us
7  and behind us.  There wasn't enough room for him
8  unless -- you know, I didn't pay attention what went
9  down the other end.  I was -- you know, I wasn't the
10 shortest.  I was the tallest, so I was at one end, and
11 then the shortest was at the other.
12 Q.    And were either of these other two officers
13 you mentioned, Stallings or Cummings, present during
14 the entire inspection?
15 A.    I don't recall if they were there.  I
16 believe Lieutenant Stallings was.
17 Q.    Was Mr. Brown, to your knowledge, invited to
18 make the inspection?
19 A.    I have no idea.
20 Q.    And did he make any comments to you during
21 the inspection?
22 A.    None.
23 Q.    Were you uncomfortable by that inspection?
24 A.    No, no.

13

1  Q.    Did you have any other incidents with
2  Mr. Brown while you were in the police academy?
3  A.    Not that I recall.
4  Q.    Prior to June of 2004 are those the only two
5  incidents that you recall having with Mr. Brown?
6  A.    That I recall, yes.  There is several -- you
7  know, if you are out on scenes or something, he would
8  try to cross our crime scene line.  He would, you
9  know -- and I would -- I was told to stay away from
10 him.
11 Q.    Who told you to stay away from Mr. Brown?
12 A.    Who told me?  My lieutenant.
13 Q.    Lieutenant Rock?
14 A.    Yes, any scenes or anything, the same as
15 with Fray.  We were moved kind of away from him.
16 Anytime anything occurred and he showed up, we had to
17 either have someone with us to be a witness or just
18 leave and have someone come and take over.
19 Q.    Prior to June 2004 were you aware of
20 Mr. Brown being involved in any other incidents with
21 female city employees other than yourself and Officer
22 Lynch?
23 A.    I remember one time there was a foot chase
24 going on, and I was working that day, and one of our

4  (Pages 10 to 13)

*PA-56*

Lynch v. City of Wilmington
Deborah A. Donohue

14

1  officers had gotten in trouble with this foot chase,
2  supposed to be a kicking incident. And I showed up at
3  the scene. It was on Kirk Avenue, Kirk Street. I am
4  not sure what it was. Off of Van Buren Street. And I
5  showed up at the same time with Captain Jubb. I am
6  not sure if he was -- he had to be a captain at the
7  time. And Captain Jubb told me to hold the scene or
8  keep the crowd back at Kirk and Van Buren Street,
9  which I did.
10        Now, later on that night -- everything, you
11  know, went about its way. The incident was over. The
12  guy was taken into custody. That night or the night
13  after, Mike Brown had a TV show or he was on a TV
14  show, that Channel 22 or something, and he made a
15  comment that a white female officer had contacted him
16  and was very distraught about the incident that
17  occurred on Kirk Avenue. Well, I didn't know because
18  I don't watch the show. I don't get involved in that
19  kind of stuff. I don't care to know.
20        Well, the next day or a couple days after, I
21  felt that I was being treated by the guys at work --
22  they were kind of avoiding me. And I get along with
23  everyone. You know, we joke. We carry on. We have a
24  great time together. When it comes to work, we all

15

1  work together. Well, they were kind of avoiding me.
2  Then I had asked someone, you know, what was going on,
3  and they said they watched the show and that a white
4  female officer -- they all checked, and I was the only
5  white female officer working that day. So they
6  automatically assumed that it was me calling Mike
7  Brown, which was definitely not true.
8        So, you know, I just felt that that was
9  something -- either he was trying to make a dig at me
10  or at someone else, you know, whoever else could have
11  been working. If it was a higher-ranking officer, I
12  have no idea.
13        On -- I am trying to think of all this
14  stuff, because I try to put him out -- there was -- I
15  don't remember. I get Alzheimer's every once in a
16  while, so things just come and go. I am sorry.
17  Q.    All right. If they come --
18  A.    If -- yes, if they come, I will let you
19  know.
20  Q.    -- let me know. All right. So let me just
21  ask the question again, and that is, prior to June
22  2004 were you aware of any other incidents involving
23  Officer Brown -- I am sorry -- Michael Brown and
24  female employees of the city?

16

1  A.    Yes. I believe there were incidents with
2  Captain Nancy Dietz. And I just -- I think they were
3  just statements and things being made.
4        I do know of a woman who worked at the
5  department whose daughter had an incident with him.
6  She had, you know, told me about that a long time ago.
7  She said that the things were in the works with that.
8  Q.    Who told you about that; the woman or the
9  daughter?
10  A.    The mother. The mother of the daughter.
11  And I want to say her name was Cherry, Jerri Cherry.
12  Yes, it was, Jerri Cherry. She worked in our records
13  division, and her daughter had an incident. I don't
14  know what the outcome was. I really didn't want to
15  know, because she had already reported the incident.
16  Q.    Do you recall what Mr. Brown was alleged to
17  have done to Jerri Cherry's daughter?
18  A.    I don't know if it was a request of some
19  kind sexually or just harassment. I have no -- she
20  said that she had reported it, and I didn't want to
21  get involved.
22  Q.    When you say, "she said," did Jerri Cherry
23  tell you that her daughter had reported the incident?
24  A.    Yes.

17

1  Q.    To whom?
2  A.    I don't know. I have no idea.
3  Q.    Were you aware of any other incidents
4  involving Mr. Brown and female employees of the city?
5  A.    Not that I recall.
6  Q.    Okay. Now I want you to shift your
7  attention to the period between June and November of
8  2004. Did you or were you aware of whether Officer
9  Lynch had any other incidents with Mr. Brown between
10  June of 2004 and November of 2004?
11  A.    I don't recall.
12  Q.    All right. So now in November of 2004 were
13  you advised about an incident involving Officer Lynch
14  and Mr. Brown at a community meeting?
15  A.    Yes. I remember it was her and I believe
16  Mike Groark. And honestly, I can't remember the
17  incident. But I remember her and Mike Groark came
18  back quite upset, and I think -- I want to say
19  Lieutenant Rock and Captain Marlyn Dietz said just
20  write it. And I may have said just write down
21  whatever happened. And I can't remember what it was.
22  Q.    Okay. In discovery the city's attorney
23  produced to me a memo addressed to Michael Szczerba
24  from Deborah Donohue, dated November 23, 2004, about a

PA-57

Lynch v. City of Wilmington
Deborah A. Donohue

18

1  community meeting and Mr. Mike Brown, and it has what
2  are called Bates numbers, 000043 and 000044. Can I
3  ask you to take a look at that document? (Pause)
4      Okay. And you had a chance to read that?
5  Yes?
6  A.    Yes, I have.
7  Q.    Okay. And is that your signature on the --
8  A.    Yes, it is.
9  Q.    -- first and the second pages of the
10 document?
11 A.    Yes.
12 Q.    Okay. So you provided this memo to Chief
13 Szczerba based on what was told to you by Officer
14 Lynch and Corporal Groark; correct?
15 A.    Correct.
16 Q.    You did not attend the community meeting?
17 A.    No, I didn't.
18 Q.    Okay. And in the memo you make reference to
19 prior incidents between you and Mr. Brown; correct?
20 A.    Yes.
21 Q.    Having read the memo, are there any other
22 incidents that come to mind involving yourself and
23 Mr. Brown?
24 A.    Yes. Sixth and Madison there was a young

19

1  man who was shot and killed in the 400 block of
2  Madison Street. They had a candlelight vigil, I think
3  it was, and community members had all, you know, come
4  to the mother's aid, and they did a walk.
5      Prior to the walk Mike Brown had talked
6  to -- I can't -- someone in our division in reference
7  to this walk and the route that they were going to
8  take, because they were going to be in the street.
9  And they gave me a specific route, which was following
10 the traffic or, you know, going in the right way the
11 traffic was going.
12     And during that incident a female who lived
13 in the block had -- she was a witness to this
14 homicide, and a big to-do was made. He had to grab
15 her, took her over to -- he was hollering, you know,
16 "Get" -- I believe it was Jonathan Hall's case. "Get
17 Jonathan Hall over here," you know, to interview this
18 female witness to the incident.
19     Well, in the meantime, they are having the
20 gathering for this candlelight vigil. He has to run
21 her down to the street. I contacted Jonathan Hall,
22 the detective who was dealing with it. And because
23 there were so many people there, it was just mayhem.
24 There was people everywhere. So he walked her in.

20

1  Jonathan was making his way down so he could talk to
2  her.
3      Mike Brown -- we had officers cutting off
4  certain streets so that the people could walk safely
5  through the streets during this candlelight vigil. In
6  the middle of it he changed the route and went against
7  traffic down on Fourth Street. I had people running
8  back and forth, and I contacted someone who was -- I
9  was at one time. I contacted I can't remember who
10 the officer was, and he said, "Mike Brown said this is
11 the way we are going. We are following him." And
12 that was -- it was like, you know, everything he had
13 said to me he changed in the middle or just -- it was
14 just mayhem, and --
15 Q.    Was Mike Brown ever a police officer in the
16 City of Wilmington or anywhere else, to your
17 knowledge?
18 A.    Not that I know of.
19 Q.    Okay. Do you recall any other incidents
20 involving Mr. Brown that may have come to mind after
21 reading this memo?
22 A.    No, I don't remember.
23 Q.    Now, after you submitted this memo to Chief
24 Szczerba, were you made aware of action taken by

21

1  Captain Marlyn Dietz in response to the November
2  incident?
3  A.    Yes.
4  Q.    And how were you made aware of what actions
5  he took?
6  A.    The only -- I just knew that Captain Dietz
7  was not happy with the responses that we were getting,
8  and he said that he was going to take it further.
9  That was all I knew.
10 Q.    Now, did any actions occur to you in
11 response to this memo of November 23, 2004 to Chief
12 Szczerba regarding the community meeting and
13 Mr. Brown?
14 A.    Any action against me? No, not that I
15 recall.
16 Q.    Were you contacted by anyone outside of the
17 police department in connection with the November 2004
18 incident?
19 A.    No.
20 Q.    Do you know who Monica Gonzales Gillespie
21 is?
22 A.    Yes.
23 Q.    Were you ever contacted by her with respect
24 to Michael Brown in regards to any issue?

6  (Pages 18 to 21)        *PA-58*

Lynch v. City of Wilmington
Deborah A. Donohue

22

1    A.    Not that I recall.
2    Q.    Did she ever interview you in connection
3    with any issue involving Michael Brown?
4    A.    No.
5    Q.    Did anyone outside of the -- or I should say
6    did anyone above the rank of captain contact you
7    regarding the November incident?
8    A.    No.
9    Q.    Did Chief Szczerba respond to this memo of
10   November 23, 2004?
11   A.    Not to me directly. If he did to anyone
12   else, I don't know.
13   Q.    Have you been made aware of any other
14   incidents involving Michael Brown and female city
15   employees since you wrote this memo on November 23,
16   2004?
17   A.    Not that I recall.
18   Q.    Were you ever advised by anyone that there
19   might be a reaction from city employees outside of the
20   police department as a result of your November 23,
21   2004 memo?
22   A.    I don't recall.
23        MR. VANCE: All right. Just give me a
24   minute. Let me meet with Officer Lynch and we will be

23

1    finished.
2         (Recess taken.)
3    BY MR. VANCE:
4    Q.    Okay, Sergeant Donohue. I just have a
5    couple more questions. Other than this memo that you
6    prepared of November 23, 2004, did you create any
7    other documents related to either any incidents
8    between Officer Lynch and Mr. Brown or any incidents
9    involving you and Mr. Brown?
10   A.    I may have. I don't recall. There is just
11   different incidents that have occurred that I don't
12   know if I wrote on them or not or just walked away
13   cussing myself or whatever.
14   Q.    But if you wrote a document, would it have
15   been the departmental information report that you
16   referred to?
17   A.    Yes.
18   Q.    Okay. And do you recall the names of the
19   other female recruits?
20   A.    Yes.
21   Q.    Can you tell me who they are?
22   A.    Her name was Andrea Horisak at the time.
23   She is now Andrea Janvier.
24   Q.    Is she still a member of the police

24

1    department?
2    A.    She is still a member of the department.
3    Sharnette Handy, who is no longer with us.
4    Q.    Sharnette Handy?
5    A.    Handy.
6    Q.    When you say "no longer with us," do you
7    mean she is deceased or --
8    A.    No, no, no. She is not with the department
9    anymore. She resigned.
10        Tracey Hammond. She is no longer with the
11   department.
12        Debbie Tymes Holden now, and she is with the
13   department.
14        There was Elizabeth Ticknor. She is with
15   the fire department and was going through the academy
16   with us.
17   Q.    Okay.
18   A.    Eileen Target. She was with University of
19   Delaware Police, going through our academy, and I am
20   not sure if she is still there or not.
21        Stacie Jimenez, who is no longer with our
22   department. I don't know where she is at either.
23   Q.    Is that it?
24   A.    I am trying to think.

25

1    Q.    That is seven so far.
2    A.    Seven? That might be it, yes.
3    Q.    And do you know which of these female
4    recruits had some prior relationship with Mr. Brown?
5    A.    Let's see. I believe Tracey Hammond. She
6    worked for the department. She was in our radio room.
7    And Debbie Tymes.
8    Q.    Who is now Debbie Holden?
9    A.    Yes. I am sorry. Who is now Debbie Holden.
10   I don't know what her relationship was.
11        And Elizabeth Ticknor may have known him,
12   but I don't know what her relationship was with him.
13   Q.    And you mentioned a Lieutenant Stallings.
14   A.    Lieutenant James Stallings. I think he
15   retired inspector.
16   Q.    Do you know whether Lieutenant Stallings had
17   a relationship with Michael Brown or what the nature
18   of their relationship was, if he had one?
19   A.    I don't know. I don't know if it was, you
20   know -- how friendly, how much of friends they were, I
21   am not -- you know, but I knew they knew each other.
22        MR. VANCE: Okay. Thank you very
23   much, Sergeant. I don't have any other questions.
24        MR. MILI: Do you want to waive

*PA-59*

7 (Pages 22 to 25)

Lynch v. City of Wilmington
Deborah A. Donohue

26

1    reading and signing of the transcript?
2              THE WITNESS:  I don't know.  Do I?
3              MR. MILI:  Do you trust her to type it
4    accurately or do you want to read it?
5              THE WITNESS:  I waive.
6              - - -
7         (Deposition concluded at 12:12 p.m.)
8              - - -
9         (There were no exhibits marked.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

27

1              CERTIFICATE
2              I, LORRAINE B. MARINO, Registered
3    Diplomate Reporter and Notary Public, do hereby
4    certify that the witness, DEBORAH A. DONOHUE, after
5    being duly sworn by me, was examined by counsel for
6    the respective parties and the questions of said
7    witness and her answers were taken down by me in
8    stenotype notes and thereafter transcribed into
9    typewriting at my direction.
10             I certify that the foregoing is a true
11   and correct transcript of the testimony given at said
12   examination of said witness.
13             I further certify that reading and
14   signing of the deposition were waived.
15             I further certify that I am not
16   counsel, attorney, or relative of either party, or
17   otherwise interested in the event of this suit.
18
19
20
         Registered Diplomate Reporter and Notary Public
21        Certificate No. 181PS/Exp.: Permanent
22
     Date:  10/24/07
23
24

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FRAY LYNCH,                              :

                 Plaintiff,    :

            vs.             :    Civil Action No.
                          06-351 JJF

CITY OF WILMINGTON,                     :

            Defendant.    :
                 - - -

        Deposition of NANCY DIETZ, taken
pursuant to notice in the offices of City of
Wilmington Law Department, Ninth Floor, City/County
Building, 800 North French Street, Wilmington,
Delaware, on Tuesday, October 23, 2007, at 12:14 p.m.,
before Lorraine B. Marino, Registered Diplomate
Reporter and Notary Public.

                 - - -

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

PA-61

Lynch v. City of Wilmington

2

1    APPEARANCES:
2            ROBERT T. VANCE, JR., ESQ.
             Law Offices of Robert T. Vance, Jr.
3            100 South Broad Street - Suite 1530
             Philadelphia, PA 19110
4            for Plaintiff
5            ALEX J. MILI, JR., ESQ.
             Assistant City Solicitor
6            City of Wilmington Law Department
             City/County Building - Ninth Floor
7            800 North French Street
             Wilmington, DE 19801
8            for Defendant
9    ALSO PRESENT:
10           FRAY LYNCH
11           - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

3

1           NANCY DIETZ, having been first duly
2    sworn, was examined and testified as follows:
3    BY MR. VANCE:
4    Q.    Good afternoon, Captain Dietz.
5    A.    Good afternoon.
6    Q.    I am Robert Vance. I represent Officer
7    Lynch in this lawsuit. And I wanted to just go over
8    two basic rules of the deposition.
9           The first is to make sure that you give a
10   verbal answer to my questions, because Ms. Marino, the
11   court reporter, is making a record, and she can't
12   interpret shrugs of the shoulder and uh-huh and uh-uh
13   and things like that. Do you understand that?
14   A.    Yes.
15   Q.    And secondly, if I ask you a question and
16   you do not understand the question, please tell me
17   that you don't understand it and I will rephrase the
18   question, because when I ask you a question and you
19   answer it, I am going to presume that you understood
20   the question and that your answer is responsive to the
21   question that I posed. Do you understand that?
22   A.    Yes.
23   Q.    Okay. How long have you been a captain with
24   the Wilmington Police Department?

4

1    A.    Over ten years.
2    Q.    So at least since 1997 or thereabouts?
3    A.    1997, yes.
4    Q.    How long have you been an officer with the
5    Wilmington Police Department?
6    A.    Almost 28 years now.
7    Q.    All right. I want you to focus on the year
8    2004. Now, at that time was Officer Lynch within your
9    chain of command?
10   A.    No.
11   Q.    Did you know Officer Lynch?
12   A.    Yes.
13   Q.    In or about June or thereafter in 2004 did
14   you have any contact with Officer Lynch regarding any
15   incidents between her and a man named Michael Brown?
16   A.    Yes, I did.
17   Q.    Can you tell me about those contacts?
18   A.    I spoke with Officer Lynch. She had
19   actually contacted me. I was the commander of the
20   office of professional standards. commonly referred to
21   as internal affairs, and she had contacted me when --
22   after she had made a complaint against Mike Brown, who
23   was then a city employee. And she asked to speak with
24   me, and I ended up meeting her for lunch at I believe

5

1    it was Bennigan's Restaurant on 202.
2           And we talked for a couple hours about the
3    complaint that she had made, and she addressed several
4    concerns about how the matter was handled and what she
5    thought was different treatment she had received since
6    she had made the complaint.
7           I wrote a report after we met and forwarded
8    it through my chain of command, addressing the issues
9    that we had discussed along with some other issues
10   that I had found on my own after I spoke with her.
11   Q.    Okay. Let me stop you if I can and go back
12   to the actual lunch that you had with Officer Lynch.
13   You said that she had some concerns about how the
14   complaint was handled?
15   A.    She addressed the timeliness of it, that she
16   had made a complaint and that she really hadn't gotten
17   a response as quickly as she thought she should have
18   gotten a response, and that as a result of that, she
19   encountered Mike Brown, who was now running for a city
20   council position, in a public forum, where he made
21   disparaging remarks directed at her.
22   Q.    Was the public forum a meeting?
23   A.    Yes.
24   Q.    And did she indicate to you whether there

Lynch v. City of Wilmington
Nancy Dietz

**6**

1  were any other officers present at the meeting?
2  A.    I believe Officer Rourke or Groark was
3  there.
4  Q.    And --
5  A.    And I believe Marcia Starks from the city
6  was there as well, she said.
7  Q.    Now, you testified you wrote a memo about
8  what Officer Lynch had talked to you about at the
9  lunch; is that right?
10  A.    I wrote a report that was not only about our
11  discussion but things that I also felt was important
12  as a result of my position on the department, other
13  issues that I found as a result of speaking with her.
14  Q.    Who did you write the report to?
15  A.    The report was given to my supervisor,
16  Inspector Martin Donohue.
17  Q.    Do you have a copy of that report with you?
18  A.    I don't have it with me, no.
19  Q.    Is a copy of that report still in the police
20  department's files?
21  A.    I believe my supervisor should have a copy.
22  Q.    Did you maintain a copy?
23  A.    I think I did.  I am sure if I looked in my
24  files, I could find it.

**7**

1  Q.    Would you mind doing that and turning the
2  report over to Mr. Mill if you find it?
3  A.    Yes.
4  Q.    Okay.  And now you also mentioned that the
5  report included not only what you had spoken with
6  Officer Lynch about concerning the timeliness of the
7  city's response to her complaint but other items that
8  you had discovered subsequent to the lunch?
9  A.    Well, it seemed to me that Officer Lynch had
10  some concerns that I thought were important enough to
11  mention in the report, issues like Mike Brown having
12  access to anywhere in the police building, issues
13  about his relationship with higher-ranking police
14  officials who Officer Lynch had felt he treated her
15  differently since she made the complaint, issues as a
16  result of my conversation with Sergeant Donohue, who I
17  spoke to after my meeting with Officer Lynch,
18  regarding Mike Brown's access to other female officers
19  and employees of the police department.
20  Q.    Let me see if I can take these one at a
21  time.  The last issue you said was issues related to
22  Inspector Donohue?
23  A.    Sergeant Donohue.  I am sorry.  Inspector
24  Donohue is my boss, though.

**8**

1  Q.    And in your memo what did you discuss about
2  Sergeant Donohue?
3  A.    Well, I had spoken to her about the
4  complaint, basically, you know, just to let her know
5  that I had talked to Fray, that I was concerned about
6  her well-being.  And Sergeant Donohue, Debbie Donohue,
7  had mentioned to me about issues that she had with
8  Mike Brown as well.
9  Q.    Do you recall what those issues were?
10  A.    Well, she told me that when she was in the
11  police academy, that he was overly friendly with her
12  and other female recruits, that he would come into the
13  police academy, conduct inspections of the female
14  recruits, that he had basically access to
15  higher-ranking officials in her academy who allowed
16  him to come into the environment of the academy and
17  have access to the female recruits.
18  Q.    Did she identify who those higher-ranking
19  officials are?
20  A.    I believe it was -- I don't know if he was a
21  sergeant or a lieutenant then, but Jim Stallings.  I
22  am not really sure who else.
23  Q.    And what other issues did you discuss in
24  your memo related to Sergeant Donohue?

**9**

1  A.    I think that's it regarding her.  It was
2  really directed at the fact that I was not aware that
3  he had access to a training environment with other
4  female officers.
5        We obviously had Fray who had made a
6  complaint against him.  I had encountered him over my
7  career, and he went out of his way to target me as
8  well for various -- on various assignments that I had.
9  Q.    Was this prior to your lunch with Officer
10  Lynch?
11  A.    Prior to and after.
12  Q.    Okay.  We will get to those.  Did you ever
13  discuss with Jim Stallings the issue of Mr. Brown's
14  access to the training environment?
15  A.    I believe he was retired at that point, so
16  no, I don't think I did.
17  Q.    You also indicated in one of your earlier
18  answers that in the memo you discussed Michael Brown's
19  relationship to high-ranking police officials who
20  Officer Lynch believed treated her differently.
21  A.    Yes.
22  Q.    Who were those high-ranking officials?
23  A.    Well, then it was Captain Gilbert Howell and
24  Inspector Jim Wright.

*PA-63*

3  (Pages 6 to 9)

Lynch v. City of Wilmington
Nancy Dietz

10

1    Q.    What did Officer Lynch say that Captain
2    Howell had done to her?
3    A.    She hadn't really said that he had done
4    anything directly to her.  It was more that she was
5    aware that Mike Brown had regular meetings with
6    Gilbert Howell.  And being that Gilbert Howell was a
7    higher-ranking officer, I think that concerned her.
8         Inspector Wright frequently met with Mike
9    Brown, who would come in the police station all the
10   time and come in and meet with other high-ranking
11   police officials.
12   Q.    Do you know what the purpose of those
13   meetings was?
14   A.    No.
15   Q.    Did you discuss with either Captain Howell
16   or Inspector Wright the concerns that you had
17   indicated in the memo?
18   A.    To them, no.
19   Q.    And I think the third issue you indicated
20   was Mr. Brown's access to the police building.
21   A.    Yes.
22   Q.    And what was the concern there?
23   A.    Basically, that he had an access card, like
24   the one I have here (indicating), where he could get

11

1    to anywhere in the police building, one of which was
2    an office that Fray Lynch worked in.  And as I
3    understood it, she had made a complaint and she was
4    waiting to hear back from the complaint, but obviously
5    because there was a pending issue with him, it
6    concerned me that her own workplace he could walk into
7    at any time and create an intimidating atmosphere to
8    her.
9         So I was concerned, A, that he had access to
10   the building at all and that, B, he specifically had
11   access to areas where she worked in.
12   Q.    Were you aware at the time that the parties
13   involved in Officer Lynch's complaint had established
14   some protocols so that she would not be in the
15   presence of Mr. Brown without another officer or in
16   any other respect have to deal with him other than
17   through the chain of command?
18   A.    Yes, I had heard that.
19   Q.    And to your knowledge, was that protocol
20   common knowledge in the police department?
21   A.    I don't know if it was common knowledge.  I
22   was aware of it, but she worked for my husband, so I
23   think I was aware of it because he had told me that.
24   Q.    Do you know whether Captain Howell at the

12

1    time was aware of those protocols?
2    A.    I don't know.
3    Q.    Did you ever determine how Mr. Brown
4    obtained access to the entire police building?
5    A.    No.  And I had previously written reports
6    about that issue as well.  So at different times we
7    have had different directors of public safety,
8    different chiefs.
9         He particularly at one time worked in our
10   building, so he did have access because he was a youth
11   intervention officer.  Once he left the building, he
12   should -- that access should have been taken away,
13   because that's what happens with other employees.
14        Once he became a councilman, he still had
15   access, full access to the Public Safety Building.
16   And I wrote another report about that as well, because
17   even if he had special access for meetings or for some
18   reason that they gave him access, it should have been
19   very restricted in where he could go in the building.
20   He shouldn't be allowed back in, you know, the support
21   services, where all the police reports are kept, or
22   evidence detection unit, where evidence is maintained,
23   or our criminal investigations division.  You know,
24   areas where there is sensitive material, he shouldn't

13

1    have access to those areas, and he has over the last
2    years.
3         What his access is now I don't know.  But I
4    know that I have written reports concerning that
5    previously.
6    Q.    You said that Mike Brown was a youth
7    intervention officer at one point.  Was that position
8    considered an employee of the police department?
9    A.    Actually, at one point it was, but then it
10   was moved to I believe it was the parks and rec,
11   Department of Parks and Recreation.  So he was
12   taken -- that whole program was taken out of the
13   police department and moved up to this building.
14   Q.    As a youth intervention officer, when that
15   position meant that he was an employee of the police
16   department, was it your understanding that he had the
17   authority to have access to the police academy and the
18   recruits at the academy?
19   A.    No.
20   Q.    Did that position under those circumstances,
21   in your understanding, give him the authority to order
22   recruits to stand for inspection or to order them to
23   do anything?
24   A.    No.

4  (Pages 10 to 13)                    PA-64

Lynch v. City of Wilmington
Nancy Dietz

| | 14 |
|---|---|
| 1 | Q.    Was there a practice at the police academy |
| 2 | of allowing employees of the police department to |
| 3 | conduct inspections of police recruits? |
| 4 | A.    No.  Other than the academy staff, no. |
| 5 | Q.    Right.  Other than the academy staff. |
| 6 | A.    Right. |
| 7 | Q.    Are you aware of any other employee of the |
| 8 | police department not an actually uniformed officer |
| 9 | conducting inspections of police recruits? |
| 10 | A.    No. |
| 11 | Q.    After you submitted your -- oh, let me |
| 12 | withdraw that question. |
| 13 |     I want you to focus on the time period prior |
| 14 | to your lunch with Officer Lynch.  Can you tell me |
| 15 | what incidents you had with Michael Brown prior to |
| 16 | that time that you recall? |
| 17 | A.    Any incidents or -- can you be more |
| 18 | specific? |
| 19 | Q.    Yes.  I am sorry.  Incidents where you felt |
| 20 | uncomfortable or you felt that Mr. Brown was trying to |
| 21 | intimidate you or harass you. |
| 22 | A.    When I was the commanding officer of |
| 23 | criminal investigations, he frequently made remarks |
| 24 | about me to other officers, who came to me and would |

| | 16 |
|---|---|
| 1 | Inspector Keith Ash. |
| 2 | Q.    Do you have a copy of that report? |
| 3 | A.    I would have to go back and search for it. |
| 4 | It has been several years.  But I am sure I do. |
| 5 | Q.    And could you do that also and give that to |
| 6 | Mr. Mili -- |
| 7 | A.    Yes. |
| 8 | Q.    -- if you find it? |
| 9 | A.    Yes. |
| 10 | Q.    Thanks.  Any other incidents that you recall |
| 11 | that made you feel uncomfortable or where you believe |
| 12 | Mr. Brown was harassing you prior to your lunch with |
| 13 | Officer Lynch? |
| 14 | A.    Well, actually, after all these comments had |
| 15 | been made over the years, I just chose to ignore it |
| 16 | and really didn't respond to him and just ignored him. |
| 17 | So whenever I saw him in the building or outside the |
| 18 | building, I just made a point of just ignoring him. |
| 19 |     One time I saw him at Rodney Square.  I |
| 20 | believe it was like a healthy day that the city has, |
| 21 | sponsors, and he came up to me and hugged me, and I |
| 22 | was really taken back by that because I wasn't |
| 23 | expecting it.  And he said, "I just want to apologize |
| 24 | to you." |

| | 15 |
|---|---|
| 1 | tell me about comments he would make.  He had a TV |
| 2 | show where he made remarks about me on his TV show. |
| 3 | Q.    What kind of comments? |
| 4 | A.    Comments that were of a racial nature, |
| 5 | comments indicating that I was transferring people out |
| 6 | of criminal investigations because of their race. |
| 7 | Q.    Can you give me an example of some of the |
| 8 | comments? |
| 9 | A.    Honestly, I never listened to the TV show. |
| 10 | I would always hear about it Monday morning.  I didn't |
| 11 | have that cable access.  And every -- his show was on |
| 12 | a Sunday, so every Monday when I would come to work, |
| 13 | the guys that worked for me would tell me about |
| 14 | different comments that he made.  So I never took the |
| 15 | time to go back and actually listen to his show or |
| 16 | listen to his comments, but this happened over, you |
| 17 | know, an extended period of time that things would get |
| 18 | back to me, comments that he was making. |
| 19 | Q.    When you say an extended period of time, |
| 20 | what do you mean by that? |
| 21 | A.    I mean like two years, over two years I |
| 22 | heard this.  I also wrote a report about it. |
| 23 | Q.    Who did you give the report to? |
| 24 | A.    To my boss at the time I believe was |

| | 17 |
|---|---|
| 1 | Q.    Did he say what he was apologizing for? |
| 2 | A.    And he said something to the effect of he |
| 3 | listened to the wrong people and he had the wrong |
| 4 | impression of me and he was sorry for the things he |
| 5 | had said. |
| 6 | Q.    And when did this statement -- when did he |
| 7 | make this statement? |
| 8 | A.    It was in Rodney Square.  It was at a |
| 9 | city-sponsored function.  I honestly don't remember |
| 10 | exactly when it was. |
| 11 | Q.    But it was before your lunch with Officer |
| 12 | Lynch? |
| 13 | A.    Oh, yes.  I was still in detectives at the |
| 14 | time. |
| 15 | Q.    Okay.  Now, getting back to the memo or the |
| 16 | report to Inspector Martin Donohue, after you wrote |
| 17 | that report and provided it to Inspector Donohue, did |
| 18 | he meet with you to discuss anything related to that |
| 19 | report? |
| 20 | A.    He did.  Yes, he called me into his office |
| 21 | and he did discuss it with me. |
| 22 | Q.    And what was the nature of that discussion? |
| 23 | A.    I believe he asked me if I was making a |
| 24 | complaint against Inspector Wright, because I had |

PA-65

5  (Pages 14 to 17)

Lynch v. City of Wilmington
Nancy Dietz

18

1  mentioned him in the report.
2  Q.    What did you tell him?
3  A.    I basically told him that I was just
4  documenting the information that I had found and
5  forwarding it to the chief and the inspector to
6  address. It wasn't specifically my complaint. It was
7  really a report that documented issues that I was
8  concerned about, one of which was that Mike Brown's
9  access to higher-ranking officials I thought
10 compromised the integrity of our police department and
11 the work environment of our employees. And that was
12 really the basis of why I wrote that report.
13 Q.    Why do you believe that?
14 A.    Because Mike Brown has this access to
15 higher -- I mean, he walks into people's office all
16 the time, people of higher rank, people of higher rank
17 than me.
18     And he also had access on a police radio.
19 He would get on that radio during the whole time
20 period that I was in detectives and after that and
21 call for the chief or call for the director and call
22 for the inspector, who would respond to him on the
23 radio.
24 Q.    On the official police band radio --

19

1  A.    Yes.
2  Q.    -- that is used for --
3  A.    Police business.
4  Q.    -- emergency calls and, you know, officer in
5  distress and things of that nature?
6  A.    Yes.
7  Q.    Do you know how Mr. Brown obtained a police
8  radio?
9  A.    I don't personally know, no.
10 Q.    What else did you and Inspector Donohue
11 discuss during that meeting?
12 A.    Well, I reiterated my concerns about that he
13 had access to female recruits in the police academy.
14 I found that out after talking to Sergeant Donohue.
15 And I was totally taken back when I had heard about
16 that, and that was really another reason why I wanted
17 him to know about that, so that certainly that would
18 not happen again in the future, because that was
19 something that I had never heard previously. And I
20 had conducted police academies prior to that, and I
21 know what the proper protocol is, and that certainly
22 would have been something that he should not have had
23 access to.
24 Q.    What did you expect Inspector Donohue to do

20

1  with your report?
2  A.    I would have expected that the issues that I
3  brought to his attention would have been looked into
4  and addressed so that they would not reoccur.
5  Q.    Did you also provide a copy of your report
6  to Chief Szczerba?
7  A.    No, but all reports are addressed to the
8  chief of police. They go through the chain of
9  command. So the report was given to Inspector
10 Donohue, but it is addressed to the chief.
11 Q.    Did Inspector Donohue follow through on your
12 report, to your knowledge?
13 A.    I don't know.
14 Q.    Did you suffer any repercussions after you
15 submitted that report to Inspector Donohue?
16 A.    What -- can you be more specific?
17 Q.    Were there any actions taken against you
18 that you believe were caused by your submission of the
19 report that we have been discussing to Inspector
20 Donohue?
21 A.    Well, I am aware of issues that came up by
22 Mike Brown after that.
23 Q.    And what are those --
24 A.    Whether or not it was directly related to

21

1  the report I wrote, I couldn't tell you, but I know
2  that he did make comments to my superior officers
3  following the point that I submitted that report.
4  Q.    What comments are you aware of that
5  Mr. Brown made to your superior officers?
6  A.    Well, a couple issues happened after that.
7  One of them was a complaint that was made against
8  Mitch Rock, Lieutenant Mitch Rock, when I was the
9  captain of internal affairs. And the complaint
10 involved an incident that happened outside of the
11 city, in Hockessin. Mike Brown brought that
12 complainant into internal affairs, walked him into the
13 building.
14     Shortly after that I had been told that city
15 council had requested that I not investigate that
16 complaint, which was unusual, because I was the
17 captain of internal affairs.
18 Q.    Who told you that city council had requested
19 that you not investigate the complaint?
20 A.    Actually, a memo came down from the director
21 of public safety requesting that a -- I am not sure
22 the terminology that was used but that either -- that
23 Captain Howell -- it actually specified that they
24 requested Captain Howell to investigate it.

PA-66

Lynch v. City of Wilmington
Nancy Dietz

22

1  Q.      Who was the public safety director at the
2  time?
3  A.      Jim Mosley.
4  Q.      Do you know whether Mr. Mosley had any prior
5  relationship with Michael Brown?
6  A.      I know that he frequently had meetings with
7  him in his office, but outside of that, I don't know.
8        And I am sorry. I need to correct myself.
9  I believe the memo from the director said that he
10  wanted an African-American captain to investigate it.
11  The memo from city council specifically requested
12  Captain Howell to investigate the complaint.
13  Q.      Did the memo from the public safety
14  director, Mosley, state why he wanted an
15  African-American captain to investigate the complaint,
16  the citizen complaint?
17  A.      No.
18  Q.      And the city council memo came from the
19  president of city council?
20  A.      No. It was the chair of the public safety
21  committee. It was Stephanie Bolden.
22  Q.      Stephanie --
23  A.      Bolden.
24  Q.      Was Michael Brown a member of the public

23

1  safety committee at the time?
2  A.      I believe he is. He attends all the
3  meetings, yes.
4  Q.      And he was a councilman at the time that he
5  walked the complainant into internal affairs?
6  A.      Yes.
7  Q.      Did the city council memo state why Captain
8  Howell, who is black, should investigate the
9  complaint?
10  A.      No.
11  Q.      Did you ever learn why the public safety
12  director requested that an African-American captain
13  investigate the citizen complaint?
14  A.      I believe his memo said that he had
15  discussed the matter with I think it was Bill
16  Montgomery, the chief of staff, and that because of
17  diversity issues, they thought it should be
18  investigated by an African-American staff officer.
19  Q.      And did you ever learn why the city council
20  memo from Stephanie Bolden or why city council
21  specifically requested that Captain Howell investigate
22  the complaint?
23  A.      No.
24  Q.      Prior to this point had you investigated

24

1  complaints brought -- well, strike that.
2        Let me ask, was the complainant black?
3  A.      Yes.
4  Q.      Okay. Prior to that time -- and Lieutenant
5  Rock is white; correct?
6  A.      Correct.
7  Q.      Prior to that time had you investigated
8  complaints brought by blacks against white officers?
9  A.      Yes.
10  Q.      Do you know how many you had investigated?
11  A.      Well, I had actually spent several years as
12  an investigator in professional standards, and there
13  were many times when I investigated complaints where
14  the complainant was black and the officer was white or
15  vice versa. I mean, it was never an issue.
16        When a complaint comes to your division, you
17  handle it. It is not assigned based on -- you know,
18  as a woman who is an investigator, they didn't give me
19  cases that were just female complainants. It was
20  really whatever came in, you know, you handled.
21        As the captain of internal affairs, any
22  complaint that was made against a ranking officer, I
23  typically handled that, because the officers that
24  worked for me were sergeants, and I always felt that

25

1  it was not appropriate for a sergeant to handle an
2  investigation against a lieutenant. So I had other
3  complaints against other lieutenants and sometimes
4  sergeants that I would handle because I didn't want to
5  put my investigators in a position to handle an
6  investigation against somebody of equal or higher rank
7  than them. So it would be more appropriate for
8  somebody like myself to handle that type of complaint.
9  Q.      And at the time that this complainant came
10  into the internal affairs department to make the
11  complaint against Lieutenant Rock, did you know
12  whether Mr. Brown had a prior relationship with
13  Captain Howell?
14  A.      Yes.
15  Q.      And did you know that they did have a prior
16  relationship?
17  A.      Yes.
18  Q.      Who ultimately investigated the complaint?
19  A.      I did.
20  Q.      And how is it that that occurred?
21  A.      I handled the investigation the way that I
22  would handle any other investigation. As I understand
23  it, after I concluded my investigation and wrote a
24  report, my report was reviewed by the new captain

*PA-67*

7 (Pages 22 to 25)

Lynch v. City of Wilmington
Nancy Dietz

26

1  assigned to professional standards, because I was
2  shortly thereafter transferred.
3  Q.      Shortly after you completed the
4  investigation?
5  A.      I actually completed the investigation when
6  I was in internal affairs, but I submitted the report
7  shortly after I was transferred.
8  Q.      When were you transferred?
9  A.      In I believe it was October of 2005.
10 Q.      And what were you transferred to?
11 A.      Human resources division.
12 Q.      Do you believe your transfer from internal
13 affairs to human resources was related to your memo to
14 Inspector Donohue?
15 A.      I don't know.
16 Q.      Were there any other actions that Mr. Brown
17 took after you wrote your report to Inspector Donohue
18 that you believe were related to that report?
19 A.      I don't really know what was related to that
20 report. I know that Mike Brown has gone out of his
21 way to make disparaging remarks against me for several
22 years, some of which were before her, Fray Lynch's
23 complaint, some of which that were after.
24 Q.      So just so I understand the timeframe here,

27

1  at some point prior to your lunch meeting with Officer
2  Lynch, Mr. Brown had seen you at Rodney Square, hugged
3  you, apologized to you, said he was sorry for the
4  things he said about you; is that right?
5  A.      That's right.
6  Q.      And then at some point after you submitted
7  your memo to Inspector Donohue, Mr. Brown began to
8  make disparaging remarks about you?
9  A.      Well, I am aware of a complaint that he made
10 after Officer Lynch's complaint about an issue
11 involving a family member of mine. My sister at the
12 time was married to another Wilmington police
13 sergeant, and I know that Mike Brown contacted the
14 public safety director and made a complaint about me
15 dealing with this personal issue with my sister in an
16 unprofessional and actually criminal way. He made a
17 false complaint against me, to sum it up, about an
18 issue that was totally untrue.
19 Q.      And when did he make this complaint?
20 A.      That would have been, I think, in like
21 February of '05.
22 Q.      February of 2005?
23 A.      Yes. I am not sure. I would have to check
24 my calendar. But it was in the beginning of 2005.

28

1  Q.      What would your calendar tell you about when
2  the complaint was made?
3  A.      It would just give me an idea of the time
4  sequence. It was around the time my sister was going
5  through a divorce, so I just can't remember the
6  specific months.
7  Q.      Now, the memo that you wrote to Inspector
8  Martin Donohue, at the time that you wrote that memo
9  had the city, to your knowledge, issued any discipline
10 against Mr. Brown related to any of his actions
11 against Officer Lynch?
12 A.      I am not really clear on what was done with
13 Mr. Brown regarding this complaint other than I was
14 told that he was not to have any direct contact with
15 Officer Lynch. I had heard different versions of what
16 had happened but nothing that was sent to me in
17 writing that I had true clarification on.
18 Q.      Do you recall how much time there was that
19 had elapsed bewteen your lunch meeting with Officer
20 Lynch and when you submitted the memo to Inspector
21 Donohue?
22 A.      It was almost right after. Within a week.
23 Q.      And do you recall how much time had elapsed
24 between the meeting in the community -- I am sorry --

29

1  the incident in the community meeting involving
2  Officer Lynch and Mr. Brown and your lunch with
3  Officer Lynch?
4  A.      I believe it was several months, because
5  that was a concern, that it had taken so long for her
6  to get a response.
7  Q.      There was an incident involving Officer
8  Lynch and Mr. Brown at a rec center in the summer of
9  2004; correct --
10 A.      Yes.
11 Q.      -- that she related to you?
12 A.      Yes.
13 Q.      And then when you had your lunch, this was
14 shortly after an incident involving Officer Lynch,
15 Officer Groark, and Mr. Brown at a community meeting;
16 is that right?
17 A.      That's correct.
18 Q.      And the lunch was how soon after -- well, do
19 you know when that community meeting was where Officer
20 Lynch, Officer Groark, and Mr. Brown had had a
21 confrontation?
22 A.      I don't know the specific date, no.
23 Q.      Was your lunch with Officer Lynch in 2004?
24 A.      I am not sure if it was the end of 2004 or

8 (Pages 26 to 29)                    PA-68

Lynch v. City of Wilmington
Nancy Dietz

30

1    the beginning of 2005.
2    Q.    But you do recall that during the lunch
3    Officer Lynch told you she had not heard from the city
4    with regard to the complaint that she had made against
5    Mr. Brown; is that correct?
6    A.    That's correct.
7    Q.    Okay. All right. Were there any other
8    statements that you can recall that Mr. Brown made,
9    derogatory statements that Mr. Brown made about you
10   after you submitted your memo to Inspector Donohue?
11   A.    Well, the director had told me that he had
12   made a comment that he was coming to get me or
13   something to that effect about this other complaint
14   that he was making that ended up not being true. It
15   was a false complaint. And he told the director he
16   was coming to get me or something that was pretty
17   direct.
18   Q.    When you say director, who do you mean; the
19   public safety director?
20   A.    Director Mosley, yes, the public safety
21   director.
22   Q.    And in what context did Director Mosley tell
23   you that Mr. Brown had told him that he was coming to
24   get you?

31

1    A.    Director Mosley came to my office when I was
2    in internal affairs. It was -- he had seen me in the
3    hallway, and he asked me if he could speak with me.
4    He obviously knew that I had found out about this
5    complaint with Mike Brown. And he asked me basically
6    what, you know, what was going on, because I think he
7    could tell that I was not very happy. And I explained
8    to him that I was going to put something in writing
9    and address it through the chain of command.
10         He asked me again, you know, if I could
11   discuss with him why I was upset. And I said, you
12   know, "Director, I prefer putting it in writing and
13   going through my chain of command."
14         After the third time he said, "Just tell me
15   why you are upset," I was very direct with him. I
16   said I was upset that Mike Brown had made a false
17   allegation against me and that he apparently had
18   enough credibility that a big meeting was called as a
19   result of this false complaint. Director Mosley had a
20   meeting with the chief of staff of the mayor's office
21   and I believe it was John Sheridan, the city
22   solicitor, about this complaint that Mike Brown was
23   making against me.
24         I was concerned, first of all, that he had

32

1    enough credibility that he could make a false
2    complaint and a meeting would be called without
3    anybody trying to verify if the complaint was even
4    true. As it turned out, the complaint was not true.
5    But I thought it was rather premature that this big
6    meeting took place and that Mike Brown had enough or
7    apparently appeared to have enough credibility that he
8    could just call the public safety director and
9    meetings could be put together over, again, what was a
10   false allegation.
11   Q.    And it was in that context that Director
12   Mosley told you that Mr. Brown had said he was coming
13   to get you?
14   A.    Director Mosley told me that he did not call
15   the meeting because he thought I did anything wrong.
16   He said he called the meeting because he was concerned
17   because of the threatening remarks that Councilman
18   Brown had directed towards me and that being one of
19   his staff officers, he was concerned about those
20   remarks.
21   Q.    Did Director Mosley tell you that he had
22   disciplined Mr. -- or sorry. Strike that.
23         Did Director Mosley tell you that he had
24   reported Mr. Brown's comments to Mr. Brown's

33

1    supervisor?
2    A.    No, he did not tell me anything like that.
3    Q.    Did he tell you he had reported Mr. Brown's
4    comments to the president of city council?
5    A.    No.
6    Q.    Did Mr. Mosley tell you anything else other
7    than Mr. Brown had told him that he was coming to get
8    you?
9    A.    Other than he made this false complaint, no.
10   Q.    And were you made aware by your superiors or
11   fellow officers of any other negative comments made by
12   Mr. Brown about you subsequent to submitting the
13   report to Inspector Donohue?
14   A.    I know that he made a remark to the mayor
15   about me.
16   Q.    What was that remark?
17   A.    The mayor had informed me that Mike Brown
18   had told him that I had a plaque in my office of the
19   Confederate flag, I believe is what he said.
20   Q.    In what context did the mayor tell you that
21   Mr. Brown had told him that you had a plaque in your
22   office of the Confederate flag?
23   A.    It was a meeting that I had with the mayor.
24   Q.    Did you have a plaque in your office with

*PA-69*

9 (Pages 30 to 33)

Lynch v. City of Wilmington
Nancy Dietz

34

1 the Confederate flag?
2 A. No, I did not.
3 Q. Did you have a plaque in your office with
4 any flag on it?
5 A. I had a plague in my office years ago, when
6 I was in detectives, that was from -- I received it at
7 an FBI conference in Birmingham, Alabama, from the
8 chief of Birmingham, and it was a proclamation given
9 to all of the participants at the FBI conference, so
10 there was probably a thousand people from different
11 police agencies throughout the country at this FBI
12 conference. And the Alabama state flag or state
13 emblem, if you look really closely, does have a flag,
14 one of which, I believe, is a Confederate flag. But
15 it was an emblem on the certificate because it came
16 from the State of Alabama.
17 Q. And why were you meeting with the mayor?
18 A. It was on an unrelated thing, nothing
19 related to Mike Brown specifically.
20 Q. The mayor just volunteered this information
21 to you?
22 A. No. It was actually a meeting about an
23 opening for the inspector rank.
24 Q. An opening for the position of inspector?

35

1 A. Yes.
2 Q. Was this an interview for that position?
3 A. It was a meeting. I don't know that it was
4 an interview.
5 Q. All right. Let me ask you this question. I
6 understand that you have an attorney and that you have
7 a legal action pending against the city related to
8 that position.
9 A. Yes.
10 Q. Okay. All right. So I won't ask you any
11 more questions about that. All right.
12     Any other statements that were made known to
13 you by either your superior officers or any officer or
14 anyone that you believe were derogatory that Michael
15 Brown made about you after you submitted the report to
16 Inspector Donohue?
17 A. I had heard one other comment through my
18 husband that Mike Brown made a remark to Captain Ayala
19 about either myself or my husband. And Captain
20 Ayala -- so this is third-hand information, but my
21 husband told me that Captain Ayala had told him, had
22 said to Mike Brown, "Why do you hate them so much?"
23 And he made a remark to Captain Ayala about Fray
24 Lynch's complaint and something to the effect of "they

36

1 didn't have to send that through," referring to her
2 complaint, that he somehow thought that Captain Marlyn
3 Dietz should have squashed that complaint and not sent
4 it through the appropriate chain of command.
5 Q. But is it your understanding that city
6 policy requires a supervisor to inform his or her
7 supervisor if one of their subordinates makes a
8 complaint of sexual harassment?
9 A. Absolutely, yes.
10 Q. Were you ever contacted by Monica Gonzales
11 Gillespie in connection with Officer Fray Lynch or
12 Michael Brown?
13 A. No.
14 Q. Were you ever contacted by anyone else with
15 respect to any incident involving Michael Brown and
16 any other female employees of the city other than
17 Officer Lynch or Sergeant Donohue?
18 A. Other than my previous complaints? No.
19 Q. Your previous complaints against Mr. Brown
20 that we have already talked about.
21 A. Yes.
22 Q. Okay. Anything else other than that?
23 A. No, I don't believe so.
24 Q. And were there any other actions that

37

1 Mr. Brown took after the report was submitted to
2 Inspector Donohue that you believe were retaliatory or
3 derogatory or harassment?
4 A. No.
5     MR. VANCE: Okay. Give me a minute.
6 I want to meet with Officer Lynch.
7     (Recess taken.)
8 BY MR. VANCE:
9 Q. I don't have any other questions for you,
10 but I just want to reiterate if you could search your
11 files for the documents that we discussed during the
12 deposition that relate to Officer Lynch, the memo to
13 Inspector Donohue, and any other documents that we
14 have talked about, and provide them to Mr. Mili, I
15 would appreciate that.
16 A. Okay. The document is addressed to the
17 chief --
18 Q. Yes.
19 A. -- but went to the inspector.
20 Q. Went to the inspector.
21 A. So I just want to clarify that.
22 Q. Yes. Okay.
23 A. All right?
24     MR. VANCE: Okay. I don't have any

10 (Pages 34 to 37)                    PA-70

Lynch v. City of Wilmington
Nancy Dietz

38

1  other questions.
2         MR. MILI:  Do you want to read and
3  sign or do you want to waive the reading and signing
4  of the transcript?  You know the routine by now.
5         THE WITNESS:  Yes.
6         MR. MILI:  Do you want to read the
7  transcript or do you want to waive it?
8         THE WITNESS:  I will waive it.
9              - - -
10        (Deposition concluded at 1:08 p.m.)
11             - - -
12       (There were no exhibits marked.)
13
14
15
16
17
18
19
20
21
22
23
24

39

1              CERTIFICATE
2         I, LORRAINE B. MARINO, Registered
3  Diplomate Reporter and Notary Public, do hereby
4  certify that the witness, NANCY DIETZ, after being
5  duly sworn by me, was examined by counsel for the
6  respective parties and the questions of said witness
7  and her answers were taken down by me in stenotype
8  notes and thereafter transcribed into typewriting at
9  my direction.
10        I certify that the foregoing is a true
11 and correct transcript of the testimony given at said
12 examination of said witness.
13        I further certify that reading and
14 signing of the deposition were waived.
15        I further certify that I am not
16 counsel, attorney, or relative of either party, or
17 otherwise interested in the event of this suit.
18
19
20
       Registered Diplomate Reporter and Notary Public
21       Certificate No. 181PS/Exp.: Permanent
22
    Date: 10/24/07
23
24

*PA-71*

11 (Pages 38 to 39)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Fray Lynch                              :
                                        :
              v.                        :        Civil Action No. 06-351 JJF
                                        :
City of Wilmington                      :

### Certificate of Service

I hereby certify that on November 27, 2007, I filed the foregoing Plaintiff's Appendix

in Opposition to Defendant's Motion for Summary Judgment electronically through the

Court's CM/ECF system, that a copy of the same is available for viewing and downloading

thereon, and that a copy was sent by facsimile to the following counsel of record:


Alex J.Mili, Jr.
Senior Assistant City Solicitor
800 N. French Street, 9th Floor
Wilmington DE 19801


Dated: November 25, 2007              _____/s/ _Robert Thomas Vance Jr_____
                                      Robert Thomas Vance Jr
                                      Attorney for the Plaintiff